# EXHIBIT C

# Deposition Transcript

Case Number: 1:23-cv-04260-DG-RML

Date: February 17, 2025

In the matter of:

# JEST HOLDINGS, LLC. v IRA RUSSACK, et al.

# IRA B. RUSSACK



**CERTIFIED COPY**

Reported by:
KENNY A. RODRIGUEZ

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------x

JEST HOLDINGS, LLC,

                     Plaintiff,

    -against-              Civil Action No.

IRA RUSSACK,               CV-04260-DG-RML

HENRY WEINSTEIN,

OCEAN WOODRUFF

DEVELOPMENT CORP.,

JOSEPH HARRISON, ESQ.,

and HSK LAW GROUP, LLC.,

5901 WEST AVE

PROPERTIES LLC.,

                Defendants.

----------------------------------------x

HYBRID STENOGRAPHIC DEPOSITION OF:
IRA B. RUSSACK
Monday, February 17, 2025
Woodbridge, New Jersey
10:12 a.m. - 2:32 p.m.

Reported stenographically by:
Kenny A. Rodriguez, CCR, RPR
Job No. 1457991

HYBRID STENOGRAPHIC DEPOSITION of IRA B. RUSSACK, taken in the above-entitled matter before KENNY A. RODRIGUEZ, CCR, RPR, Stenographic Certified Court Reporter, taken at the offices of WILENTZ GOLDMAN & SPITZER, P.A., 90 Woodbridge Center Drive, Woodbridge, New Jersey, 07095, on Monday, February 17, 2025, commencing at 10:12 a.m.

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

A P P E A R A N C E S:


ARTHUR H. LANG, ATTORNEY AT LAW

BY:  ARTHUR H. LANG, ESQ.

918 East Kennedy Boulevard

Lakewood, New Jersey, 08701

(732) 609.5530

lakewoodlaw@gmail.com

Attorney for the Plaintiff


WILENTZ GOLDMAN & SPITZER, P.A.

BY:  DANIEL S. BERNHEIM, III, ESQ.

Two Penn Center

John F. Kennedy Boulevard

Suite 910

Philadelphia, Pennsylvania, 19102

(215) 636.4468

dbernheim@wilentz.com

Attorney for the Defendant,

Ira B. Russack

A P P E A R A N C E S:  (CONT'D.)


FRIEDMAN SANCHEZ, LLP

BY:  ANDREW M. FRIEDMAN, ESQ.

16 Court Street

Suite 2600

Brooklyn, New York, 11241

(929) 264.7074

afriedman@friedmansanchez.com

Attorney for the Defendant,

Ocean Woodruff Development Corp.


ALSO PRESENT:

Joseph Harrison, Esq.

Henry Weinstein

IRA B. RUSSACK                                          JOB NO. 1457991
FEBRUARY 17, 2025

                         I N D E X

WITNESS                                      EXAMINATION

IRA B. RUSSACK

   BY MR. LANG                                    8

   BY MR. FRIEDMAN                              172

   BY MR. BERNHEIM                              175

   BY MR. HARRISON                              176


                        E X H I B I T S

EXHIBIT NO.        DESCRIPTION                    PAGE

Russack 1          letter dated 10/16/1985        12

Russack 2          promissory noted dated         23
                   5/10/2018

Russack 3          membership sale agreement       46

Russack 4          document titled, Assignment     56
                   of Shares

Russack 5          document titled,                62
                   Certification, dated
                   3/12/2020

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

E X H I B I T S  (CONT'D.)

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Russack 6 | document titled, Affidavit of Confession of Judgment, dated 3/12/2020 | 73 |
| Russack 7 | document titled, First Amendment to Membership Sale Agreement | 74 |
| Russack 8 | document titled, Second Amendment to Membership Sale Agreement | 77 |
| Russack 9 | document titled, Declarations of Restrictions | 79 |
| Russack 10 | Jest Holdings, LLC letterhead, dated 5/29/2021 | 92 |
| Russack 11 | email correspondence dated 2/13/2025 | 96 |
| Russack 12 | email correspondence dated 2/13/2025 | 98 |

E X H I B I T S  (CONT'D.)

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Russack 13 | email correspondence dated 2/13/2025 | 107 |
| Russack 14 | document titled, Ira Russack personal financial statement | 123 |
| Russack 15 | page 46 of multipage document | 124 |
| Russack 16 | email correspondence dated 2/13/2025 | 128 |
| Russack 17 | email correspondence | 129 |
| Russack 18 | email correspondence | 138 |
| Russack 19 | email correspondence | 142 |
| Russack 20 | email correspondence | 152 |
| Russack 21 | UCC financing statement | 157 |

**Original exhibits retained by

WILENTZ GOLDMAN & SPITZER, P.A.**

(exhibit index concluded)

IRA B. RUSSACK                                                    JOB NO. 1457991
FEBRUARY 17, 2025

---------------------------------------------------------

P R O C E E D I N G S

10:12 a.m.

Woodbridge, New Jersey

---------------------------------------------------------

CERTIFIED STENOGRAPHER:  Good morning.  My name is Kenny Rodriguez.  I am your stenographer for today.

(Whereupon, the Stenographer administered the oath to the witness.)

I R A   B.   R U S S A C K,
having been first duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY MR. LANG:

BY MR. LANG:

Q.    State your name, for the record.

A.    Ira Russack.

Q.    Can you spell your name?

A.    I-r-a, R-u-s-s-a-c-k.

Q.    Okay.  Where do you live?

A.    I live in Rockaway Park, New York in the borough of Queens.

Q.    Okay.  What do you do for a living?

A.    Most of my life, I've been a

retailer, a merchant.  I've done some sales work, and I don't know, the last ten, 15 years, I made some investments in real estate.

Q.    And do you own properties, other than the Ocean Woodruff Development?  Do you own other properties?

A.    Yes, I do.

Q.    Do you have any other properties in New Jersey?

A.    Yes.

Q.    Okay.  Where?

A.    Along the corridor, you know, North Bergen.  There's another one in Piscataway.

Q.    Any other states?

A.    There's a property in Pennsylvania.

Q.    Anything in Florida?

A.    Yeah, I have some property in Florida.

Q.    Okay.  Do you sometimes live in Florida?

A.    I used to spend a lot of time in Florida, but since the, call it, the COVID, I've been up here.  My life changed a lot.  All of our lives changed a lot.

Q.    Where do you own property in Florida?

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

A.    Northwest Florida.

Q.    Around Jacksonville -- oh, no, that would be towards Pensacola, something like that?

A.    More into Tallahassee area.

Q.    Okay.  I was going to say Tallahassee, but I thought that was in the East. Jacksonville is not east.  Right.  Okay.

Now, do you know Mr. Weinstein, that would be Henry Weinstein?

A.    I do.

Q.    How long have you known him?

A.    Most of my life.

Q.    Are you family friends, like, before -- your parents were friends or something?

A.    My brother and Mr. Weinstein's brother, who's deceased, you know, were best friends, and we lived near each other in the same area in Brooklyn.  I would say that we know each other late teens early 20s.  I'm a little older than Mr. Weinstein.

Q.    And have you lived in the Northeast your whole life besides going to Florida?

A.    Most of my life.  I'm a networker.

Q.    Okay.  Have you done business with Henry Weinstein?

A.      I have.

Q.      Could you be more specific?

MR. BERNHEIM:  Well, your question was, have you done business, and you said yes.  You want to ask a more specific question, please?

MR. LANG:  Okay.

BY MR. LANG:

Q.      Have you invested in real estate with Mr. Weinstein?

A.      I have.

Q.      And is Ocean Woodruff one of them?

A.      That's basically what we shared.

Q.      Are there other properties that you've invested with him?

A.      Nothing, other than right now.

Q.      Okay.  And when did you go -- when did you purchase?

A.      Oh, a long time ago.  Probably mid-80s, a little bit before that.

Q.      Okay.

A.      '85, '84, something like that.

Q.      Okay.  So let's go back to '85 because there's a document from 1985.

A.      Sure.

Q.      That would be the agreement.

MR. BERNHEIM:  Are we going to mark this as an exhibit?

MR. FRIEDMAN:  If we're marking it for the record, can you identify it?

MR. LANG:  Yes, I'm asking him to identify it.

MR. FRIEDMAN:  You're proffering a document.

MR. BERNHEIM:  Yeah, what's been presented to Mr. Russack appears to be a letter dated October 16, 1985, appears to be addressed to Mr. Weinstein.  Why don't we mark this for identification purposes as Russack 1.

(Whereupon, letter dated 10/16/1985, is received and marked as Russack 1 for Identification.)

BY MR. LANG:

Q.     Does this look familiar to you?

A.     Yes, it looks familiar.

Q.     Okay.  What is it?

A.     It's a letter of understanding between Mr. Weinstein and myself because we went into a joint venture.

MR. BERNHEIM:  He asked what the document is.

A.     It's a document.  It's an agreement.

BY MR. LANG:

Q.     Okay.  Does this -- is this the document that you created with Mr. Weinstein in order to purchase Ocean Woodruff to put together Ocean Woodruff Development, in other words, in this the corporate document, you know, the corporate agreement?

A.     This document was put together by an attorney that represented me.

Q.     Okay.  Yeah, I kind of, like, skipped.  I should start from the beginning.

What is Ocean Woodruff Development?

A.     It's a multifamily building on Ocean Avenue, the southern part of Prospect Park. It's located near Flatbush Avenue.

Q.     When was the building purchased?

A.     When?

Q.     Yeah, what year?

A.     I think some time in the middle or maybe '83, '84, I'm not sure.

Q.     And was the building purchased before this document was written?

A.     I don't know.  I mean, I'm not going to guess.

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

Q.      Okay.  When the building was purchased, did both of you purchase it together?  In other words, were you partners at the time of purchase?

A.      Yes, we were partners.

Q.      Okay.  Do you know how much the property value is right now?

A.      No.

Q.      Okay.

A.      I hear a lot of things, but I don't --

MR. BERNHEIM:  Your answer was no.

A.      No, I don't know what it is.

BY MR. LANG:

Q.      Okay.  Now, let me call your attention to seven because there's been a lot of talks of seven.

Could you read that?

A.      Number seven?

Q.      Yeah.

A.      "This agreement may not be changed orally, may not be assigned, and shall be construed in accordance with the law or the state of New York."

MR. BERNHEIM:  "Of the state of New

York."

    A.    "Of the state of New York."

BY MR. LANG:

    Q.    And who -- was it you or the lawyer, who put this clause in, number seven?

    A.    I believe it was the attorney that authored this.  You said authored, who wrote this?

    Q.    Yeah.

    A.    The attorney.

    Q.    And what was your intent in this paragraph?

    A.    I believe that my lawyer actually -- it was his idea to do.  I was very friendly with Henry before this, and I've done some business with him with merchandise, and we never needed to have agreements.  We didn't even have to shake hands, but I guess because in real estate it's a little bit more formal, so this was put together.

    Q.    Well, what was your understanding of what this means?

    MR. BERNHEIM:  Object to the extent it asks for legal conclusion.

    MR. FRIEDMAN:  Join in that objection.  The document speaks for itself anyway.

BY MR. LANG:

Q.      So let me ask you this question. Again, I might be repeating myself, but the lawyer put this in.

This wasn't your idea or Mr. Weinstein's idea?

A.      No, we both agreed.  I agreed to it.

MR. BERNHEIM:  The question was who drafted it, the lawyer?

THE WITNESS:  The lawyer drafted it.

BY MR. LANG:

Q.      Did this -- was it your intent and Mr. Weinstein's intent, as far as you understand, to put a restriction upon selling the shares of your stock?

MR. FRIEDMAN:  Object to the form of that question.

You can't ask him Mr. Weinstein's intent.

MR. LANG:  Okay.  Yeah.

BY MR. LANG:

Q.      Was it your intent to put a restriction upon your --

A.      I don't remember.

MR. BERNHEIM:  Let him finish the

question.

BY MR. LANG:

Q.      Was it your intent to put a restriction on the ability of either of you to convey the shares of stock?

MR. BERNHEIM:  No, that's --

MR. FRIEDMAN:  Same objection.

MR. LANG:  What is his problem?

MR. FRIEDMAN:  You cannot ask somebody Mr. Weinstein's intent, understanding --

MR. LANG:  I didn't ask Mr. Weinstein's intent.  I asked him --

MR. FRIEDMAN:  You said both.  You said both in your question.

MR. LANG:  Okay.

BY MR. LANG:

Q.      Again, was it your intent to put a restriction upon you and Mr. Weinstein -- was it your intent to put a restriction upon you and Mr. Weinstein to convey the shares in the company?

MR. BERNHEIM:  This is in 1985, if you recall.

A.      I don't remember what happened in 1985.

BY MR. LANG:

Q.    Okay.  So as far as you're concerned -- let me ask you this:  Going forward from 1985, was your understanding that you could convey the shares of stock?  Was that your understanding, that you had -- you were not restricted from conveying the shares?

MR. BERNHEIM:  Object to the form of the question, as well as to the extent it seeks legal conclusion.

MR. FRIEDMAN:  Joined.

MR. LANG:  Okay.  Hang on a minute.

BY MR. LANG:

Q.    At any time, previous, prior or after 1985, did you ever intend that either of you should not be able to convey or encumber the shares of Ocean Woodruff Corporation?

MR. BERNHEIM:  Object to the form of the question to the extent --

MR. FRIEDMAN:  Joined.

MR. LANG:  Wait, I want to listen to him.

What?

MR. BERNHEIM:  To the extent he understands, he can respond, and then can I ask you

to do a favor here?  You're raising your voice.
It's really unnecessary.

MR. LANG:  Okay.

MR. BERNHEIM:  Do you understand the question?

THE WITNESS:  Yeah.

MR. BERNHEIM:  Okay.  To the extent you understand it, you can respond.

A.      All right.  So from 1985 until, I don't know, a short time ago, I never even looked at this.  I didn't even -- it didn't occur to me because we never had to go out -- they were put in boxes and files, put away.  Because of this whole case that came up, okay, I had an opportunity to look at it, okay?  Obviously, I signed it, okay, Henry signed it, so it was basically --

I'm not going to speak to Mr. Weinstein, to him, but for me, you know, at that time, you know, my opinion and what attorneys' represented in my life, it was very serious thing, and they based their license, you know, I guess of the law or whatever, and I was recommended that we have some sort of a document, but because we never had an -- it was never necessary to take it out and look at it and read it.

MR. BERNHEIM:  Mr. Russack, the question is --

THE WITNESS:  I don't know.

MR. BERNHEIM:  -- did you have any understanding, yes or no, if you could convey your interest?  One way or the other, did you know?

THE WITNESS:  I don't know.  No, I don't know.  I don't know.  I don't know.  I felt that, you know, if I was going to sell the property, I would go to Henry, and I would be very, you know, civil and talk to him.  From me, that's what I would do.

BY MR. LANG:

Q.    Okay.  Was --

A.    I never wanted to get into litigation with my friend.  That's it.

Q.    Was there at any time that you approached Henry about conveying or encumbering the property -- the shares in the property or in the corporation?

A.    I don't understand the question.

Q.    Let me say it again.

Since 1985, or whenever the both of you formed a corporation, did you ever go to Henry to talk about conveying your shares?

MR. BERNHEIM:  It's a yes-or-no question.

A.    No.

BY MR. LANG:

Q.    Okay.  Did you ever go to Henry to talk about encumbering your shares?

A.    No.

Q.    Okay.  Was it your understanding that if you were to convey your shares or -- let me just leave out or.

Was it your understanding that if you were to convey your shares, you would have to get his permission first?

A.    I remember what came up for me was to convey my shares without going to him and having a conversation about it.

Q.    Pardon?

A.    What bothered me, what would bother me is to go and do something like that without going to my partner and talking to him about it first.

Q.    Okay.  Let me ask the same question.

A.    It didn't enter my mind to go and look for documents.  It didn't enter my mind.  It was more of a do the right, do the wrong thing, do something, you know, without telling someone, you

should have told him, that was more important to me than to even, you know, let's find what the document says, see if we can get away with it.  I don't operate that way.

Q.    I'm just going to ask the same question in terms of instead of conveying, but encumbering, meaning, that it becomes a security for a loan.

Did you ever speak to -- was it your understanding that you would have to speak to Henry, or should speak to Henry, like, let's start with should, that you should speak to Henry if you were to encumber the shares?

A.    Yes, I should definitely speak to him.

Q.    Okay.

MR. BERNHEIM:  Let me just note, and I'm not going to keep interrupting you on this, but to the extent you're seeking legal conclusion, I object.

You're asking what his understanding is, and so be it.

MR. LANG:  Okay.

MR. FRIEDMAN:  I join.

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

BY MR. LANG:

Q.    Okay.  I'm going to ask you about a document.

In 19 -- in 2018, did you borrow money from Mr. Weinstein?

A.    I borrowed money from Mr. Weinstein. I'm not sure of the exact date, but it could be close to 2018, 2019.

Q.    Okay.  I'm looking for the document. Here it is.

MR. LANG:  This should be in the pile there.  Can we mark -- let me ask him to identify --

MR. BERNHEIM:  Well, I think you need to mark and identify what it is.

MR. LANG:  Okay.  Can we mark this?

(Whereupon, promissory noted dated 5/10/2018, is received and marked as Russack 2 for Identification.)

MR. BERNHEIM:  This appears to be a promissory note of May 10, 2018.

MR. FRIEDMAN:  Thank you.

It's number two, Russack 2?

MR. LANG:  Yeah.

A.    Can I see it?

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

BY MR. LANG:

Q.    Yeah, I'm going to ask you to look at it, if you can identify it.

A.    I'm familiar with the document.

Q.    Okay.  And what is the document?

A.    It's basically, it's a document to outline the agreement on the borrowing of $750,000 from Mr. Weinstein.

Q.    Was that money that you borrowed from Mr. Weinstein, was it secured by anything?

A.    Yes, it was secured by my shares.

Q.    It was secured by your shares?

A.    Yes.

Q.    Shares in what?

A.    In my 50 percent of the shares on Ocean Woodruff.

Q.    And that was your intent also?

A.    Well, it was a very -- it was supposed to be a temporary transaction, meaning, that if Mr. Weinstein decided to invest that particular property that I invested in, he was invited in.  Then, the 750 would be used as his investment and not as a loan from me.  Therefore, there would be no reason to rely on, you know, the collateral in order to guarantee, you know, that the

money would be able to be taken back, in the event of a nonpayment.

Because apparently, the people involved that were offering both of us an opportunity to invest in the property, they said that they needed 750 in 24 hours in order to not lose the property. There was a certain amount -- they said there was a certain amount of funds that went hard, and they needed -- for the next morning, they needed another 750, and Mr. Weinstein said, "Listen, you know, unless I do some due diligence, and I need a certain amount of time to decide whether I'm going to, you know, want to invest in this property, and I want to look at the property."

So that was Mr. Weinstein's security, that he had my shares as collateral, and in the event that he decided not to participate in the investment, then he would get his 750 back. That was the intention, to get it back, not keep my shares or take my shares. Now, in the event that he would become an investor in the property, that was the reason that we had the meeting, is an investor's meeting, then the money would be applied to his investment just like my money would be applied to my investment.

Q.      How much money did you put in?

A.      I put in a million-five.

Q.      And then were there other investors?

A.      I don't know.

Q.      Okay.

A.      I have a hard time -- I've had a very hard time getting accounting and getting answers from the people that were basically doing their promote.  It's been a long time.

Q.      Did that deal ever go through?

A.      No, it didn't go through, but there was a replacement piece of property that was also owned by the same seller, and that replacement piece of property was purchased with the investment money.

Q.      And when you say "with the investment money," that means your 1.5 million?

A.      My 1.5, and it's unknown -- it's not good to assume, but I'm assuming that Henry's money went also as an investment in the original property, but Henry has not gotten any documentation.  I've been trying to help him for years to have meetings with these people, and we just can't get any accounting.  We can't get any paperwork from them.

Q.      What is this other property?

A.      It's a property in -- I no longer

have it.  It was given back to the bank.  It's a property in Princeton.  It's a commercial piece of property, one-tenant property.

Q.      Okay.  So do you remember the purchase price of the property?

A.      Which property?  The first one?

Q.      The first one you never got; is that correct?

A.      That one was -- I think it was twice the amount -- it was around 50-some-odd million dollars, and what was told to Henry and I, was that -- I believe that the investor, or the other investor, they fell through, and there was not enough money to be able to close that deal.  And rather than lose on money, there was a substitute property that was probably less than -- the cost was less than half of the first property, and that property was purchased.

Q.      You mentioned before an investors meeting, before you had with the --

A.      Well, we were the only investors there.  There was no -- we never met any other.

Q.      And that was the day before, you know, when you mentioned about having 24 hours.  That was the --

A.      Yes.

Q.      Okay.  So you mentioned also that the first property was around 50 million?

A.      It was about 50 million.

Q.      But your share, am I correct, was 1.5 million?

A.      Yes.

Q.      And Henry's share would be 750,000?

A.      If Henry was to complete, we were told -- I was told first, and then I told Henry, and in a meeting, they told him that they needed about 3 million because I had other money from other investors.  And so Henry and I, we had an opportunity.  If Henry didn't -- Henry wasn't interested.  I -- there was two properties that were purchased -- that were supposed to purchased.

There's another one in Piscataway that was supposed to purchased, and I had an opportunity -- I only had enough money to invest in one of them, but by having Henry come in, as a co-investor, not together, separately, then we both would be able to have less shares in both properties and spread the risk.

Q.      And that would be a total of two --

A.      3 million.

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

Q.    How do you get --

A.    A million-five each.

Q.    Oh, okay.  And the million-five each, the million-five for Henry --

A.    And million-five for me.

Q.    -- represents -- well, let me ask it this way, this question:  The promissory note is for 750,000, is that, like, half of the 1.5 million that Henry invested?

A.    Yeah, if Henry decided not to buy it, he wouldn't put any other money in it, he would get back his 750.  That was the agreement.

Q.    So he put in a total of 1.5 million?

A.    I don't have proof of it.  I don't have proof of it.  I haven't seen it.  I was told by the gentleman that put the deal together that his money went into the deal.  I have had numerous meetings with Henry and this gentleman, and we -- all we got it promises.

Q.    Let me --

A.    We don't -- we had -- we need to have the proof.  We need to have the proof.  All Henry has -- all Henry has is whatever -- whatever -- what little he has between his money leaving his hands and --

Q.      Well, what was your understanding of how much money left his hands?

A.      I don't know --

MR. BERNHEIM:  I don't know, but is this not a little bit collateral to what we're here for?

THE WITNESS:  I don't know --

MR. BERNHEIM:  No, no, no, please.

MR. LANG:  Can we go off the record?

MR. BERNHEIM:  No, on the record.

MR. LANG:  Okay.  I want to know -- there's a promissory note for $750.  I want to know if that has been satisfied or not.  If it was put into an investment, then it was satisfied.  That's what --

MR. FRIEDMAN:  Objection.

No, no, no, that's not correct.  You can't prove whether it's satisfied or not just because.  You need the paperwork.  It's never been satisfied.  It's all collateral.

MR. LANG:  Let me ask --

MR. BERNHEIM:  Yeah.  Right.  I happen to think we're getting pretty far afield, but since the scope in depositions is something that's reasonably calculated and lead to admissible

evidence, and we may disagree with Mr. Lang's theory, you can proceed, but I'm assuming there's a lot that needs to be covered here today, so --

MR. LANG: All right. Let's get back to business.

BY MR. LANG:

Q.    Did you ever -- do you have a promissory note from Henry, which means -- I mean, I'm not even going to say what it means.

Did you ever pay Henry back the $750,000?

A.    No.

Q.    You never paid him back?

A.    No.

Q.    Where did that money go?

A.    Again, I have no proof, but I'm assuming that the money went to the Penn Station -- with the attorney and the person that put the deal together I'm assuming, but I have no proof of any of this. I tried to get proof.

Q.    Did that deal go through? In other words, --

A.    No, no, that building was lost because there wasn't -- they told us that the other investors backed out. So there wasn't enough cash

money to be put into the deal to even go out and find a lender, and then they came up with some good news, and the good news was, you didn't lose your money, that the same people that owned the building, the sellers of the building, they have another building, a small building for much less money in Princeton, and you have an opportunity to buy that building.

Q.      Okay.  That's what I meant to ask is, did the $750,000 that you borrowed from Henry or whatever you want to characterize what's represented in the promissory note, did that $750,000 get spent in the second investment?  In other words, did it go towards it?

A.      We need proof.  We need the paperwork.  We need proof from these people because obviously the proof is in the evidence.  We don't have the evidence.  We tried to get the evidence, both of us, for a long time, and there was a lot more money that I invested with them, and there was a lot more money that Henry invested with them, and we don't have any satisfaction of where our money is.

Q.      Do you still owe Henry the $750,000?

A.      I don't feel that I owe him 750, but

this needs to be proved.  Henry and I need -- we need to get the evidence, where it went.

Q.      So as far as you're concerned, you're not sure if you owe Henry the money?

A.      If it's proven that the money was invested, I don't own the money.  If it's proven that the money -- I don't know what my second response can be.  In other words, if he was an investor, then I don't owe him any money, if he invested the money.  If the money was invested -- but I believe Henry, that the money left Henry's hands.  Henry is out 750.  He's out that money.  I believe that, that to be true.

Q.      Did you ever get hold of that money?

A.      No, I never touched the money.  It never crossed my hands.

Q.      And why did you sign the promissory note if you never physically got --

A.      Because Henry said at the meeting, the gentleman that put the deal together, and the attorney that was there, myself and Henry, they said, "Look, we need the money for tomorrow morning."  Henry said, "Well, I am out.  I'm out because I'm not going go and put a deposit, an un-refundable deposit on the building.  I wouldn't

do it anyway without even seeing it, without even doing my due diligence."

So I'm not sure who came up with the idea to pledge the shares.  It may not have been Henry.  I don't remember who came up with the idea.  It could have been the guy that organized it.  It could have been the attorney.

Q.   And -- okay.

A.   I didn't come up with it.

Q.   So as far as you understand --

A.   We need the truth.  We need the truth to come out.  This is four years already.  Something like that.

Q.   Okay.  So as far as you understand, since that -- Henry's money was going to -- this is a yes-or-no question:  As far as you understand, was Henry's money going into the investment?

A.   I understood the intention was, and the agreement was verbally, when we had the meeting, that the 750 was going to give us more time to have control of the property, and not sell it to somebody else or take it away from us, you know, whatever.

We needed the 750.  We were told to buy another -- whatever.  It was two or three weeks.  And that would have been given Henry the time to do

the due diligence, and I felt good about it because Henry is very knowledgable in real estate, much more than I am.  And it was good for me because I felt that Henry would do the due diligence, and I would benefit from that also.

Q.    So is there a possibility that that promissory note was made even though you didn't receive the money?

MR. BERNHEIM:  Objection.

That's not what was stated.

MR. FRIEDMAN:  Objection.

A.    I wasn't supposed to receive it.

BY MR. LANG:

Q.    Okay.  You did say you did not receive the money; is that correct?

A.    I wasn't supposed to.  The money was supposed to go to the seller.

Q.    Okay.  And you don't know if the money went to the seller?

A.    No.

Q.    Okay.  One second.

Why did you sign the promissory note?

MR. BERNHEIM:  Objection.

MR. LANG:  What?

MR. BERNHEIM:  Because you've asked

this twice already.  Asked and answered.

A.    I trusted the lawyer who represented me.  He worked for me for a couple of years.  I trusted him.

BY MR. LANG:

Q.    Okay.

A.    And I believe he may --

MR. BERNHEIM:  All right.  You've responded.

BY MR. LANG:

Q.    Okay.  Was it your intent to guarantee to Henry the investment in case it goes bad?

A.    No.

Q.    I have to ask this, because I don't know the answer, but why would you -- why did you encumber your shares?

MR. BERNHEIM:  Objection.

You're jumping to -- from past 1985 now to 2018?

MR. LANG:  Yeah.

MR. BERNHEIM:  All right.  And your question is specifically what?

MR. LANG:  Why was the encumbrance made if he never received the money?

MR. BERNHEIM:  Well, I'm going to object to the form.

MR. FRIEDMAN:  No, that's --

MR. BERNHEIM:  Let me finish first.

I'm going to object to the form of the question, and you're assuming something that's not in evidence, that he's encumbered anything.

MR. LANG:  He said he encumbered it.

THE WITNESS:  No, I didn't.

MR. BERNHEIM:  His conclusions legally are not what we're here to ascertain as to what the nature of this transaction truly was.  So if you would like to rephrase the question, I think that would be appropriate.

MR. LANG:  Okay.

BY MR. LANG:

Q.    You mentioned before that someone else -- let me ask this.  I don't even remember, so I'm going to ask it again.

That document over there --

MR. BERNHEIM:  What document?

MR. LANG:  This document that I showed him, Russack 2.

BY MR. LANG:

Q.    Was it your intent to encumber your

shares?

MR. BERNHEIM:  Through the promissory note of May 10, 2018?

A.      It was my intention to encumber the shares temporarily for a short period of time because one of two things were going to happen.  If Henry wanted to invest, he said I liked the deal, and he could have said, "Listen, if you're going to get a loan from the bank, they're going to do the due diligence.  If the bank is willing to loan all these multimillions of dollars, you know, 40 million, you know, to buy the property, that's a good sign, right?"

"Or if he doesn't want to buy it, then they're going to get back the 750, and we're going to tear this up."

So that was my two choices.  I didn't think that was a third way.  Apparently there's a third way.  That's why we're here.

One of the reasons why we're here.  Sorry.

BY MR. LANG:

Q.      Just one second.

So you mentioned this third way, did it ever dawn on you that those shares would be taken

from you?

A.     No, absolutely not.

MR. BERNHEIM:  You have to let him finish the question before you respond.

THE WITNESS:  Okay.  I'm sorry.

BY MR. LANG:

Q.     So as far as you're concerned or you remember, it was not necessary to put that -- was it necessary to put that into the promissory note?

A.     I believe that Henry would not have put up the 750 if he didn't have collateral that he could somehow, you know, have a way to collect, you know, just on a whim of people that I introduced him to, that he never met people.  You know, why would he go and put up 750 and trust them?  I believe Henry needed to have this, and I respect him for it.

Q.     So did you ever come to the realization that it wasn't made good on the $750.000?

A.     I'm sorry.  Say it again.

Q.     I don't to use pronouns, so I'm going to use a passive.

Did you ever come to the realization that it wasn't made good, the $750,000?

MR. BERNHEIM:  Object to the form of

the question.

MR. FRIEDMAN:  Object to the form.

MR. BERNHEIM:  Yeah, I don't understand what you're asking.

BY MR. LANG:

Q.    Did you ever come to the realization that you did not make good on the $750,000?

MR. BERNHEIM:  Still object to the form of the question.

MR. LANG:  Why?

MR. BERNHEIM:  I think it's been asked and answered, but to the extent you understand, you can respond.

A.    I feel that Henry and I were duped. You know what the word dupe means?

BY MR. LANG:

Q.    Yeah.

A.    Okay.  And we need to have all the backup, the money trail, the paper trail, we need to know what went on over here because if we don't have that, then everything is just hearsay.  I mean, you know, it's my interpretation, your interpretation, his interpretation, like, you know, you're here today.  You don't know what went on in the last four years.  You have no idea about all these people

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

involved and what transpired.  It's very difficult for you.  I understand that, and I respect that.

Q.      Okay.  So you mentioned about a third possibility.  The first possibility was that, you know, he go through -- he would --

A.      Either he buys the property --

Q.      Either he buys the property, or the --

A.      Or the money back, right.

(Unintelligible, simultaneous testimony interrupted by the certified stenographer.)

CERTIFIED STENOGRAPHER:  I need one at a time, please.

THE WITNESS:  Sorry.

BY MR. LANG:

Q.      Okay.  And then the third possibility is what we ended up with; correct?  You didn't mention that there was a third possibility.  That third possibility, would you characterize as --

A.      Never thought it would happen.  Never thought it would happen.  Never thought there would be a third possibility.

Q.      And that's what you're calling now being duped; is that correct?

A.    I can only speak for myself, Counsel. If I thought there was going to be a third possibility, I would have gotten out of my chair. I would have left the meeting and never come back and took Henry with me, okay?

Q.    When did you realize that you got duped?

A.    Later on, much later on. I made other investments, and Mr. Weinstein made other investments, which the amounts are much greater than the amount of money we're talking about here, much greater, and we had the same problem with all of the investments, the same problem, which is not for this case. It has nothing to do with this case, so I don't want to talk about it.

Q.    Okay. Who hooked you up with Jest, my client?

A.    I believe -- it's easy for me to say Sam Sprei. Do you know who he is?

MR. BERNHEIM:  You're to answer questions, not ask him.

(Stenographer clarification.)

THE WITNESS:  S-p-r-e-i, Sam, S-a-m.

BY MR. LANG:

Q.    When did -- did he introduce you to

Joseph, or do you know Joseph Teichman?

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Q.      Do you know Joseph Teichman?

A.      I never met him.  I spoke to him briefly.

MR. BERNHEIM:  The question was, do you know him?

THE WITNESS:  Yes, I know him.

MR. BERNHEIM:  Listen to the question.

A.      I know him, but not in a physical plane.

BY MR. LANG:

Q.      Okay.  You've had communications with him?

A.      I've had communications with him.

Q.      Email?

A.      I'm not sure if it's email.  It could have been texts, you know --

Q.      I have some emails.  Okay.

A.      You know, through devices.

Q.      Okay.  So Sprei, as far as you know, was the person who introduced you to Jest, my

client?

A.      Well, it could have been through Jonathan Rubin also.

Q.      Jonathan Rubin?

A.      Yes.  Yes, Sprei and Ruben worked together very closely for many years.

Q.      And did you borrow money from Jest?

A.      Yes.

Q.      Do you know how much you borrowed?

A.      The original amount was supposed to be a million-five.  Actually, I want to change my testimony.

Q.      What?

A.      I guaranteed the million-five, but it was not my loan.  Mr. Sprie borrowed the money.

Q.      Mr. Sprie?

A.      Sam Sprei borrowed the money.

Q.      Mr. Sprei?

A.      Yeah, Mr. Sprei, sorry.  Can I call him Sam?

Q.      Yeah.

A.      Okay.  Sam borrowed the money.

Q.      So why did you secure it?

        MR. BERNHEIM:  Object to the form of the question, the term "secure."

MR. LANG:  Pardon?

MR. BERNHEIM:  I said I object to the form of the question, the term "secured."

MR. LANG:  Oh, okay.  Right.  Right. Right.

THE WITNESS:  Maybe I'm not describing the relationship properly.

MR. BERNHEIM:  Would you please wait until a question is asked?  You volunteer one more time, I promise to hit you.

THE WITNESS:  I apologize.  Okay.  I better move my chair away.

BY MR. LANG:

Q.     Let me show you -- do you recall a membership sales agreement of March 12, 2020?

A.     No.

Q.     Okay.  I'll show you --

A.     I mean, I looked at it, but I can't remember every one of them.

Q.     All right.  I'll just show you. Let's start off with this.

(Stenographer clarification.)

CERTIFIED STENOGRAPHER:  Off the record at 11:02 a.m.

(Whereupon, a recess is taken.)

CERTIFIED STENOGRAPHER:  Back on the record at 11:05 a.m.

BY MR. LANG:

Q.      All right.  I've just given Mr. Russack Exhibit 3.

(Whereupon, membership sale agreement, is received and marked as Russack 3 for Identification.)

BY MR. LANG:

Q.      Could you tell us what that is, or does it look familiar?  Do you recognize it?  Let's change the question, do you recognize it?

A.      I recognize it, yeah.

Q.      Okay.  Do you know what that is?

A.      I would have to read it.

Q.      I'm more concerned --

A.      Does it describe anywhere here, in one paragraph, the --

Q.      The first --

MR. BERNHEIM:  Look, it's caption membership sale agreement, all right, of March 12, 2020.  So let's proceed.

BY MR. LANG:

Q.      Okay.  Is your signature on the back?  Looks like the last page, is that your signature?

Well, I guess not the last page.  Somewhere, there's a signature.

MR. BERNHEIM:  It would be the third to last page.

BY MR. LANG:

Q.    Is that your signature?

A.    Honestly, it could be or it could not.  I mean, there's -- I went through these documents.

MR. BERNHEIM:  The question is, is that your signature; yes or no or you don't know?

THE WITNESS:  I don't know.

BY MR. LANG:

Q.    Okay.  Let me ask you this:  Do you remember if you signed that document?

A.    I signed a number of documents.  I signed --

MR. BERNHEIM:  The question, this one document?  Please --

THE WITNESS:  I don't remember.

MR. BERNHEIM:  We're going to be here until dinnertime.

THE WITNESS:  Okay.  I don't remember.

BY MR. LANG:

Q.    Okay.  This paragraph here, purchase price, you mind reading that?

A.    Sure.

"Purchase price, the purchase price for the interest shall be $1,500,000.  The purchase price payables follows 45,000 payable on due date [sic], by check, subject to collection, $1,500,000 payable to closing by bank cashier or good certified check drawn in New York Clearing House or wire transfer and issued to seller and to such other persons or entities as seller may direct."

MR. BERNHEIM:  All right.  So there was an error in reading it.  It was the $45,000 payable and date hereof, not due date.

BY MR. LANG:

Q.    Okay.  So you read something about 1.5 million; is that correct?  Is that what you happened, as you recall?

A.    As I recall --

MR. BERNHEIM:  Will you let him ask a question, please?

THE WITNESS:  All right.

MR. BERNHEIM:  What's your question?

BY MR. LANG:

Q.      My question is:  Is that paragraph correct?  Is it true?

MR. BERNHEIM:  Object to the form of the question.

I don't understand that at all, "Is that paragraph true?"  It makes no sense whatsoever.

MR. LANG:  Okay.

BY MR. LANG:

Q.      As far as you recall, is the -- are the facts recited in that paragraph correct?

MR. BERNHEIM:  Object to the form of the question.

Same objection as I indicated before. What do you mean, "is it correct?"

BY MR. LANG:

Q.      Do you --

A.      Are you asking for the amount?

MR. BERNHEIM:  No, no.  Let him ask.

BY MR. LANG:

Q.      Was the purchase price referred to here -- what was this purchase price for?  Was anything -- do you recall anything being purchased?

MR. BERNHEIM:  Object to the form of the question.

What are we talking about?  When before?

MR. LANG:  I went to know if this is true.

MR. BERNHEIM:  You're a nice guy, but I really can't do your deposition for you.

MR. LANG:  I'll get it right.  Correct.

BY MR. LANG:

Q.    Okay.  You said you know what this is; correct?

A.    I know there was a loan for a million-five.  That's the best answer I can give you, verbally.  The loan was for a million-five.

Q.    Okay.  Good.  That's all I wanted to know.  That's what I was asking.

Okay.  Did you pay interest on that loan?

A.    I never paid interest on the loan. Interest was paid on the loan, but I never paid interest.

Q.    Do you know who paid it?

A.    Sam Sprie.

Q.    Oh.  Okay.  Did you ask Sam Sprie to guarantee this loan?

A.        No, he asked me to guarantee the loan, and it's his alone, and he would pay the interest, and he would pay it off in three months.

Q.        So what you're saying is -- you did say it before that this money was for the use of Sam Sprie?

A.        Yes, or maybe somebody else that he owed it, or maybe he owed money to Jonathan Ruben. He always owed money, and Jonathan calls me and complains.  And Jonathan says, "I'm not going to loan him anymore money."  So he had to, desperation, trickle me into this deal.  I never took the money. I never had the money.  The money went to my account and it went.

Q.        What is your relationship with Mr. Sprie?

A.        Well, we have to hire a psychiatrist. He really is in a situation.

Q.        No, I mean, do you have a business relationship with him, or did you?

A.        I no longer talk to him.

Q.        At that time, what was your relationship with him when this contract was signed, March 12, 2023?

                    MR. BERNHEIM:  Object to the form of

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

the question.

As of March 12, 2020, but not --

A.      Business relationship.

BY MR. LANG:

Q.      Business relationship?

A.      Yeah, but also you see somebody all the time, you do business with them, so it spills off a little bit, you know.  Some person -- personalities get involved in the business also, right?

Q.      Why did you encumber your shares if Sam Sprie -- why did you encumber your shares?

MR. BERNHEIM:  Object to the form of the question.

MR. LANG:  Okay.

BY MR. LANG:

Q.      Was it your intent to encumber the shares, so that Sam Sprie should have the money -- should have the loan?

A.      I did it because it was the lesser of two evils.

Q.      What was the other evil?

A.      That I would lose multimillions of dollars if he didn't get this money, and he pretty much begged me to take this loan, and he would pay

it back.

Q.      So you would lose money?  Are you saying that you would of lost money on some other --

A.      I have other investments with Mr. Sprie of which he manages.  It was the original agreement through my attorney, you know, he was going to manage and handle it because I'm not skilled to manage these large pieces of real estate. I'm a retailer.

And a lot of these properties, put it this way, they went into the red.  They went on the rocks, and a lot of money is owed out, and he promised that he would do everything possible to straighten everything out and help repay me whatever he could of the money that I lost.  And this came up, and he said, "You have to do this.  You have to do this.  You don't do it, don't blame me, I'm going to walk away."  I was coerced into this.

Q.      When you refer to money that you lost, you're referring to other investments?

A.      Other, yes, a lot of other investments.

Q.      Okay.

MR. BERNHEIM:  Can you hold on a second?  Is it Mr. Harrison that's online?

MR. LANG:  Yes.

MR. BERNHEIM:  Mr. Harrison, are you there?

MR. HARRISON:  I am.

MR. BERNHEIM:  Is anybody with you?

MR. HARRISON:  Nobody is with me.

MR. BERNHEIM:  All right.  And you elect to have your camera off?

MR. HARRISON:  I'll turn it on, and -- hold on.  I can un-blur the background.

MR. BERNHEIM:  Well, I just want to make sure that nobody else is present.  You want to keep it off, that's up to you, and I certainly would accept your representation that nobody else is there.

MR. HARRISON:  Hold on, I'm un-blurring the background.  It's on a laptop. Nobody else is here.

MR. BERNHEIM:  I take you at your word, sir.

MR. HARRISON:  I'd rather show you. My kids may be home soon, though.  They're out of school, so there maybe someone later on.

MR. BERNHEIM:  Fair enough.

BY MR. LANG:

Q.      Okay.  On March 12, 2020, were you still -- did you -- let me start over.

You mentioned earlier that you don't talk to Mr. Sprie anymore; correct?  You had a falling out?

A.      I had many falling outs, but it's hopeless.

Q.      Now, so I'm asking --

A.      It's hopeless.

Q.      On March 20th, was that -- on March 20th -- 2020, was your relationship with him better than it is now?

A.      Yeah, it was better.  It deteriorated.  It got worse as I found more things out, more lies, more deceit.

Q.      So at this time, you trusted him?

A.      I didn't trust him, but in my opinion, he was definitely an abnormal person.

Q.      Okay.  But your representation, I'm just going to repeat it again, is that you did it because you had -- to shore up some other investments that you would of lost money?

A.      Right, and I didn't get an answer where the money went, and it doesn't matter anyway

because he basically plays musical chairs with everybody's money.

Q.      All right.  I want to ask you -- we're getting back to my client.  This here, let's mark this.

(Whereupon, document titled, Assignment of Shares, is received and marked as Russack 4 for Identification.)

MR. LANG:  For Mr. Friedman's benefit, it's the document that's captioned "Assignment of Shares," two pages.

MR. FRIEDMAN:  Thank you.

BY MR. LANG:

Q.      Mr. Russack, do you recognize that?

A.      Am I the only one that signs these documents?

MR. BERNHEIM:  So the question to you was:  Do you recognize that; yes, no?

A.      I recognize the document, yes.

BY MR. LANG:

Q.      Okay.  Did you assign your shares in Ocean Woodruff Corporation to Jest Holdings?

MR. BERNHEIM:  Object to the extent it calls for a legal conclusion.

MR. LANG:  Oh.

BY MR. LANG:

Q.      Did you intend to assign your shares of Ocean Woodruff Development Corporation to Jest Holdings?

A.      That was the intention.

Q.      Okay.

A.      That was the intentions.

Q.      Okay.  Why did you sign these shares?

A.      I didn't want to do it.  Nobody put a gun to my head, but he practically put me in a situation where he said if he didn't get the money, there would be great -- some tremendous amount of damage done to -- I don't remember which investment money that was needed to keep these investments going, to pay bills, and promised that in three months all this money would be paid back.

Q.      Okay.  And when you say, "he," you mean Sam Sprie?

A.      Yes.

Q.      Okay.  One second.

You mentioned that it was a 1.5 million loan earlier; correct?

MR. BERNHEIM:  No, I'm going to object.

I think the record will say that was

the original intent.

BY MR. LANG:

Q.    The original intent.

A.    Original intent.

Q.    What was the intention to assign shares?  What was your intention in doing --

A.    Collateral on the million-five because he needed the money, and he didn't have any collateral, and nobody wanted to loan him anymore money because he -- I guess his credit is no good.  His word is no good.  I don't know.

Q.    Okay.  Was the assignment of shares for the purpose of collateral?

MR. BERNHEIM:  Objection.

BY MR. LANG:

Q.    Or was the purpose to convey?

MR. BERNHEIM:  Object to form.

BY MR. LANG:

Q.    Okay.  Was it your intent to convey or -- to convey the shares in Ocean Woodruff to Jest?

A.    No, just a collateral.

Q.    Okay.  That's what I was asking.

Now, the membership sales agreement that we talked about earlier, going back to that,

look at paragraph five.  This is Exhibit 3, about closing.

A.     Okay.  I read it.

Q.     Do you understand what that means?

A.     What I understand is --

MR. BERNHEIM:  Your question is, did you understand the paragraph?

A.     In other words, to re-cash the loan, you have to pay more money and make payments, right?  You got to make payments.  That's what I understand.

MR. BERNHEIM:  The document says what the document says.

MR. LANG:  Right.  Hold on.

BY MR. LANG:

Q.     Okay.  Why -- was there any intent that this transaction should be a conveyance with the purchaser?

A.     I don't understand.

MR. BERNHEIM:  Object to the form of the question.

MR. LANG:  Okay.

BY MR. LANG:

Q.     The document says -- uses the word "purchaser."

Does the use of that word surprise

you?

MR. BERNHEIM:  Object to the form of the question.

I don't understand, "surprise."

BY MR. LANG:

Q.      The closing -- the document says, "The closing of the purchase and sale of the interest."

Was it a sale?

MR. BERNHEIM:  Was what a sale, sir?

MR. LANG:  The assignment of shares.

MR. FRIEDMAN:  Objection.

MR. BERNHEIM:  You're asking him to interpret what this document says?

MR. LANG:  No, I'm not asking that. I'm asking what exactly happened.  Let's put it this way.  Let's cut to the chase.

BY MR. LANG:

Q.      Why was -- you're going to object.

Why was this done, this agreement done, to appear as a conveyance?

MR. BERNHEIM:  Well, you're right.  I am going to object to that.

MR. LANG:  Right.  Okay.

MR. BERNHEIM:  You're asking him the

intent of your client who dictated the terms of

whatever this transaction was.

MR. LANG:  Okay.

BY MR. LANG:

Q.      So I'm going to ask you:  Did you

intend or ask that this transaction be structured as

a conveyance?

A.      I did not negotiate this at all.

Q.      You didn't negotiate it at all?

A.      No, none of it.

Q.      Okay.

A.      I was against the whole thing to

begin with.  I was coerced into it, and I

basically -- I wasn't interested.  I was only

interested that he would just, you know, pay it

back, and that's all.  I didn't want to do it, and I

felt very bad about, you know, causing me to have a

problem with my partner, Henry Weinstein.

Q.      Okay.  So your representation is --

let me just -- is this correct, that as far as you

understood, that you were only encumbering the

share, but not conveying it?

MR. BERNHEIM:  Do you understand the

difference?

THE WITNESS:  No, I don't understand

the difference.

BY MR. LANG:

Q.      Okay.  There's two things.  One is just selling something.

A.      I wasn't selling the shares.

Q.      Okay.  That answered my question.  Or -- and the other thing is making a collateral.  You have to -- you know what a collateral means?

A.      Yeah, you have -- you're holding something of value, you know, to make sure that you get paid.

Q.      But it's still yours; correct?

A.      Yes, it was always mine.

Q.      So that's how you characterized this assignment of shares, that it was just giving collateral; correct?

A.      Yeah.

Q.      Okay.

(Whereupon, a discussion is held off the record.)

MR. LANG:  Let's mark this over here.

(Whereupon, document titled, Certification, dated 3/12/2020, is received and marked as Russack 5 for Identification.)

BY MR. LANG:

Q.      Before I give this to you, and I'm not trying to be anything funny or something, just trying to set --

A.      I'm not laughing.

Q.      Yeah, I'm not trying to trap or anything, but I'm just trying to understand.

So going back to 2018, when you got the $750,000 from Henry Weinstein --

A.      I didn't get it.

Q.      I'm sorry, when it went -- you don't even know where it went, but at that time, by the year -- by March 12th, 2020, did you become suspicious that the money was lost?

A.      I don't know the exact date, but of course I was suspicious, and Henry was suspicious.

Q.      Okay.

A.      Yes.

Q.      Let me ask you this.  Have a look at this.

Does that look familiar?

MR. BERNHEIM:  Well, first, for the benefit of Mr. Friedman, what's being shown to Mr. Russack is a one-page document captioned "Certification," which has a date of March 12, 2020.

MR. FRIEDMAN:  Thank you.

A.       Okay.  I'm familiar with the document.

BY MR. LANG:

Q.       What is it?

A.       It basically describes, you know, my relationship to the property and, you know, it lists the apartments that make up the shares.  I mean, what else should I say?

Q.       Okay.  And what about this, number four, what does it say?

A.       "To the best of my knowledge, there are no liens, judgments or pending litigation against the property or the company, to the best of my knowledge."  Okay.

Q.       What -- I have to phrase this correctly.

Does that contradict what you said earlier about Henry's $750,000 in your mind?

MR. BERNHEIM:  Objection to form.

It's argumentive.

MR. FRIEDMAN:  I join that objection.

BY MR. LANG:

Q.       What about the promissory note?  It was your testimony that you were encumbered the

shares of the corporation to Henry Weinstein in
2018.

How do you reconcile that?

MR. BERNHEIM:  Objection.

One, that's not the testimony.

MR. LANG:  What's the testimony?

MR. BERNHEIM:  Well, you're not
getting me to do that, but you're arguing with him.

MR. LANG:  I'm not arguing with him.

MR. BERNHEIM:  Well, you're saying,
how do you reconcile that --

MR. LANG:  Okay.  I'm trying to make
a question to where there wouldn't be an objection,
so I'll rephrase it.

BY MR. LANG:

Q.    Promissory note Exhibit 2, and was it
your testimony that this encumbered -- if the third
scenario, that if you got duped, was it your
testimony that encumbered your shares in
Ocean Woodruff?

MR. BERNHEIM:  To the extent it calls
for a legal conclusion, I object.

You can respond.  You can respond to
your understanding.

BY MR. LANG:

Q.      What's your understanding?

A.      Okay.  Well, it says over here, I'm going to read --

MR. BERNHEIM:  No, no, no, you're going to answer his question.

THE WITNESS:  I'm going to answer the question the only way I know how.  I mean -- okay.

MR. BERNHEIM:  Did you understand you were encumbering the stock back in 2018; yes or no?

THE WITNESS:  Because it was never decided.  The outcome was never decided.  I didn't put it in the same categories if somebody had a judgment on the property or litigation or something.  I didn't look at it that way.  I looked at it as something we had to work out to get to the truth.

And Henry and I could never get to the truth because we were both duped.  So I didn't put in the category if there was any kind of liens or any kind of UCCs or anything on the property.  So I put over here, to the best of my knowledge.  I'm talking about any outside actions.  Maybe I didn't interpret it correctly.  Maybe.  I don't know, but that's how I interpreted it.

I don't look at it as, you know --

it's not settled.  That is not settled.

BY MR. LANG:

Q.      But was it your representation, your testimony, was it your testimony just a few minutes ago that by the year 2020, you had doubts about that investment?

A.      Well, there's two separate things. The investment is a separate situation than what we're here for.  I mean, whether that investment was positive or negative, good or bad, that's nothing to do with anything that we're talking about today. The investment in the property that we were offered, is that what you're talking, about the investment?

Q.      Yes.

A.      Okay.  Whether that was successful or not, whether it failed or whether it was a big moneymaker, has nothing to do with the information that you're trying to -- the information that you need or to the conclusions in this.  It has nothing to do with the loan.  I don't even know -- maybe I'm mixing up the 750 with this million-five.

I didn't use the million-five.  It wasn't even a million-five.  The amount that was sent over was a little bit more than a million-two. I found this out fairly recently when I called the

lawyer that was supposed to be representing me, and he said that never sent you a million-five.  It was about a million-two, and he gave me the wires.

I said, "Why didn't you call me, all these years and tell me?"  I never got a million-five.  I'm in the middle of a situation here.  I'm thinking it's a million-five, and any interest onto a million-five when I never got less than $300,000.  Am I missing something?  You know, am I missing something here?

Q.    No.

A.    There's so much sloppiness that went on in this whole thing, and these people, they're in the business.  They make a loan, right?  So what is this constantly reshuffle like you're playing poker.  You're reshuffling the deck all the time.  They keep reshuffling the loan, and every time they reshuffled it, the loan goes -- the principle goes up, and the interest keeps going on, and then it's all about Sam not making the payments and saying, no -- they all know Sam.  They all know what's going on with Sam.  It's all about them and Sam.  It's not me.  I was used in this whole situation over here.

Q.    Okay.  At the time that you made the certification, did you have doubts about the

$750,000 owed or not owed --

A.    I don't remember.  I don't even remember.  It's so much lies and so much craziness.  It's unnecessary information.

MR. BERNHEIM:  The question is --

THE WITNESS:  I don't know.

MR. BERNHEIM:  -- in or around March 12, 2020, did you have doubts; yes or no?

THE WITNESS:  Yes.

BY MR. LANG:

Q.    Okay.  Who was the lawyer?  You mentioned a lawyer before.

Who was the lawyer that did this?

MR. BERNHEIM:  Who did what?

MR. LANG:  Put together this deal, the membership sales agreement.

A.    I don't even know if he put it together.  Noah Burton, I don't even know if he did it.  He never even spoke to me about this.

BY MR. LANG:

Q.    Did he tell you to sign that certification?

MR. BERNHEIM:  Object to the form of the question.

One, I assume you're talking about

Mr. Burton; is that correct?

MR. LANG:  Correct.

THE WITNESS:  He never --

MR. BERNHEIM:  No, no, no, you're not going to answer any questions regarding Mr. Burton or Mr. Harrington, since it's unclear who they were representing, and whether or not anything would be privileged.

MR. LANG:  Okay.  So let me just ask the question.

BY MR. LANG:

Q.    Was it your understanding that Mr. Burton represented you?

A.    I was told by Sam Sprie that he's handling this.

Q.    Okay.  So basically, what you're saying is, correct, yes or no, that Mr. Sprie was the person who got Burton involved?

A.    Yes.

Q.    Okay.  Did Mr. Burton tell you to sign that certification?

MR. BERNHEIM:  Objection.

MR. LANG:  Oh, I'm sorry.  You're right.

BY MR. LANG:

Q.    Okay.  You do recall -- do you recall signing the certification?

A.    No, I don't remember.

Q.    Okay.

A.    I don't remember.

Q.    Okay.

A.    I sign things at 10:00, 11 o'clock at night on 13th Avenue in Borough Park in the dark with Sam.  You got to do it because "I have a big day tomorrow.  Don't worry about it, trust me."  I said, "I don't trust you."  He said, "If you don't do this, this is what's going to happen.  You have a lot of money at stake.  I'm washing my hands to you. You're on your own owing all this money, and don't call Burton, don't call these people because you make things more difficult.  Go through me."

Q.    Are you saying that you were suspicious of him at that time?

MR. BERNHEIM:  Of who?

MR. LANG:  Mr. Sprie?

A.    Yeah.

BY MR. LANG:

Q.    And Mr. Sprie -- he's not a lawyer.

Did Mr. Sprie ask you to sign the

certification?

A.      Anything that I did sign was done with him.  It was not -- unless I don't remember everything, it could be -- maybe it's not 100 percent accurate, but most of the things that I signed, he basically made copies.  He basically had it on his cell phone and basically printed things, and he would give me the signature page, wouldn't give me the rest of it, and promised me that I'm going to get the copies of it.  My assistant would ask him for the copies.  We'd keep hammering him, and he doesn't give it to us, and we say, what are we going to do?  Should I go hire a lawyer because he's not giving me copies, and everything is going to get worse?  I was living a nightmare.

Q.      Okay.  Did you understand -- was it your understanding that Jest -- was it your understanding that Jest Holdings would rely upon the certification?

A.      I didn't think about it.  I felt he was going to pay it back, and the whole thing would be over.

Q.      I'm asking, given what you understood at the time, that the deal with Weinstein, around the $750,000, might have been bad, you did

understand -- you did have those concerns at that time, didn't you?

A.    I don't remember.

Q.    Okay.  Let me ask you about this.

(Whereupon, document titled, Affidavit of Confession of Judgment, dated 3/12/2020, is received and marked as Russack 6 for Identification.)

MR. BERNHEIM:  Again, for Mr. Friedman's benefit, what's been marked as Exhibit Russack 6 is something captioned "Affidavit of Confession of Judgment," which bears a date of March 12, 2020.

MR. FRIEDMAN:  Thank you.

BY MR. LANG:

Q.    Do you recognize that?

A.    I saw it a couple of days ago for the first time.

Q.    Does that look like your signature?

A.    This one doesn't look like my signature.

Q.    Can I see it again?

A.    This one is funny.

Q.    So you don't recall ever signing this?

A.      I don't recall signing it.

Q.      Okay.  Let's mark this one also.

(Whereupon, document titled, First Amendment to Membership Sale Agreement, is received and marked as Russack 7 for Identification.)

BY MR. LANG:

Q.      Do you recognize that document?

A.      I looked at it a few days ago.  I recognized it.

MR. BERNHEIM:  Again, just for the record, for Mr. Friedman's benefit, the document marked as Russack 7 is captioned, "First Amendment to Membership Sale Agreement."  It has a date of March blank, no actual day number is filled in, of 2021.

BY MR. LANG:

Q.      Okay.  Do you know what that is?

A.      I think there's a second amendment also.

Q.      There is a second actually, but do you know what this document is?

A.      I don't know.  It's all boring.

Q.      Huh?

A.      I find it very boring.

MR. BERNHEIM:  Do you recognize this;

yes or no?

THE WITNESS:  I saw it a couple of days ago, yeah.

BY MR. LANG:

Q.    Okay.  Before you saw it a couple of days ago, because I sent it, would you have -- do you recognize it from before a couple of days ago?

A.    What's the date on this?

Q.    It's March, 2021?

A.    I don't remember.

Q.    Do you recognize that at all?  Do you know anything about an amendment to the sale agreement?

A.    No, I don't even know what it is.

Q.    Okay.  Let me just look at the signature.  There's a signature page.

Is that your signature?

MR. BERNHEIM:  Wait a second.

A.    I don't know.

MR. BERNHEIM:  Hold on.

You have two documents here.  So we're now looking at the third page of what's marked as Exhibit Russack 7.

A.    I don't know if it's my signature.  It could be.  I don't know.  I have so much mistrust

because of what was done to me.  There was so much fraud and so much deceit, and I have --

MR. BERNHEIM:  The question is, is that your signature; yes, no or --

THE WITNESS:  I don't know.  I don't know.  I can't say yes, I can't say no.  Totally honest, I don't know.

BY MR. LANG:

Q.    Okay.  You don't recall -- besides what I sent a week ago, you don't recall this document at all; is that correct?

A.    No, I looked at the documents.  I looked at it all, and I don't remember.  I'm supposed to memorize all these things?

Q.    No, I'm asking, do you recall?

A.    I remember looking at it, yes.  I got it.  My assistant printed it out for me.  A lot of it was very small on the, you know --

MR. BERNHEIM:  He's not talking about the materials that were sent in the notice of deposition.  He's talking about otherwise.  Do you have a recollection before of this document?

THE WITNESS:  I don't have a recollection of it.

MR. LANG:  Okay.

                    THE WITNESS:  I don't.

                    MR. LANG:  And let's mark this one also.

                    (Whereupon, document titled, Second Amendment to Membership Sale Agreement, is received and marked as Russack 8 for Identification.)

BY MR. LANG:

          Q.     Okay.  This is the second amendment to membership sales agreement.

                    MR. BERNHEIM:  This is Exhibit Number 8, for Mr. Friedman's benefit.  It's captioned "Second Amendment to Membership Sale Agreement."

          A.     They're both signed on the same day?

BY MR. LANG:

          Q.     Are they?

          A.     Look at the dates.

          Q.     No, this is 2022.

          A.     And what about the first amendment?

                    MR. BERNHEIM:  You've been asked to look at this document.

                    What's the question?

BY MR. LANG:

          Q.     Do you recognize the document?

          A.     I saw it a few days ago.  Other than

that, I don't recognize it.

Q.      Look at the last page.

Is that your signature?

A.      This could be my signature.  This one could be my signature.  I'm not 100 percent sure.  I don't know.  I don't know.

Q.      I don't know if this is a good question, but --

A.      I don't know if it's a good answer.  It's very difficult to look at your signatures and say this could be, it cannot be.  It's very difficult, especially if it's years ago, different times.

MR. BERNHEIM:  Okay.  All right.

A.      I don't know.

BY MR. LANG:

Q.      Are you more confident that this is your signature than you are on the first amendment?  Because in the first amendment, it seemed to be your testimony that it was not.

A.      I don't know on both of them.

Q.      They're both the same --

A.      This one is a little bit more like I would write it.

Q.      Okay.

A.    And this is not how I would write it.

Q.    Okay.

A.    But now that I'm looking at them, I don't know.  I don't know.

Q.    Okay.  I just wanted to know why the second one was more likely to be your signature.

A.    This looks like something that was signed.  This looks like it was scribbled, or maybe -- I don't know.  I'm not going to --

MR. BERNHEIM:  I think we --

A.    I don't know.

MR. BERNHEIM:  -- beat a dead horse here.  He's not sure.

A.    I'm trying to help, but I don't know.

BY MR. LANG:

Q.    Okay.  Let's mark this.

(Whereupon, document titled, Declarations of Restrictions, is received and marked as Russack 9 for Identification.)

BY MR. LANG:

Q.    This is the declaration of -- is that your signature?

A.    I don't know.  The I and the B look like I write it, but this doesn't look like I wrote this.  I don't write the R like that.  I can't give

you an answer.  I don't know.

Q.     Okay.  Let me ask you this, and I don't mean, like, you know, if you saw documents that I sent to you.  I only sent those to you just so you would be prepared.

A.     Okay.

Q.     So when I asked if you recognize this document, I mean before that.

A.     I don't recognize any of the documents.  It doesn't mean that I didn't see them.  It doesn't mean that I didn't sign them.  I'm not making it -- I'm not saying that, but I don't recognize the documents.  It's because of maybe memories, it's because of not paying attention or knowing that he's going to pay the loan off because basically he got the money.  He used the money.  I don't know what he used the money for.  He needed the money.  He borrowed the money.

MR. BERNHEIM:  All right.  All right.

A.     That's what happened.

MR. BERNHEIM:  Okay.  The question is, do you recognize it?

THE WITNESS:  No, I don't recognize it.

BY MR. LANG:

Q.    I don't know if I could ask this: Did you refer my client to Mr. Harrison, the lawyer?

MR. BERNHEIM:  Do you refer Jest Holdings to Mr. Harrison?

MR. LANG:  Yes.

A.    I don't even know Mr. Harrison.

BY MR. LANG:

Q.    Oh, you don't know him?

A.    No.

Q.    Okay.  That's good.  You answered the question.

A.    I never hired him.

Q.    Did you ever -- did you ever hear his name before?

A.    Yes.

Q.    Before this lawsuit?

A.    Yes.

Q.    In what context?

A.    Another matter.  I was supposed to send -- to put money into --

MR. BERNHEIM:  He just asked if you heard of him.

A.    I've heard of him before.

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

BY MR. LANG:

Q.     Do you have any idea or recollection of how Joseph Harrison got involved in this transaction?

A.     No.

Q.     Okay.  You did say Mr. Burton has represented you before?

A.     Yes.  You didn't ask me that.  You asked me about Harrison --

Q.     Sorry.  Okay.

Who represented you on this transaction?

MR. BERNHEIM:  Object to the form of the question.

That assumes something not in evidence, that he was represented.

MR. LANG:  Okay.

BY MR. LANG:

Q.     Were you represented on this transaction?

A.     I don't know.  I was led to believe that I was represented, but I don't know because he also -- I think I read somewhere that he was also representing Jest Holdings, either Jest Holdings or Jonathan, and they worked together.  They're, like,

partners, you know?  They work together.  They share loans, whatever they do.

Q.     Did you have any other representation, legal representation?

MR. BERNHEIM:  In this transaction?

MR. LANG:  Yeah, sure.

A.     Not that I know of, no.

BY MR. LANG:

Q.     Okay.  Going back to a previous exhibit, I just noticed something.  This is Exhibit 5, the certification.

Could you read Number 5?

A.     Yes, "I have the full authority to assign the interest to the assignee without the consent of any third party."  I don't understand what that means.  Could someone help me with it?

MR. BERNHEIM:  You were just asked to read it.  You read it.

A.     Okay.  I just read it.

BY MR. LANG:

Q.     Okay.  You know, I asked you about Number 4 and Number 5.  Number 5, if we relate back to the 1985 agreement, that's what we started with?

A.     Yeah.

Q.     Paragraph seven -- let's go back to

here.

You want to read it?

A.      Read it to myself?

Q.      No, read it out loud.

MR. BERNHEIM:  We've already gone through what paragraph seven is.  If you want to ask him for a legal conclusion --

MR. LANG:  No, I'm not --

(Unintelligible, simultaneous testimony interrupted by the certified stenographer.)

CERTIFIED STENOGRAPHER:  I need one at a time, please.  This isn't a conversation.  This is a deposition.

MR. BERNHEIM:  What's your question?

BY MR. LANG:

Q.      My question is:  Is it your understanding that you did have the authority to encumber the share?

MR. BERNHEIM:  Object to the form of the question.

MR. FRIEDMAN:  Joined.

MR. LANG:  Why?

MR. BERNHEIM:  Look, I really hate to do this, but you've represented that it was not an

encumbrance of any of his shares, but it was a transfer of the interest in his shares.  So you keep mixing up what the nature of the transaction is from your side here in this litigation.

MR. LANG:  That's not correct.

MR. BERNHEIM:  Well, we're not going to debate it.  So in any event, you're asking him, you know, for a legal conclusion.  These documents say what they say.  Respectfully, they're all over the place.  The only consistency is inconsistency, and you're asking him to interpret it, and that's the basis of my objection here.

MR. LANG:  Okay.

BY MR. LANG:

Q.      Let me ask you something.

When you made the transaction with Jest, did you intend to assure him that you had the legal right to encumber or convey your shares?

A.      I don't remember.  I don't know.

Q.      And that has to do with that number --

A.      I assume that I believed, again, I'm not supposed to assume things, and, you know, I have to know the facts, okay?  I believed that I owned 50 percent of the shares, and I believed that --

actually, I didn't think -- I didn't think about it. I probably didn't even think about it.  It was something that was going to get paid back, and there was no option in my mind that this was going to get to where it happened and it caused a big problem.

Q.    But you did say you were starting to distrust Sam Sprie; correct?

MR. BERNHEIM:  Objection to form.

Asked and answered.

MR. FRIEDMAN:  Objection.

BY MR. LANG:

Q.    Okay.  You said that you were beginning to not trust Sam Sprie.

So why are you saying now that you didn't think it would come to --

A.    No, on this particular transaction, okay?  I honestly, I guess I'm gullible, believed that he would pay it back in three months, and the whole thing would go away.

Q.    Okay.

A.    And any time I would bring up, you know, what if this happens, what if this happens, "It's not going to happen, Ira.  Stop it."  You know, "Enough is enough," you know?

Q.    Okay.

A.        "I'm going to pay it back, and that's all."

Q.        Okay.

A.        And he didn't pay it back.  And that's what happened.

Q.        Okay.  You do understand that Jest Holdings -- was it your understanding that Jest Holdings was looking for reassurance that the encumbrance, the securities, which is the share, that means encumbrance, the collateral --

A.        I know what it is.

MR. BERNHEIM:  Let him finish the question.

BY MR. LANG:

Q.        -- was good?

MR. BERNHEIM:  Object to the form of the question.

You're asking him Jest Holdings' position.  He can't answer that.

BY MR. LANG:

Q.        Was it your understanding -- was it your intent to give Jest Holdings -- to reassure Jest Holdings that you had authority to transfer or convey or encumber the shares?

A.        I believed that I had control of my

50 percent at the time.  I believed that I did, but I consciously, morally, okay, I felt that I did wrong by not going to my friend and my partner and talking to him about it because it definitely would affect him, and I had a situation.  Do I or don't I, okay?

If I go ahead, I go against Sam.  I'm going to lose a lot of money.  All hell is going to break loose, okay?  So I went ahead, and I made the decision, and I hoped for the best that he would pay it off and the whole thing would go away.

Q.    That who would pay off?

A.    Sam would pay it off.  He paid all the payments, except one payment, and I don't even know if he gave it back to me.  I wrote a check I shouldn't have written from a corporate account that I have, $39,000.

Q.    But let me ask again because I don't think I got the answer.

Was it your intent to assure Jest Holdings that you had the authority to sign the shares?

MR. BERNHEIM:  He has answered that question.  Let's move on.

MR. LANG:  What's the answer?

MR. BERNHEIM:  It's on the record. I'm not going to sit here and have it all read back.

MR. LANG:  Okay.

BY MR. LANG:

Q.     Was it your intent to assure Jest Holdings that -- to assure Jest Holdings that there are no liens on the property?

A.     I did not have any intention, and I did not misrepresent or lie to him or tell him that I owned something that I didn't have.  I did not commit fraud to him, that I know.

Does that answer the question?  I did not commit fraud.

Q.     Okay.

A.     If I misjudged something, I didn't remember something, I didn't remember a document, what it said, from 20 years ago, four years ago, that's another story, but at the time, okay, because I believed that I wouldn't --

MR. BERNHEIM:  Stop.  The question is, were you aware of any liens on the property at the time; yes or no?

THE WITNESS:  No.

MR. BERNHEIM:  Okay.  Next question, please.

BY MR. LANG:

Q.      You did say that you were already suspecting --

A.      It was an advertence job --

MR. BERNHEIM:  Stop --

A.      -- because I wasn't directing him.

MR. BERNHEIM:  Please, you need to --

(Unintelligible, simultaneous testimony.)

MR. BERNHEIM:  Timeout.

We're going to take a break.

CERTIFIED STENOGRAPHER:  Off the record at 12:04 p.m.

(Whereupon, a recess is taken.)

CERTIFIED STENOGRAPHER:  Back on the record at 12:15 p.m.

BY MR. LANG:

Q.      Who's Adam Kalish?

A.      He's an attorney.

Q.      Did he represent you?

A.      I don't believe he ever represented me, but he was involved in things that Sam and I were involved in, and Sam does a lot of business with him, and I met him a few times.

Q.      Okay.  Let me ask you this:  The 1.2 million or whatever it is that was originally

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

tenured in March of 2020, do you know where it went to?

MR. BERNHEIM:  Object to the form of the question.

You're assuming something that's not in evidence when you say 1.2 million that was tenured in March of 2020.

MR. LANG:  He said -- that's what he said.

MR. BERNHEIM:  No.

BY MR. LANG:

Q.    Okay.  The money for the loan, do you know where it went to?

A.    The amount of the money that was received?

Q.    No, no, where did it go to?

A.    Okay.

Q.    Let me ask you this:  Did it go to Burton?

A.    It went to Burton.  I assume -- yeah, it went to Burton because I called Burton up and I asked him.

Q.    Okay.  Do you know where it went after that?

A.    Burton told me that he sent a

million-two to an account -- my account, and then the money was wired from my account out, which I know nothing about, which is more complicated.

Q.    Who wired the money out of your account?  You, did you wire the account?

A.    I had a bookkeeper.

Q.    Okay.

A.    It wasn't wired out for my benefit. I didn't wire it out.  It wasn't for me at all.  It went somewhere else.

Q.    I'm just going to try to find some emails with your name on it, if that's okay.

A.    Sure.

Q.    Do you use email?

A.    Yes, I do.

Q.    Okay.  Let me ask you this -- let's put this into evidence.

(Whereupon, Jest Holdings, LLC letterhead, dated 5/29/2021, is received and marked as Russack 10 for Identification.)

BY MR. LANG:

Q.    Have you ever seen this besides last week?

MR. BERNHEIM:  Again, for the record, for the benefit of Mr. Friedman, this appears to be

a letterhead, Jest Holdings, LLC, dated June 29, 2021, addressed to Mr. Russack.  The question is:  Have you ever seen this before?

THE WITNESS:  No, I never saw it before, other than when it was sent to me recently.

BY MR. LANG:

Q.      Okay.  As you read it now, is there anything in there that you dispute?

MR. BERNHEIM:  Object to the form of the question.

We're not doing that.  That's just inappropriate.

MR. LANG:  Okay.  I just didn't know.

MR. BERNHEIM:  That's not the way to do it.  It's not his letter, and it doesn't even look like it's a full copy of whatever it is you're providing.  It's only a first page.

BY MR. LANG:

Q.      Let me ask you this:  Is this your bank account?

MR. BERNHEIM:  You're talking about the bottom of the document?

MR. LANG:  Yeah.

MR. BERNHEIM:  It appears to be Jest Holdings' bank account.

MR. LANG:  Oh, okay.

MR. BERNHEIM:  It says, "Bank name, J.P. Morgan Chase, Account Name, Jest Holdings, LLC."

MR. LANG:  Okay.

MR. BERNHEIM:  Do you have other pages to this letter?

MR. LANG:  What is that, 14?  So maybe it was here.  One second.

(Whereupon, a discussion is held off the record.)

MR. BERNHEIM:  What are you doing?

MR. LANG:  You asked me if there's anything that came with it.

MR. BERNHEIM:  No, what you have marked as Exhibit Number 10 appears to be one page of a letter that may have more pages to it.  It's addressed to Mr. Russack.  There's no signature.  There's no -- it seems to be that there should be paged behind it, not in front of it.  So I've only seen, prior to this deposition, this one page.  My question to you was:  Do you have others, which appear that would go with it?

MR. LANG:  This is the email.

MR. BERNHEIM:  Well, now you're

showing me an email that may have transmitted this, but --

MR. LANG:  Okay.  We can mark this.

MR. BERNHEIM:  I'm not sure what you're doing, sir.

MR. LANG:  Okay.

MR. FRIEDMAN:  Can I just interject? I don't have any emails.  None were provided, so I don't know what you're referring to.

MR. LANG:  I got these emails recently.  You want me to send them to you?

MR. FRIEDMAN:  Yeah, well, if you're going to use them at the deposition, I'm entitled to.  I'm entitled to them in any event, but if you're certainly going to use them at the deposition, I'm entitled to them prior to the deposition, or at least now.

MR. LANG:  I'll send it now.

MR. BERNHEIM:  Yeah, as I indicated to you when we were off the record, you handed a stack of documents, emails, 46 pages, which appear to have been sent to you by your client on February 13, 2025, and we're just getting them, you know, at the time the deposition begins, and many of these do not include Mr. Russack as being in the

email chain.

So for the record, what you've handed me, while, again, it appears to have been sent to you on February 13 from your client, it's an email of June 29 from Jest Servicing to Sam.  It appears to also Mr. Russack, Mr. Teichman and Mr. Rubin, and then saying, "As requested, please see attached letters showing the closing funds due as of today. Per diem of $500 should be added for each additional day.  This letter expires on July 14th.  Please keep seller informed of any closing dates.  Thank you. Miriam."

(Whereupon, email correspondence dated 2/13/2025, is received and marked as Russack 11 for Identification.)

THE WITNESS:  What email is down here?

MR. LANG:  I'll show it to you.

MR. BERNHEIM:  There's no question. I'm just accommodating Mr. Lang.

MR. LANG:  The file that I just sent Mr. Friedman, it says page 28.

BY MR. LANG:

Q.    Did you receive that email?

A.    First time I'm seeing this.

Q.    Okay.

A.    I mean, it's possible.  I have some emails that -- I missed it, but I don't know about this.

Q.    Okay.

A.    My testimony is, I don't know about this.

Q.    Okay.  Getting back to this exhibit here, do you have any understanding of what is meant by purchase price?

A.    I guess when they add on more.  When a lender adds on more charges, more fees, then it becomes a higher purchase price.  When you pay it down, it's another purchase price.  Is that what it is?  I don't know what a purchase price is.

Q.    Okay.

MR. FRIEDMAN:  I have the emails. What page are you referring to?

MR. LANG:  I was referring to page 28.

BY MR. LANG:

Q.    You don't recall seeing this; correct?

A.    No, I saw it for the first time a few days ago.

Q.    Okay.

MR. FRIEDMAN:  Just looking at this, there's an attachment.  Where is the attachment?

MR. LANG:  We have it.  It's Exhibit 10.  Let's mark this also.

(Whereupon, email correspondence dated 2/13/2025, is received and marked as Russack 12 for Identification.)

MR. BERNHEIM:  For the record, Mr. Russack has been handed what's been marked for identification purposes as Russack 12.  It appears to be an email chain of May 17 through May 19, 2021 from the documents produced this morning.  On the bottom, it's got pages 29, 30 and 31.

BY MR. LANG:

Q.    Do you recognize this?

A.    Give me a minute to take a look at it.  This was sent to my email?

Q.    Let me see.

MR. BERNHEIM:  The question is --

A.    I never saw this before.

BY MR. LANG:

Q.    Okay.  Then you answered it.

Okay, but this over here -- is that your -- let me ask, just for the record:  Is your

email account irarussack@gmail.com?

A.      Yes, but there's another one also.

Q.      Okay.

A.      Yes, it is.  So I never saw this before.  I never saw it.  I didn't answer this.

Q.      Does someone else have access to your email account?

A.      I hope not.

Q.      Okay.

A.      It's very possible.

Q.      Okay.  Well, anything is possible.

This email, you said you don't recognize.  It's content is, we have said we will only do wires I guess ever [sic] month.  I'm sure --

A.      Who's we?

Q.      Oh, I have no idea.

A.      That's what I'm asking myself.  Who's we?  I don't have a "we" with me.

(Unintelligible, simultaneous testimony.)

MR. BERNHEIM:  Gentlemen, the court reporter is going to hit you both if you keep talking over one another.  So it's question and then answer.

BY MR. LANG:

Q.      It clearly says your email account,

so try to remember.

MR. BERNHEIM:  So what's your question, sir?

MR. LANG:  Well, I'm going to ask him what it means.

MR. BERNHEIM:  You're asking him on May 19, 2021 at 10:30 a.m. where it says, quote, "We have said we will only do wires ever month," end quote?

MR. LANG:  That's correct.

MR. FRIEDMAN:  You said at 10:30 --

MR. BERNHEIM:  11:30, I'm sorry if I said 10:30, 11:30 a.m.

A.    I don't know when it means.

BY MR. LANG:

Q.    You don't know when it means, or do you?

A.    I don't feel any connection to this, that I wrote this at all.

Q.    Do you have any -- okay.  The reason why I'm asking is because you're saying before that more --

A.    When was this sent?

Q.    Right here, May 19, 2021.

A.    You know, I have a problem, okay?

Q.      What?

A.      I have a problem.

MR. BERNHEIM:  There's no question on the table.  You're not giving speeches or just telling people your problems.  What's the question?

BY MR. LANG:

Q.      The question is that you represented before that Sam was supposed to make all the payments?

A.      Make the payments, and he was the one --

Q.      I'm not --

MR. BERNHEIM:  Let him ask a question, please.

A.      Okay.  Go ahead.

BY MR. LANG:

Q.      In this email over here, whether it's you or not, coming from your account, speaks of "We will do wires every month."

You don't recall, but if I showed this to you, does this mean anything to you?  Who is we?  That's what I'm asking.  You just asked that yourself, right?

A.      Who is we?  And he's gotten hold of my phone, which I stopped it.

Q.    Who has hold of your phone?

A.    Sam.

Q.    He has hold of --

A.    In the past, yes.  I would go be in the car with him, sitting, you know, making phone calls, you know, I would wait for him.  Then I go out to get coffee, I go to the bathroom, I come back, he's on my phone.

Q.    And he --

A.    I don't know.  I'm not accusing, okay?  It's very possible that he did this.

Q.    So he's actually -- possible that he accessed your email account?

A.    Yes.

Q.    Okay.

A.    I'm not accusing him.  I don't want to get a --

Q.    No, it's fine.  You said possible. That's okay.

What about the second part, the second email -- well, this is it.

Well, the second part, 11:28, I guess, "Can you please explain what will happen to the check we deposited?"

MR. BERNHEIM:  Well, that's coming

from somebody else.

MR. LANG:  No, it says from Ira.

MR. BERNHEIM:  It's not.  It says from Miriam.

MR. LANG:  Okay.

BY MR. LANG:

Q.    What about this one here?  I mean, you know, these are a lot of emails coming from you.

Is that an email that you just sent --

A.    Which email?

MR. FRIEDMAN:  What page are you referring to?

MR. LANG:  Second page -- oh that would number -- page 30.

MR. BERNHEIM:  And there's two emails there.

MR. LANG:  There's three pages in the whole thing.

MR. BERNHEIM:  Okay.  Which email are you referring to on page 30, sir?

MR. LANG:  Okay.  The top one, "Wire sent today."

MR. BERNHEIM:  And your question is what?

MR. LANG:  My question is:  Did he write that?

MR. BERNHEIM:  Do you recall sending this email of May 19 --

THE WITNESS:  How many people can answer a question like that?

MR. BERNHEIM:  Just -- look, either you recall, you don't recall.

THE WITNESS:  I don't recall.  I don't recall.

BY MR. LANG:

Q.    Okay.  So the email's coming out of your account on -- wait, let me just see this -- May 19, this is this the same date probably of the previous email, May 19.  So you don't know -- well, -- May 19, yeah.

You don't know if you ever sent this email?  That's what you're saying?

(Stenographer clarification.)

A.    No, I don't know.  I don't know.

BY MR. LANG:

Q.    Okay.  What about this email on May 17?

MR. LANG:  Did we mark this?

MR. BERNHEIM:  Yes.

A.      This is Sam writing this.  Come on. I was not participating in any of this stuff.  There was one time I spoke to Mr. Teichman, okay?  I came back to my car.  He's on the phone, my phone.

MR. BERNHEIM:  Please.  There's no question that's on the table.  You said that you --

(Unintelligible, simultaneous testimony.)

BY MR. LANG:

Q.      Okay.  So you're saying that on May 17 -- you just said this is Sam.  On May 17 and on May 19, he must have got into your account?

A.      I don't know how it happened, but I do have to say that, in defense on myself, I caught him.  If you depose him, he would tell the truth. He would say he uses my phone.

Q.      Fine.

A.      He talks to two different people at the same time.  Some people do.  They have one phone, so they use your phone.  You know, he does that.

Q.      On two different dates?

A.      I don't know.  You're talking about years being involved with this craziness.  Who can remember?

Q.      Okay.  You know what I'm getting

at --

A.    I can be with him on two different dates.

MR. BERNHEIM: Okay.  Stop.  There's no question on the table.  Please, gentlemen, let's try to do this orderly.

BY MR. LANG:

Q.    Okay.  You know what I'm getting at, what I'm trying to establish, yes or no --

A.    It's a yes or no, did I write it, I didn't write it?  That's what you're --

Q.    No, no that's not what I'm asking.

MR. BERNHEIM:  He has not asked the question.

A.    Oh, you didn't ask the question?

BY MR. LANG:

Q.    You already answered that.  You said you don't know if you wrote it.

What I'm asking is this:  These documents are referring to sending money to Jest, so I'm asking you, on or about those dates, did you send money to Jest?

A.    No.

Q.    Okay.

MR. LANG:  Could I have a paperclip

for this?  All right.  Let's mark this.  Let's get the rest of it.

(Whereupon, email correspondence dated 2/13/2025, is received and marked as Russack 13 for Identification.)

MR. LANG:  Okay.  So over here it looks like you're copied.  I mean, you can say something else, but here -- okay.  This initial one --

MR. BERNHEIM:  You want to identify it, what we're talking about for the record, please?

MR. LANG:  Okay.  Yeah, this is page 32 through 35.  We're marking it as Exhibit 13, and it's an email that -- it's "RE: Ocean Woodruff dash notice address for buyer."  It's just a whole chain.

A.    Can I look at it?

BY MR. LANG:

Q.    Yeah, sure.

A.    Okay.  Let me look at it.

MR. FRIEDMAN:  What page?

MR. BERNHEIM:  32 through 35, he said.

BY MR. LANG:

Q.    Let's just do one page at a time. Make it easier.

A.      Okay.  It's possible --

MR. BERNHEIM:  There's no question.

BY MR. LANG:

Q.      Do you recognize these emails?

A.      I don't recognize the emails.  Let me just read the last two.  Hang on.

Okay.

Q.      Do you recognize them?

A.      Can I say what I think happened here?

MR. BERNHEIM:  No, do you recognize it; yes or no?

THE WITNESS:  I don't know how to play this game.  I don't know what to do here.

MR. BERNHEIM:  You listen to the question.  You answer the question.

THE WITNESS:  Okay.

BY MR. LANG:

Q.      Do you recognize the email?

A.      I don't recognize the specific emails.  Is that what you're asking me?  I don't recognize these specific emails, but I was asked a few times, by Sam, to talk to Mr. Teichman, to assure him that he would get the money from Sam.  He's going to get the money.

So there's a connection here or

something.  I knew he was making the payments.  I knew he was making the payments, and apparently he doesn't have --

MR. BERNHEIM:  Once again, the question was whether you recognize this document.

THE WITNESS:  I don't recognize the document.

MR. BERNHEIM:  You need to listen to the question and answer that and that only.  This is, like, the tenth time that I'm telling you --

THE WITNESS:  All right.  I'm not going to do it anymore.  Okay.

MR. BERNHEIM:  I don't believe you, but okay.

BY MR. LANG:

Q.    Let me just point out that you were copied on the front page of the email, but your representation is that you don't recall these?

A.    I said that it's possible that I got these emails.  I have a huge amount of emails that come to me.  I subscribe to all kinds of stuff, not my business, and it's all mixed up, and I don't catch every email.

Q.    Okay.  Let me ask you this question: Because you said it's possible that Sam got into

your account, have you ever caught him getting into your account?

A.    He has done scrupulous things to me.

Q.    But have you ever caught him getting into this particular account, irarussack@gmail.com?

A.    Many times when I was with him, he asked me -- he just takes my phone and he called people.  He says, "I have to call this other person.  Hang on.  I'll be right back."  And he used my phone, and then I go for coffee or I go to the bathroom, so I'm saying that he's notorious for doing stuff like this, so this is possibly -- I'm looking to help over here.  I'm telling the truth over here, okay?

Q.    Okay.

A.    I'm not hiding anything.

Q.    No.  Okay.

A.    So it's hard for me to say yes, no, yes, no, when there's reason, and you're not familiar with the case, so I'm just trying to help.

Q.    That's what we're here for.

A.    Yeah, I'm trying to help.

Q.    So is that a yes or no, that you caught him before, or you know that he has done this?

A.      Yes, I've caught him many times.

Q.      And then going into --

A.      And then finally --

Q.      Using your account?

A.      I don't know about my account.  He uses my phone.  Who knows what he does on the phone. I think he's calling people.  I go out, even with the phone, he'd be sending emails and doing stuff like this.

Q.      Why do you let him use your phone?

A.      I stopped it a long time ago.  I stopped it maybe a year ago, a year and a half ago. I stopped it.  I said -- I keep it in my pocket.  I don't leave it, so he can get his hands on it.

Q.      Do you use this email account often?

A.      All the time.

Q.      Is it possible, is it likely that these emails were sent, and you wouldn't know?

        MR. BERNHEIM:  Object to the form of the question.

        MR. LANG:  Okay.

BY MR. LANG:

Q.      Do you ever check your emails to see what was sent?

A.      I clean my computer.  I clean my

Gmail.  I have not come across these in my --

MR. BERNHEIM:  The question was:  Do you check your emails for what was sent?

THE WITNESS:  Yes.  I don't do it all the time.

BY MR. LANG:

Q.     So you have never caught Sprei or someone else --

A.     He has had --

Q.     -- hacking, if that's not the word, going into your email and sending things?

MR. BERNHEIM:  Objection.  I think he stated --

MR. FRIEDMAN:  Objection to the form.

MR. BERNHEIM:  Yeah, he said he would take his phone, and he would send emails.

BY MR. LANG:

Q.     Okay.  Again, you have -- you just said you checked your emails that were sent.

A.     But I don't do it all the time. Sometimes, two or three days go by, and I get so many emails.  I miss a lot of stuff.

Q.     Okay.

A.     I did talk to Teichman.

MR. BERNHEIM:  Come on, that's not

the question.

THE WITNESS:  All right.  Okay.

BY MR. LANG:

Q.    Now, I didn't ask you about this second page.  It's 33.  It's part of the exhibit. The middle email, that's directly towards you for sure.

MR. BERNHEIM:  What's your question?

MR. LANG:  Well, let me just see it.

BY MR. LANG:

Q.    Do you recall this email?  I guess you already testified that you don't recall any of this?

A.    I don't recall specific emails.  This is in 2021.

Q.    Okay.  Is it true that Jest received checks, and at a certain point, that they insisted that money should be wired?

A.    I don't remember.

Q.    Okay.  Now, this email is from you, supposedly, --

A.    To Miriam?

Q.    To Miriam, this one here.

A.    I communicate.  I have to communicate --

MR. BERNHEIM:  Would you please wait until there's a question asked?

BY MR. LANG:

Q.      All right.  Who is Miriam?

A.      He doesn't know.

Q.      Well, yeah.  Who is it?

MR. BERNHEIM:  Do you know who Miriam is?

THE WITNESS:  Yes, I do.

MR. BERNHEIM:  Who's Miriam?

THE WITNESS:  Miriam is Jonathan Rubin's wife.  It's his LLC, and I communicate with him, and he's involved with this whole thing.  They're partners on this.

MR. BERNHEIM:  The question was, who is Miriam?

THE WITNESS:  Okay, his wife.

MR. BERNHEIM:  Thank you.

BY MR. LANG:

Q.      All right.  The bottom email, it says it's coming straight from you.

A.      I'm not saying that I didn't send it it.  I don't recognize it.

Q.      Okay.

A.      I have a lot of emails that I send to

Jonathan and Miriam.  So maybe it's getting mixed up over here.

Q.    I'm not -- maybe recognize is not the right word because you already said that you don't recognize them.  I'll just read it.

Is this true, that you emailed -- that on -- did this even happen, that you will -- you told Miriam you will only do wires every month?

A.    I don't remember.

Q.    Okay.  So the point is.  The point is, is that I'm trying to understand your involvement in the transaction and, you know, paying back and all this.

Your testimony is that you did not make any of the payments every month, is that true?

A.    One of the papers you sent, there's one payment that was made.

Q.    Is that the check that bounced?

A.    Yeah, I think it was the check that bounced.

Q.    Why did you make that payment?

A.    He didn't have the money, and he promised that he'd make the payment, and he said to me -- he said, "I promise, I promise, I promise. I'm going to make good on the money.  I'll give it

back to you."  I said, "I don't want to commingle the money."  I mean, I knew he was paying the loan. Everyone knew he's paying the loan.  Everybody knew that he took the money.  Everybody knows that he's involved with Jonathan.  He brokers all the deals. He gets some of the points.  It's not just Teichman's loan.  It's -- he's involved in all the loans.

Q.    Okay.  What about this email from -- I guess it would be from -- one second.  Let me make sure I have this in the right order.  Okay.

What about this chain?  What about this one right here?  I guess Miriam wrote this to you.

MR. BERNHEIM:  Are we still on Exhibit 13?

MR. LANG:  Yes, the last page.

MR. BERNHEIM:  So looking at an email from April 27, 2021 at 9:52 p.m., reportingly to be from Miriam to Mr. Russack, which is on your page 35.

What's your question?

BY MR. LANG:

Q.    The question is that this email is addressed to you, and it's speaking of the, I

believe, if I can see it, the first amendment, the first membership sales agreement.

A.      Apparently --

MR. BERNHEIM:  He hasn't asked a question.

THE WITNESS:  Okay.  Ask the question.

BY MR. LANG:

Q.      Do you recall the events that email should be referring to?

A.      Apparently --

MR. BERNHEIM:  Object to the form of the question.

I'm just going to do this for the record.

THE WITNESS:  So I shouldn't say anything?

MR. BERNHEIM:  You should not. "Please confirm which mailing address to be inserted into the first amendment of membership sale agreement for any notice that would need to be delivered to you, as the buyer."  That's the body of the email, and your question is what?

MR. LANG:  My question is, did he respond to this email?

MR. BERNHEIM:  In other words, did you ever provide some address?

THE WITNESS:  I have --

MR. BERNHEIM:  Yes or no, did you provide an address?  I'm going to get us through this.  Did you provide an address to Miriam regarding the first amendment to membership agreement?

THE WITNESS:  I don't know if I did that.

MR. LANG:  What is the first amendment membership agreement?

MR. BERNHEIM:  That is Exhibit 7 that you have here, and for the record, on page two, it provides -- has Ira Russack's name with no address.

MR. LANG:  What is it?

MR. BERNHEIM:  What do you mean "what is it"?

MR. LANG:  What is it?  It was emailed to him, something, asking for an address. What is the second -- the first -- that document that's referred to in the email?

MR. BERNHEIM:  Well, he doesn't recall the email.  Somebody else wrote the email. You can't ask him about what somebody else wrote in

the email.

BY MR. LANG:

Q.    Did somebody else -- did you receive that email?

MR. BERNHEIM:  Asked and answered.

A.    I don't know.  I would have to go through it.

BY MR. LANG:

Q.    Okay.  What is the first -- what is the first amendment to membership sales agreement? What is that?

MR. BERNHEIM:  You mean what you marked as Exhibit 7?

MR. LANG:  Yes.

A.    Exhibit 7?  Give it to me.  I'm going to take a look at it.  I don't know.

MR. BERNHEIM:  Here is Exhibit 7. I'm handing to you.

BY MR. LANG:

Q.    What is it?

MR. BERNHEIM:  It says, "First Amendment to Membership Sale Agreement."  The document speaks for itself whatever it is to whatever relevance it may have.

BY MR. LANG:

Q.      Do you recall what that is?

A.      I see what it is, yes, it's an update on the amount that's owed, yeah.

Q.      Have you seen that before?

MR. BERNHEIM:  Didn't we do this before?

MR. LANG:  Yes, we did.

MR. BERNHEIM:  Okay.  So we're not doing this again.  Next question.

BY MR. LANG:

Q.      So it's your representation that you don't know what it is?

A.      I know what it is now.  I knew what it was with -- we went over it before, about an hour ago.

Q.      Oh, you did know what it is?

A.      Yeah, we went over it.  Didn't we just read it before, about an hour and a half ago?

Q.      Yeah.

MR. BERNHEIM:  Next question.

BY MR. LANG:

Q.      I thought you said that you don't know what it is?

A.      No, --

MR. BERNHEIM:  Stop.  The record says what it says.  We're not repeating questions again.  Let's go.  Next question, please.  We got to get through this.

MR. LANG:  Where's the last thing we were at?

MR. BERNHEIM:  You handed him this page, which is part of Exhibit 13.

BY MR. LANG:

Q.    This email says it needs to be delivered to you.

Was it ever delivered to you?

MR. BERNHEIM:  Again, for the record, so somebody will know when we're talking about, the email you handed him is the same, April 27, which appears to be from Miriam to Mr. Russack.  And your question is what, sir?

BY MR. LANG:

Q.    Was it ever delivered, the thing that they're talking about in the email?

MR. BERNHEIM:  Well, object to the form of the question.  Again, the body of it talks about any notices that would be, as in the future, would be delivered to you as the buyer.  So what's your question?

BY MR. LANG:

Q.      Was it delivered?

MR. BERNHEIM:  Was what delivered?

MR. LANG:  This, here.

MR. BERNHEIM:  What?

MR. LANG:  The first amendment to the membership sales agreement.

MR. BERNHEIM:  Well, that's not what the email says.  The email talks about something in the future for notices being delivered to him.

BY MR. LANG:

Q.      "Please confirm what should be inserted for notices that would need to be delivered to you as the buyer."

Well, was the first amendment to the membership sales agreement ever delivered to you?

MR. BERNHEIM:  Well, I object to the form of the question.

You have two things that don't connect.  Sir, I'm going to help you out, but then pretty soon I'm going to stop this because I'm not doing this.  Exhibit 7, do you recall receiving this; yes or no?

THE WITNESS:  No.

MR. BERNHEIM:  Next question.

MR. LANG:  Is that it to what we were just talking about?  What about this email here?  January 17, 2024, from Miriam to -- from -- no, one second.  Forget about that.

(Whereupon, document titled, Ira Russack personal financial statement, is received and marked as Russack 14 for Identification.)

BY MR. LANG:

Q.    Let's do this one first.

Do you recognize that?  This is page 46 --

A.    Financial statement.

Q.    Yeah, financial statement.

MR. LANG:  Did you get that, Mr. Friedman?

MR. FRIEDMAN:  Got it.  Thank you.

MR. BERNHEIM:  And the question is, sir?

BY MR. LANG:

Q.    Do you recognize that?

A.    Yes.

Q.    Okay.  Let me see.

Is this correct?

A.    Is it correct?  Was it correct?

Q.    Is it correct?

A.      Well, is it or was it?  Financial statements change all the time.

Q.      No, as of that date?

A.      Yes.

Q.      Okay.  That's all.  And here's Exhibit 15.

(Whereupon, page 46 of multipage document, is received and marked as Russack 15 for Identification.)

BY MR. LANG:

Q.      This here -- let me ask you, do you recognize this?  This is page 45 of that whole file that I sent, Exhibit 15.  And the question is, have you ever seen that?

A.      I never saw it.  Could it be what you sent me and it came out like this, there was something --

MR. BERNHEIM:  No.  No.  No.  No.

BY MR. LANG:

Q.      No, that doesn't count, what I said --

A.      I never saw it before.

MR. BERNHEIM:  Do you want to tell us where this came from?

MR. LANG:  I think this -- this came

from my client.  It could be that -- I don't know.

It came from Mr. Russack.

MR. BERNHEIM:  Well, I assure you it did not.  I've never seen it before.

MR. LANG:  Okay.

BY MR. LANG:

Q.      Do you own a building on 5901 West Side Avenue?

A.      5901?

Q.      Yeah, in -- one second.

A.      It's in litigation.

MR. BERNHEIM:  The question you say, do you have an ownership interest?

A.      Yes, I have an ownership.

BY MR. LANG:

Q.      It's in litigation?

A.      Yes, with Jonathan.

Q.      Is Jonathan Rubin your partner in that?

A.      No.

Q.      Do you have any partners in that?

A.      No, somebody might have an interest with Sam.  I don't know.  He sells interests in buildings without telling me.

Q.      What was that?

A.    Scratch that.

Q.    So are you aware or recall any kind of discussion of payoff in 2023?

A.    No, I don't remember that.

Q.    At any time, you know, after March 12?

A.    It could have been Sam, through Sam. I don't know.  I do think that Sam brought something like that up.  He's working on a payoff with a discount.  Now that I think about it, he said that. I guess you got your answer.

Q.    You did mention you spoke with Mr. Teichman, right?

A.    Yeah.

Q.    What did you discuss with him?

A.    Sam didn't ask me if I wanted to speak to him.  Sam said I shouldn't talk to him because it's going to complicate things, and then Sam put me on the phone with him.  It was in the car.  Sam put me on the phone with him, and apparently, he was -- it was a warning that if you don't make the payments or something, I have to be responsible.  I have to go and do something, and Sam asked me to go on the phone and tell him that Sam is going to make the payments.  Something like that.

That's what I wanted to get out before, that I did speak to him briefly.

Q.    I don't think I showed you this.

A.    So there could be some interaction there.

Q.    What do you mean?

A.    Well, you know, communicating with him, you know, Sam asking me to communicate with him the three of us, you know, on the phone.  Sam says, "I'm going to send it to him, I'm going to send it to him, tell him you're going to send it."  Not that it means anything because Sam is the one that pays it.

Q.    Okay.  Now, let's look at this one here.  This is an email from you.  I'll get another one without a stapler.  This would be page four of the email bunch.  I got it here.  A whole bunch of them.

Did you ever ask for another loan besides the March 12 --

A.    I never did.

Q.    Okay.  I have to rip this out.  Okay.  This is an email --

MR. BERNHEIM:  You want to mark it for identification?

MR. LANG:  Okay.  Do that first?

MR. BERNHEIM:  Yes, please.

MR. LANG:  Okay.  Let's mark this.

(Whereupon, email correspondence dated 2/13/2025, is received and marked as Russack 16 for Identification.)

BY MR. LANG:

Q.    Okay.  So do you recognize this email?  Well, for the record, it's page four and five of the emails, and it's email, Friday, April 16, 2021.

A.    What's on top?  It's separate?

MR. BERNHEIM:  Right.  That was the transmittal from -- to Mr. Lang.

A.    I don't even understand it.  It says from Ira.

MR. BERNHEIM:  The question is:  Do you recognize that?  That's the question.

THE WITNESS:  No, I don't recognize it.

BY MR. LANG:

Q.    Okay.  This email here is from Ira, sent on that date to Jonathan Rubin, and it says here, "Please wire the other 15K to my account."

Do you recognize that?

A.      I don't recognize it.  It's possible that it happened --

MR. BERNHEIM:  Do you recognize --

THE WITNESS:  I don't recognize it. I don't recognize it.

BY MR. LANG:

Q.      Okay.  Just put that there.

(Whereupon, email correspondence, is received and marked as Russack 17 for Identification.)

BY MR. LANG:

Q.      Do you recognize any of that?

MR. BERNHEIM:  Hold on for a second. Again, you've handed Mr. Russack what's been marked for identification purposes as deposition Exhibit Russack Number 17, emails from March 12th, and it has your Bates stamp numbers six, seven, eight, nine and ten.

BY MR. LANG:

Q.      We can do one page at a time.  I mean, it doesn't matter.

A.      You want to talk about this first page?

Q.      Well, I'm going to ask the others --

A.      Let me look at the rest of them.

Q.    Okay.  Whatever you want.

Do you recognize those emails?

A.    I don't recognize the emails, but I recognize what was going on.

Q.    Okay.  What was going on?

A.    It was the beginning of the origination of the loan, and apparently I was involved, Sam was involved, Jonathan was involved and Teichman was involved.  That's the way I see it.

Q.    Okay.  And --

A.    So if this is what happened, you know, as it says here, so apparently --

MR. BERNHEIM:  No, apparentlies, please.

THE WITNESS:  I don't know.  I don't know.

BY MR. LANG:

Q.    All right.

A.    I don't know.

Q.    We referred to earlier a confession of judgment for 750,000.

Is that what this is referring to over here?

A.    I don't know if this is it and why is it only 750.

Q.      That's what I was going to ask.

A.      Ask me.

Q.      Well, is this email from you?

A.      It's got my email on here, so apparently, I mean, you know, it's apparently from me, but I don't remember seeing it.  It could be that it was sent on my -- it says over here, cell phone, on my iPhone.

Q.      Okay.

A.      So that gets me to believe that happened.

Q.      Okay.  So --

A.      I didn't have -- I didn't have, I'm not going to say the ability, but I was not the lead person.  The person that was doing all this with Burton and with Ruben and with Teichman, it was basically all these back and forths, all the conversations of what was written here, I didn't author any of these things, okay?

In other words, I wasn't, what you say -- I didn't have the position to go and negotiate these loans and do all these things and take the lead.  I was not the lead in this whole situation here.  In other words, I agreed to take the loan.  I agreed to it, okay, but the people --

the lawyer, the lender, and Jonathan is also a lender, and Sam, they basically -- it's all between them.

Q.      Okay.  But this email right here came from your --

A.      Apparently, it came from -- yeah.

Q.      And what does that mean right there?

A.      It says over here -- what is COJ?

Q.      I'm asking you.

A.      I don't know.

Q.      Is it possible that it means confession of judgment?

A.      It's possible, but I don't have the ability to go ahead.  People that do this all day, they abbreviate these things COJ.  You know that I don't that.  You don't know me, but I don't do that.  That's not what I would do.  So somebody else -- somebody else did this.  So this just shows me that this is not me.

Q.      What do you mean "somebody else did this"?

A.      Well, here I would not have the ability.  I would not think of abbreviating confession of judgment by putting down COJ.

Q.      So you're saying somebody else wrote

this line right here?

A.      I don't -- apparently.  It didn't happen with me.  In other words, it's my email, okay?  But it says COJ, okay, is only 750.  This is part of the email.  I know that I didn't write that.

Q.      Okay.  Let me ask you something --

A.      100 percent, I know that I didn't write that.

Q.      I think I already know the answer because we talked about it before, but do you know why the COJ, the confession of judgment, was only 750?

A.      I do not know.

Q.      Okay.  You recall this email to -- from Noah to you -- I don't think its privileged because it has got a whole bunch of CCs.

A.      I'm not saying that he didn't send it.  I don't know.

Q.      Okay.

A.      I don't know.  I don't remember it.

Q.      But this is a critical email.  Right, in the middle, this is from Ira Russack, that one right there.

A.      Okay.  Let me see over here.

            "I will print the documents and

overnight you the originals.  Let's try to fund tomorrow.  Thank you.  Mr. Russack, I'm working on the loan, and the lender is requiring" --

Q.    I was just asking -- I'm asking this: Did you write this, "Noah, I will print the documents and overnight you the original.  Let's try to fund tomorrow"?

A.    You know what all this is?

Q.    What?

A.    This is setting me up for this day. That's what this is.  It's a setup.  It's a setup.

Q.    What do you mean?

A.    Okay?  And I believe the reasons Sam stopped paying these things is to renegotiate, you know, more amendments and more amendments, is to make it thicker and thicker, to blame me.  That's what I think happened here.

Q.    Okay.

A.    That's what I think happened.

Q.    Okay.  But could you answer the question, though?

A.    I don't know.  I don't know.  I don't know.  I don't remember.  I don't remember doing this.  I was not a participant in this whole situation.

Q.      Okay.

A.      But it's very possible that I was asked to send an email back from me to Mr. Teichman. Maybe Sam said to me or Burton said to me, "You have to take this and send it to them," okay, "so at least they see that you're a real person."

Q.      Okay.

A.      I'm trying to help.  You know that. I'm trying to help.

Q.      Yeah, yeah.

MR. BERNHEIM:  All right.  For the record --

THE WITNESS:  I don't know what else to say.

MR. BERNHEIM:  Yeah, well, right now, say nothing.

THE WITNESS:  All right.

MR. BERNHEIM:  For the record, what was referred to was an email chain on March 12, 2020.  The first appears to be from Mr. Burton and Mr. Russack stating, "I am working on the loan with Mr. Teichman, and the lender is requiring that your certification further stipulates as to the accuracy of the financial statement that you submitted.  I've revised the certification accordingly."  The next

email appears to be from Mr. Russack back to Mr. Burton, "No, I will print the documents and overnight you the originals.  Let's try to fund tomorrow.  Thank you."

THE WITNESS:  Okay.

MR. LANG:  So apparently, Mr. Burton, as of March 12, 2020, is the attorney for the lender.

BY MR. LANG:

Q.    Was he your attorney?

MR. BERNHEIM:  We've already gone through this.  When we get Mr. Burton in here, it will be very interesting to get his explanation.

MR. LANG:  Yeah.  Right.

BY MR. LANG:

Q.    How about the last page, okay?  It says from you, and you're telling Ira -- I mean, you're telling Noah about -- well, you can read it.

A.    Well, over here, from Ira?

Q.    Yeah, that's you.

A.    "Noah, I'm sending you the signed confession" --

MR. BERNHEIM:  I just want to -- so we actually have a record, we're now on an email, which is dated March 12th, 2020 at 8:29 p.m.,

purportedly from Ira to Mr. Burton, again, also sent from Mr. Russack's iPhone as it would indicate here.

THE WITNESS:  At what time, at night?

MR. BERNHEIM:  It says 8:29 p.m.

THE WITNESS:  I never use -- very rarely ever use my iPhone in the house.  I got no reception.  There is no reception.

BY MR. LANG:

Q.      It says iPhone there?

A.      Yeah, I was outside.

Q.      Okay.  So --

A.      Because I have a home phone I use all the time.

Q.      How did that email get made?

MR. BERNHEIM:  If you know.

BY MR. LANG:

Q.      If you know.

A.      I don't know.  "Wait, Ira, I'm sending you the original signed" --

MR. BERNHEIM:  Read it to yourself. It says what it is.  We don't have to cloud the record.

BY MR. LANG:

Q.      You don't have any recall of that? Okay.

MR. LANG:  This is the rest of the chain there.  Could I put it in, or I have to make a separate exhibit?

MR. BERNHEIM:  Well, if you're going to ask him questions about documents, I think for your benefit and our benefit and the court, you need to mark it as an exhibit.

MR. LANG:  Okay.  Let's mark it.  I meant if I should attach it to here because it's, like, the next page, page ten, and this is 11.

MR. BERNHEIM:  Why don't you just do it as another exhibit.

(Whereupon, email correspondence, is received and marked as Russack 18 for Identification.)

BY MR. LANG:

Q.    How many of these emails -- do you recognize any of these -- yeah, it says to Ira Russack.

MR. BERNHEIM:  Again, for the record, you've handed what's been marked for identification purposes as Russack 18.  Your Bates number is 11 through 13.  It appears also to be other emails of March 12, 2020.

A.    I'm just reading what's below here,

right?

BY MR. LANG:

           Q.      Well, I'm asking first --

           A.      Read it all?

           Q.      No, no, I'm just asking -- okay.  We can do one at a time.

                   MR. BERNHEIM:  Read the whole thing.  See if you recognize these emails or not, please.

           A.      This is duplication.

BY MR. LANG:

           Q.      Oh, is it?  Okay.

           A.      I read this before.  Take a look.  Is it a duplication?

                   MR. BERNHEIM:  Yes.

                   MR. LANG:  Oh, no, this one thing here because it has a confession of judgment attached.

                   MR. BERNHEIM:  Where?

                   MR. LANG:  On the last page.  That's why I pulled this up.

                   And of course the question is:  Do you recall getting that email?

                   MR. BERNHEIM:  This is an email from Mr. Burton on March 12, 2020, apparently to Mr. -- well, actually it doesn't indicate to whom it's

sent, but it says, "I'm working on a loan with Mr. Teichman, and the lender is requiring that your certification further stipulate as to the accuracy of the financial statement that you submitted.  I have revised the certification accordingly."

MR. LANG:  Also, like, right above that, it says from Ira Russack to Noah Burton.  So, I mean, -- so we'll start right there, page 12.

MR. BERNHEIM:  Yeah, again, we looked at these.  This is the March 12, 2020 email, 3:25 p.m.

MR. LANG:  Okay.

BY MR. LANG:

Q.    So you don't recall receiving --

A.    Yeah, we just did that.  It's, like, a retake.

Q.    No, but this time I have the confession of judgment there.  I didn't ask that last time.

MR. BERNHEIM:  No, you didn't.  What do you mean, you have the confession?

MR. LANG:  It's an attachment to this email.

THE WITNESS:  I'm saying you didn't mention the confession of judgment the first time.

MR. BERNHEIM:  An attachment to which email, sir?

MR. LANG:  The email on page 13.  You can see right here, it says, "Russack Confession of Judgment Doc."

MR. BERNHEIM:  Okay.  So I'm going to object to that because the email, which I read its body of, refers to certification and financial statements.  At the bottom, these have something that you're purporting that says, "Confession of Judgment 750 Page Point Doc" that was somehow attached.  I don't know that these two things coincide with one another.  I don't know what was attached nor can you tell because if you look above it, it says, "Certification" on page 13.

MR. LANG:  Okay.

BY MR. LANG:

Q.    But you don't recall receiving that, I guess?

A.    I don't remember.

Q.    Okay.  I don't want to be redundant. Let me look and see.

(Whereupon, email correspondence, is received and marked as Russack 19 for Identification.)

BY MR. LANG:

Q.      The question is:  Do you recognize that?  I guess you can read it first.

MR. BERNHEIM:  Again, for the record, you've handed Mr. Russack what's been marked for identification purposes as Russack 19.  It appears to be more emails, dated March 12, 2020, from Mr. Burton to Mr. Russack and to Mr. Rubin and to Mr. Teichman.

And so your question is what?

BY MR. LANG:

Q.      Do you recognize it?

MR. BERNHEIM:  If I may, it appears, looking at this, other than the first email, which is from Mr. Burton to your client, which at this point, Mr. Burton seems -- declared himself counsel for the lender.  The others are redundant, what we've already looked at.

MR. LANG:  Okay.  We did page 15 already?

MR. BERNHEIM:  Yes.

MR. LANG:  Okay.

CERTIFIED STENOGRAPHER:  Off the record at 1:33 p.m.

(Whereupon, a recess is taken.)

CERTIFIED STENOGRAPHER:  Back on the record at 1:45 p.m.

BY MR. LANG:

Q.     Do you owe Jest any money?

A.     Do I owe Jest any money?

Q.     Yeah.

A.     Are you talking about the loan here?

Q.     Yeah.

A.     I -- that's a very interesting question.

Q.     That's what it's all about.

A.     That's a very interesting question because I don't believe that I owe any money.

Q.     But you did sign a lot of documents; yes or no?

A.     Some documents I signed, some I didn't sign, and the ones that I did sign, I signed under duress.

Q.     Under duress?

A.     What's the word, when --

Q.     No, duress is the right word.  I mean, duress, no, if you hold a gun to someone.

A.     It wasn't a gun.  It was a monetary gun.

Q.     Yeah, I get it.

A.    And also personal guarantees.

Q.    Okay.  So --

A.    I was basically framed.  I was framed in this whole thing.  That's all.  That's all I can tell you.

Q.    But you did put hand and paper on some documents?  That's what you said; correct?

MR. BERNHEIM:  We've gone through this.  That's for your argument at a later point in time.

MR. LANG:  Okay.

BY MR. LANG:

Q.    So your answer was that you don't think you owe Jest anything?

A.    No.  Where's the money?

MR. BERNHEIM:  We're not here to argue.

THE WITNESS:  Okay.  We're not arguing.  Where's the money?  You should ask that, whoever you spoke to on the phone.

MR. LANG:  That was Mr. Teichman, my client.

THE WITNESS:  Ask him where the money is.

MR. LANG:  Ask him?

MR. BERNHEIM:  Gentlemen, we're not doing this back and forth type of dialogue.  If you have a question, please ask him.

BY MR. LANG:

Q.     Okay.  There's something that bothers me from before about the certification.  You said those two things, 4 and 5, 4 saying that there's no encumbrance, that there's no lien on the shares, and five saying that you have the full authority.

And I think your response was that, you know, you didn't really pay attention, that you were told by Sam to sign that?

MR. BERNHEIM:  Object to the form of the question.

The record speaks for itself, and I don't want to be the one to repeat what it states, but --

MR. LANG:  Okay.

MR. BERNHEIM:  What's your question?

BY MR. LANG:

Q.     So on one hand -- and we talked about this before, but still, I don't think we got to this enough.  On the one hand, you said that you encumbered the shares to Weinstein, but by the year 2020, you felt that something might have been going

wrong.

Do you think you have any responsibility to Jest because of that?

MR. BERNHEIM:  Object to the form of the question to the extent it calls for legal conclusions, and it's a different form of your prior questions.  You're going to get to argue whatever the record is and what you think --

MR. LANG:  I know, but I'm trying -- certain things don't make sense, even according to the explanation.

MR. BERNHEIM:  Well, this whole thing doesn't make sense.  If you had a sale of the interest of all of the stock, why did you have a confession of judgment?

MR. LANG:  Yeah, the whole thing doesn't make sense.

BY MR. LANG:

Q.    Let me ask you this.  This is a good question.

A.    Ask me what was in it for me.

MR. BERNHEIM:  Please just respond to his question.

BY MR. LANG:

Q.    Yeah, but you have to understand

where Jest is coming from, got certain guarantees.

When you signed that certification with 4 and 5, saying that there's no liens and that you have the ability to sell, okay, was it your -- was it questionable in your mind what you were signing?

A.     I thought I could sell my 50 percent, and as long as I don't touch Henry's 50 percent, that's what I thought, and that was -- I was wrong.

Q.     But --

A.     I found, later on, I was wrong.

Q.     Okay.

A.     I wasn't advised properly.  Don't forget, you have certifications.  You have, you know -- Burton read this.  He should have said -- he should have stepped into this thing.  He was representing me.  He was my lawyer.  He overlooked that.  Why didn't he tell me, "Are you sure you can do this?  You know, why don't we call up Mr. Weinstein and have it written squeaky clean?"

Q.     Well, let me ask you that.  You said that --

A.     That's a good question, right?

Q.     Yes.

You said that your understanding was

in 1985, when the document talked about number seven in the document, that you would always speak with Mr. Weinstein, or you would speak with Mr. Weinstein before you did anything?

MR. BERNHEIM:  Object to the form of the question.

MR. LANG:  Well, I didn't say the question yet.

MR. BERNHEIM:  I know, but you're linking --

MR. LANG:  All right.

BY MR. LANG:

Q.    Why -- did you speak to Mr. Weinstein about the thing -- the loan with Jest?

A.    I told you that whenever we had a disagreement, Henry and I, we would talk and work it out.  We would do --

MR. BERNHEIM:  The question is:  Did you talk to him about --

THE WITNESS:  No, I didn't talk to him about --

MR. BERNHEIM:  -- about the transaction?  Just answer the question that's asked and nothing more.

(Unintelligible, simultaneous

testimony interrupted by the certified

stenographer.)

CERTIFIED STENOGRAPHER:  I have no idea what you just said because you're talking over him.

BY MR. LANG:

Q.      The question is:  Did you speak to Mr. Weinstein about the Jest loan -- I mean, whatever it is --

A.      No.

Q.      -- let's just call it loans?

A.      No.

Q.      No?  Your answer was no?  Okay.

Did you speak to Mr. Weinstein about what happened with the 2018 loan, or whatever you want to call it, the promissory note, that $750,000?

A.      I spoke to him about it, and we had so many other things to deal with concerning the same players, okay, that we agreed to leave everything alone, try to leave it alone, you know, and try to work together to try to get the truth out in this on what really happened.

And then once we get this out of the way, get the truth out.  Then we can sit down and attempt to revolve our own indifferences, if there's

still any at that time.

Q.     Okay.

A.     That's my answer.

Q.     Okay.  And you did say -- I mean, the document says what it says, you know, but you did say it was your intent -- you didn't think it would come to fruition, but it was your intent to encumber the shares to Henry in 2018?

MR. BERNHEIM:  Again, objection.

Asked and answered.  The record will speak for itself.  This is going to be at least the third time we're going through the same items.  You already --

MR. FRIEDMAN:  Joined in the objection.

MR. LANG:  What's his problem?

MR. BERNHEIM:  He says he joins in the objection.  We've gone through this several times.

MR. LANG:  Okay.  You're going to object to this.

BY MR. LANG:

Q.     How can you sign, for Jest, a certification that there's no encumbrance if you made an encumbrance in 2018?

MR. BERNHEIM:  You're right, I'm going to object.  It's argumentative.  You have a record.  You get to argue things at a later time.  You don't get to argue with a witness here and now.  The document says -- he's given you the explanation several times.

BY MR. LANG:

Q.     Okay.  Did you feel that you were not telling the truth?

A.     I felt that my 50 percent wasn't a problem.  I didn't feel in any way that I was hurting Henry, even though I knew better than that.  I knew that on a more -- on a more human level, it was wrong what I did.  Everything that he ever did with the company, he came to me.  He sold an apartment or he's doing a renovation, he always calls me up and talks me about it.  We share information.  There's no secrets.  And I kept a secret, okay?  If I'm guilty of something with Henry, I kept a secret.  That's what I did.  I did wrong, and I apologized to him.

Q.     Okay.  My question is concerning Jest.

A.     I would never encumber or do anything knowingly to encumber his 50 percent.

MR. BERNHEIM:  Stop.  I generally never do this, but I am not going to permit one more question on that topic.  He's explained to you what's in the certification to the extent he understood it.  He thought it was accurate, and he's given you the explanation now four times.  You need to move on to another topic.

MR. LANG:  Fine.  Okay.

(Whereupon, email correspondence, is received and marked as Russack 20 for Identification.)

MR. BERNHEIM:  All right.  You've handed Mr. Russack what you asked be marked as Exhibit Russack 20, and it's your Bates number seven through 24.  And the problem I have with this is you have a number of emails here that don't include Mr. Russack that were shown to us for the first time.  These are not sequential emails.  Let me just finish, for the record.

MR. LANG:  I'll take them out.

MR. BERNHEIM:  You've got all different dates.  These are not sequential.  There's some in July, but you have emails from Mr. Rubin to Mr. Teichman that do not include Mr. Russack.  You have Mr. Kalish that do not include Mr. Russack,

whoever he's supposedly represented in this matter.
So you know you're going to have a lot of problems
with this.  If we can keep with sequential emails
that have Mr. Russack's name on it, that would be
preferable.

MR. LANG:  Okay.  Some of them he's
copied on.

MR. BERNHEIM:  All right.  Look, at
this point, just so that we can get out of here,
because he's not copied on all of these, what we
have now is pages 17, 18, 22, 23 and 24.
Mr. Friedman, unless you're going to raise some
other objection, I just want to get this over with
and, you know, let's proceed.

MR. FRIEDMAN:  I agree with that.
Objections are reserved anyway.

BY MR. LANG:

Q.     Do you recognize any of that?

A.     I don't remember it.  I don't
remember it.  But I do remember there were
conversations I told before about increasing the
loan.  I heard that from Sam, but I don't remember
anything else.

Q.     Okay.

A.     It was never increased, was it?  No.

It was never increased.  I don't think so.

Q.    Who is that encumbered?  I think I asked you that already.

A.    You did.

MR. BERNHEIM:  You did.

BY MR. LANG:

Q.    Okay.  You know what HPD and DHCR are?  You were copied on that one.

MR. BERNHEIM:  Well, for the record, this is an email of July 19, 2021, at 9:18 a.m., apparently from Mr. Kalish to Mr. Teichman, and it says, "Happy to discuss, although I'm not aware of the transaction.  Ira asked me to provide an HPD and DHCR printout, but I am limited to that information that I provided."

BY MR. LANG:

Q.    Do you know what that's about?

A.    I don't even know what the abbreviation means.

MR. LANG:  Can I have that back?

MR. BERNHEIM:  You may.

BY MR. LANG:

Q.    Okay.  So here's some emails from you, supposedly.  Allegedly, this one is from you, and there's a few of them there.

A.     Starting over here?

Q.     Yeah, I'm just asking if you recall any of them?

A.     Speaking to a broker, I think they're talking about another deal.

MR. BERNHEIM:  The question is, do you recall these?

A.     No, I don't remember.

BY MR. LANG:

Q.     You don't remember any of those emails?

A.     All I told you is I remember there were conversations about maybe increasing or getting another loan.  I know that Mr. Teichman was working with Sam on other deals.  There was a deal he was working on in Staten Island.  I have some emails somewhere.  I have to go look.  There's also all kinds of other stuff going on.  They go to work everyday.  This is what they do all day long, you know?  They make money.  Sam doesn't pay a lawyer, then he has to get another lawyer for a little while, and then he goes back to that lawyer.  They make up when he pays the bill, so maybe that's why Kalish is involved.  Maybe Kalish --

MR. BERNHEIM:  You know what?  Will

you just please stop speculating.  The question is, do you recognize these emails?

A.      No.

BY MR. LANG:

Q.      Were you an officer of Woodruff Development Corp., the corporation?  Were you an officer?

A.      I believe I am.

Q.      Ocean Woodruff?

A.      It's in one of the documents, what I am and what Henry is.  I don't remember.  I have to think about it.

Q.      Well, what do you consider yourself or represent yourself?

A.      I'm a 50 percent owner.

Q.      But in terms of administration?

A.      Henry manages the property.

Q.      Okay.  You know, I never asked you about the declaration of restriction, so let me just get that done.

MR. BERNHEIM:  It was marked as Exhibit Number 9.

MR. LANG:  Oh, it's already in there, declarations of restrictions?

MR. BERNHEIM:  Yes, and you did ask

about it.

MR. LANG:  Okay.  Good.  I just want to make sure I got everything.  There's another thing.

(Whereupon, UCC financing statement, is received and marked as Russack 21 for Identification.)

BY MR. LANG:

Q.    Okay.  Do you know what that is?

MR. BERNHEIM:  For the record, we're looking at what's been marked for identification purposes as deposition Exhibit Russack 21.  It appears to be a UCC financing statement or at least that's how it's captioned.

BY MR. LANG:

Q.    Do you know what that is?

A.    It says it's a UCC financial statement.  It's a form.

Q.    Do you know what it is?

MR. BERNHEIM:  Do you have an understanding of what a UCC financial statement is?

THE WITNESS:  No.

MR. BERNHEIM:  Okay.  Next question.

MR. LANG:  You said we did have the declaration of restriction?

MR. BERNHEIM:  Yes, you did, number nine.

MR. LANG:  Okay.

BY MR. LANG:

Q.    Are you aware that when Jest tried to collect on the shares, that before the lawsuit in 2022, that Mr. Weinstein objected to that?

A.    Well, I read about it.

Q.    Were you aware in 2022?

A.    I don't remember.

Q.    Okay.

A.    We discussed it.  It could have been 2023, '24.

Q.    You did discuss it?

A.    Yeah.

Q.    What was the discussion?

A.    We just -- I don't know what the discussion was, it was so long ago, but we spoke about it.  I don't know exactly what we spoke about.

Q.    Well, did you tell him -- did you tell Mr. Weinstein that you --

A.    Mr. Weinstein, he discovered that I had borrowed the money, and that forced a confrontation for Henry and I to talk, okay?  And we speak about it a lot.  We speak about it all the

time.

Q.      So Mr. Weinstein, I mean, did he tell you -- did he object to that?

MR. BERNHEIM:  Object to what?

BY MR. LANG:

Q.      To the fact that you loaned the money and put a lien on the shares?

A.      Of course.

MR. BERNHEIM:  Well, he didn't loan any money.

MR. FRIEDMAN:  Objection to form.

MR. BERNHEIM:  Right.  There's no loans, and there's no liens on the shares.

BY MR. LANG:

Q.      Did Mr. Weinstein object to the transaction with Jest?

MR. FRIEDMAN:  Object to the form of the question.

When?

MR. LANG:  When we're talking about is in 2022.

A.      I don't remember.

MR. FRIEDMAN:  Two years after --

BY MR. LANG:

Q.      We're talking about what -- your last

sentence, okay, when you spoke to Mr. Weinstein, and he wasn't very happy.  Something like that.  You said -- I'm talking about then.

A.      The most important thing about the conversation was -- is that I went behind Henry's back.  Whatever the reason would be.  Whatever the reason would be, okay?  I went behind his back.  Everything else, in business, we always worked it out.  The thing is that this was a wrong thing that I did, to go do something that affected him.  What I did affected him, okay?  And not only it's affected, you know, business wise, but I'm sure he's very hurt and disappointed in me.

You know, you spend a whole lifetime building a relationship.  It goes up and down, but you somehow hang it on by a thread, you get back together again, you know, whatever it is, okay?  It was not a straight business relationship.  We have family.  We have a lot of family, and I should have said something to him.  I should have said, "Sam, no, I'm not going to do it."  Or I should have said, "Let's have a meeting with Henry, okay?  He has a right to have a voice in this."

And I didn't do it, and I was wrong, what I did to Henry, and I'd say it again.  I'll say

it on the record, I went to Henry and I apologized, okay?  But we're going to get to the bottom of it. We can't get to the bottom of it, what's happening with Henry and I because someone else, other people, refuse to give us documentation.

MR. BERNHEIM:  All right.  We've gone through this eight times.  Let's go.  Next question.

THE WITNESS:  That's my statement.

MR. LANG:  That was very good.

THE WITNESS:  Was it okay?

MR. LANG:  No, yeah, you explained. I don't think we've gone over that before, by the way.  We're just about done.

BY MR. LANG:

Q.    My client asked me, and I think I agree to reserve incase something comes up that we need to ask in the future, a deposition?

MR. BERNHEIM:  You can say that all your want.  He's your one shot under the rules, you know?  You're going to explain the rules of civil procedure to your client.

MR. LANG:  Well, in case I have to say something in terms of reserving, I would like to reserve, and then, you know, if that's meaningless, it's meaningless.

BY MR. LANG:

Q.   Okay.  Let me ask you one more thing.

Are you aware that there was a problem when Jest asked Weinstein about the books and the shares and, you know, what's going on with the corporation, and he sent a letter back saying, "Wait a second --

A.   I got that in the --

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Q.   Are you aware that Henry told Jest that Ira did not have the ability to encumber the shares, in other words, or that the shares belonged to Henry?

A.   I read that there was a document, that that document was in with the papers.

Q.   Yeah, besides the document, are you aware of that?  Are you aware of that?  Were you aware of that?

A.   I don't know.  I don't know.

Q.   Did Henry tell you that he owned the shares when you had the conversations with him in 2022, that he owned the shares, he owned your shares?

MR. BERNHEIM:  Do you recall a conversation in 2022?

THE WITNESS:  No, I don't.  But I know --

MR. BERNHEIM:  All right.  Stop.

BY MR. LANG:

Q.    Did -- at any time, did Henry say to you personally that he owns 100 percent of the shares?

MR. BERNHEIM:  Yes or no?

A.    That is a wrong question because it's $750,000, and the shares are worth three and a half million -- 1 million, so the whole thing is wrong.  Just like this, where did the 750 go, right?  He's not answering questions, and there are people that have the answers, and they hired you, and they got the answers.

BY MR. LANG:

Q.    Okay.  So I got to rephrase the question.  I have to do these things.

A.    And I'm kept in the dark.  They used me as a pawn.

Q.    Okay.  I understand.

A.    So how am I going to, you know --

Q.    I have to rephrase that question.

Did Henry ever tell you that you only owned one quarter, or he owns half of your shares?

A.    Henry and I had conversations along that topic.  I don't know specifically, but we had many, many conversations, and I mentioned earlier when we came here today, that we want to solve these other problems first, and then we need to go and find out where we can get documentation, that whether he --

MR. BERNHEIM:  Stop.  Stop.  Stop.  I can't do this ten times.  I can't.  Let's move on.  Next question.

BY MR. LANG:

Q.    So you just said that you did engage in that conversation with Henry.

When did you engage --

A.    I don't know if he said that specific thing that you're saying.  We had conversations on the same topic.

Q.    Okay.  When?

A.    I don't know when.

MR. BERNHEIM:  Mr. Lang, what's the difference whether it happened or didn't happen or when?  What does that get you?

MR. LANG:  I'll tell you in a minute,

but let me ask the question.

MR. BERNHEIM:  What's the difference, what Henry said --

MR. LANG:  Let me ask you --

MR. BERNHEIM:  But you've gotten the same answer.

MR. LANG:  Okay.  You want to know the difference?  I should say this on the record?

MR. BERNHEIM:  Go right ahead.

MR. LANG:  Okay.  The question, if Henry already told him -- let me just ask the question, and you can straggle whatever you want. Let me ask the question.

BY MR. LANG:

Q.    Did you have these conversations where Henry is saying that he owns half of your shares before the loan was made to Jest?

A.    Did Henry, before --

Q.    Before March 12th, 2020, did you have this conversation with Henry?

A.    We didn't talk about shares before that.  It only came up, you know, because this problem with the 750.  It had nothing to do with that.

Q.    The problem with the 750?

MR. FRIEDMAN:  Objection to the form and move to strike as non-proper.

(Unintelligible, simultaneous testimony interrupted by the certified stenographer.)

CERTIFIED STENOGRAPHER:  One at a time, please.

MR. BERNHEIM:  Gentlemen, stop. Stop.  The court reporter can only take down one person at a time.

Mr. Friedman, you were making an objection?  Hold on, please be quiet.

MR. FRIEDMAN:  The testimony asks multiple times, did he ever speak to Weinstein about the Jest loan at the time it was originated or prior.  The answer is no.

THE WITNESS:  No.

MR. LANG:  That's not what I asked.

MR. FRIEDMAN:  That is what you asked.

MR. LANG:  That's not what I asked. Gosh.

(Unintelligible, simultaneous testimony.)

MR. BERNHEIM:  Quiet.

BY MR. LANG:

Q.    Here's the question:  You just said that Henry and you had a discussion about the 750, and I'm assuming that's the 2018 loan in the context of whether he owns half of your shares.

Did you not just talk about that and say --

A.    No.

Q.    Okay.  You said you had a discussion with Henry about what's going on; correct?

A.    Yeah.

Q.    Okay.  When did this discussion that you were talking about before take place?

MR. BERNHEIM:  Object to the form of the question.

I have no idea what you're talking about, and I'm telling you raise your voice one more time, this is over, okay?  You understand that?

MR. LANG:  Okay.

MR. BERNHEIM:  Because it's four times I've asked politely.  You keep going on around and around on the same issue.  You somehow want Mr. Russack to say, "Oh, at the time of this certification, I knew what I was saying in the certification.  To the extent he even signed it was

false."  He's explained to you that that's not the case.  You're trying to hit a reset button here for what we did hours ago and get at the same thing in a different fashion.  It's not happening.

If you don't have any other questions, we are finished because I am at my limit of what's going on here.  I've never been in a deposition where I've had to do your organization or an organization for another attorney like I've had to do today.  I've had it.  So if you have another question on another topic, fine, or we're done.  Your choice.

MR. LANG:  I don't know why I can't ask that question.  I mean, why can't we just strike it if it's a problem?

MR. BERNHEIM:  Do what you want.

MR. LANG:  Okay.  Thank you.

BY MR. LANG:

Q.    It is your testimony that Henry claimed to own half of your shares; correct?

A.    What do you mean half of my shares?

Q.    750,000 worth of the shares -- or not half.  It was $750,000 worth of your shares?

A.    Henry is probably protecting himself for what happened to him.  He wouldn't even be

involved in this case if it wasn't for me and Sam and this whole situation.  He would only be involved in the situation maybe -- and we would probably be able to work out the 750, whether it was an investment or something else.  We can't even work that out because it's so many horrible things happened to me and to him, okay, that was done to him too.  He's out a lot of money.  I don't want to tell you about his business.  I'm not going to tell you about his business, but he's harmed, I'm harmed, okay?

Q.     So is it yes or no --

A.     And we agreed to stay friends and to work it out, okay, and be big boys about it, okay, after this whole thing is straightened out, that he and I go for a beer and we straighten this whole thing out.  So I don't have to go and argue that and show you my dirty underwear and his dirty underwear. It's between him and me.  It has nothing to do with this money.

Q.     So what's the answer to the question?

A.     What is the question?

Q.     The question is, did Henry -- you mentioned earlier that Henry said to you that there's $750,000 of the shares that belong to him?

MR. BERNHEIM:  Objection.

That's not what was said.

BY MR. LANG:

Q.     Okay.  So is that true or not?

A.     We haven't gotten anywhere into discovering what happened with that 750, and until we found out what happened with that 750, I'm not blaming him, and hopefully he's not blaming me. That's my answer.

Q.     When did this first come up, the problem of the 750 that you don't know?

MR. LANG:  Why can't I ask that question?

MR. BERNHEIM:  Because we've done this so many times.

MR. LANG:  No, I don't have an answer.

MR. BERNHEIM:  I'm giving you the answer to the question.  You asked me why you cannot do it.  Under the rules, Rule 403, where you're repetitive, commonly known as asked-and-answered, when people object that you can't go forward.  This must be fifth, sixth, seventh time on the same topic.  So you're going to get the same answer again and again.  We can't keep going over the same thing

because for some reason you're not getting a response that you're looking for.  So at this point --

THE WITNESS:  That's the key.

MR. LANG:  What?

MR. BERNHEIM:  It's time for you move on.

THE WITNESS:  He just said you're not getting the response you want.

BY MR. LANG:

Q.    Well, what is the response?

A.    You're looking for a response that is not -- it's not appropriate what you're looking for. I don't have a crystal ball.  Let's go into a machine, time machine, and come out next year, 2026. Maybe I'll have the answer.

Q.    All I'm trying to get is an answer to the question, whether this discussion took place with Henry before the loan was made to Jest?

A.    How about everybody go into a room and say the fucking truth?

MR. FRIEDMAN:  Objection to that question.  Objection --

THE WITNESS:  Tell the truth.

MR. FRIEDMAN:  Ira, please.

The question has been answered 50 times at least on this record.  There was no discussions between Ira and Henry pertaining to the Jest loan at any time prior to the Jest loan.  So that's it.  Stop.

MR. LANG:  Okay.  We're finished.

THE WITNESS:  Thank you.

MR. FRIEDMAN:  I have two questions for Ira, just to clarify something.

EXAMINATION BY MR. FRIEDMAN:

BY MR. FRIEDMAN:

Q.    Russack 2, the promissory note between yourself and Mr. Weinstein, who was the lawyer who drafted that?

A.    Let me see the document.  I think it was Jeff Levington.  Let me see.  Hang on.

THE WITNESS:  Which one is this?

MR. BERNHEIM:  This is the promissory note.

A.    Jeff Levington.

BY MR. FRIEDMAN:

Q.    And was he your lawyer in connection with that or something else?

A.    He was everybody's lawyer.  Actually,

he was my lawyer, but he wasn't acting like my lawyer.  He was, like, promoting the deal with Sam.  Obviously, he was a partner on the deal.  Henry and I found out later, but he did this.  He did this.  He created this document.

Q.      Thank you.

For purposes of the Jest loan, who was your lawyer?

MR. BERNHEIM:  Objection.

You're assuming he had one.

BY MR. FRIEDMAN:

Q.      If you had one.

MR. BERNHEIM:  Thank you.

A.      It was presented to me that --

MR. LANG:  Well, I want to object because that was already asked.

MR. FRIEDMAN:  Not by me.

MR. BERNHEIM:  Go ahead.

THE WITNESS:  What should I do?

MR. BERNHEIM:  Respond.

A.      All right.  It was told to me that Noah Burton was my lawyer.

BY MR. FRIEDMAN:

Q.      By whom was it told to you?

A.      By Sam, and I never -- and I don't

even -- I assumed because he was handling all of this, Noah.  Noah took Jeff Levington's place.

MR. BERNHEIM:  The question was who told you that Noah was your lawyer?

THE WITNESS:  Sam.

MR. BERNHEIM:  Stop.

Next question, please.

BY MR. FRIEDMAN:

Q.     Who is Mr. Harrison in all of this?

A.     Okay.  Harrison was renting an office on Troy Avenue in Williamsburg.

MR. BERNHEIM:  Who cares where his office was.  What was his position in this transaction?

THE WITNESS:  I have no idea.  I never knew he was involved in it.  I never spoke to him.  I never hired him, but I knew of him years ago.

MR. FRIEDMAN:  I have nothing further.  Thank you.

THE WITNESS:  All right.  You're welcome.

MR. BERNHEIM:  I'm just going to follow up on that.

EXAMINATION BY MR. BERNHEIM:

BY MR. BERNHEIM:

Q.    There's no engagement letter that you have with Mr. Burton at all for him to represent you; correct?  You don't have a letter of engagement?

A.    You mean from the very beginning?

Q.    Correct, in this transaction.

A.    I don't have it.

Q.    But do you recall one existing?

A.    No.

Q.    With Mr. Harrison; correct?

A.    No.

Q.    You never received an invoice from Mr. Burton, have you?

A.    No, I never paid a bill.

Q.    Listen to my question from Mr. Burton; yes or no?

A.    No.

Q.    Have you received an invoice from Mr. Harrison?

A.    No.

Q.    Have you ever paid Mr. Burton for legal services in this transaction?

A.    No, either Sam paid him, or it came

--

Q.      I asked you, did you ever pay --

A.      No, I never paid him.

Q.      Did you ever pay Mr. Harrison in connection with this transaction?

A.      No, I never did.

Q.      Have you ever had a conference with Mr. Burton where he explained to you, any one of these documents that we looked at here today, what they meant?

A.      No.

Q.      Have you ever had a conversation with Mr. Harrison where he explained to you any one of these documents that we looked at here today?

A.      No.

CERTIFIED STENOGRAPHER:  Let him finish his question, please.

MR. BERNHEIM:  Thank you.  I don't have any other questions.


EXAMINATION BY MR. HARRISON:

BY MR. HARRISON:

Q.      Understanding that my position and my recollection is I have 100 percent met you on March 17 and March 18, I believe it was March 18,

would you -- could you state under oath in this deposition that you did not speak with me on March 17th or March 18th, and you're 100 percent sure of that?

MR. BERNHEIM:  Mr. Harrison, I'm going to object to the form of the question.

You're not -- you want to ask questions, that's one thing.  You want to give testimony, it's another.  So if you want to --

MR. HARRISON:  I'm not giving testimony.  I'm asking him, in understanding that my recollection is that I have 100 percent met with him, I want to ask him if he can say, under oath at the deposition, that on March 17th or March 18th, he 100 percent did not talk to me in any way?

A.    What year?

BY MR. HARRISON:

Q.    2020.

A.    2020?

Q.    2020.

A.    You sure it was me?

Q.    What was that?

A.    You sure it was me?

Q.    I'm 100 percent it was you, yes.

MR. BERNHEIM:  All right.  Now,

you're testifying, Mr. Harrison.  So your question is, does he recall speaking to you on March --

A.    I don't recollect ever meeting you or talking to you, but my son --

MR. BERNHEIM:  Stop.  The question is to you, not your son.  Next question.

BY MR. HARRISON:

Q.    And you will state that --okay.  You don't recollect?

A.    I don't.

Q.    And are you 100 percent certain of that or just --

A.    Where was it?

MR. BERNHEIM:  He said he doesn't recollect, he doesn't recollect.  You don't get to challenge him.

BY MR. HARRISON:

Q.    Troy Avenue, the same address that you stated on the record.

A.    I don't think you have any credibility.

MR. BERNHEIM:  Stop.  So the question is -- what's your question, Mr. Harrison?

BY MR. HARRISON:

Q.    Are you 100 percent certain that you

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

did not speak to me on March -- I believe it was 18th, but I'm just saying March 17th, just in case?

MR. BERNHEIM:  Well, he's indicating he doesn't recall, so.

A.    I don't recall.

BY MR. HARRISON:

Q.    But you're not 100 percent certain?

MR. LANG:  Well, not recalling means he doesn't recall.

A.    Is it over the phone or in person?

MR. BERNHEIM:  Stop.  We're not doing this.

THE WITNESS:  I don't know.

MR. LANG:  Next question, please.

(Continued on next page for jurat.)

MR. HARRISON:  No further questions.

(Stenographer confirms copy orders.)

MR. BERNHEIM:  Yes.

MR. FRIEDMAN:  Yes.

MR. HARRISON:  Yes.

CERTIFIED STENOGRAPHER:  Off the record at 2:32 p.m.

(Time noted:  2:32 p.m.)


_____
IRA B. RUSSACK


Subscribed and sworn to before me

this _____ day of _____ 2025.



_____
Notary Public
My Commission Expires:


/

/

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

                        C E R T I F I C A T E
STATE OF NEW JERSEY    )
                       ) :ss.
COUNTY OF MIDDLESEX    )
              I, KENNY A. RODRIGUEZ, a stenographic

New Jersey Certified Court Reporter, Registered

Professional Court Reporter, do hereby certify:

              That IRA B. RUSSACK, the witness whose

deposition is hereinbefore set forth, having been

duly sworn, and that such deposition is a true

record of the testimony of said witness.

              I further certify that I am not related

to any of the parties to this action by blood or

marriage, and that I am in no way interested in the

outcome of this matter.

              IN WITNESS WHEREOF, I have hereunto set

my hand this 7th day of March 2025.


_____
KENNY A. RODRIGUEZ, CCR, RPR
LICENSE NO. 30XI00245600

ERRATA SHEET
CHANGES IN TESTIMONY
JEST HOLDINGS, LLC. v IRA RUSSACK, et al.
IRA B. RUSSACK
February 17, 2025

Page  Line    From                    To

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE:_____DATE:_____

        IRA B. RUSSACK

**$**

**$1,500,000** 48:6,8
**$300,000** 68:9
**$39,000** 88:17
**$45,000** 48:14
**$500** 96:9
**$750** 30:12
**$750,000** 24:7 31:11 32:10,12,24 39:24 40:7 63:9 64:19 69:1 72:25 149:16 163:12 168:23 169:25
**$750.000** 39:19

**-**

**--okay** 178:8

**1**

**1** 12:13,15 163:13
**1.2** 90:25 91:6
**1.5** 26:16,17 28:6 29:8, 13 48:18 57:22
**10** 23:20 38:3 92:20 94:16 98:5
**10/16/1985** 12:14
**100** 72:5 78:5 133:7 163:8 176:24 177:3,12, 15,24 178:11,25 179:7
**10:00** 71:8
**10:12** 8:3
**10:30** 100:7,11,13
**11** 71:8 96:15 138:10, 22
**11:02** 45:24
**11:05** 46:2
**11:28** 102:22
**11:30** 100:12,13

**12** 45:15 46:21 51:24 52:2 55:2 63:25 69:8 73:13 98:8,11 126:6 127:20 135:19 136:7 138:24 139:24 140:8,10 142:7
**12:04** 90:12
**12:15** 90:15
**12th** 63:13 129:16 136:25 165:19
**13** 95:23 96:4 107:5,13 116:16 121:8 138:23 141:3,15
**13th** 71:9
**14** 94:8 123:7
**14th** 96:10
**15** 9:2 124:6,8,13 142:19
**15K** 128:24
**16** 12:11 128:6,11
**17** 98:12 104:23 105:10 123:3 129:9,16 153:11 176:25
**17th** 177:3,14 179:2
**18** 138:14,22 153:11 176:25
**18th** 177:3,14 179:2
**19** 23:4 98:12 100:7,24 104:4,14,15,16 105:11 141:24 142:6 154:10
**1985** 11:23 12:11 17:21,24 18:4,15 19:9 20:23 36:19 83:23 148:1
**1:33** 142:24
**1:45** 143:2

**2**

**2** 23:17,22 37:23 65:16 172:13
**2/13/2025** 96:14 98:7 107:4 128:5

**20** 89:17 152:10,14
**2018** 23:4,8,20 36:20 38:3 63:8 65:2 66:10 149:15 150:8,25 167:4
**2019** 23:8
**2020** 45:15 46:22 52:2 55:2,12 63:13,25 67:5 69:8 73:13 91:1,7 135:20 136:7,25 138:24 139:24 140:10 142:7 145:25 165:19 177:18, 19,20
**2021** 74:15 75:9 93:2 98:12 100:7,24 113:15 116:19 128:11 154:10
**2022** 77:18 158:7,9 159:21 162:24 163:2
**2023** 51:24 126:3 158:13
**2024** 123:3
**2025** 95:23
**2026** 171:15
**20s** 10:19
**20th** 55:11,12
**21** 157:6,12
**22** 153:11
**23** 153:11
**24** 25:6 27:24 152:15 153:11 158:13
**27** 116:19 121:15
**28** 96:22 97:20
**29** 93:1 96:5 98:14

**3**

**3** 28:12,25 46:5,7 59:1
**3/12/2020** 62:23 73:7
**30** 98:14 103:15,21
**31** 98:14
**32** 107:13,21
**33** 113:5

**35** 107:13,21 116:21
**3:25** 140:11

**4**

**4** 56:8 83:22 145:7 147:3
**40** 38:12
**403** 170:20
**45** 124:12
**45,000** 48:7
**46** 95:21 123:11 124:7

**5**

**5** 62:24 83:11,12,22 145:7 147:3
**5/10/2018** 23:17
**5/29/2021** 92:19
**50** 24:15 28:3,4 85:24 88:1 147:7,8 151:10,25 156:15 172:1
**50-some-odd** 27:10
**5901** 125:7,9

**6**

**6** 73:7,11

**7**

**7** 74:5,12 75:23 118:13 119:13,15,17 122:22
**750** 24:22 25:6,10,18 29:12 32:25 33:12 34:20,23 38:15 39:11, 15 67:21 130:25 133:4, 12 141:11 163:14 165:23,25 167:3 169:4 170:6,7,11
**750,000** 28:8 29:8 130:21 168:22

**8**

**8** 77:6,11
**83** 13:21
**84** 11:21 13:21
**85** 11:21,22
**8:29** 136:25 137:4

**9**

**9** 79:19 156:22
**9:18** 154:10
**9:52** 116:19

**A**

**a.m.** 8:3 45:24 46:2 100:7,13 154:10
**abbreviate** 132:15
**abbreviating** 132:23
**abbreviation** 154:19
**ability** 17:4 131:14 132:14,23 147:4 162:13
**abnormal** 55:19
**absolutely** 39:2
**accept** 54:14
**access** 99:6
**accessed** 102:13
**accommodating** 96:20
**accordance** 14:23
**account** 51:13 88:16 92:1,2,5 93:20,25 94:3 99:1,7,25 101:18 102:13 104:13 105:11 110:1,2,5 111:4,5,15 128:24
**accounting** 26:7,23
**accuracy** 135:23

140:3
**accurate** 72:5 152:5
**accusing** 102:10,16
**acting** 173:1
**actions** 66:22
**actual** 74:14
**Adam** 90:17
**add** 97:11
**added** 96:9
**additional** 96:9
**address** 107:15 117:19 118:2,5,6,15,20 178:18
**addressed** 12:11 93:2 94:18 116:25
**adds** 97:12
**administered** 8:10
**administration** 156:16
**admissible** 30:25
**advertence** 90:4
**advised** 147:13
**affect** 88:5
**affected** 160:10,11
**Affidavit** 73:6,11
**affirmed** 8:13
**afield** 30:23
**agree** 153:15 161:16
**agreed** 16:7 131:24, 25 149:19 169:13
**agreement** 11:25 13:1,8 14:21 24:7 29:12 34:19 45:15 46:7,21 53:6 58:24 60:20 69:16 74:4,13 75:13 77:5,9,13 83:23 117:2,21 118:8, 12 119:10,22 122:7,16
**agreements** 15:16
**ahead** 88:7,9 101:15 132:14 165:9 173:18
**Allegedly** 154:24

**amendment** 74:4, 12,18 75:12 77:5,8,12, 19 78:18,19 117:1,20 118:7,12 119:10,22 122:6,15
**amendments** 134:15
**amount** 25:7,8,12 27:10 42:11 44:10 49:18 57:12 67:23 91:14 109:20 120:4
**amounts** 42:10
**answering** 163:15
**answers** 26:7 163:16,17
**anymore** 51:11 55:5 58:9 109:12
**apartment** 151:16
**apartments** 64:8
**apologize** 45:11
**apologized** 151:21 161:1
**apparentlies** 130:13
**apparently** 25:3 38:18 109:2 117:3,11 126:21 130:7,12 131:5 132:6 133:2 136:6 139:24 154:11
**appears** 12:10,11 23:19 92:25 93:24 94:16 96:3,5 98:11 121:16 135:20 136:1 138:23 142:6,13 157:13
**applied** 25:23,24
**approached** 20:18
**April** 116:19 121:15 128:11
**area** 10:4,18
**argue** 144:17 146:7 151:3,4 169:17
**arguing** 65:8,9 144:19
**argument** 144:9

**argumentative** 151:2
**argumentive** 64:21
**ascertain** 37:11
**asked-and-answered** 170:21
**asks** 15:22 166:13
**assign** 56:21 57:2 58:5 83:14
**assigned** 14:22
**assignee** 83:14
**assignment** 56:7,11 58:12 60:11 62:15
**assistant** 72:10 76:17
**assume** 26:18 69:25 85:22,23 91:20
**assumed** 174:1
**assumes** 82:15
**assuming** 26:18 31:2,17,19 37:6 91:5 167:4 173:10
**assure** 85:17 88:20 89:5,6 108:23 125:3
**attach** 138:9
**attached** 96:7 139:17 141:12,14
**attachment** 98:3 140:22 141:1
**attempt** 149:25
**attention** 14:16 80:14 145:11
**attorney** 13:10 15:6, 9 31:18 33:21 34:7 53:6 90:18 136:7,10 168:9
**attorneys'** 19:19
**author** 131:19
**authored** 15:7
**authority** 83:13 84:18 87:23 88:21 145:9
**Avenue** 13:15,16 71:9 125:8 174:11

178:18

**aware** 89:21 126:2 154:12 158:5,9 162:3, 12,19,20

## B

**back** 11:22 25:1,18,19 27:1 29:12 31:4,10,13 38:15 41:9 42:4 46:1,24 53:1 56:4 57:16 58:25 61:16 63:8 66:10 72:21 83:9,22,25 86:3,18 87:1,4 88:15 89:2 90:14 97:8 102:8 105:4 110:9 115:13 116:1 131:17 135:3 136:1 143:1 145:2 154:20 155:22 160:6,7,16 162:6

**backed** 31:25

**background** 54:10, 17

**backup** 40:19

**bad** 36:13 61:17 67:10 72:25

**ball** 171:14

**bank** 27:1 38:9,10 48:9 93:20,25 94:2

**based** 19:21

**basically** 11:12 19:16 24:6 26:8 56:1 61:14 64:6 70:16 72:6,7 80:16 131:17 132:2 144:3

**basis** 85:12

**Bates** 129:17 138:22 152:14

**bathroom** 102:7 110:11

**bears** 73:12

**beat** 79:12

**beer** 169:16

**begged** 52:25

**begin** 61:13

**beginning** 13:12

86:13 130:6 175:7

**begins** 95:24

**believed** 85:22,24,25 86:17 87:25 88:1 89:19

**belong** 169:25

**belonged** 162:14

**benefit** 35:5 56:10 63:23 73:10 74:11 77:11 92:8,25 138:6

**Bergen** 9:13

**BERNHEIM** 11:3 12:1,9,24 14:12,25 15:21 16:8,25 17:6,21 18:8,18,24 19:4,7 20:1, 4 21:1 22:17 23:13,19 30:4,8,10,22 35:9,23,25 36:8,18,22 37:1,4,10,21 38:2 39:3,25 40:3,8,11 42:20 43:2,8,11 44:24 45:2,8 46:20 47:3,10, 18,21 48:13,21,24 49:4, 12,19,24 50:5 51:25 52:13 53:24 54:2,5,7, 11,19,24 56:17,23 57:23 58:14,17 59:6,11, 19 60:2,10,13,22,25 61:23 63:22 64:20 65:4, 7,10,21 66:5,9 69:5,7, 14,23 70:4,22 71:20 73:9 74:10,25 75:18,20 76:3,19 77:10,20 78:14 79:10,12 80:19,21 81:4, 22 82:13 83:5,17 84:5, 15,20,24 85:6 86:8 87:12,16 88:23 89:1,20, 24 90:5,7,9 91:3,10 92:24 93:9,14,21,24 94:2,6,12,15,25 95:4,19 96:19 98:9,20 99:20 100:2,6,12 101:3,13 102:25 103:3,16,20,24 104:3,7,25 105:5 106:4, 13 107:10,21 108:2,10, 14 109:4,8,13 111:19 112:2,12,15,25 113:8 114:1,7,10,15,18 116:15,18 117:4,12,18 118:1,4,13,17,23 119:5, 12,17,21 120:6,9,21 121:1,7,13,21 122:3,5, 8,17,25 123:17 124:18, 23 125:3,12 127:24

128:2,13,17 129:3,13 130:13 135:11,15,18 136:11,23 137:4,15,20 138:4,11,20 139:7,14, 18,23 140:9,20 141:1,6 142:4,13,21 144:8,16 145:1,13,19 146:4,12, 22 148:5,9,18,22 150:9, 17 151:1 152:1,12,21 153:8 154:5,9,21 155:6, 25 156:21,25 157:10, 20,23 158:1 159:4,9,12 161:6,18 162:9 163:1,5, 10 164:10,22 165:2,5,9 166:8,24 167:14,20 168:16 170:1,14,18 171:6 172:19 173:9,13, 18,20 174:3,6,12,23 175:1,2 176:18 177:5, 25 178:5,14,22 179:3, 11

**big** 67:16 71:10 86:5 169:14

**bill** 155:23 175:16

**bills** 57:15

**bit** 11:19 15:17 30:5 52:8 67:24 78:23

**blame** 53:17 134:16

**blaming** 170:8

**blank** 74:14

**body** 117:22 121:22 141:8

**bookkeeper** 92:6

**books** 162:4

**boring** 74:22,24

**borough** 8:23 71:9

**borrow** 23:4 44:7

**borrowed** 23:6 24:9 32:10 44:9,15,17,22 80:18 158:23

**borrowing** 24:7

**bother** 21:18

**bothered** 21:18

**bothers** 145:5

**bottom** 93:22 98:14 114:20 141:9 161:2,3

**bounced** 115:18,20

**boxes** 19:13

**boys** 169:14

**break** 88:9 90:10

**briefly** 43:7 127:2

**bring** 86:21

**broker** 155:4

**brokers** 116:5

**Brooklyn** 10:18

**brother** 10:15,16

**brought** 126:8

**building** 13:14,17,22 14:1 31:23 32:4,5,6,8 33:25 125:7 160:15

**buildings** 125:24

**bunch** 127:17 133:16

**Burton** 69:18 70:1,5, 13,18,20 71:16 82:6 91:19,20,21,25 131:16 135:4,20 136:2,6,12 137:1 139:24 140:7 142:8,15,16 147:15 173:22 175:4,15,18,23 176:8

**business** 10:24 11:4 15:14 31:5 51:19 52:3, 5,7,9 68:14 90:22 109:22 160:8,12,18 169:9,10

**button** 168:2

**buy** 29:10 32:7 34:24 38:12,14

**buyer** 107:15 117:22 121:24 122:14

**buys** 41:6,7

## C

**calculated** 30:25

**call** 9:22 14:15 44:19 68:4 71:16 110:8 147:19 149:11,16

**called** 67:25 91:21 110:7

**calling** 41:24 111:7

**calls** 51:9 56:24 65:21 102:6 146:5 151:17

**camera** 54:8

**caption** 46:20

**captioned** 56:10 63:24 73:11 74:12 77:12 157:14

**car** 102:5 105:4 126:20

**cares** 174:12

**case** 19:14 36:12 42:14 110:20 161:22 168:2 169:1 179:2

**cash** 31:25

**cashier** 48:9

**catch** 109:23

**categories** 66:13

**category** 66:19

**caught** 105:13 110:1, 4,24 111:1 112:7

**caused** 86:5

**causing** 61:17

**CCS** 133:16

**cell** 72:7 131:7

**certification** 62:23 63:25 68:25 69:22 70:21 71:3 72:1,19 83:11 135:23,25 140:3, 5 141:8,15 145:6 147:2 150:24 152:4 167:24,25

**certifications** 147:14

**certified** 8:6 41:11,13 45:23 46:1 48:9 84:10, 12 90:11,14 142:23 143:1 149:1,3 166:4,6 176:16

**chain** 96:1 98:12 107:15 116:12 135:19 138:2

**chair** 42:3 45:12

**chairs** 56:1

**challenge** 178:16

**change** 44:11 46:12 124:2

**changed** 9:23,24 14:21

**characterize** 32:11 41:20

**characterized** 62:14

**charges** 97:12

**chase** 60:17 94:3

**check** 48:8,10 88:15 102:24 111:23 112:3 115:18,19

**checked** 112:19

**checks** 113:17

**choice** 168:12

**choices** 38:17

**civil** 20:11 161:20

**claimed** 168:20

**clarification** 42:22 45:22 104:19

**clarify** 172:9

**clause** 15:5

**clean** 111:25 147:20

**Clearing** 48:10

**client** 42:17 44:1 56:4 61:1 81:3 95:22 96:4 125:1 142:15 144:22 161:15,21

**close** 23:8 27:14

**closely** 44:6

**closing** 48:9 59:2 60:6,7 96:8,11

**cloud** 137:21

**co-investor** 28:21

**coerced** 53:18 61:13

**coffee** 102:7 110:10

**coincide** 141:13

**COJ** 132:8,15,24 133:4,11

**collateral** 24:25

25:16 30:5,20 39:11 58:7,9,13,22 62:7,8,16 87:10

**collect** 39:12 158:6

**collection** 48:8

**commercial** 27:2

**commingle** 116:1

**commit** 89:11,13

**commonly** 170:21

**communicate** 113:24,25 114:13 127:8

**communicating** 127:7

**communications** 43:16,18

**company** 17:20 64:14 151:15

**complains** 51:10

**complete** 28:9

**complicate** 126:18

**complicated** 92:3

**computer** 111:25

**concerned** 18:3 33:3 39:7 46:16

**concerns** 73:1

**conclusion** 15:22 18:10 22:19 56:24 65:22 84:7 85:8

**conclusions** 37:10 67:19 146:6

**conference** 176:7

**confession** 73:6,12 130:20 132:12,24 133:11 136:22 139:16 140:18,21,25 141:4,10 146:15

**confident** 78:17

**confirm** 117:19 122:12

**confrontation** 158:24

**connect** 122:20

**connection** 100:18 108:25 172:23 176:5

**consciously** 88:2

**consent** 83:15

**consistency** 85:10

**constantly** 68:15

**construed** 14:22

**content** 99:13

**context** 81:19 167:4

**continued** 179:15

**contract** 51:23

**contradict** 64:18

**control** 34:21 87:25

**conversation** 21:16 84:13 160:5 163:2 164:15 165:20 176:12

**conversations** 131:18 153:21 155:13 162:23 164:3,5,18 165:15

**convey** 17:5,20 18:5, 16 20:5 21:9,12,15 58:16,19,20 85:18 87:24

**conveyance** 59:16 60:21 61:7

**conveying** 18:7 20:18,25 22:6 61:22

**copied** 107:7 109:17 153:7,10 154:8

**copies** 72:6,10,11,14

**copy** 93:16

**Corp** 156:6

**corporate** 13:7 88:16

**corporation** 18:17 20:20,24 56:22 57:3 65:1 156:6 162:6

**correct** 27:8 28:5 30:17 35:15 41:18,25 48:18 49:3,11,15 50:8, 11 55:5 57:22 61:20 62:12,16 70:1,2,17

76:11 85:5 86:7 97:23 100:10 123:23,24,25 144:7 167:10 168:20 175:5,8,12

**correctly** 64:17 66:23

**correspondence** 96:13 98:6 107:3 128:4 129:8 138:13 141:23 152:9

**corridor** 9:12

**cost** 27:16

**counsel** 42:1 142:16

**count** 124:20

**couple** 36:3 73:17 75:2,5,7

**court** 99:20 138:6 166:9

**covered** 31:3

**COVID** 9:22

**craziness** 69:3 105:23

**created** 13:4 173:5

**credibility** 178:21

**credit** 58:10

**critical** 133:21

**crossed** 33:16

**crystal** 171:14

**cut** 60:17

---

**D**

---

**damage** 57:13

**dark** 71:9 163:21

**dash** 107:14

**date** 23:7 48:7,15 63:15,25 73:12 74:13 75:8 104:14 124:3 128:23

**dated** 12:11,14 23:16 62:23 73:6 92:19 93:1 96:14 98:7 107:4 128:5 136:25 142:7

**dates** 77:17 96:11 105:21 106:3,21 152:22

**dawn** 38:25

**day** 27:23 71:11 74:14 77:14 96:10 132:14 134:10 155:19

**days** 73:17 74:8 75:3, 6,7 77:25 97:25 112:21

**dead** 79:12

**deal** 26:10 27:14 29:16,17 31:18,21 32:1 33:20 38:7 51:12 69:15 72:24 149:18 155:5,15 173:2,3

**deals** 116:5 155:15

**debate** 85:7

**deceased** 10:16

**deceit** 55:16 76:2

**decide** 25:12

**decided** 24:20 25:17 29:10 66:12

**decision** 88:10

**deck** 68:16

**declaration** 79:21 156:19 157:25

**declarations** 79:18 156:24

**declared** 142:16

**defense** 105:13

**delivered** 117:22 121:11,12,19,24 122:2, 3,10,13,16

**depose** 105:14

**deposit** 33:24,25

**deposited** 102:24

**deposition** 50:6 76:21 84:14 94:21 95:13,16,17,24 129:15 157:12 161:17 168:8 177:2,14

**depositions** 30:24

**describe** 46:17

**describes** 64:6

**describing** 45:7

**desperation** 51:11

**deteriorated** 55:15

**Development** 9:5 13:6,13 57:3 156:6

**devices** 43:23

**DHCR** 154:7,14

**dialogue** 145:2

**dictated** 61:1

**diem** 96:9

**difference** 61:24 62:1 164:23 165:2,8

**difficult** 41:1 71:17 78:10,12

**diligence** 25:11 34:2 35:1,4 38:10

**dinnertime** 47:22

**direct** 48:12

**directing** 90:6

**directly** 113:6

**dirty** 169:18

**disagree** 31:1

**disagreement** 148:16

**disappointed** 160:13

**discount** 126:10

**discovered** 158:22

**discovering** 170:6

**discuss** 126:15 154:12 158:14

**discussed** 158:12

**discussion** 62:19 94:10 126:3 158:16,18 167:3,9,12 171:18

**discussions** 172:3

**dispute** 93:8

**distrust** 86:7

**Doc** 141:5,11

**document** 11:23 12:8,25 13:1,4,7,9,23 15:24 19:23 22:2 23:3,9 24:4,5,6 37:20,21,22 47:15,19 56:6,10,19 59:11,12,23 60:6,14 62:22 63:24 64:3 73:5 74:3,7,11,21 76:11,22 77:4,21,24 79:17 80:8 89:16 93:22 109:5,7 118:21 119:23 123:5 124:8 148:1,2 150:5 151:5 162:16,17,18 172:16 173:5

**documentation** 26:20 161:5 164:8

**documents** 21:23 47:9,16 56:16 75:21 76:12 80:3,10,13 85:8 95:21 98:13 106:20 133:25 134:6 136:2 138:5 143:14,16 144:7 156:10 176:9,14

**dollars** 27:11 38:11 52:24

**doubts** 67:5 68:25 69:8

**drafted** 16:9,10 172:15

**drawn** 48:10

**due** 25:11 34:2 35:1,4 38:10 48:7,15 96:8

**duly** 8:13

**dupe** 40:15

**duped** 40:14 41:25 42:7 65:18 66:18

**duplication** 139:9, 13

**duress** 143:18,19,21, 22

---

**E**

---

**earlier** 55:4 57:22 58:25 64:19 130:20 164:5 169:24

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

**early** 10:19

**easier** 107:25

**east** 10:6,7

**easy** 42:18

**elect** 54:8

**email** 43:19,20 92:14 94:24 95:1 96:1,4,13, 16,24 98:6,12,18 99:1, 7,12,25 101:17 102:13, 21 103:9,11,20 104:4, 15,18,22 107:3,14 108:18 109:17,23 111:15 112:11 113:6, 11,20 114:20 116:9,18, 24 117:9,23,25 118:22, 24 119:1,4 121:10,15, 20 122:9 123:2 127:15, 17,23 128:4,9,10,22 129:8 131:3,4 132:4 133:3,5,14,21 135:3,19 136:1,24 137:14 138:13 139:22,23 140:10,23 141:2,3,7,23 142:14 152:9 154:10

**email's** 104:12

**emailed** 115:6 118:20

**emails** 43:22 92:12 95:8,10,21 97:3,17 103:8,16 108:4,5,20,21 109:20 111:8,18,23 112:3,16,19,22 113:14 114:25 128:10 129:16 130:2,3 138:17,23 139:8 142:7 152:16,18, 23 153:3 154:23 155:11,16 156:2

**encumber** 18:16 22:13 36:17 37:25 38:4 52:11,12,17 84:19 85:18 87:24 150:7 151:24,25 162:13

**encumbered** 37:7,8 64:25 65:17,19 145:24 154:2

**encumbering** 20:18 21:6 22:7 61:21 66:10

**encumbrance** 36:24 85:1 87:9,10

145:8 150:24,25

**end** 100:8

**ended** 41:18

**engage** 164:14,16

**engagement** 175:3, 6

**enter** 21:22,23

**entities** 48:12

**entitled** 95:13,14,16

**error** 48:14

**establish** 106:9

**estate** 9:3 11:8 15:17 35:2 53:8

**event** 25:1,17,20 85:7 95:14

**events** 117:9

**everybody's** 56:2 172:25

**everyday** 155:19

**evidence** 31:1 32:17, 18 33:2 37:7 82:16 91:6 92:17

**evil** 52:22

**evils** 52:21

**exact** 23:7 63:15

**EXAMINATION** 8:15 172:11 175:1 176:21

**examined** 8:14

**exhibit** 12:2 46:5 59:1 65:16 73:11 75:23 77:11 83:10,11 94:16 97:8 98:5 107:13 113:5 116:16 118:13 119:13, 15,17 121:8 122:22 124:6,13 129:16 138:3, 7,12 152:14 156:22 157:12

**existing** 175:10

**expires** 96:10

**explain** 102:23 161:20

**explained** 152:3 161:11 168:1 176:8,13

**explanation** 136:13 146:11 151:5 152:6

**extent** 15:21 18:9,19, 24 19:7 22:19 40:12 56:23 65:21 146:5 152:4 167:25

_____

**F**

_____

**fact** 159:6

**facts** 49:11 85:24

**failed** 67:16

**Fair** 54:24

**fairly** 67:25

**falling** 55:6,7

**false** 168:1

**familiar** 12:18,19 24:4 46:11 63:21 64:2 110:20

**family** 10:13 160:19

**fashion** 168:4

**favor** 19:1

**February** 95:23 96:4

**feel** 32:25 40:14 100:18 151:8,11

**fees** 97:12

**fell** 27:13

**felt** 20:8 35:1,3 61:17 72:20 88:2 145:25 151:10

**file** 96:21 124:12

**files** 19:13

**filled** 74:14

**finally** 111:3

**financial** 123:6,12,13 124:1 135:24 140:4 141:8 157:17,21

**financing** 157:5,13

**find** 22:2 32:2 74:24 92:11 164:8

**fine** 102:18 105:16 152:8 168:11

**finish** 16:25 37:4 39:4 87:12 152:19 176:17

**finished** 168:6 172:6

**Flatbush** 13:16

**Florida** 9:16,18,20, 22,25 10:1,22

**follow** 174:24

**forced** 158:23

**forget** 123:4 147:14

**form** 16:16 18:8,18 37:2,5 39:25 40:2,9 43:2 44:24 45:3 49:4, 12,24 51:25 52:13 58:17 59:19 60:2 64:20 69:23 82:13 84:20 86:8 87:16 91:3 93:9 111:19 112:14 117:12 121:22 122:18 145:13 146:4,6 148:5 157:18 159:11,17 162:9 166:1 167:14 177:6

**formal** 15:18

**formed** 20:24

**forths** 131:17

**forward** 18:3 170:22

**found** 55:15 67:25 147:11 170:7 173:4

**framed** 144:3

**fraud** 76:2 89:11,13

**Friday** 128:10

**Friedman** 12:3,7 15:23 16:16 17:7,9,13 18:11,20 22:24 23:21 30:16 35:11 37:3 40:2 56:12 60:12 63:23 64:1, 22 73:14 84:22 86:10 92:25 95:7,12 96:22 97:17 98:2 100:11 103:12 107:20 112:14 123:15,16 150:14 153:12,15 159:11,17,23 166:1,11,13,19 171:22, 25 172:8,11,12,22 173:11,17,23 174:8,19

**Friedman's** 56:9 73:10 74:11 77:11

**friend** 20:16 88:3

**friendly** 15:13

**friends** 10:13,14,17 169:13

**front** 94:20 109:17

**fruition** 150:7

**fucking** 171:21

**full** 83:13 93:16 145:9

**fund** 134:1,7 136:3

**funds** 25:8 96:8

**funny** 63:3 73:23

**future** 121:23 122:10 161:17

## G

**game** 108:13

**gave** 68:3 88:15

**generally** 152:1

**gentleman** 29:16,18 33:20

**gentlemen** 99:20 106:5 145:1 166:8

**give** 34:20 50:13 63:2 72:8,9,12 79:25 87:22 98:17 115:25 119:15 161:5 177:8

**giving** 62:15 72:14 101:4 170:18 177:10

**Gmail** 112:1

**good** 8:6 26:18 32:2,3 35:1,3 38:13 39:18,24 40:7 48:9 50:15 58:10, 11 67:10 78:7,9 81:11 87:15 115:25 146:19 147:23 157:2 161:9

**Gosh** 166:22

**great** 57:12

**greater** 42:10,12

**guarantee** 24:25 36:12 50:25 51:1

**guaranteed** 44:14

**guarantees** 144:1 147:1

**guess** 13:25 15:17 19:21 47:1 58:10 86:17 97:11 99:14 102:23 113:11 116:10,13 126:11 141:19 142:3

**guilty** 151:19

**gullible** 86:17

**gun** 57:10 143:22,23, 24

**guy** 34:6 50:5

## H

**hacking** 112:10

**half** 27:17 29:8 111:12 120:19 163:13 164:2 165:16 167:5 168:20, 21,23

**hammering** 72:11

**hand** 144:6 145:21,23

**handed** 95:20 96:2 98:10 121:7,15 129:14 138:21 142:5 152:13

**handing** 119:18

**handle** 53:7

**handling** 70:15 174:1

**hands** 15:16 29:24 30:2 33:12,16 71:14 111:14

**hang** 18:12 108:6 110:9 160:16 172:17

**happen** 30:23 38:6 41:21,22 71:13 86:23 102:23 115:7 133:3 164:23

**happened** 17:23 48:19 60:16 80:20 86:5 87:5 105:12 108:9 129:2 130:11 131:11 134:17,19 149:15,22 164:23 168:25 169:7 170:6,7

**happening** 161:3 168:4

**happy** 154:12 160:2

**hard** 25:9 26:6,7 110:18

**harmed** 169:10

**Harrington** 70:6

**Harrison** 53:25 54:2, 4,6,9,16,21 81:3,5,7 82:3,9 174:9,10 175:12, 21 176:4,13,21,22 177:5,10,17 178:1,7,17, 23,24 179:6

**hate** 84:24

**head** 57:10

**hear** 14:10 81:14

**heard** 81:23,24 153:22

**hearsay** 40:21

**held** 62:19 94:10

**hell** 88:8

**Henry** 10:9,25 15:14 19:16 20:10,18,24 21:5 22:10,11,12 26:20 27:11 28:9,10,13,14,20 29:4,9,10,18,22,23 31:8,10 32:10,21,24 33:1,4,11,12,19,21,23 34:5,25 35:2,4 36:12 38:7 39:10,16 40:14 42:5 61:18 63:9,16 65:1 66:17 148:16 150:8 151:12,20 156:11,17 158:24 160:22,25 161:1,4 162:12,15,22 163:7 164:1,3,15 165:3, 11,16,18,20 167:3,10 168:19,24 169:23,24 171:19 172:3 173:3

**Henry's** 26:18 28:8 33:11 34:15,17 64:19 147:8 160:5

**hereof** 48:15

**hiding** 110:16

**higher** 97:13

**hire** 51:17 72:13

**hired** 81:13 163:16 174:17

**hit** 45:10 99:21 168:2

**hold** 33:14 53:24 54:10,16 59:13 75:20 101:24 102:1,3 129:13 143:22 166:12

**holding** 62:9

**Holdings** 56:22 57:4 72:18 81:5 82:24 87:7, 8,22,23 88:21 89:6 92:18 93:1 94:3

**Holdings'** 87:18 93:25

**home** 54:22 137:12

**honest** 76:7

**honestly** 47:7 86:17

**hooked** 42:16

**hope** 99:8

**hoped** 88:10

**hopeless** 55:8,10

**horrible** 169:6

**horse** 79:12

**hour** 120:15,19

**hours** 25:6 27:24 168:3

**house** 48:10 137:6

**HPD** 154:7,13

**huge** 109:20

**human** 151:13

**hurt** 160:12

**hurting** 151:12

## I

**I-R-A** 8:20

**idea** 15:13 16:5,6 34:4, 5 40:25 82:2 99:16 149:4 167:16 174:15

**identification** 12:13,16 23:18 46:8 56:8 62:24 73:8 74:5

77:6 79:19 92:20 96:15 98:8,11 107:5 123:7 124:9 127:25 128:6 129:10,15 138:15,21 141:25 142:6 152:11 157:7,11

**identify** 12:4,6 23:12, 14 24:3 107:10

**important** 22:1 160:4

**inappropriate** 93:12

**incase** 161:16

**include** 95:25 152:16,24,25

**inconsistency** 85:10

**increased** 153:25 154:1

**increasing** 153:21 155:13

**indicating** 179:3

**indifferences** 149:25

**information** 67:17, 18 69:4 151:18 154:14

**informed** 96:11

**initial** 107:8

**inserted** 117:19 122:13

**insisted** 113:17

**intend** 18:15 57:2 61:6 85:17

**intent** 15:10 16:12,13, 19,22 17:3,10,12,17,19 24:17 36:11 37:25 52:17 58:1,3,4,19 59:15 61:1 87:22 88:20 89:5 150:6,7

**intention** 25:19 34:18 38:4 57:5 58:5,6 89:8

**intentions** 57:7

**interaction** 127:4

**interest** 20:6 48:6 50:17,19,20,21 51:3 60:8 68:8,19 83:14 85:2 125:13,22 146:14

**interested** 28:15 61:14,15

**interesting** 136:13 143:9,12

**interests** 125:23

**interject** 95:7

**interpret** 60:14 66:23 85:11

**interpretation** 40:22,23

**interpreted** 66:24

**interrupted** 41:11 84:10 149:1 166:4

**interrupting** 22:18

**introduce** 42:25

**introduced** 39:13 43:25

**invest** 24:20 25:5,13 28:19 38:7

**invested** 11:8,14 24:21 29:9 32:20,21 33:6,10

**investment** 24:23 25:18,24,25 26:14,15, 19 30:14 32:13 34:17 36:12 57:13 67:6,8,9, 12,13 169:5

**investments** 9:3 42:9,10,13 53:4,20,22 55:23 57:14

**investor** 25:21 27:12, 13 33:9

**investor's** 25:22

**investors** 26:3 27:19,21 28:13 31:25

**invited** 24:22

**invoice** 175:14,20

**involved** 25:4 41:1 52:9 70:18 82:3 90:21, 22 105:23 114:13 116:5,7 130:8,9 155:24

169:1,2 174:16

**involvement** 115:12

**iphone** 131:8 137:2, 6,9

**Ira** 8:18 86:23 103:2 118:15 123:5 128:16,22 133:22 136:17,19 137:1,18 138:19 140:7 154:13 162:13 171:25 172:3,9

**irarussack@ gmail.com** 99:1 110:5

**Island** 155:16

**issue** 167:22

**issued** 48:11

**items** 150:12

---

## J

**J.P.** 94:3

**Jacksonville** 10:2,7

**January** 123:3

**Jeff** 172:17,21 174:2

**Jersey** 8:4 9:9

**Jest** 42:16 43:25 44:7 56:22 57:4 58:21 72:17, 18 81:5 82:24 85:17 87:7,8,18,22,23 88:21 89:6 92:18 93:1,25 94:3 96:5 106:20,22 113:16 143:4,5 144:14 146:3 147:1 148:14 149:8 150:23 151:23 158:5 159:16 162:4,12 165:17 166:15 171:19 172:4 173:7

**job** 90:4

**join** 15:23 22:24 64:22

**Joined** 18:11,20 84:22 150:14

**joins** 150:17

**joint** 12:23

**Jonathan** 44:3,4 51:8,9,10 82:25 114:12 115:1 116:5 125:17,18 128:23 130:8 132:1

**Joseph** 43:1,5 82:3

**judgment** 66:14 73:6,12 130:21 132:12, 24 133:11 139:16 140:18,25 141:5,11 146:15

**judgments** 64:13

**July** 96:10 152:23 154:10

**jumping** 36:19

**June** 93:1 96:5

**jurat** 179:15

---

## K

**Kalish** 90:17 152:25 154:11 155:24

**Kenny** 8:7

**key** 171:4

**kids** 54:22

**kind** 13:11 66:19,20 126:2

**kinds** 109:21 155:18

**knew** 109:1,2 116:2,3 120:14 151:12,13 167:24 174:16,17

**knowing** 80:15

**knowingly** 151:25

**knowledgable** 35:2

**knowledge** 64:12, 15 66:21

---

## L

**Lang** 8:15,16 11:6,7 12:5,17 13:2 14:14 15:3 16:1,11,20,21 17:2,8, 11,15,16 18:1,12,13,21 19:3 20:13 21:4 22:23 23:1,11,15,23 24:1

30:9,11,21 31:4,6 35:13,24 36:5,10,21,24 37:8,15,16,22,24 38:22 39:6 40:5,10,16 41:16 42:24 43:4,15 45:1,4,13 46:3,9,23 47:5,13 48:1, 16 49:1,8,9,16,20 50:3, 7,9 52:4,15,16 54:1 55:1 56:9,13,20,25 57:1 58:2,15,18 59:13,14,21, 22 60:5,11,15,18,24 61:3,4 62:2,21 63:1 64:4,23 65:6,9,12,15 66:1 67:2 69:10,15,20 70:2,9,11,23 71:1,21,23 73:15 74:6,16 75:4 76:8,25 77:2,7,15,23 78:16 79:15,20 81:1,6,8 82:1,17,18 83:6,8,20 84:8,16,23 85:5,13,14 86:11 87:14,20 88:25 89:3,4 90:1,16 91:8,11 92:21 93:6,13,18,23 94:1,5,8,13,24 95:3,6, 10,18 96:18,20,21,23 97:19,21 98:4,15,22 99:24 100:4,10,15 101:6,16 103:2,5,6,14, 18,22 104:1,11,21,24 105:8 106:7,16,25 107:6,12,17,23 108:3, 17 109:15 111:21,22 112:6,17 113:3,9,10 114:3,19 116:17,23 117:8,24 118:11,16,19 119:2,8,14,19 120:1,8, 11,22 121:5,9,18 122:1, 4,6,11 123:1,8,14,19 124:10,19,25 125:5,6, 15 128:1,3,7,14,21 129:6,11,19 130:17 136:6,9,14,15 137:8,16, 23 138:1,8,16 139:2,10, 15,19 140:6,12,13,22 141:3,16,17 142:1,11, 19,22 143:3 144:11,12, 21,25 145:4,18,20 146:9,16,18,24 148:7, 11,12 149:6 150:16,20, 22 151:7 152:8,20 153:6,17 154:6,16,20, 22 155:9 156:4,23 157:2,8,15,24 158:3,4 159:5,14,20,24 161:9, 11,14,22 162:1,11 163:6,18 164:13,22,25

165:4,7,10,14 166:18, 21 167:1,19 168:13,17, 18 170:3,12,16 171:5, 10 172:6 173:15 179:8, 14

**Lang's** 31:1

**laptop** 54:17

**large** 53:8

**late** 10:19

**laughing** 63:5

**law** 14:23 19:22

**lawsuit** 81:17 158:6

**lawyer** 15:4,12 16:3, 9,10 36:2 68:1 69:11, 12,13 71:24 72:13 81:3 132:1 147:17 155:20, 21,22 172:15,23,25 173:1,2,8,22 174:4

**lead** 30:25 131:14,23

**leave** 21:10 111:14 149:19,20

**leaving** 29:24

**led** 82:21

**left** 30:2 33:11 42:4

**legal** 15:22 18:10 22:19 56:24 65:22 83:4 84:7 85:8,18 146:5 175:24

**legally** 37:11

**lender** 32:2 97:12 132:1,2 134:3 135:22 136:8 140:2 142:17

**lesser** 52:20

**letter** 12:10,14,21 93:15 94:7,17 96:10 162:6 175:3,5

**letterhead** 92:19 93:1

**letters** 96:8

**level** 151:13

**Levington** 172:17, 21

**Levington's** 174:2

**license** 19:21

**lie** 89:9

**lien** 145:8 159:7

**liens** 64:13 66:19 89:7,21 147:3 159:13

**lies** 55:16 69:3

**life** 8:25 9:23 10:12,22, 23 19:20

**lifetime** 160:14

**limit** 168:6

**limited** 154:14

**linking** 148:10

**listen** 18:21 25:11 38:8 43:11 108:14 109:8 175:17

**lists** 64:7

**litigation** 20:15 64:13 66:14 85:4 125:11,16

**live** 8:21,22 9:19

**lived** 10:17,21

**lives** 9:24

**living** 8:24 72:15

**LLC** 92:18 93:1 94:4 114:12

**loan** 22:8 24:23 38:9, 10 44:15 50:12,14,18, 19,20,25 51:2,11 52:19, 25 57:22 58:9 59:8 67:20 68:14,17,18 80:15 91:12 116:2,3,7 127:19 130:7 131:25 134:3 135:21 140:1 143:7 148:14 149:8,15 153:22 155:14 159:9 165:17 166:15 167:4 171:19 172:4 173:7

**loaned** 159:6

**loans** 83:2 116:8 131:22 149:11 159:13

**located** 13:16

**long** 10:11 11:18 26:9 32:19 111:11 147:8 155:19 158:18

**longer** 26:25 51:21

**looked** 19:10 45:18 66:15 74:8 76:12,13 140:9 142:18 176:9,14

**loose** 88:9

**lose** 25:7 27:15 32:3 52:23 53:2 88:8

**lost** 31:23 53:3,15,20 55:23 63:14

**lot** 9:21,23,24 14:10,16 31:3 32:19,21 53:10,12, 21 71:14 76:17 88:8 90:22 103:8 112:22 114:25 143:14 153:2 158:25 160:19 169:8

**loud** 84:4

---

## M

**machine** 171:15

**made** 9:2 35:7 36:25 39:18,24 42:8,9 68:24 72:6 85:16 88:9 115:17 137:14 150:25 165:17 171:19

**mailing** 117:19

**make** 40:7 54:12 59:9, 10 62:10 64:8 65:12 68:14 71:17 101:8,10 107:25 115:15,21,23,25 116:10 126:22,25 134:16 138:2 146:10, 13,17 155:20,23 157:3

**makes** 49:7

**making** 62:7 68:20 80:12 102:5 109:1,2 166:11

**manage** 53:7,8

**manages** 53:5 156:17

**March** 45:15 46:21 51:24 52:2 55:2,11 63:13,25 69:8 73:13 74:14 75:9 91:1,7 126:6 127:20 129:16 135:19 136:7,25 138:24 139:24 140:10 142:7 165:19

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

176:25 177:3,14 178:2 179:1,2

**mark** 12:1,12 23:12, 14,15 56:5 62:21 74:2 77:2 79:16 95:3 98:5 104:24 107:1 127:24 128:3 138:7,8

**marked** 12:15 23:17 46:7 56:7 62:24 73:7,10 74:5,12 75:22 77:6 79:18 92:19 94:16 96:14 98:7,10 107:4 119:13 123:7 124:8 128:5 129:9,14 138:14, 21 141:24 142:5 152:10,13 156:21 157:6,11

**marking** 12:3 107:13

**materials** 76:20

**matter** 55:25 81:20 129:21 153:1

**meaning** 22:7 24:19

**meaningless** 161:24,25

**means** 15:20 26:16 31:8,9 40:15 59:4 62:8 83:16 87:10 100:5,14, 16 127:12 132:11 154:19 179:8

**meant** 32:9 97:9 138:9 176:10

**meeting** 25:22,23 27:20 28:11 33:19 34:19 42:4 160:22 178:3

**meetings** 26:21 29:18

**membership** 45:15 46:6,21 58:24 69:16 74:4,13 77:5,9,12 117:2,20 118:7,12 119:10,22 122:7,16

**memories** 80:14

**memorize** 76:14

**mention** 41:19 126:12 140:25

**mentioned** 27:19,24 28:2 37:17 38:24 41:3

55:4 57:21 69:12 164:5 169:24

**merchandise** 15:15

**merchant** 9:1

**met** 27:22 39:14 43:6 90:23 176:24 177:12

**mid-80s** 11:19

**middle** 13:20 68:6 113:6 133:22

**million** 26:16 27:10 28:3,4,6,12,25 29:8,13 38:12 48:18 57:22 90:25 91:6 163:13

**million-five** 26:2 29:2,3,4,5 44:11,14 50:13,14 58:7 67:21,22, 23 68:2,6,7,8

**million-two** 67:24 68:3 92:1

**mind** 21:22,23 48:3 64:19 86:4 147:5

**mine** 62:13

**minute** 18:12 98:17 164:25

**minutes** 67:4

**Miriam** 96:12 103:4 113:22,23 114:4,7,10, 11,16 115:1,8 116:13, 20 118:6 121:16 123:3

**misjudged** 89:15

**misrepresent** 89:9

**missed** 97:3

**missing** 68:9,10

**mistrust** 75:25

**mixed** 109:22 115:1

**mixing** 67:21 85:3

**monetary** 143:23

**money** 23:5,6 24:9 25:1,23,24 26:1,14,16, 18 27:14,15 28:12,19 29:11,17,24 30:2 31:15, 17 32:1,4,6,20,21,22 33:4,5,6,7,9,10,11,12, 14,15,22 34:15,17 35:8,

15,16,19 36:25 40:19 41:9 42:11 44:7,15,17, 22 51:5,8,9,11,12,13 52:18,24 53:2,3,12,15, 19 55:23,25 56:2 57:11, 14,16 58:8,10 59:9 63:14 71:14,15 80:16, 17,18 81:21 88:8 91:12, 14 92:2,4 106:20,22 108:23,24 113:18 115:22,25 116:2,4 143:4,5,13 144:15,19, 23 155:20 158:23 159:6,10 169:8,20

**moneymaker** 67:17

**month** 99:14 100:8 101:19 115:8,15

**months** 51:3 57:16 86:18

**morally** 88:2

**Morgan** 94:3

**morning** 8:7 25:9 33:23 98:13

**move** 45:12 88:24 152:7 164:11 166:2 171:6

**multifamily** 13:14

**multimillions** 38:11 52:23

**multipage** 124:7

**multiple** 166:14

**musical** 56:1

---

## N

**nature** 37:12 85:3

**needed** 15:15 25:6,9, 10 28:11 34:23 39:16 57:14 58:8 80:17

**negative** 67:10

**negotiate** 61:8,9 131:22

**networker** 10:23

**news** 32:3

**nice** 50:5

**night** 71:9 137:3

**nightmare** 72:15

**Noah** 69:18 133:15 134:5 136:18,21 140:7 173:22 174:2,4

**non-proper** 166:2

**nonpayment** 25:2

**North** 9:13

**Northeast** 10:21

**Northwest** 10:1

**note** 22:17 23:20 29:7 30:12 31:8 32:12 33:18 35:7,22 38:3 39:9 64:24 65:16 149:16 172:13,20

**noted** 23:16

**notice** 76:20 107:15 117:21

**noticed** 83:10

**notices** 121:23 122:10,13

**notorious** 110:11

**number** 14:19 15:5 23:22 47:16 64:10 74:14 77:11 83:12,22 85:21 94:16 103:15 129:16 138:22 148:1 152:14,16 156:22 158:1

**numbers** 129:17

**numerous** 29:17

---

## O

**oath** 8:10 177:1,13

**object** 15:21 16:16 18:8,18 22:20 37:2,5 39:25 40:2,8 43:2 44:24 45:2 49:4,12,24 51:25 52:13 56:23 57:24 58:17 59:19 60:2,19,23 65:22 69:23 82:13 84:20 87:16 91:3 93:9 111:19 117:12 121:21 122:17 141:7 145:13 146:4 148:5 150:21 151:2 159:3,4,15,17 162:9 167:14 170:22

173:15 177:6

**objected**  158:7

**objection**  15:24 17:7 30:16 35:9,11,23 36:18 49:14 58:14 60:12 64:20,22 65:4,13 70:22 85:12 86:8,10 112:12, 14 150:9,15,18 153:13 159:11 166:1,12 170:1 171:22,23 173:9

**Objections**  153:16

**occur**  19:11

**Ocean**  9:5 11:11 13:5, 6,13,15 18:17 24:16 56:22 57:3 58:20 65:20 107:14 156:9

**October**  12:11

**offered**  67:12

**offering**  25:4

**office**  174:10,13

**officer**  156:5,7

**older**  10:19

**one-page**  63:24

**one-tenant**  27:3

**online**  53:25

**operate**  22:4

**opinion**  19:19 55:19

**opportunity**  19:14 25:5 28:14,19 32:7

**option**  86:4

**orally**  14:22

**order**  13:5 24:25 25:6 116:11

**orderly**  106:6

**organization**  168:8, 9

**organized**  34:6

**original**  26:19 44:10 53:5 58:1,3,4 134:6 137:19

**originally**  90:25

**originals**  134:1

136:3

**originated**  166:15

**origination**  130:7

**outcome**  66:12

**outline**  24:7

**outs**  55:7

**overlooked**  147:17

**overnight**  134:1,6 136:3

**owe**  32:24,25 33:4,9 143:4,5,13 144:14

**owed**  51:8,9 53:12 69:1 120:4

**owing**  71:15

**owned**  26:13 32:4 85:24 89:10 162:22,24 164:2

**owner**  156:15

**ownership**  125:13, 14

**owns**  163:8 164:2 165:16 167:5

---

**P**

**p.m.**  90:12,15 116:19 136:25 137:4 140:11 142:24 143:2

**paged**  94:20

**pages**  56:11 94:7,17 95:21 98:14 103:18 153:11

**paid**  31:13 50:19,20, 22 57:16 62:11 86:3 88:13 175:16,23,25 176:3

**paper**  40:19 144:6

**paperclip**  106:25

**papers**  115:16 162:17

**paperwork**  26:23 30:19 32:16

**paragraph**  15:11 46:18 48:2 49:2,7,11 59:1,7 83:25 84:6

**Pardon**  21:17 45:1

**parents**  10:14

**Park**  8:22 13:15 71:9

**part**  13:15 102:20,22 113:5 121:8 133:5

**participant**  134:24

**participate**  25:17

**participating**  105:2

**partner**  21:20 61:18 88:3 125:18 173:3

**partners**  14:3,5 83:1 114:14 125:21

**party**  83:15

**passive**  39:22

**past**  36:19 102:4

**pawn**  163:22

**pay**  31:10 50:17 51:2,3 52:25 57:15 59:9 61:15 72:21 80:15 86:18 87:1, 4 88:10,12,13 97:13 145:11 155:20 176:2,4

**payable**  48:7,9,15

**payables**  48:7

**paying**  80:14 115:12 116:2,3 134:14

**payment**  88:14 115:17,21,23

**payments**  59:9,10 68:20 88:14 101:9,10 109:1,2 115:15 126:22, 25

**payoff**  126:3,9

**pays**  127:12 155:23

**pending**  64:13

**Penn**  31:17

**Pennsylvania**  9:15

**Pensacola**  10:3

**people**  25:3 26:8,22 32:4,16 39:13,14 40:25

68:13 71:16 101:5 104:5 105:17,18 110:8 111:7 131:25 132:14 161:4 163:16 170:22

**percent**  24:15 72:5 78:5 85:25 88:1 133:7 147:7,8 151:10,25 156:15 163:8 176:24 177:3,12,15,24 178:11, 25 179:7

**period**  38:5

**permission**  21:13

**permit**  152:2

**person**  31:18 43:25 52:8 55:19 70:18 110:8 131:15 135:6 166:10 179:10

**personal**  123:6 144:1

**personalities**  52:9

**personally**  163:8

**persons**  48:12

**pertaining**  172:3

**phone**  72:7 101:25 102:1,6,8 105:4,15,19 110:7,10 111:6,8,10 112:16 126:19,20,24 127:9 131:8 137:12 144:20 179:10

**phrase**  64:16

**physical**  43:13

**physically**  33:18

**piece**  26:12,13 27:2

**pieces**  53:8

**pile**  23:11

**Piscataway**  9:13 28:17

**place**  85:10 167:13 171:18 174:2

**plane**  43:14

**play**  108:13

**players**  149:19

**playing**  68:15

**plays** 56:1

**pledge** 34:4

**pocket** 111:13

**point** 109:16 113:17 115:10 141:11 142:16 144:9 153:9 171:3

**points** 116:6

**poker** 68:15

**politely** 167:21

**position** 87:19 131:21 174:13 176:23

**positive** 67:10

**possibility** 35:6 41:4,17,19,20,23 42:3

**possibly** 110:12

**practically** 57:10

**preferable** 153:5

**prepared** 80:5

**present** 54:12

**presented** 12:10 173:14

**pretty** 30:23 52:24 122:21

**previous** 18:14 83:9 104:15

**price** 27:5 48:3,5,7 49:21,22 97:10,13,14, 15

**Princeton** 27:2 32:7

**principle** 68:18

**print** 133:25 134:5 136:2

**printed** 72:7 76:17

**printout** 154:14

**prior** 18:14 94:21 95:16 146:6 166:16 172:4

**privileged** 70:8 133:15

**problem** 17:8 42:12, 13 61:18 86:5 100:25 101:2 150:16 151:11

152:15 162:4 165:23,25 168:15 170:11

**problems** 101:5 153:2 164:7

**procedure** 161:21

**proceed** 31:2 46:22 153:14

**produced** 98:13

**proffering** 12:7

**promise** 45:10 115:24

**promised** 53:13 57:15 72:9 115:23

**promises** 29:19

**promissory** 23:16, 20 29:7 30:12 31:8 32:12 33:18 35:7,22 38:3 39:9 64:24 65:16 149:16 172:13,19

**promote** 26:9

**promoting** 173:2

**pronouns** 39:21

**proof** 29:14,15,22 31:16,19,20 32:15,16, 17

**properly** 45:7 147:13

**properties** 9:4,6,8 11:13 28:15,22 53:10

**property** 9:15,17,25 14:7 20:9,19 24:21 25:5,7,14,21 26:12,14, 19,24,25 27:2,3,5,6,16, 17,18 28:3 34:21 38:12 41:6,7 64:7,14 66:14,20 67:12 89:7,21 156:17

**Prospect** 13:15

**protecting** 168:24

**prove** 30:18

**proved** 33:1

**proven** 33:5,6

**provide** 118:2,5,6 154:13

**provided** 95:9 154:15

**providing** 93:17

**psychiatrist** 51:17

**pulled** 139:20

**purchase** 11:17 13:5 14:2,4 27:5 48:2,5,6 49:21,22 60:7 97:10,13, 14,15

**purchased** 13:17,22 14:2 26:14 27:18 28:16, 18 49:23

**purchaser** 59:17,24

**purportedly** 137:1

**purporting** 141:10

**purpose** 58:13,16

**purposes** 12:13 98:11 129:15 138:22 142:6 157:12 173:7

**put** 13:5,9 15:5,18 16:4,14,22 17:3,17,19 19:12,13 26:1,2 29:11, 13,16 30:13 31:18 32:1 33:20,24 39:8,9,11,15 53:10 57:9,10 60:16 66:13,19,21 69:15,17 81:21 92:17 126:19,20 129:7 138:2 144:6 159:7

**putting** 132:24

## Q

**quarter** 164:2

**Queens** 8:23

**question** 11:3,5 16:2,8,17 17:1,14 18:9, 19 19:5 20:2,21 21:2,21 22:6 29:7 34:16 36:23 37:6,13 39:4 40:1,9 43:3,8,12 44:25 45:3,9 46:12 47:10,18 48:22, 24 49:2,5,13,25 52:1,14 56:17 59:6,20 60:3 62:6 65:13 66:6,8 69:5,24 70:10 76:3 77:22 78:8 80:21 81:12 82:14 84:15,17,21 87:13,17 88:24 89:12,20,24 91:4 93:2,10 94:22 96:19

98:20 99:22 100:3 101:3,5,7,14 103:24 104:1,6 105:6 106:5,14, 15 108:2,15 109:5,9,24 111:20 112:2 113:1,8 114:2,15 116:22,24 117:5,7,13,23,24 120:10,21 121:3,17,22, 25 122:18,25 123:17 124:13 125:12 128:17, 18 134:21 139:21 142:2,10 143:10,12 145:3,14,19 146:5,20, 23 147:23 148:6,8,18, 23 149:7 151:22 152:3 155:6 156:1 157:23 159:18 161:7 162:10 163:11,20,25 164:12 165:1,10,12,13 167:2, 15 168:11,14 169:21, 22,23 170:13,19 171:18,23 172:1 174:3, 7 175:17 176:17 177:6 178:1,5,6,22,23 179:14

**questionable** 147:5

**questions** 42:21 70:5 121:2 138:5 146:7 163:15 168:6 172:8 176:19 177:8

**quiet** 166:12,24

**quote** 100:7,9

## R

**R-U-S-S-A-C-K** 8:20

**raise** 153:12 167:17

**raising** 19:1

**rarely** 137:6

**re-cash** 59:8

**read** 14:18 19:25 46:15 48:17 59:3 66:4 82:23 83:12,18,19 84:2, 3,4 89:2 93:7 108:6 115:5 120:19 136:18 137:20 139:4,7,12 141:7 142:3 147:15 158:8 162:16

**reading** 48:3,14 138:25

**real**  9:3 11:8 15:17 35:2 53:8 135:6

**realization**  39:18,23 40:6

**realize**  42:6

**reason**  24:24 25:22 100:20 110:19 160:6,7 171:1

**reasons**  38:20 134:13

**reassurance**  87:8

**reassure**  87:22

**recall**  17:22 45:14 48:19,20 49:10,23 71:2 73:24 74:1 76:9,10,15 97:22 101:20 104:3,8,9, 10 109:18 113:11,12,14 117:9 118:24 120:2 122:22 126:2 133:14 137:24 139:22 140:14 141:18 155:2,7 163:1 175:10 178:2 179:4,5,9

**recalling**  179:8

**receive**  35:8,12,15 96:24 119:3

**received**  12:15 23:17 36:25 46:7 56:7 62:23 73:7 74:4 77:5 79:18 91:15 92:19 96:14 98:7 107:4 113:16 123:6 124:8 128:5 129:9 138:14 141:24 152:10 157:6 175:14,20

**receiving**  122:22 140:14 141:18

**recently**  67:25 93:5 95:11

**reception**  137:7

**recess**  45:25 90:13 142:25

**recited**  49:11

**recognize**  46:11,12, 13 56:14,18,19 73:16 74:7,25 75:7,11 77:24 78:1 80:7,9,13,22,23 98:16 99:13 108:4,5,8, 10,18,19,21 109:5,6 114:23 115:3,5 123:10,

20 124:12 128:8,18,19, 25 129:1,3,4,5,12 130:2,3,4 138:18 139:8 142:2,12 153:18 156:2

**recognized**  74:9

**recollect**  178:3,9,15

**recollection**  76:22, 24 82:2 176:24 177:12

**recommended**  19:22

**reconcile**  65:3,11

**record**  8:17 12:4 30:9,10 45:24 46:2 57:25 62:20 74:11 89:1 90:12,15 92:24 94:11 95:20 96:2 98:9,25 107:11 117:15 118:14 121:1,13 128:9 135:12, 18 136:24 137:22 138:20 142:4,24 143:2 145:15 146:8 150:10 151:3 152:19 154:9 157:10 161:1 165:8 172:2 178:19

**red**  53:11

**redundant**  141:21 142:17

**refer**  53:19 81:3,4

**referred**  49:21 118:22 130:20 135:19

**referring**  53:20 95:9 97:18,19 103:13,21 106:20 117:10 130:22

**refers**  141:8

**refuse**  161:5

**relate**  83:22

**relationship**  45:7 51:15,20,23 52:3,5 55:12 64:7 160:15,18

**relevance**  119:24

**rely**  24:24 72:18

**remember**  16:24 17:23 21:14 27:4 34:5 37:18 39:8 45:19 47:15, 20,24 57:13 69:2,3 71:4,6 72:3 73:3 75:10 76:13,16 85:19 89:16

100:1 105:24 113:19 115:9 126:4 131:6 133:20 134:23 141:20 153:19,20,22 155:8,10, 12 156:11 158:10 159:22

**renegotiate**  134:14

**renovation**  151:16

**renting**  174:10

**repay**  53:14

**repeat**  55:21 145:16

**repeating**  16:3 121:2

**repetitive**  170:21

**rephrase**  37:13 65:14 163:19,25

**replacement**  26:12, 13

**reporter**  99:21 166:9

**reportingly**  116:19

**represent**  90:19 156:14 175:4

**representation** 54:14 55:20 61:19 67:3 83:4 109:18 120:12

**represented**  13:10 19:20 32:11 36:2 70:13 82:7,11,16,19,22 84:25 90:20 101:7 153:1

**representing**  68:1 70:7 82:24 147:17

**represents**  29:6

**requested**  96:7

**requiring**  134:3 135:22 140:2

**reserve**  161:16,24

**reserved**  153:16

**reserving**  161:23

**reset**  168:2

**reshuffle**  68:15

**reshuffled**  68:17

**reshuffling**  68:16, 17

**respect**  39:16 41:2

**Respectfully**  85:9

**respond**  18:25 19:8 39:4 40:13 65:23 117:25 146:22 173:20

**responded**  36:9

**response**  33:8 145:10 171:2,9,11,12

**responsibility** 146:3

**responsible**  126:23

**rest**  72:9 107:2 129:25 138:1

**restricted**  18:7

**restriction**  16:14,23 17:4,18,19 156:19 157:25

**restrictions**  79:18 156:24

**retailer**  9:1 53:9

**retake**  140:16

**revised**  135:25 140:5

**revolve**  149:25

**rip**  127:22

**risk**  28:23

**Rockaway**  8:22

**rocks**  53:12

**Rodriguez**  8:7

**room**  171:20

**Ruben**  44:5 51:8 131:16

**Rubin**  44:3,4 96:6 125:18 128:23 142:8 152:23

**Rubin's**  114:12

**Rule**  170:20

**rules**  161:19,20 170:20

**Russack**  8:18 12:10, 13,15 20:1 23:17,22 37:23 46:5,7 56:8,14 62:24 63:24 73:7,11

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

74:5,12 75:23 77:6
79:19 92:20 93:2 94:18
95:25 96:6,14 98:7,10,
11 107:4 116:20 121:16
123:6,7 124:8 125:2
128:5 129:9,14,16
133:22 134:2 135:21
136:1 138:14,19,22
140:7 141:4,24 142:5,6,
8 152:10,13,14,17,24,
25 157:6,12 167:23
172:13

**Russack's** 118:15
137:2 153:4

---

**S**

---

**S-A-M** 42:23

**S-P-R-E-I** 42:23

**sale** 46:6,21 60:7,9,10
74:4,13 75:12 77:5,12
117:20 119:22 146:13

**sales** 9:1 45:15 58:24
69:16 77:9 117:2
119:10 122:7,16

**Sam** 42:19,23 44:17,
20,22 50:23,24 51:6
52:12,18 57:18 68:19,
21,22 70:14 71:10 86:7,
13 88:7,13 90:21,22
96:5 101:8 102:2 105:1,
10 108:22,23 109:25
125:23 126:7,8,16,17,
19,20,23,24 127:8,9,12
130:8 132:2 134:13
135:4 145:12 153:22
155:15,20 160:20 169:1
173:2,25 174:5 175:25

**satisfaction** 32:22

**satisfied** 30:13,14,
18,20

**scenario** 65:18

**school** 54:23

**scope** 30:24

**Scratch** 126:1

**scribbled** 79:8

**scrupulous** 110:3

**secret** 151:19,20

**secrets** 151:18

**secure** 44:23,25

**secured** 24:10,11,12
45:3

**securities** 87:9

**security** 22:7 25:15

**seeking** 22:19

**seeks** 18:9

**sell** 20:9 34:21 147:4,7

**seller** 26:13 35:17,19
48:11,12 96:11

**sellers** 32:5

**selling** 16:14 62:4,5

**sells** 125:23

**send** 81:21 95:11,18
106:22 112:16 114:22,
25 127:10,11 133:17
135:3,5

**sending** 104:3
106:20 111:8 112:11
136:21 137:19

**sense** 49:7 146:10,13,
17

**sentence** 160:1

**separate** 67:7,8
128:12 138:3

**separately** 28:21

**sequential** 152:18,
22 153:3

**services** 175:24

**Servicing** 96:5

**set** 63:4

**setting** 134:10

**settled** 67:1

**setup** 134:11

**seventh** 170:23

**shake** 15:16

**share** 28:5,8 61:22
83:1 84:19 87:9 151:17

**shared** 11:12

**shares** 16:14 17:5,20
18:5,7,16 20:19,25
21:6,9,12,15 22:13
24:11,12,14,15 25:16,
20 28:22 34:4 36:17
38:1,5,25 52:11,12,18
56:7,11,21 57:2,8 58:6,
12,20 60:11 62:5,15
64:8 65:1,19 85:1,2,18,
25 87:24 88:22 145:8,
24 150:8 158:6 159:7,
13 162:5,14,23,24,25
163:9,12 164:2 165:17,
21 167:5 168:20,21,22,
23 169:25

**shore** 55:22

**short** 19:10 38:5

**shot** 161:19

**show** 45:14,17,20
54:21 96:18 169:18

**showed** 37:23
101:20 127:3

**showing** 95:1 96:8

**shown** 63:23 152:17

**shows** 132:18

**sic** 48:8 99:14

**side** 85:4 125:8

**sign** 33:17 35:22
38:13 57:8 69:21 70:21
71:8,25 72:2 80:11
88:21 143:14,17 145:12
150:23

**signature** 46:24,25
47:2,6,11 72:8 73:19,21
75:16,17,24 76:4 78:3,
4,5,18 79:6,22 94:18

**signatures** 78:10

**signed** 19:15,16
47:15,16,17 51:23 72:6
77:14 79:8 136:21
137:19 143:16,17 147:2
167:25

**signing** 71:3 73:24
74:1 147:6

**signs** 56:15

**simultaneous**
41:10 84:9 90:8 99:19
105:7 148:25 166:3,23

**sir** 54:20 60:10 95:5
100:3 103:21 121:17
122:20 123:18 141:2

**sit** 89:2 149:24

**sitting** 102:5

**situation** 51:18
57:11 67:8 68:6,23 88:5
131:24 134:25 169:2,3

**sixth** 170:23

**skilled** 53:8

**skipped** 13:12

**sloppiness** 68:12

**small** 32:6 76:18

**sold** 151:15

**solve** 164:6

**son** 178:4,6

**sort** 19:23

**southern** 13:15

**speak** 19:17 22:9,10,
11,12,14 42:1 126:17
127:2 148:2,3,13 149:7,
14 150:11 158:25
166:14 177:2 179:1

**speaking** 116:25
155:4 178:2

**speaks** 15:24 101:18
119:23 145:15

**specific** 11:2,5
108:19,21 113:14
164:17

**specifically** 36:23
164:4

**speculating** 156:1

**speeches** 101:4

**spell** 8:19

**spend** 9:21 160:14

**spent** 32:12

**spills** 52:7

**spoke** 43:6 69:19

105:3 126:12 144:20 149:17 158:18,19 160:1 174:16

**spread** 28:23

**Sprei** 42:19 43:24 44:5,17,18,19 112:7

**Sprie** 44:15,16 50:23, 24 51:6,16 52:12,18 53:5 55:5 57:18 70:14, 17 71:21,24,25 86:7,13

**squeaky** 147:20

**stack** 95:21

**stake** 71:14

**stamp** 129:17

**stapler** 127:16

**start** 13:12 22:11 45:21 55:3 140:8

**started** 83:23

**starting** 86:6 155:1

**state** 8:17 14:23,25 15:2 177:1 178:8

**stated** 35:10 112:13 178:19

**statement** 123:6,12, 13 135:24 140:4 157:5, 13,18,21 161:8

**statements** 124:2 141:9

**Staten** 155:16

**states** 9:14 145:16

**stating** 135:21

**Station** 31:17

**stay** 169:13

**stenographer** 8:6, 8,9 41:12,13 42:22 45:22,23 46:1 84:11,12 90:11,14 104:19 142:23 143:1 149:2,3 166:5,6 176:16

**stepped** 147:16

**stipulate** 140:3

**stipulates** 135:23

**stock** 16:15 17:5 18:5 66:10 146:14

**stop** 86:23 89:20 90:5 106:4 121:1 122:21 152:1 156:1 163:5 164:10 166:8,9 172:5 174:6 178:5,22 179:11

**stopped** 101:25 111:11,12,13 134:14

**story** 89:18

**straggle** 165:12

**straight** 114:21 160:18

**straighten** 53:14 169:16

**straightened** 169:15

**strike** 166:2 168:14

**structured** 61:6

**stuff** 105:2 109:21 110:12 111:8 112:22 155:18

**subject** 48:8

**submitted** 135:24 140:4

**subscribe** 109:21

**substitute** 27:15

**successful** 67:15

**supposed** 24:19 28:16,18 35:12,16,17 44:10 68:1 76:14 81:20 85:23 101:8

**supposedly** 113:21 153:1 154:24

**surprise** 59:25 60:4

**suspecting** 90:3

**suspicious** 63:14, 16 71:19

**sworn** 8:13

---

## T

**table** 101:4 105:6 106:5

**takes** 110:7

**talk** 20:11,25 21:6 42:15 51:21 55:5 108:22 112:24 126:17 129:22 148:16,19,20 158:24 165:21 167:6 177:15

**talked** 58:25 133:10 145:21 148:1

**talking** 21:20 42:11 50:1 66:22 67:11,13 69:25 76:19,21 88:4 93:21 99:22 105:22 107:11 121:14,20 123:2 143:7 149:4 155:5 159:20,25 160:3 167:13,16 178:4

**talks** 14:17 105:17 121:22 122:9 151:17

**Tallahassee** 10:4,6

**tear** 38:16

**teens** 10:19

**Teichman** 43:1,5 96:6 105:3 108:22 112:24 126:13 130:9 131:16 135:3,22 140:2 142:9 144:21 152:24 154:11 155:14

**Teichman's** 116:7

**telling** 21:25 101:5 109:10 110:13 125:24 136:17,18 151:9 167:17

**temporarily** 38:5

**temporary** 24:19

**ten** 9:2 129:18 138:10 164:11

**tenth** 109:10

**tenured** 91:1,7

**term** 44:25 45:3

**terms** 22:6 61:1 156:16 161:23

**testified** 8:14 113:12

**testifying** 178:1

**testimony** 41:11 44:12 64:25 65:5,6,17, 19 67:4 78:20 84:10

90:8 97:6 99:19 105:7 115:14 149:1 166:4,13, 23 168:19 177:9,11

**texts** 43:21

**theory** 31:2

**thicker** 134:16

**thing** 19:20 21:24 61:12 62:7 68:13 72:21 86:19 88:11 103:19 114:14 121:5,19 139:7, 15 144:4 146:12,16 147:16 148:14 157:4 160:4,9 162:2 163:14 164:18 168:3 169:15,17 170:25 177:8

**things** 14:10 38:6 55:15 62:3 67:7 71:8,17 72:5,7 76:14 85:23 90:21 110:3 112:11 122:19 126:18 131:19, 22 132:15 134:14 141:12 145:7 146:10 149:18 151:3 163:20 169:6

**thinking** 68:7

**thought** 10:6 41:21, 22 42:2 120:23 147:7,9 152:5

**thread** 160:16

**time** 9:21 11:18 13:20 14:3 18:14 19:10,19 20:17 25:12 26:6,7,9 32:19 34:20,25 38:5 41:14 45:10 51:22 52:7 55:17 63:12 68:16,17, 24 71:19 72:24 73:2,18 84:13 86:21 88:1 89:18, 22 95:24 96:25 97:24 105:3,18 107:24 109:10 111:11,16 112:5,20 124:2 126:5 129:20 137:3,13 139:6 140:17, 19,25 144:10 150:1,12 151:3 152:18 159:1 163:7 166:7,10,15 167:18,23 170:23 171:6,15 172:4

**Timeout** 90:9

**times** 78:13 90:23 108:22 110:6 111:1

150:19 151:6 152:6 161:7 164:11 166:14 167:21 170:15 172:2

**titled**  56:6 62:22 73:5 74:3 77:4 79:17 123:5

**today**  8:8 31:3 40:24 67:11 96:8 103:23 164:6 168:10 176:9,14

**told**  22:1 27:11 28:10, 11 29:15 31:24 34:23 70:14 91:25 115:8 145:12 148:15 153:21 155:12 162:12 165:11 173:21,24 174:4

**tomorrow**  33:22 71:11 134:2,7 136:4

**top**  103:22 128:12

**topic**  152:3,7 164:4,19 168:11 170:24

**total**  28:24 29:13

**Totally**  76:6

**touch**  147:8

**touched**  33:15

**trail**  40:19

**transaction**  24:19 37:12 59:16 61:2,6 82:4,12,20 83:5 85:3,16 86:16 115:12 148:23 154:13 159:16 174:14 175:8,24 176:5

**transfer**  48:11 85:2 87:23

**transmittal**  128:14

**transmitted**  95:1

**transpired**  41:1

**trap**  63:6

**tremendous**  57:12

**trickle**  51:12

**Troy**  174:11 178:18

**true**  33:13 49:3,7 50:4 113:16 115:6,15 170:4

**trust**  39:15 55:18 71:11,12 86:13

**trusted**  36:2,4 55:17

**truth**  34:11 66:16,18 105:14 110:13 149:21, 24 151:9 171:21,24

**turn**  54:9

**type**  145:2

### U

**UCC**  157:5,13,17,21

**UCCS**  66:20

**un-blur**  54:10

**un-blurring**  54:17

**un-refundable**  33:25

**unclear**  70:6

**understand**  16:13 19:4,8 20:21 34:10,14, 16 40:4,13 41:2 49:6 59:4,5,7,10,18 60:4 61:23,25 63:7 66:9 72:16 73:1 83:15 87:6 115:11 128:15 146:25 163:23 167:18

**understanding**  12:21 15:19 17:10 18:4, 6 20:5 21:8,11 22:10,21 30:1 65:24 66:2 70:12 72:17,18 84:18 87:7,21 97:9 147:25 157:21 176:23 177:11

**understands**  18:25

**understood**  34:18 61:21 72:23 152:5

**underwear**  169:18

**unintelligible**  41:10 84:9 90:8 99:19 105:7 148:25 166:3,23

**unknown**  26:17

**unnecessary**  19:2 69:4

**update**  120:3

### V

**venture**  12:23

**verbally**  34:19 50:14

**voice**  19:1 160:23 167:17

**volunteer**  45:9

### W

**wait**  18:21 45:8 75:18 102:6 104:13 114:1 137:18 162:7

**walk**  53:18

**wanted**  20:15 38:7 50:15 58:9 79:5 126:16 127:1

**warning**  126:21

**washing**  71:14

**week**  76:10 92:23

**weeks**  34:24

**Weinstein**  10:8,9,20, 25 11:9 12:12,22 13:4 17:18,20 19:18 23:5,6 24:8,10,20 25:10 42:9 61:18 63:9 65:1 72:24 145:24 147:20 148:3,13 149:8,14 158:7,21,22 159:2,15 160:1 162:4 166:14 172:14

**Weinstein's**  10:15 16:6,13,18 17:10,12 25:15

**West**  125:7

**whatsoever**  49:7

**whim**  39:13

**wife**  114:12,17

**Williamsburg**  174:11

**wire**  48:10 92:5,9 103:22 128:24

**wired**  92:2,4,8 113:18

**wires**  68:3 99:14 100:8 101:19 115:8

**wise**  160:12

**Woodbridge**  8:4

**Woodruff**  9:5 11:11 13:5,6,13 18:17 24:16 56:22 57:3 58:20 65:20 107:14 156:6,9

**word**  40:15 54:20 58:11 59:23,25 112:10 115:4 143:20,21

**words**  13:6 14:3 31:22 32:13 33:8 59:8 118:1 131:20,24 133:3 162:14

**work**  9:1 66:16 83:1 148:16 149:21 155:18 169:4,5,14

**worked**  36:3 44:5 82:25 160:8

**working**  126:9 134:2 135:21 140:1 155:14,16

**worry**  71:11

**worse**  55:15 72:15

**worth**  163:12 168:22, 23

**write**  78:24 79:1,24,25 104:2 106:10,11 133:5, 8 134:5

**writing**  105:1

**written**  13:23 88:16 131:18 147:20

**wrong**  21:24 88:3 146:1 147:9,11 151:14, 21 160:9,24 163:11,14

**wrote**  15:7 79:24 88:15 100:19 106:18 116:13 118:24,25 132:25

### Y

**year**  13:19 63:13 67:5 111:12 145:24 171:15 177:16

IRA B. RUSSACK
FEBRUARY 17, 2025

JOB NO. 1457991

**years**  9:2 26:21 34:12
36:3 40:25 44:6 68:5
78:12 89:17 105:23
159:23 174:17

**yes-or-no**  21:2
34:16

**York**  8:22 14:24 15:1,2
48:10