# EXHIBIT E

Page 1

          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
                      *   *   *
  JEST HOLDINGS, LLC,      :   NO.
          Plaintiff,       :   1:23-cv-04260
                           :   -DG-RML
          v.               :
                           :
  IRA RUSSACK, HENRY       :
  WEINSTEIN, OCEAN         :
  WOODRUFF DEVELOPMENT     :
  CORP., JOSEPH            :
  HARRISON, ESQ., and      :
  HSK LAW GROUP, LLC,      :
          Defendants.      :


                      *   *   *
          Wednesday, March 12, 2025
                      *   *   *


                  Oral Sworn Deposition of
  NOAH BURTON, taken pursuant to Notice,
  held at the Law Offices of Wilentz,
  Goldman & Spitzer, P.A., 90 Woodbridge
  Center Drive, Suite 900, Woodbridge, New
  Jersey, beginning at 1:12 p.m., on the
  above date, before Brandy M. Christos,
  Registered Professional Reporter,
  Certified Court Reporter, and Notary
  Public, there being present.



                      *   *   *
      GOLKOW LITIGATION SERVICES, INC.
       877.370.3377 ph| 917.591.5672
              deps@golkow.com

Page 2

APPEARANCES:


        LAKEWOOD LAW
        BY:   ARTHUR H. LANG, ESQUIRE
        918 East Kennedy Boulevard
        Lakewood, New Jersey 08701
        (732) 609-5530
        LakewoodLaw@gmail.com
        Representing the Plaintiff


        WILENTZ, GOLDMAN & SPITZER, P.A.
        BY:   DANIEL BERNHEIM, III, ESQUIRE
        90 Woodbridge Center Drive
        Suite 900, Box 10
        Woodbridge, New Jersey 07095
        (732) 636-8000
        DBernheim@wilentz.com
        Counsel for Defendants


        FRIEDMAN SANCHEZ, LLP
        BY:   ANDREW M. FRIEDMAN, ESQUIRE
        16 Court Street, Suite 2600
        Brooklyn, New York 11241
        (718) 797-2488
        AFriedman@friedmansanchez.com
        Representing the Defendants,
        Weinstein and Ocean Woodruff

Page 3

*   *   *

I N D E X

WITNESS:

NOAH BURTON

EXAMINATION BY:                          PAGE

        MR.  BERNHEIM                    5, 226

        MR.  FRIEDMAN                    164

        MR.  LANG                        192, 235

*   *   *

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| NB-1 | Subpoena, 5 pages | 11 |
| NB-2 | Checklist | 49 |
| NB-3 | E-mail, dated 3/8/20 | 114 |
| NB-4 | Letter, dated 3/18/20 | 143 |
| NB-5 | E-mail, dated 3/12/20 | 148 |
| NB-6 | E-mails, dated 3/19/20, 2 pages | 149 |
| NB-7 | E-mail from Lakeland Bank, 3 pages | 151 |
| NB-8 | E-mail, dated 3/12/20 | 158 |
| NB-9 | Letter, dated 4/19/20, 2 pages | 161 |
| NB-10 | E-mail, dated 4/30/20 | 163 |
| NB-11 | Packet of E-mails, 7 pages | 191 |

Page 4

```
                        *    *    *

                DEPOSITION SUPPORT INDEX

                        *    *    *


STIPULATIONS:

Page    Line

(None)


MARKED QUESTIONS:

Page    Line

(None)


REQUESTS FOR DOCUMENTS:

Page    Line

167     14


WITNESS INSTRUCTED NOT TO ANSWER:

Page    Line

(None)
```

Page 5

*   *   *

NOAH BURTON, having first duly affirmed, was examined and testified as follows:

*   *   *

DIRECT-EXAMINATION

*   *   *

BY MR. BERNHEIM:

Q.    Mr. Burton, for the record, would you just please state your full name?

A.    Noah Burton, B-U-R-T-O-N.

Q.    And what is your address, sir?

A.    7 Evian Court, Lakewood, New Jersey.

Q.    Is that a residence or a work address?

A.    That's my residence.

Q.    Okay.  And what's your work address?

A.    500 River Avenue, Lakewood, New Jersey.

Q.    And you are an attorney; correct?

Page 6

A.    Yes.

Q.    You ever been involved in a deposition as an attorney?

A.    Yes.

Q.    You have taken depositions and defended them?

A.    Yes.

Q.    All right.  So albeit you presumably understand the process, just permit me just to make sure you and I have a common understanding.  I'm going to ask questions; your job is to answer to the best of your ability.  If for any reason you don't understand the question I ask, let me know and I'll do my very best to rephrase it.

Do you understand that?

A.    Yes.

Q.    Okay.  I anticipate that we're going to be here for quite some time, and at your request we're starting at 1 p.m., but nevertheless, it's still not an endurance test.  If you need a break, let me know and we'll be glad to accommodate.  The only caveat is, if

Page 7

there is a question pending, I ask that you answer that before we start.

A.    Sure.

Q.    All right.  Sir, as you know, I represent Ira Russack in this action which has been brought by Jest Holdings.

And you're aware of this lawsuit, I presume; correct?

A.    I am.

Q.    What's your understanding of the nature of the lawsuit?

A.    My understanding is that -- I have not -- I have not reviewed the pleadings.

If I recall, I think Mr. Teichman was suing Mr. Russack to collect on the -- to collect a debt, or something of that nature.

Q.    Have you looked at any of the pleadings, the complaint, the answers, any of the motions that have been filed in this matter?

A.    I remember seeing one of the pleadings about a year and a half ago; a

year, year and a half ago, something like that.

Q.    What were the circumstances by which you reviewed one of the pleadings?  Was it sent to you, you looked at it on your own, or what?

A.    I believe I looked at it on PACER.

Q.    You indicated you're an attorney.  You're licensed to practice law where?

A.    In New York and New Jersey.

Q.    And for how long, sir?

A.    Since 2005.

Q.    Do you practice at a particular office or under -- with a firm or on your own?

A.    I practice at the office I identified earlier, 500 River Avenue, and I have a partner.

Q.    And is there a trade name for your firm?

A.    Yes.  Burton Jacobovitch Law Group.

Q.    Do you have a particular

Page 9

specialty of your practice?

        A.    I do primarily business and real estate related transactional practice.

        Q.    Where did you go to law school, sir?

        A.    Rutgers.

        Q.    And when did you graduate?

        A.    2005.

        Q.    And since graduating law school can you give a brief overview of your employment history?

        A.    Sure.  Worked at Latham Watkins out of law school.  My practice group then moved over to Patton Boggs.  And somewhere around 2011 I opened up on my own.

        Q.    Has the nature of your practice always been business, real estate transactional work?

        A.    No.  I used to do a fair amount of litigation.

        Q.    What type of litigation were you involved in?

        A.    Initially, toxic tort

Page 10

litigation, and then in private practice some business litigation.

Q.    But presently the nature of your practice is primarily the business, real estate transactional work?

A.    Yes.

Q.    And for how long has that been the focal point of your practice?

A.    It's been the focal point for the past dozen years.

Q.    You indicated that you're licensed in New York and New Jersey.

Are you also a member of any federal courts?

A.    Yes.  I am a member of -- in the District of New Jersey.

Q.    Do you have any other Bar affiliations?

A.    No.

Q.    All right.  Any other professional organizations of which you're a member?

A.    No.

Q.    Have you ever written any professional articles or given any

Page 11

continuing legal education courses as an instructor?

A.    Not since law school.

Q.    Okay.  Now, you're here today by virtue of a subpoena, which before commencing we briefly referenced.

MR. BERNHEIM:  I'm going to ask if the court reporter would be kind enough to mark this.  Why don't we do it as NB No. 1.

*    *    *

(Whereupon, the court reporter marked Exhibit NB-1 for purposes of identification.)

*    *    *

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 1.  It's a copy of the subpoena which brings you here today, along with a request for production of documents.

Are you familiar with that?

A.    Yes.

Q.    This document.

Page 12

And you did receive this subpoena in and around the time that's indicated here on this one, December 23, '24?

A.    Yes.

Q.    If you can hold one second because I -- that's my office calling about these other documents.

*    *    *

(Whereupon, a short break was taken.)

*    *    *

BY MR. BERNHEIM:

Q.    Sir, before I just had to take that call we were talking about Exhibit No. 1, the subpoena.

With that there is a request that you produce documents pertaining to the matter that brings us here today, as well as some other matters that you may have had with Ira Russack.

Correct me if I'm wrong, before we began you indicated that you had actually sent a Dropbox to my office with all of those documents; is that

Page 13

correct?

          A.     I don't know if I sent a Dropbox.  I was provided a link to drag the files, responsive files into.

          Q.     And explain what it is that you did in order to make the production. What did you go through to -- a hard copy file, electronic file, some combination thereof?

          A.     It was entirely electronic.

          Q.     Did you withhold anything from your production or did you produce your entire file?

          A.     I produced my entire file in this -- on the matter relating to the litigation.

          I discussed with your associate, Christopher Spina, that there were some transactional matters in which Ira was a partner prior and subsequent to this matter which I did not produce.

          Q.     Okay.  And what were those matters?  How would you identify them?

          A.     Real estate purchases.

          Q.     Okay.  Real estate purchases

Page 14

for which pieces of real estate?

         A.      There was one in Atlantic City, I believe, or something -- somewhere in South Jersey.  One of them was an office building, I believe it went by the name of Centennial Plaza.  And then there was another one called something West, I forget the name.  Those are the ones I can recall off the top of my head.

         Q.      What was your role in connection with those transactions?

         A.      I was the purchaser's attorney on those transactions.

         Q.      And the purchaser was Mr. Russack or some entity in which he was affiliated?

         A.      Correct.

         Q.      On each of the three?

         A.      Yes.

         Q.      Do you recall when it is that you first performed any legal services on behalf of Mr. Russack or an entity in which he's affiliated?

         A.      Could have been anywhere

Page 15

between 2017 and 2019, I believe.  I'm just estimating.

Q.    So if the matter that brings us here today has documents which were or appear to be executed in or around March of 2020, would your first involvement with Mr. Russack have been about, you know, three years earlier; is that consistent with your recollection?

A.    Would make sense.

Q.    When you were -- do you recall which of those three transactions would have been the first, be it Atlantic, Centennial Plaza, or West something?

A.    I believe it might have been the Centennial Plaza, but I don't know.

Q.    And how is it that it came about that you were engaged to represent Mr. Russack and/or some entity involved in that Centennial Plaza acquisition?

A.    A partner of his approached me for representation on the purchase.

Q.    And who was that partner?

A.    Sam Sprei.

Page 16

Q.    Prior to that matter, the Centennial Plaza matter, had you had any dealings with Mr. Sprei one way or the other?

A.    If that was the first transaction, then no.

Q.    When you state that Mr. Sprei was Mr. Russack's partner, what was your understanding of that exact relationship?

A.    My understanding of the relationship was that they were purchasing real estate together.

Q.    I'm not going to jump too deep into Centennial Plaza, but I'm just trying to get an understanding that -- from you that Mr. Sprei and Mr. Russack were acquiring this property through an entity in which they were partners; is that correct?

A.    That was my initial understanding, yes.

Q.    Did you have an engagement letter with either that entity, Mr. Sprei, and/or Mr. Russack for the

Page 17

services you were providing?

A.    I don't believe so.

Q.    Are you aware of any requirement that you have as an attorney to have an engagement letter when you start performing services on behalf of a client?

A.    A requirement, no.

Q.    Do you have a practice, one way or the other, of having an engagement letter when you are retained by a client?

A.    I generally do.

Q.    Is there any reason for which you did not have an engagement letter in connection with the Centennial Plaza matter?

A.    Not that I can recall, but I didn't see one in the file.

Q.    Okay.  What about the Atlantic property or West something property, was there an engagement letter you had in connection with either of those two matters?

A.    I don't recall any engagement letters with regards to any of

Page 18

those files.

Q.     What about the matter that brings us here today regarding Jest Holdings --

A.     No.

Q.     -- was there ever an engagement letter?

A.     Definitely not.

Q.     I'm sorry?

A.     No.  I didn't represent Ira on that.

Q.     Was there an engagement letter with anybody in connection with Jest Holdings?

A.     No.

Q.     Other than those three transactions and the one that brings us here today, did you have any other dealings with Mr. Russack?

A.     Over the years there were quite a number.  I believe there was one loan that I had represented him on on a -- maybe a Long Beach -- property somewhere like in the Long Beach area.

Q.     Was this representing Mr.

Page 19

Russack individually or an entity?

A.     Individual capacity, if I remember correctly.

Q.     Do you have any recollection as to when that occurred?

A.     No.

Q.     Before or after the Jest Holdings matter?

A.     I believe it was before.

Q.     Do you have any recollection as to who the lender was?

A.     No.

Q.     Do you have any recollection of the amount?

A.     No.

Q.     Do you have any recollection if there was collateral?

A.     I believe there was.  It was somehow tied to a property in Long Beach.

MR. FRIEDMAN:  Just for the record, is that Long Beach, New York or Long Beach Island?

THE WITNESS:  Long Beach, New York.

BY MR. BERNHEIM:

Page 20

Q. Correct me if I'm wrong, but there was no engagement letter for that transaction either?

A. No, there was not.

Q. You indicated that Mr. Sprei was involved with the Centennial Plaza matter.

Was he involved with any of the other ones, Atlantic, West whatever, or Long Beach?

A. Yes.

Q. Which ones?

A. All.

Q. In reference to Centennial, you indicated that he was actually a business partner of some type in another entity.

In these other matters, what was his involvement?

A. In some of them he was the sole member and some of them he was a partner.

Q. In some of these transactions Mr. Sprei was the --

A. No.

Page 21

Q.    -- sole member?

A.    Mr. Russack.

Q.    Mr. Russack was the sole member.

And so what was Mr. Sprei's role where Mr. Russack was a sole member?

A.    I don't know.  He -- as far as I knew, he was working for Mr. Russack.

Q.    When you say working for Mr. Russack, would that be as an employee such as someone who gets a W-2?

A.    I have no idea.

Q.    All right.  Do you know if there was any type of formal employment engagement between Mr. Sprei and Mr. Russack?

A.    I have no idea.

Q.    So when you say that he was working for Mr. Russack, what's the source of information you have which leads you to that comment?

A.    There were transactions where he would communicate to me with regards to the transaction and with

Page 22

regards to what's going on with the transaction and I would then -- depending on what that communication involved, I would then speak to Mr. Russack about it.

Q.    All right.  If Mr. Sprei was providing you with communication, what was the reason you would then go back to Mr. Russack?

A.    Oh, well depending on the situation.  You could have on a deal if I'm looking for a survey and perhaps Mr. Sprei would send me the survey or Mr. Sprei would tell me that they're looking to do an extension, okay, so if they're looking to do a extension, then I would speak to Mr. Russack.

Q.    Did you have some understanding that Mr. Sprei had authority to speak on behalf of Mr. Russack?

A.    No.

Q.    Do you still do business with Mr. Sprei as we sit here today?

A.    No.  No, I haven't done any business with him in quite a while.

Q.    What's the last time you did any business with Mr. Sprei?

A.    An actual transaction?

Q.    Yes.

A.    He brokered a loan two years ago between someone who -- between an acquaintance of his, and that -- the name of the person was -- I can't remember the actual name of the person who was lend-- I'm going say Frankel perhaps was the name of the lender.

Q.    But this had -- was not related --

A.    No relation to --

*   *   *

(Simultaneous speakers. Reporter interruption for clarification.)

*   *   *

THE WITNESS:  I believe the name of the lenders was Frankel. It came from an entity that -- I mean, the actual loan was -- was from an entity to another entity, but I believe the name of the

Page 24

borr-- the lender was someone by the name of Frankel, and the borrower was non-related, but a party who I had never met or seen before.

BY MR. BERNHEIM:

Q.    I take it you're familiar with Joseph Teichman?

A.    Yes.

Q.    You understand he's the principal of Jest Holdings and is the plaintiff in this action?

A.    Yes.

Q.    Mr. Teichman's deposition was taken, and during the course of his deposition he described Mr. Sprei as a, quote, crook, end quote.

Do you share that assessment?

A.    I don't know.

Q.    One way or the other?

A.    I don't know one way or the other.

Q.    But you're not counting that out?

Page 25

A.    I'm not expressing any opinion on the subject.

Q.    Have you had any reason to be concerned about the manner in which Mr. Sprei conducts his business as it relates to Mr. Russack?

A.    I have been careful at all times that any decision affecting Mr. Russack would be made by Mr. Russack and Mr. Russack alone.

Q.    And is that practice because of a lack of confidence that Mr. Sprei had authority and/or would act in the best interest of Mr. Russack?

A.    That is because I don't ever take someone else's word for something that they have authority to act on behalf of anyone.

Q.    Did you ever seek from Mr. Russack and/or Mr. Sprei written description of what their relationship is and what Mr. Sprei was or was not permitted to do?

A.    No, because I've always done it on a case by case basis.  I've never

Page 26

-- I've never relied on Mr. Sprei to do anything for Mr. Russack.

Q.    Prior to today's deposition, have you had any discussions with Mr. Teichman about the deposition in this case?

A.    No.

Q.    When was the last time you had any communication with Mr. Teichman?

A.    I may have seen him socially.  We live in a small town.  I don't -- I don't recall.

Q.    Have you done any further business with Mr. Teichman or Jest Holdings since this transaction?

A.    I know he lends hard money, I'm trying to remember whether or not any of my clients have borrowed money from Mr. Teichman over -- since that time.  I don't remember any such thing.

I believe I may have had one or two files over the years where he was a hard money lender on the file.

Q.    Subsequent to the matter that brings us here today?

Page 27

A.    I don't remember whether it was prior or subsequent to.

Q.    You're familiar with Jonathan Rubin?

A.    Yes, I am.

Q.    Have you had any discussions with Mr. Rubin about your testimony today?

A.    I met him at a social event, it was, I think, his brother's son's bar mitzvah, about a month and a half ago and said I was going to be deposed in this action.

Q.    Did you have any substantive discussion about the matter?

A.    No.

Q.    Since the Jest Holdings transaction that brings us here today have you had any other business dealings with Mr. Rubin or any of his entities?

A.    There have been a few instances where my office has closed transactions where we've needed to obtain discharges from one of Mr. Rubin's entities called Queen Equities.  I

Page 28

actually don't recall any recent files where he's been a lender and my clients have been a borrower, but I could be wrong.  I don't -- it's certainly been a while.

Q.    Have you ever represented Queen Equities?

A.    I seem to recall having once represented him on a hard money loan.

Q.    Well, him would be, I assume Mr. Rubin.

A.    Queen Equities.

Q.    I'm talking about Queen Equities.

A.    Queen Equities, yes.

Q.    Okay.  And you --

A.    I believe generally he's represented by his brother Solomon Rubin, but I think there was some file he needed to get done quickly, and for whatever reason I think I represented him on that.

Q.    Do you recall if that was before or after the transaction that brings us here today?

A.    I don't recall.

Page 29

Q.    Okay.  What about the entity Miriam Equities, are you familiar with that?

A.    I know that to be one of Mr. Rubin's entities as well.

Q.    Have you ever represented Miriam Equities in any fashion?

A.    I don't think so.

Q.    Okay.

A.    Oh.  I didn't represent them.  The -- the -- the -- we did have an interaction with I believe Miriam Equities on the Atlantic City property or it may have been a seller on that.  I think Miriam Equities was somehow involved.  Either they had a lien on the property or they were a seller or something of that nature.

Q.    All right.  Sir, I don't mean to be the least bit impertinent when I ask you this question.  Do you carry malpractice insurance?

A.    Yes.

Q.    Have you placed your carrier on notice --

Page 30

A.    No.

Q.    -- regarding this incident?

It was represented to us by Mr. Teichman that you were placed on notice of a potential claim.

A.    Um-hum.

Q.    Is that yes, that occurred, or just --

A.    There was -- they had sent me a notice to Rabbinical Court and then they subsequently withdrew it.

Q.    Explain to me, if you would please, what you mean by notice to Rabbinical Court.

A.    They sent me an invitation to come to Rabbinical Court.

Q.    Invitation to come to Rabbinical Court for what purpose?

A.    With regards to this loan.

Q.    Was it in order to have some type of adjudication regarding your performance and potential liability --

A.    Yes.

Q.    -- to Jest Holdings?  Yes.

Was that document one of the

Page 31

documents you provided to Mr. Spina of our office?

A.    I don't think I kept a copy.

Q.    Do you recall when that occurred, meaning when you were sent the invitation?

A.    I am going to say the end of 2023 perhaps, somewhere around -- maybe a little bit earlier, maybe fall of 2023.

Q.    You state that that invitation was withdrawn.

A.    Yes.

Q.    How was the invitation withdrawn?

A.    I had actually spoken to Mr. Lang about it and then it was subsequently withdrawn.

Q.    Was that withdrawal in writing?

A.    No.

Q.    In your conversation with Mr. Lang or anyone else, is there any agreement that has been reached that any potential claim against you would be put on hold pending this litigation?

Page 32

A.    No.

Q.    When you state that you received an invitation to Rabbinical Court, was there any agreement that you had with Jest Holdings -- well, let me back up.

Who sent you the invitation?

A.    Mr. Teichman.

Q.    Did he send it on behalf of himself or Jest Holdings?

A.    I don't recall.

Q.    Okay.  Did you have any agreement with Mr. Teichman or Jest Holdings that if there was a dispute that it would be brought before the Rabbinical Court?

A.    No.

Q.    What was the substance of the conversation you had with Mr. Lang before the invitation was withdrawn?

A.    He asked me for some of the documents concerning the loan and he had some questions about explaining the substance of the documents.

Q.    Do you recall what documents

you were requested?

A. I'm sorry, I just want to re-characterize my statement.

I said loan. I wouldn't characterize it -- I don't -- I'm using the term loan for this; that's not my legal opinion. I'm not stating any legal opinion as to what this transaction was.

Q. Fair. And that's happened throughout our discussions where people have referred to this as a loan. I've tried to refer to it as a transaction. But if you end up stating loan, we will understand that that's not a legal conclusion that you are providing to the nature of this transaction. Is that fair?

A. Correct.

Q. Okay. Did you provide Mr. Lang with any of the transaction or loan documents?

A. Yes.

Q. All right. And do you recall which ones you provided?

A. I believe they were the PDF

Page 34

loan documents that I provided to you and to your office, same ones.

Q.     And we'll review the documents, but this would have been like the Membership Sales Agreement; correct?

A.     Correct.

Q.     The Assignment?

A.     Correct.

Q.     Confession of Judgment?

A.     Correct.

Q.     We'll go through them individually.

What was your initial involvement in this matter?  Or let me rephrase it.

When were you first contacted to be involved in this matter?

A.     Jonathan Rubin called me, he told me that Mr. Teichman and Mr. Russack wanted to enter into this transaction, they want to do it quickly, this is the way they want to structure it, and can you draw up documents.

Q.     Do you recall when you were contacted by Mr. Rubin?

Page 35

A.    I do not.

Q.    If the documents were executed, I believe the date is March 12th of 2020, do you have a recollection of how far in advance of that you were contacted by Mr. Rubin?

A.    I'm guessing it probably would have been less than ten days prior. I remember it to be a hastily-executed transaction.

Q.    Did you have an understanding as to who you were representing in the course of this transaction?

A.    At the time I wrote up the documents, I -- before I did anything, I -- I -- I prepared some documents, I did not -- I was going to assume -- I was assuming that Ira retained me, but I had not yet spoken to him about it.  I believe I drafted documents fairly quickly and then Mr. Rubin asked me to confirm with Mr. Teichman that the documents were enforceable.

My response to Mr. Rubin

Page 36

was, I am not going to do that if I represent Mr. Russack, and I'm not going to represent Mr. Russack if I'm going to say anything to Mr. Teichman about the documents. So at that point I told him that Mr. Russack should retain independent counsel, which I believe he did, and I said I would limit my involvement to just reviewing with Mr. Teichman what the documents said.

Q. Let's go back, if you'd be so kind, as to my question.

When you were first contacted, who did you understand you were representing?

A. I assumed that I was going to be retained by Mr. Russack. I was ultimately not retained.

Q. At the time you were contacted by Mr. Rubin, what did you understand his role in the transaction was?

A. My understanding was that he was brokering the transaction.

Q. Did you understand that --

Page 37

who did you understand had retained Mr. Rubin as a broker?

A.   I don't know that he was ever retained.

Q.   Who did you understand at the time he contacted you he was working for as a broker?

A.   I didn't assume that he was working for anyone.

Q.   Well, if he's a broker, generally -- we'll use the loan scenario for purposes of the question.  For the borrower or for the lender?

A.   When I understand the term working for, I understand that as an employment term.  I don't believe there was an employee/employment relationship.

Q.   All right.  I'm not talking about strict employment in that fashion, but he'd be an agent for somebody.  For whom was he an agent?

A.   I believe he was doing this on behalf of Mr. Teichman.

Q.   Okay.  Did you find it the least bit odd or unusual that an agent

Page 38

for the lender would be seeking to engage you on behalf of the borrower?

A. No. I wasn't necessarily going to be engaged on behalf -- that he was engaging me on behalf of the borrower. It was a -- I was assuming that Mr. Russack would ultimately engage me, which he did not. I had written up some documents on the fly to reflect what Mr. Rubin represented the transaction was, and if I wasn't going to get paid, I would just --

Q. Well, dovetailing back to your earlier comments that you don't take anybody's representation on their own, that you would contact someone, did you contact Mr. Russack once you received a call from Mr. Rubin?

A. There was a -- there were some e-mails that Mr. Russack was copied on. Very soon thereafter was when Mr. Rubin asked me to confirm with -- it must have been that day or the next day, before I had spoken to Mr. Russack, and he asked me, could you confirm with Mr.

Page 39

Teichman that these documents are what they say they are.  So I said at that point I'm not going to be representing. If that -- if you need me to do that, then find Mr. Russack a --

* * *

(Reporter interruption for clarification.)

* * *

THE WITNESS:  Some legal representation.

BY MR. BERNHEIM:

Q.    Did you ever call and speak with Mr. Russack about this transaction before you received this notification that you were just referring to from Mr. Rubin?

A.    No.

Q.    Had you been in contact with Mr. Sprei about this transaction?

A.    I believe he was copied on some e-mails.

Q.    Had you ever talked to Mr. Sprei about this transaction?

A.    I don't recall any

Page 40

conversations with him about it.

Q.    What did you understand to be the nature of the transaction?

A.    The nature of the transaction was a purchase option whereby Mr. Teichman was essentially purchasing -- well, purchasing -- structuring a loan in order to be a purchase option so that he would buy Mr. Russack's interest in a company, a New York entity, and Mr. Russack would have the right to purchase it back within a certain time frame.

MR. LANG:  It's not -- it's not mine.

THE WITNESS:  Sorry about that.

MR. BERNHEIM:  Would you be kind enough just to read that back.

*   *   *

(Whereupon, the court reporter reads back the requested portion of the transcript.)

*   *   *

Page 41

BY MR. BERNHEIM:

Q.     The nature of this transaction that you just described, is that what Mr. Rubin explained to you when he first contacted you?

A.     Yes.

Q.     Did you then contact Mr. Teichman in order to ascertain his understanding of the transaction?

A.     I believe there were one or two phone calls and then there were some e-mails that I produced.

Q.     These phone calls, were they prior to you drafting any of the documents?

A.     No.

Q.     Were you concerned at all at the time that you were being asked to prepare these documents about any conflict of interest that you may possess?

A.     At the time that I produced the documents, I drafted the documents without being retained.  I wouldn't have -- at that point I was not

Page 42

representing anyone.  I was asked to prepare documents.

Q.     You weren't -- without trying to be argumentative, sir, you weren't just preparing documents because you had nothing to do, you were preparing documents at the request of a client; correct?

A.     I was preparing documents at the request of Mr. Rubin.

Q.     Okay.  And you understood that Mr. Rubin was a broker in connection with the loan that was coming through Mr. Teichman's company, Jest Holdings; correct?

A.     Correct.

Q.     Okay.  And did you understand that Mr. Rubin was also a participant in providing funds for this transaction?

A.     No.

Q.     Did you ever learn that?

A.     No.

Q.     Did you ever learn that there was any contribution, be it by

Page 43

actual money or sweat equity or anything else that Mr. Rubin was contributing to this transaction?

         A.    No.

         Q.    Even as we sit here today, that would be news to you; correct?

         A.    That would be news to me.

         Q.    Nevertheless, at the time that you were preparing these documents or later in the continuum where you described that you were not going to give certain -- well, we'll use -- I'll allow you to use your phraseology.

               At a later point in time where Mr. Rubin indicated to you that you were to repre-- let's try this in English. We'll start all over.

               There was a point in time where Mr. Rubin indicated that you would be representing Jest Holdings and not Mr. Russack; correct?

         A.    Yes.

         Q.    Okay. At that point in time were you concerned about your obligations under the Rules of Professional Conduct

Page 44

as it related to concurrent or other conflicts?

A.     Yes.

Q.     Okay.  And what did you do predicated upon that concern?

A.     I had confirmed with Mr. Russack that Mr. Russack was -- would waive the conflict and I told Mr. Teichman that my representation would be limited to just explaining the documents to him, not acting as a closing agent or doing anything more than -- and not necessarily recommending the structure of the way they decided to do it.

Q.     Having been concerned about the issuance of a conflict, did you consult the Rules of Professional Conduct as to what your requirements were?

A.     No.

Q.     Did you consult any expert in the field of the Rules of Professional Conduct in order to ascertain what your requirements are?

A.     No.

Q.     You state that there was a

Page 45

waiver of the conflict from Mr. Russack. Is that waiver in writing?

A.    There was an e-mail to that effect.

Q.    And do you recall what the contents of that e-mail is?

A.    No.

Q.    Did you ever set forth in writing an explanation of the nature of the conflict to Mr. Russack?

A.    I don't recall.

Q.    Are you aware, even sitting here today, that under the Rules of Professional Conduct that there's a requirement that you would set forth specifically in writing what potential adverse effect there could be if you were to continue in the representation giving the conflict?

A.    I am.

Q.    Okay. Did you set that forth in writing to Mr. Russack?

A.    I did not.

Q.    Are you aware that the Rules of Professional Conduct also require that

Page 46

you would set forth what the implications are of common representation in writing?

A.    Yes, I am aware.

Q.    Did that occur?

A.    It did not.

Q.    Are you aware that the Rules of Professional Conduct also required that you would describe what -- what the problems could be with duties of loyalty and confidentiality in writing?

A.    Yes.

Q.    All right.  Did that occur?

A.    No.

Q.    Are you aware that the rules require that you spell out what the advantages and risks are of you continuing in the representation notwithstanding the conflict?

A.    Yes.

Q.    All right.  And did that occur?

A.    No.

Q.    There are a series of documents we referenced before and we're going to go through them, but I just want

to find out.  Did you draft the Assignment of Shares?

A.    I believe so.

Q.    Did you draft the Membership Sale Agreement?

A.    I believe so.

Q.    Did you draft the Affidavit of Confession of Judgment?

A.    I don't remember if I drafted that particular document.

Q.    Did you draft the Declaration of Restrictions?

A.    I don't remember if I drafted that.  I know I have it in my file, I don't remember if I drafted it.

Q.    All right.  Now, there's an opinion letter that we've seen, one which has your signature and one that has Mr. Harrison.

Do you recall preparing an opinion letter?

A.    An opinion letter with my signature on it?

Q.    Yes, sir.

A.    I don't recall an opinion

Page 48

letter with my signature on it.

Q. We'll take a look a little bit later.

There was a Certification of Mr. Russack. Did you draft that document?

A. I don't recall.

Q. There's also, and I'll apologize if I mispronounce it, the Heter Iska Investment Agreement. Did you draft that document?

A. I don't think so.

Q. Other than those documents that I've just outlined, do you recall if there are any other transactional related documents that you prepared?

A. Not that I can recall.

Q. Okay.

A. I would probably recognize the Heter Iska agreement if I saw it.

Q. I'm sorry, I didn't hear what you said.

A. I would probably be able to answer your questions more accurately if I saw them, I would probably be able to

Page 49

recognize whether or not I had a hand in drafting them.

Q.    We'll give you that opportunity.

*    *    *

(Whereupon, the court reporter marked Exhibit NB-2 for purposes of identification.)

*    *    *

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 2.  It's captioned, Checklist, Jest Holdings to Ira Russack, 1,500,000.

Do you recognize this document?

A.    Yes.

Q.    Did you prepare this document?

A.    I believe so.

Q.    So on the left-hand column it identifies certain transactional documents; correct?

A.    One second.  I'm just -- the

Page 50

font doesn't look like something that I would have originally generated.  This might have -- this might have started in Mr. Teichman's office.  I've seen the document though.

Q.    When you say this might have started in Mr. Teichman's office, what do you mean by that?

A.    It might have been sent -- it might -- the document may have been sent to me from Mr. Teichman's office.

Q.    Your voice trailed off on that, I didn't hear you.

A.    The -- the -- the -- this document may have been sent to me from Mr. Teichman's office.  It doesn't look like a font that I would have used for this particular document and it doesn't look like any of my forms, but I definitely recognize the document.

Q.    Okay.  But you're not sure if you actually prepared it or Mr. Teichman prepared it?

A.    Correct.

Q.    I'm going to draw your

Page 51

attention to Item No. 5, which says Promissory Note on the left column and on the right column it says cancelled as per text message from lender.

Do you see that?

A.    Yes.

Q.    Do you know what that text message is about?

A.    I do know that at one point there was a Promissory Note.  I had had the discussion with Mr. Teichman saying that the Promissory Note was not consistent with the way this transaction was structured, and as a result I believe -- I'm not sure if this was a -- I was looking for a text message like this, I -- I don't -- I don't have it, but it's quite possible that it was -- you know, this is awhile back, I don't know if -- if perhaps at one point there was a text message to me about it as well, but I do know I had a discussion with Mr. Teichman about that a Promissory Note would not be consistent with this transaction.

Q.    Did you ever prepare a

Page 52

Promissory Note for this transaction?

A.    I believe at one point I've -- I know I have a Promissory Note. I think -- I think I may have had a Promissory Note in my file at one point on this transaction.

Q.    And if that exists, that would be within that production that you've made?

A.    Yes.

Q.    However, you'll agree with me that the transaction itself never had a Promissory Note that was presented and executed; correct?

A.    Did not.

Q.    In the course of Mr. Teichman's deposition he represented that you would have a list identifying any of the transactional expenses.

While you've been testifying I've been trying to see if I could locate that from any of the materials you possess and cannot.  That just may be my deficiency.

Do you have such a list?

Page 53

A.    No.

Q.    Sir, I'm going to show you what was marked during Mr. Teichman's deposition as Deposition Exhibit JT No. 3.   And it's captioned Assignment of Shares.

MR. FRIEDMAN:   This is not from me.

MR. BERNHEIM:   That's correct.

Off the record.

*   *   *

(Whereupon, a discussion was held off the record.)

*   *   *

BY MR. BERNHEIM:

Q.    Did you prepare that document, sir?

A.    Yes.

Q.    Was any other attorney involved in the preparation of this document?

MR. LANG:   Is this the Declaration?

MR. BERNHEIM:   This is the

Page 54

Assignment of Shares.

THE WITNESS: Not to my recollection.

BY MR. BERNHEIM:

Q. You indicated earlier in your testimony that Mr. Russack had obtained other counsel. Who were you referring to in that testimony?

A. I forget his name. The lawyer who signed the opinion letter.

Q. Mr. Harrison?

A. That sounds -- sounds fair.

Q. As of March 12th, 2020, however, Mr. Harrison had not been engaged, had he?

A. I have no idea.

Q. You certainly had no contact with him as of March 2020, did you?

A. I don't remember the dates.

Q. Do you remember having any contact with Mr. Harrison?

A. I believe he e-mailed his opinion letter to my office.

Q. Okay. I'm going to represent to you, and we're going to look

Page 55

at it later, that his opinion letter's dated March 17, 2020.

A. Um-hum.

Q. And he testified that he was retained six hours before he signed the opinion letter.

A. Okay.

Q. Okay. So assuming, then, he was retained on March 17, 2020 --

A. Um-hum.

Q. -- do you have any recollection of any discussions with him about the Assignment of Shares or any other document prior to March 12th?

A. No.

Q. The Assignment of Shares starts out in capitals, it says, for valuable consideration. Do you see that?

A. Yes.

Q. The receipt and sufficiency of which are hereby acknowledged.

What valuable consideration had been provided to Mr. Russack as of March 12th?

A. I don't know if there was

Page 56

any at that point.  I don't remember when -- I do not know when funds were transferred by Mr. Teichman to Mr. Russack.  I know funds that were sent to me that were sent directly to Mr. Russack, which I sent you copies of the wires.  I believe there may have been other money as well.

Q.    Are you aware of any funds that went directly from Mr. Teichman and/or Jest Holdings to Mr. Russack, as opposed to being sent to you?

A.    I'm not aware of them, but my understanding was that there -- I -- I am not aware of those amounts or of those transfers, but I recall that there were other funds that did not go through me.

Q.    And what's your source of knowledge that there were other funds that did not go through you?

A.    My source were both Ira as well as Mr. Teichman, at the time I had questioned that the amount of money that was sent to me to disburse was not equal to the entire amount and was told that

Page 57

that money had either been given before or something of that nature.

Q.    Okay.  We're going to look at those amounts and those transfers, but let me first go back to your statement.

At some point in time, do I understand, you questioned Mr. Teichman that the amounts which you received did not equal the amount of the transaction and you were trying to find out what occurred with the shortfall?

A.    I don't remember the circumstances.  I do remember that I had a question about whether or not this is the entire amount of the money that was going through and he said no.

Q.    And do I understand your testimony, and please correct me if I'm wrong, that Mr. Teichman informed you that funds other than those that were sent to you were sent to Mr. Russack directly; is that correct?

A.    I don't recall that there was ever a -- ever that statement, that they were sent to him directly or

Page 58

indirectly or anything of that nature.  I just recall that there were funds that were involved that were not sent through me.

Q.    Well --

A.    I don't remember any specific conversation as to how those funds were transferred.

Q.    I'm having difficulty following you, sir.

You get ahold of Mr. Teichman because the amount of money that you received, which I'm going to tell you is about 1.2 million --

A.    That's my recollection as well.

Q.    Okay.

-- to find out what has occurred with other funds since this transaction was written for 1.5 million; correct?

A.    Correct.

Q.    Okay.  And Mr. Teichman indicates to you that other funds, in some fashion, were transferred to Mr.

Page 59

Russack; is that correct?

A.   That was my understanding, yes.

Q.   Were you ever provided with the amount that was transferred to Mr. Russack?

A.   No.

Q.   Were you ever provided any documents which showed what was transferred to Mr. Russack?

A.   No.

Q.   Have you ever seen at any point in time, up to today, an accounting of funds that were part of this transaction that went from Jest Holdings to the benefit of Mr. Russack purportedly?

A.   No.

Q.   Did you ever contact Mr. Russack to verify that he had received funds as referenced by Mr. Teichman?

A.   No.

Q.   Let's go back to the Assignment if we can, please.

As of March 12th, and I'm

going to show you, you can accept this representation, your documents indicate the first wire transfer is March 13th. No money had been transferred as of March 12th.  What document, if any, obligates Jest Holdings to provide $1.5 million, or any sum?

A.    I don't know that any document obligates them to pay it.

Q.    Right.  Where you indicated there is no Promissory Note, there was also no loan agreement; correct?

A.    Correct.

Q.    Okay.  So as of March 12th, wherein this document indicates that Mr. Russack is assigning his interest in Ocean Woodruff Development Corp., there was no written document obligating Jest Holdings to do anything?

A.    Correct.  I believe this document was signed -- Mr. -- okay. That's it.

Q.    Okay.  If you'd take a look at the second page of the document, there's a portion for a signature.

A.    Yes.

Q.    All right.  It appears to have Mr. Russack's signature on the left; correct?

A.    Correct.

Q.    There is no signature for Jest Holdings.  Do you see that?

A.    Correct.

Q.    You notarized the signature on behalf of Mr. Russack; correct?

A.    Correct.

Q.    Now, I've looked while we're here.  I can't find a signed copy of this of your materials.  Does one exist?

A.    Not that -- if it's not in my file, then it's not saved.

Q.    Do you have any recollection of ever seeing a signed document by Jest Holdings?

A.    No.

Q.    Okay.  You prepared this, however, so that the signatures of both Mr. Russack and a representative of Jest Holdings would be notarized; correct?

A.    Correct.

Page 62

Q.    Why?  Why did you prepare this so that the signatures would be notarized?

A.    For Jest Holdings to accept the Assignment.

Q.    The signature of Jest Holdings would be to accept the Assignment, but why the notary?

A.    I don't know.  I just -- just have a more -- a valid -- more definitive proof that it was signed.

Q.    Did Mr. Russack actually appear before you to sign this document?

A.    Yes.

Q.    Where was that?

A.    In my office.

Q.    On March 12th?

A.    Yes.

Q.    Do you maintain a log of some nature as a notary when you notarize documents for people?

A.    No.

Q.    Okay.  So coming from Philadelphia I can only speak from knowledge of Pennsylvania for a moment

Page 63

that there's a requirement that when somebody notarizes a document they need to enter date, show identification of the individual whose signature they are notarizing, and keep a log.

Is there any such requirement that you have as a notary?

A. There is not.

Q. Do you do anything of that nature as a notary?

A. I no longer notarize documents as a practice, or rarely do so, but no, I don't.

Q. All right. The Assignment has several representations and warranties in its second paragraph on the first page.

A. Um-hum.

Q. The first one states that the assignor, that being Mr. Russack, has not and shall not pledge, assign, convey or transfer any portion of its shares to any other person or entity. Do you see that?

A. Yes.

Page 64

Q.    And I read that accurately?

A.    Yes.

Q.    Okay.  Now if, indeed, by executing this Assignment as indicated in the first paragraph, Mr. Russack is assigning and conveying his interest in Ocean Woodruff, what would be the significance of a representation and warranty that he will not in the future pledge, convey, or assign?  In other words, he has nothing to pledge, convey, or assign; he's already given it away.

A.    This is not a recorded document.  As a result, we want that pledge as well.

Q.    Well, I'm trying to figure out what significance, if any, it actually possesses.  So as an analogy, if I sell my house, right, and pledge that the day after the sale I'm not going to sell my house, that really doesn't have much significance at all, unless I'm trying to find out here why there would be a warrant and representation you're not going to pledge something you no

Page 65

longer own.

A.    For the very reason that I just -- so maybe I wasn't as clear as I should have been.

If you have an Assignment where someone else -- where someone goes the next day and sells it to somebody else, you're right, the second Assignment should not be valid, but you'd still end up in court with them.

Q.    Well, but this Assignment is -- you're already conveying someone's interest and you're able to get the shares of stock, it can only occur once and be recorded within the company once; correct?

A.    That is if you have a recorded document within the company that actually ends up getting signed and executed and recorded, but -- and there's no registry in New York for these transfer of shares, so in order to prevent further fraud, this would be prudent.

Q.    You're not recording this

Page 66

as -- on a piece of real estate, this is a corporate transaction of a sale of stock, right?

A.    Um-hum.

Q.    Correct?

A.    Correct.

Q.    Okay.  Now, my question to you, sir, is:  Did you just cut and paste this from some other document or was there really some thought put to it, since you said you were under time pressure?

A.    No, I think this is actually -- I've -- I've -- it -- it is one of the documents that I use and this is some of the boilerplate that I use and I would recommend using this -- this language further as well, because I would want that warranty.

Q.    And again, paragraph 1 goes, assignor has not and shall not pledge, assign, convey, or transfer any portion of its shares.

A.    Um-hum.

Q.    It usually refers to an

Page 67

entity.  We're dealing with an individual here, right?

A.    Correct, but here it's used colloquially because we're using the defined term assignor.

Q.    Well, but assignor is defined, the assignor is an individual, and then it would be an entity, not -- it should be his if you're doing it properly; correct?

A.    No, I don't -- I don't tend to use gender-specific terms when -- when -- when I can avoid them, because then you end up having to tail through a document and go back and forth on every single -- on every single contingent term, so that's --

Q.    Right.  Hold that thought and let's go take a look at paragraph 3 little line.  It says, the shares being assigned, transferred, and conveyed pursuant to this Assignment of Shares is 100 percent of all membership interest in the company.  Do you see that?

A.    Yes.

Page 68

Q.    Okay.  That's in error, isn't it?

A.    That at the -- yes, that is in error.

Q.    Okay.  Right.

A.    It should have said, all its membership interest in the company.

Q.    Well, it should be all of Mr. Russack's interest.

A.    All of assignor's membership interest.

Q.    Right.  Which was only 50 percent ownership --

A.    That is correct.

Q.    -- of the units at issue; correct?  All right.

Then let's take a look at subparagraph No. 4.  It says, that he has, not it has.  This time you're using it, he; that he has the requisite power and authority to enter into and perform his respective obligations under this Assignment of Shares such that this Assignment of Shares constitute a legal, valid and binding obligation of assignor

Page 69

enforceable in accordance with its terms and subject to general principals of equity.  I read that accurately?

A.    Yes.

Q.    All right.  And you're having Mr. Russack sign that in your office on March 12th, 2020 at a time you know he's not represented by an attorney; correct?

A.    At the time I did not -- I -- I -- I -- at the time that I had already recommended that he get represented by counsel, my recollection at this point was that these -- that Mr. Russack had been in the area of my office, had wanted to come sign these. These were not for release on that day at all.  At that point Mr. Russack had not even authorized them for release at the time they were signed.

Q.    Let's first go back to my question.

At the time that Mr. Russack signed this document on May 12th, 2020 --

A.    Yes.

Page 70

Q.    -- you knew he was not represented by counsel?

A.    Correct.

Q.    Right.  You had not shared this with any attorney on behalf of Mr. Russack, especially in connection with the representation and warranty in subparagraph 4, had you?

A.    Correct.

Q.    Now, you state that Mr. Russack had not authorized the release of this document --

A.    Correct.

Q.    -- is that right?  All right.

Is that authorization or lack of authorization in writing?

A.    No.

Q.    As of March 12th, 2020 did you make any assessment as to whether Mr. Russack had the authority to assign, we'll say his 50 percent interest in the units owned by Ocean Woodruff?

A.    Can you repeat the question?

Q.    Certainly.

Page 71

As of March 12th, 2020, when you had Mr. Russack sign these warrants and representations, did you make any assessment as to whether he had the legal authority to convey his 50 percent interest?

A.    I don't remember if I had at that time.

Q.    At that time were you in possession of any organizational documents for Ocean Woodruff, such as a shareholders agreement, operating agreement, or anything of that nature?

A.    To my knowledge there's no shareholders agreement.  I was in possession of a -- the original corporate formation agreement and I believe some other recorded Agreements.  There was -- to my knowledge, there was never -- there were not any bylaws for this corporation that I saw.

Q.    Sir, I'm going to show you what was previously marked for identification as Deposition Exhibit JT No. 4.  It is a letter of October 16,

Page 72

1985.  It purports to be from Mr. Russack to Henry Weinstein.

Can you take a look at that, please?

A.    Yes, I'm familiar with this.

Q.    All right.  Who do you understand Mr. Weinstein to be?

A.    His partner in this company, Ocean Woodruff.

Q.    In Ocean Woodruff?

A.    Yes.

Q.    Did you ever have any contact with Mr. Weinstein or anyone on his behalf?

A.    No.

Q.    When do you recall first obtaining a copy of this October 16, 1985 letter?

A.    It was somewhere around this same time, March 12th, or somewhere around that time.

Q.    Did you review this letter?

A.    Yes.

Q.    Did you review it for the purpose of, among other things,

Page 73

ascertaining whether Mr. Russack had the authority to convey his 50 percent interest in Ocean Woodruff?

A.    Yes.

Q.    Okay.  Did you reach a conclusion?

A.    Yes.

Q.    And what was your conclusion?

A.    My conclusion is that yes.

Q.    I'm sorry?

A.    That yes.

Q.    Okay.

MR. BERNHEIM:  Off the record for a second.

*   *   *

(Whereupon, a discussion was held off the record.)

*   *   *

BY MR. BERNHEIM:

Q.    Take a look if you would, please, at paragraph 7 of that letter, it's on the second page.  The paragraph reads:  This agreement may not be changed orally, may not be assigned and shall be

Page 74

construed in accordance with the laws of the State of New York.

Did I read that accurately?

A.     Yes.

Q.     Did you review that sentence in coming to your analysis?

A.     Yes.

Q.     Were you concerned in any fashion given the language of that sentence about there being any type of Assignment or otherwise which was not in writing?

A.     No.

Q.     Can you explain why not?

A.     Do you want me to express my legal conclusion?

Q.     I want to understand the basis upon which you had the opinion that Mr. Russack could convey his 50 percent interest.

A.     Under New York law, Assignments of Shares in either an LLC or a corporation cannot be prohibited, No. 1.  Any -- under New York law, any such clause is null and void.  No. 3, my

Page 75

understanding of this agreement was particular -- was -- was not an agreement that the stocks could not be assigned, but rather, the specific terms of the financial arrangements relating to the company, as opposed to this -- as opposed to a restriction for the sale on stocks, which is furthermore understood that any restriction on the sale of any stock under New York law is to be strictly construed and, therefore, even were this document to purport that it would restrict the sale, which it cannot, it would be strictly construed to mean that only the terms specifically set forth in this document are not assignable.

Q.    Did you express that opinion in writing to anybody in and around March of 2020?

A.    No.

Q.    Any particular reason why not?

A.    I wasn't writing an opinion letter on the subject, as far as I remember.  Or -- or there may have been

Page 76

-- there may have been -- I don't -- I don't remember.

Q.    Well, you were engaged --

A.    Sorry.

Q.    -- to draft the Assignment of Shares, which included representations and warranties about the ability to convey the interest in Ocean Woodruff; correct?

A.    Was I engaged -- again, what was the question?

Q.    You were engaged to draft an Assignment of Shares --

A.    Yes.

Q.    -- which included representations and warranties about the ability to convey the 50 percent interest in Ocean Woodruff?

A.    Not my representation and warranties.

Q.    Well, I understand it --

A.    Yes.

Q.    -- but it was to include representations --

A.    Yes.

Page 77

Q.    -- and warranties; correct?

And you would not, as a matter of course, would you, draft an Assignment with representations and warranties which you knew would be inconsistent with New York law, right?

A.    Correct.

Q.    Okay.  So you would have made an assessment before drafting it that this was permissible; correct?

A.    Correct.

Q.    Sir, I'm going to show you what was marked for identification purposes during Mr. Teichman's deposition as Exhibit JT No. 2.  It is captioned, Membership Sale Agreement.

A.    Okay.

Q.    You drafted this document?

A.    Yes.

Q.    Do I understand that the terms that are in this document is that which Mr. Rubin had imparted to you when you were first contacted?

A.    Yes.

Q.    Had you ever been involved

Page 78

with Mr. Rubin, Mr. Teichman, Queen Equities, Miriam Equities, on any similar type of transaction wherein there was a purchase of somebody's interest in property that they would be able to re-acquire, similar to this?

A. No.

Q. Was this the first time that you had been involved in such as a transaction?

A. Yes.

Q. The purchase price in this agreement, found in paragraph 3, refers to $1.5 million.

A. Correct.

Q. And utilizing what we've done here today and not for legal determination in calling it loan or transaction, the $1.5 million was the amount of the loan, so to speak; correct?

A. Yes.

Q. All right. Did you have any understanding as to why that was the loan amount?

A. No.

Page 79

Q.    Did you have any understanding as to what the funds were to be used for?

A.    No.

Q.    Did you ever inquire of Mr. Russack, Mr. Sprei, Mr. Rubin, Mr. Teichman or anyone else, all right, well, what's this transaction about?  Why do they need $1.5 million?

A.    No.

Q.    Did you think that in any role that you were playing, be it while you were drafting the documents and anticipating that Mr. Russack would retain you, or thereafter, that it was part of your responsibilities, obligations or duty to ascertain, what are these funds being used for?

A.    No.

Q.    Now, the paragraph 3 of the purchase price provides that the purchase price for the interest shall be $1,500,000, payable as follows:  $45,000 payable on the date hereof, by check, subject to collection and 1,500,000,

Page 80

payable at closing, by bank cashier or
good certified check drawn on a New York
Clearing House or wire transfer.

What was the basis upon
which the $45,000 was included in the
purchase price?

A.    I don't know.

Q.    Did you have any
understanding of any nature whatsoever
where the 45,000 came from?

A.    No.

Q.    Paragraph 5 indicates that
the closing, meaning the date to
repurchase the shares, would be on June
13th, 2020, a mere three months later.
Do you see that?

A.    Yes.

Q.    Were you ever informed that
this transaction, if it were a loan,
would, in essence, be trying to charge
interest at any particular rate?

A.    My understanding is that
there's -- in paragraph 5 the price,
repurchase price as it would be termed,
would go up $15,000 per month over a

Page 81

period of nine months.

Q. Well, I'm trying to first focus upon the purchase price of $45,000 in paragraph 3 and where that came from, okay.

A. My understanding is that that would be -- that if we were to repurchase the shares three months later, that 45 -- I believe -- the way it's written, I -- I'm -- just to rephrase what I'm saying, the way it's written, I don't really understand the way it was written; however, my understanding is that $45,000 was his -- he would repurchase the shares after what was apparently three months for a million 45 -- 1.545, which -- which essentially would be $15,000 a month, and that if he would repurchase those shares sometime later, it would be that much more.

Q. You state, and I quote, you do not understand the way it was written.

A. Yes.

Q. But you were the one that wrote it --

Page 82

A.    Yes.

Q.    -- correct?  Okay.

A.    And it should have been written that the purchase price should be $1,545,000.  The way it's broken down is not very well broken down.

Q.    So let's suppose that this Membership Sales Agreement, which is dated March 12th, 2020, and the closing date we see here shall take place on or before June 13th, 2020 --

                    *    *    *

          (Whereupon, a discussion was held off the record.)

                    *    *    *

BY MR. BERNHEIM:

Q.    Are you with me so far --

A.    Yes.

Q.    -- or do I need to repeat it?

A.    No, I just don't want this to still be on.

Q.    No.  Are you with me on the question?

A.    Yeah.

Page 83

Q.    All right.  So the question I'm asking, let us suppose that after March 12th, 2020 decision is made to repurchase the interest one month later, in April, they still have to pay $1,545,000, according to this agreement?

A.    Yes.  I believe the 45,000 was paid at that point, at the original point.

Q.    When you say the original point, what do you mean by the original point?

A.    In other words, the $45,000 was already given, was deemed to have been given at the time of the -- in other words, that -- that $45,000 was already deemed to have been given, or was given already essentially by Mr. Russack already at the time of the transaction.

Q.    All right.  The agreement which you drafted states that $45,000 was payable on the date hereof.

A.    Hereof, exactly.

Q.    The date hereof was March 12, 2020; correct?

Page 84

A.    Correct.

Q.    All right.  On March 12, 2020, are you aware of Mr. Russack paying $45,000?

A.    No.

Q.    Do you know --

A.    My under--

Q.    Let me just finish the question for the record, if you'd be so kind.

Do you know one way or the other if Mr. Russack paid $45,000 in or around March 12, 2020?

A.    My understanding is that the way this transaction was structured was that Mr. Teichman was paying -- Mr. Teichman was buying the shares, Mr. Teichman was buying the shares for 1.5 million.  He did not actually pay 1.5 million, he paid 1-- he -- what he actually tendered to Mr. Russack at the time was 1.5 minus 45.  That's the way I understand the transaction.  Therefore, for Mr. Russack to pay back a full 1.5 -- for Mr. Russack to repurchase the shares

Page 85

three months later, or anytime thereafter for 1.5, he'd be essentially paying 1.545.

Q.    So as of --

A.    So just to clarify, there wouldn't have been any money coming from Mr. Russack, it would be short of the money that Mr. Teichman was paying Mr. Russack.

Q.    But that would have the same net effect as if he paid 45,000 and then received 1.5; correct?

A.    Correct.

Q.    Okay.  And your understanding was that even if there was an election to repurchase the shares just one month later, then he would not get any refund of the 45,000 which was advanced as if it were 15,000 a month payment, he would lose that; correct?

A.    Correct.

Q.    Take a look at paragraph 5 on the second page of this document, five lines up, where it starts, Failure by purchaser to pay any such extension fee

Page 86

on or before the expiration of each extension period or failure to pay the purchase price when due shall be deemed an automatic termination of purchaser's rights under this agreement and seller may cancel this agreement and all monies deposited hereunder towards payment of liquidated damages.  Do you see that?

A.    Yes.

Q.    What did you mean by the term liquidated damages in this context?

A.    My understanding was that -- that any money previously advanced, which would include that $45,000, would be liquidated damages.

Q.    Are you aware of any document which defines the term liquidated damages in this transaction?

A.    Not to my recollection.

Q.    All right.  Did you have any discussion with any attorney on behalf of Mr. Russack about the terms of this agreement or the transaction?

A.    I believe I had a phone call with, whatever, that Harrison guy at some

Page 87

point before this thing actually was
disbursed and closed.

Q.    Did Mr. Harrison seek to
change any terms of the transaction?

A.    Curiously no.

Q.    Why do you say curiously no?

A.    Because, in my experience,
every lawyer wants to show his client
that he's making some changes.

Q.    Do you know what the scope
of Mr. Harrison's engagement was?

A.    I would have no idea.

Q.    Do you know if he was to do
anything other than issue the opinion
letter, which you indicated you were not
willing do?

A.    I would have no idea what
his -- scope of his engagement was.

Q.    Did you, yourself, ever do
any analysis as to the commercial
reasonableness of this transaction?

A.    In what sense?  I don't
understand the question.

Q.    We'll try to drill down and
make it more clear.

Page 88

Did you at any point in time learn what the value of the units of Ocean Woodruff were that are the subject matter of this transaction?

A.    I believe at one time I made some sort of assessment that they were worth at least $1.5 million.

Q.    How did you make that assessment?

A.    At some point I believe either by way of looking at the New York title records and looking at the assets of the company I made -- and looking at what potential liens were out there against the company, I did make a ballpark estimate that the value of this asset would be in excess of the $1.5 million.

Q.    All right.  Did you seek to ascertain any real estate appraisals?

A.    No.

Q.    Did you ever learn if any were conducted?

A.    No.

Q.    Did you take a look at any

Page 89

title reports or records indicating the purchase price of these units?

A.    No.

Q.    Did you look at what was taking place in March of 2020 for the acquisition prices of these units?

A.    No.

Q.    It was pled in this litigation that the 100 percent value of these units was approximately $8 million, meaning Mr. Russack's value would be about $4 million. Does that seem consistent with what you learned?

A.    That would make sense.

Q.    Okay. All right. Now let's go back to the question that I asked in connection with the commercial reasonableness.

Did you ever make an assessment as to the commercial reasonableness for somebody to convey $4 million in real estate in return for $1.5 million and pay $15,000 a month for the privilege of doing so?

A.    My understanding was that

Page 90

Mr. Russack had treated this as a loan and that he was -- had no intention of not paying it -- of -- of -- of not exercising his repurchase.

Q.    Well, in your experience, borrowers at Day 1 always intend to repay their loan; is that fair?

A.    This is fair.

Q.    Okay.  And in the commercial world, however, where somebody is giving up collateral and certain things may happen that they can't predict, I'll go back to my question, did you ever assess if this makes commercial sense for an individual to convey $4 million of property in return for $1.5 million?

A.    I told the parties as such, no, that I was making no opinion about this, whether it worked -- whether this structure made sense on either side.

Q.    Given the fact --

A.    I remember having -- that -- that I do remember having a conversation with both Ira and Mr. Teichman right at the outset, and I said, I have no idea

what this is and I'm not weighing in at all on that.

Q.    Well, did it strike you, sir, as a transaction that seemed to be a bit onerous as it relates to Mr. Russack?

A.    No, because the actual payment terms were not onerous.  The risk that he was taking was not a risk that I would personally take, but the deal points did make sense.

Q.    Well, if we were to assume, and I'm going to represent to you Mr. Teichman seemed to indicate this, that the $45,000 represented $15,000 a month, which would translate to 12 percent interest if it were a loan.

A.    Right.

Q.    Follow me thus far?

A.    Yeah.

Q.    We're talking about March of 2020, so let's go back to the pandemic.

A.    Um-hum.

Q.    Which is when that occurred.

Are you aware what the commercial interest rates were for real

Page 92

estate transactions at that time?

A.    They were in the 3s.

Q.    Yeah, about 3 and a quarter; sound about right?

A.    Yeah.

Q.    Okay.  And this is 12 percent on a property which has no liens or incumbrances on it; correct?

A.    Correct.

Q.    Okay.  Did you ever think of inquiring of Mr. Russack, look, why don't you just do a conventional loan; it'll be a whole lot cheaper?

A.    My understanding that he was going to do a conventional and that was the whole purpose of this, he was trying to get this as a bridge to -- and that was the -- I -- I would assume, sorry. It wasn't my understanding, but it was my assumption.  Money was almost free in that -- in that period and Mr. Russack -- my understanding was, for whatever reason, Mr. Russack needed the funds --

Q.    Okay.

A.    -- and a loan takes some

Page 93

time, so that's why he did this as a three-month loan.

Q.    Well, in fact, when you say money was almost free, indeed, in some places there were 0 interest; correct?

A.    Yes.  Correct.

Q.    And in this situation did you ever advise Mr. Russack, look, you can get a short-term loan at substantially less interest rate and avoid the risk which you just referenced?

A.    I'm not aware of any such short-term loans available at that size at a low interest rate, I'm not aware of any.

Q.    If you had an understanding that this was to be some form of a bridge loan, did you ever suggest to Mr. Russack that he may want to go and then apply for whatever longer-term loan he was seeking utilizing this property which is free and clear?

A.    Again, I wasn't advising Mr. Russack on this loan; however, my assumption would be that Mr. Russack

Page 94

would not be able to get traditional financing on this property, as my understanding is that him and his partner in Ocean Woodruff do not see eye to eye.

Q.    And how, as of March 2020, did you know that?

A.    As a matter of curiosity, when I got this Membership Sale Agreement, as lawyers are want to do, we fish around on PACER, or the equivalent in the New York court system, and I came across a fair amount of litigation between the two of them.

Q.    Did you come across litigation that Mr. Weinstein had with Mr. Sprei?

A.    I don't remember those -- those names.  I've seen litigation where Mr. Sprei was involved.  I don't recall whether or not Mr. Sprei was a party in the Ocean Woodruff and Weinstein stuff, but I definitely remember his name appearing on pleadings somewhere.

Q.    Are you aware Mr. Weinstein obtained a $6 million judgment against

Page 95

Mr. Sprei?

A.    I was not aware.

Q.    Were you aware of any of the judgments that had been gained against Mr. Sprei?

A.    I'm not aware of any judgments.

Q.    None whatsoever?

A.    I -- I have not -- I don't remember judgments.  I remember just Googling once and seeing that he was a party in a lot of actions, but it wouldn't surprise me, if you're a party to a bunch of lawsuits, you know, I'm not -- I'm not surprised if some of them went to judgment.

Q.    Sir --

A.    Oh, you know what, actually, sorry, there may have been a transaction where -- no, no, no.  I'm trying to think if there was ever any transaction where he was actually personally involved as a partner and there would have been a judgment search, but no.

Q.    Sir, I'm going to show you

Page 96

what was marked in Mr. Teichman's deposition as Exhibit JT No. 5. And it's referred to as Affidavit of Confession of Judgment.

A. Okay.

Q. Did you draft this document?

A. That does look like my -- my -- my font, yes.

Q. The Confession of Judgment is for an amount of $750,000, and then it states at the bottom, nonpayment of 1,500,000 debt evidenced by a Promissory Note, parentheses, copy of which is attached hereto, end parentheses. Do you see that?

A. Yes.

Q. And we've already established there is no Note; correct?

A. Correct.

Q. Why was the Confession of Judgment in the amount of $750,000?

A. My understanding, and again, I was not involved in these negotiations, but there was a -- I believe an e-mail to that effect that I produced that Ira had

Page 97

either negotiated or just said that he would not sign a Confession of Judgment for more than $750,000 in connection with this transaction.

Q.    Actually, sir, isn't it that Mr. Rubin stated that the Confession of Judgment had to be $750,000 in order to give credit for the shares acquired?

A.    My understanding of that e-mail was that that was the agreement by Mr. Russack because he would not agree to a Confession of Judgment larger than $750,000 because Mr. Teichman still had the security in the -- in the shares.

Q.    Well why have a Confession of Judgment at all?

A.    As a larger -- as a greater degree of security.

Q.    Excuse me?

A.    As a greater degree of security.

Q.    So we have a $1.5 million loan as we call it --

A.    Um-hum.

Q.    -- secured by the already

Page 98

conveyed interest of property worth $4 million, and yet another $750,000 was required?

A.      That is what Mr. Teichman -- well, Mr. Teichman wanted seemingly more, and this is, I think, what they settled on.

Q.      If, indeed, there had been a breach of --

If, indeed, there had not been a repurchase of the shares, was it your understanding that Jest Holdings then would be able to retain the full interest that it had acquired in Ocean Woodruff?

A.      Yes.

Q.      Okay.   And is it your understanding they also could then go confess judgment as well?

A.      No.

Q.      What document states that Jest Holdings would be able -- or Jest Holdings would not be able to then confess judgment as well as retain its interest in Ocean Woodruff?

Page 99

A.    What document is the Affidavit of Confession of Judgment itself.  The Promissory Note was never executed.

Q.    So --

A.    I don't think there was ever a loan given.

Q.    Excuse me?

A.    There was never -- there was never a Promissory Note executed.

Q.    All right.  So what's the -- in your mind, the significance of not having a Promissory Note as it relates to the Confession of Judgment?

A.    I think the Confession of Judgment's void, if you'd ask my legal opinion.

Q.    Because of the lack of the Note with a Confession --

A.    Yes.

Q.    -- of Judgment clause --

A.    Yes.

Q.    -- is that correct?

A.    Yes.

Q.    Okay.  Prior to this

Page 100

transaction, would I be correct in the assumption that you have dealt with Confessions of Judgment as a transactional lawyer?

A.    Rarely, but on occasion.

Q.    Are you familiar with any constitutional requirements -- or let me rephrase it.

Are you aware of any requirements which have been imposed by the Supreme Court of the United States as it relates to Confession of Judgments?

A.    Not off the top of my head.

Q.    Are you aware of any of the opinions ever issued in connection with Confession of Judgment by the Supreme Court?

A.    Not specifically.  Only to say that they're rarely enforceable.

Q.    And you're aware, are you not, that in order for there to be an enforceable Confession of Judgment it's got to be a knowing, intelligent and voluntary waiver of rights; correct?

A.    Yes.

Q.    And that's got to be spelled out in some writing; correct?

A.    Correct.

Q.    And that's something that you would frequently find in a Promissory Note which would have a Confession of Judgment clause; correct?

A.    Correct.

Q.    This Confession of Judgment is notarized by someone by the name of Jaakov, J-A-A-K-O-V, Winkler.  Do you see that?

A.    Yes.

Q.    Do you know who Mr. Winkler is?

A.    No.

Q.    Do you know why this Confession of Judgment, which is also March 12th, 2020, the same date that you notarized documents, was notarized by somebody else?

A.    I have no idea.  Again, I don't put much stock into the Affidavit of Confession of Judgment.

Q.    Well, was this executed

Page 102

Affidavit of Confession of Judgment presented to you at some point in time?

A.    I don't believe I ever got the originals, no.

Q.    Do you have any recollection of advising Mr. Rubin, Mr. Teichman or Mr. Russack that, in your view, absent the Promissory Note with a Confession of Judgment clause, that this Affidavit was null and void?

A.    I believe that I did have a discussion with Mr. Teichman at one point that I didn't think much of it.

Q.    Did you ever go any further than, I didn't think much of it, as to render the same opinion you have here today, that it was unenforceable?

A.    I think I might have used the word probably.

Q.    You might have used the word?

A.    The word probably.

Q.    Before unenforceable?

A.    Yes.

Q.    Did you ever put that in

writing?

A.    No.

Q.    Did you ever provide Mr. Russack with that assessment that the Confession of Judgment was probably unenforceable?

A.    No, I had never discussed these documents with Mr. Russack.

Q.    Okay.  Sir, I'm going to show you what was marked during Mr. Teichman's deposition as Exhibit JT No. 6.  And it is an e-mail which relates to the Confession of Judgment and its amount at $750,000.

Are you familiar with these e-mails?

A.    Yes.

Q.    Okay.  With the e-mail starting on the first page, Mr. Teichman inquires of you as to why is the Confession of Judgment for 750,000.  Do you see that?

A.    Yes.

Q.    Among the recipients of that e-mail, which is at 9:07 p.m., is Jest

Page 104

Serving.  Do you know what Jest Servicing is?

A.    I believe it's a company e-mail address for Mr. Teichman.

Q.    The e-mail from Mr. Teichman comes from a gmail address, JosephTeichman, and your understanding Jest Servicing is the company e-mail?

A.    Some sort of company e-mail.

Q.    Did you ever deal with a entity Jest Servicing, as opposed to Jest Holdings?

A.    No.

Q.    The response to Mr. Teichman's e-mail appears to be coming from Mr. Rubin, which says, because you have to give some credit for, letter R, the shares acquired.  Do you see that?

A.    Yes.

Q.    Okay.  And in that e-mail Mr. Rubin makes no reference to Mr. Russack insisting 750 be the ceiling for which he would agree to any Confession of Judgment; correct?

A.    He's explaining the theory

Page 105

behind it, yes.  Explaining why they made the deal they made.

Q.    All right.  But you weren't part of any of these discussions --

A.    No.

Q.    -- when you --

A.    Not at all.

Q.    -- talked about it one way or the other?  Okay.

Take a look at the second page of this e-mail.

A.    Yes.

Q.    At the bottom, March 19, 2020, you communicate with Mr. Teichman and Mr. Rubin stating, I'm now in receipt of, and there's a colon, and the first is a wire, $600,000 from Joseph Teichman 3/13/2020, and the second, 625 from Mr. Teichman, 3/19/2020.  Do you see that?

A.    Yes.

Q.    We're going to come back to that, but I point that out to you because I previously represented the first wire referenced in any documentation is on March 13th, the day after the Assignment

Page 106

or any other documents were executed.

A.   That is correct.

Q.   Sir, I show you what was previously marked as Deposition Exhibit JT No. 7.  It's captioned, Declaration of Restrictions.

A.   Um-hum.

Q.   Okay.  You prepared this document?

A.   Yes.

Q.   Okay.  It's also dated March 12, 2020 and appears to be signed by Mr. Russack?

A.   Yes.

Q.   And you notarized it as well?

A.   Yes.

Q.   What's the purpose of this document?

A.   I believe it is a -- the purpose is to have a recorded document whereby the company could not sell its collateral without paying off Jest.

Q.   This document is signed by Mr. Russack on behalf of Ocean Woodruff

Development Corp.; correct?

A.    Yes.

Q.    What was the basis upon which you determined that Mr. Russack had the authority to sign on behalf of Ocean Woodruff Development Corp.?

A.    The only basis was -- the only basis and -- and -- and this was -- at the time that this was signed I did not yet have sufficient basis for it. And I was still awaiting someone to -- I was awaiting an opinion letter from his attorney to supply that basis.

Q.    And in your view did you receive an opinion letter which provided that basis?

A.    That provided with certainty that he had the authority, no.

Q.    Did you, yourself, ever make an assessment whether Mr. Russack had the authority to sign on behalf of Ocean Woodruff Development Corp.?

A.    No.

Q.    Did you take a look at the October 1985 letter agreement in order to

make a determination one way or the other?

A.      I don't recall.

Q.      Okay.  Now, sir, I told you that there's a copy of an opinion letter with your signature.  I'm going to show you what was marked for identification purposes as Deposition Exhibit JT No. 8.

A.      Um-hum.

Q.      And -- sir?

A.      Yes.

Q.      Okay.  This appears to be a letter dated March 12, 2020 as an opinion letter bearing your signature.  Do you recognize this?

A.      I do not recognize -- I mean, I recognize this as the same letter that his attorney signed, at the same time I -- this does not look like -- I mean, I can tell you right away this is not my signature.  It's an electronic -- it looks like a electronic copy of my signature that was pasted here.  And it's not on my stationery.  I would not have put an opinion letter on a piece of paper

like this.

Q.   Did you draft this letter as a template or form for some other attorney on behalf of Mr. Russack to utilize?

A.   Possibly.  That would -- that -- that would make sense, yes.

Q.   Do you recognize the language as something that you would have drafted?

A.   Yes.

Q.   Okay.  So --

A.   There is a possibility, and I'm just -- I'm just thinking aloud, that it was a document that I did draft on a letter template, obviously not on my stationery, and that's -- and probably had my -- it's possible that it had my electronic signature in there to whomever I sent it to.

But again, this was -- it would not have been signed as me signing, it may have been an electronic signature that stayed on my template.  But again, it's not on my stationery and it wouldn't

even be something that I would have signed and circulated.

Q.    So would it be fair to say from looking at this letter and your recollection that you did not issue this letter as an official opinion letter to Jest Holdings, but you prepared this so that some other attorney would have the form of an opinion letter which they should issue?

A.    Yes.  Yes.

Q.    Where the first paragraph states, I have acted as counsel to Ira Russack --

A.    Yes.

Q.    -- is it your position, sir, that you were not acting as counsel for Mr. Russack?

A.    Correct.

Q.    At any point in time?

A.    With regards to this loan?

Q.    Yes.

A.    Absolutely not.

Q.    It further states in the second paragraph, In this capacity, I

have examined documents provided to me by the assignor and I have made certain other inquiries with respect to borrower and guarantor and the loan as I have deemed necessary or appropriate for the purposes of this opinion.  Do you see that paragraph?

A.    Yes.

Q.    The words assignor, borrower, and guarantor are all capitalized, right?

A.    Yes.

Q.    The assignor is not defined in this draft letter, but would that be Mr. Russack?

A.    Yes.

Q.    Okay.  As you and I have noted a couple times before, this wasn't truly a loan, so there isn't really truly a borrower now, is there?

A.    Not entirely true.

My understanding was that there was a Heter Iska document involved. I don't know if it went through my office or it didn't go through my office, and

Page 112

sort of technically the Heter Iska document doesn't make him a borrower either, but at the same time, colloquially and within the legal community that deals with the Orthodox Jewish community, we treat the word Heter Iska as a loan, so it would not have been out of the realm of appropriate definition here to have used the word borrower as well.

Q.    Okay.   But in this draft opinion letter, the term borrower is not defined; correct?

A.    Correct.

Q.    And the Heter Iska, is that supposed to supercede any other documents?

A.    Are you asking my religious opinion or you're asking my legal opinion?

As far as my legal opinion, no, it's not intended to do so.

Q.    This draft letter also refers to as a guarantor.

A.    Yes.

Page 113

Q.    That would be yet somebody different from the borrower; correct?

A.    Correct.

Q.    And there is no guarantor?

A.    There was no guarantor, no. Again, I probably threw this out onto a piece of paper to send out to somebody who would be potentially signing something at some future date, and as you noted, I had not spoken to Mr. Harrison at that time yet.  And would have expected something to be changed and edited.

Q.    Sir, let me show you what was previously marked at Mr. Teichman's deposition as Exhibit JT No. 9, an e-mail of March 12, 2020 at 9:51 a.m. from Mr. Rubin to yourself and Mr. Teichman.

Are you familiar with this e-mail?

A.    Yes.

Q.    All right.  Now, this e-mail states, To be clear, Noah Burton will be representing the lender, parentheses, Jest, end parentheses, in this

Page 114

transaction.

Is this the e-mail that you were previously referring to which identified what your role would be as attorney for Jest Holdings and not Mr. Russack?

A.    Correct.

* * *

(Whereupon, a short break was taken.)

* * *

(Whereupon, the court reporter marked Exhibit NB-3 for purposes of identification.)

* * *

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 3.  It appears to be an e-mail of March 8, 2020 at 11:09 p.m. from Mr. Rubin to yourself and Sam Sam.  And it -- the e-mail seems to be transferring to you e-mails between Mr. Teichman and Mr. Rubin.

Are you familiar with this

Page 115

e-mail?

A.    Yes.

Q.    And the bottom e-mail, at 9:26 p.m., appears to be from Mr. Rubin saying, Here is draft of docs.  Will be getting title search and Note of Confession of Judgment.

Had you provided Mr. Rubin with documents as of March 8?

A.    I believe so.

Q.    Okay.  Seeing this e-mail of March 8, does that refresh your recollection one way or other as to when you were originally contacted in order to prepare documents?

A.    No.  I just know it was sometime before March 12th and I remember it being a rush, so I can't imagine it was more than a week or ten days before.

Q.    Fair.

A.    Probably much faster than -- much -- much sooner than that.

Q.    Mr. Teichman responds to Mr. Rubin inquiring, Has counsel reviewed their corporate docs and confirmed that

Page 116

title to condos is in name of the Corp.?
Do you see that?

A.    Yes.

Q.    And the counsel Mr.
Teichman's referring to would be you?

A.    I have no idea.  At the
time, I believe -- before -- at that
point, I don't believe that I had had any
discussion that I would be representing
Mr. Teichman on this.

Q.    I'm sorry, you had any
discussion that?

A.    That I'd be representing Mr.
Teichman at all on this.

Q.    Were you aware of any other
attorney that was working on this matter
besides yourself as of March 8, 2020?

A.    No.

Q.    Okay.  Did you ever come to
learn that there was any other attorney
besides yourself?

A.    Besides Mr. Harrison, no.

Q.    Well, leaving aside Mr.
Harrison, but --

A.    No.

Page 117

Q.    -- working -- thank you.

Sir, I'm going to show you what was marked for identification purposes as Deposition Exhibit -- that's not what I'm referring to -- but Deposition Exhibit JT No. 10.  It's another e-mail on March 12th, 2020, this one at 9:58 a.m. from Mr. Rubin to Sam and you are copied on this e-mail.

A.    Yes.

Q.    Okay.  The e-mail refers to a wire of, it says at the bottom, As per my conversation with same and Ira, please wire $25,000 to Queen Equities, LLC.  And this is an e-mail from Sam to Rubin and yourself.

Do you know what that's in reference to?

A.    I believe I sent a copy of this wire to you.  This was a wire that I received from Ira around March 12th, which, to my knowledge, was unrelated to this transaction.  It was a wire that I received directly from Ira for $100,000 and with -- and I had received these

Page 118

instructions about wiring a portion of that money to Queen Equities, and in fact, I did subsequently do so after confirming that verbally with Ira.

Q.    Okay.  So at the top of the e-mail Mr. Rubin writes, In other words, to make this gibberish clear, upon receipt of the 100,000, please wire 32,500 to Queen Equities, LLC as per the instructions below; correct?

A.    Correct.

Q.    Do you know what transaction that was involved in or why $32,500 was going to Queen Equities?

A.    I believe that that Atlantic transaction was right around there.  I don't remember what the -- I don't remember the specifics, but the -- Ira had fronted some money for that transaction.  I don't know if this 32,500 was related to that or anything else, or related to money that he owed him, I have no idea.

Q.    What would be the reason for which these funds would run through your

account?

A.    They were closing this transaction, there was a -- there was a fair amount of money that was wired to my account for this transaction.  I believe -- my understanding, if I -- just my recollection, and this is very vague, was money that Ira owed to Queen Equities.

Q.    Do you know why?

A.    No.

Q.    The account that it was wired to, your account, is that an attorney trust account?

A.    Yes.

Q.    Separate from your operating account; correct?

A.    Yes.

Q.    And that account's maintained where?

A.    At the time, was at Lakeland Bank.

Q.    Is it -- do you still maintain a trust account there?

A.    Yes.  No, not at Lakeland Bank, no.

Page 120

Q.     During the transaction of 2020 that brings us here today, your account was at which bank?

A.     Lakeland Bank.

Q.     Okay.  Do you maintain records which would show money going in and money going out and separate it by client or matter --

A.     Yes.

Q.     -- for all of that?

And that's kept in some type of ledger or spreadsheet of QuickBooks or something?

A.     Yeah.

Q.     Okay.  So if, for example, we wanted to get from your trust account the history of the money that went in and the money that went out relating to Mr. Russack via this transaction or others --

A.     Right, this would be in a different ledger than --

                    *   *   *

(Simultaneous speakers. Reporter interruption for clarification.)

Page 121

* * *

BY MR. BERNHEIM:

Q.    -- that would be available?

A.    Yes.  Yes.  I would be happy to provide you with the ledger.

Q.    Sir, I show you what was previously marked as Deposition Exhibit JT No. 11.  And it appears to be more e-mails on March 12, 2020.  The one on the first page is at 11:32 p.m. and it is from you to Mr. Teichman and Mr. Rubin and Mr. Russack, it says, Please see the revised Membership Sale Agreement.  Do you see that?

A.    Yes.

Q.    Do you have any recollection as to what revisions were being made on that agreement?

A.    No.

Q.    Would you send revisions as red-lined or black-lined versions?

A.    Sometimes.

Q.    Do you have recollection one way or the other what occurred here?

A.    No.

Page 122

Q.    Take a look at the third page of this exhibit, if you would, please.  There's an e-mail of March 12, 2020 at 3:15 p.m. from yourself to Mr. Russack and copied to Mr. Rubin and Mr. Teichman.

It reads, Mr. Russack, I am working on the loan with Mr. Teichman and the lender is requiring that your Certification further stipulate as to the accuracy of the financial statement that you submitted.  I have revised the Certification accordingly.  Regards, Noah Burton.

Why is it on March 12, 2020 you were informing Mr. Russack that you're working on the loan with Mr. Teichman?  Wouldn't he have known that before?

A.    I don't know.  I don't know. At some point on that day he came into my office, I don't know.

Q.    Well, you're sending him this e-mail that --

A.    Yeah.

Q. Right.

A. Yeah.

Q. Correct?

A. Yeah.

Q. And when you say he came to your office --

A. Yeah.

Q. -- that was whom?

A. What?

Q. When you said he came --

A. Ira.

Q. -- to your office.

A. Ira.

Q. Because he signed documents --

A. Right.

Q. -- on that date; correct?

A. Um-hum.

MR. LANG: Excuse me. How can I get a copy of those e-mails?

MR. FRIEDMAN: You got them already.

MR. BERNHEIM: These are all -- everything I'm using was marked as an exhibit from Mr. Teichman's

Page 124

deposition, that's what I've been referring to.

MR. LANG:  Oh, okay.  All right.

BY MR. BERNHEIM:

Q.    You state that there's a request to confirm accuracy of the financial statement.  Who made that request?

A.    Mr. Teichman.

Q.    Do you know why?

A.    No.

Q.    They're not trying to assess Mr. Russack's creditworthiness in order to do this transaction, are they?

A.    No.  It references a specific financial statement.  I became aware this financial was submitted by Mr. Russack later -- before I even knew about this loan.  Mr. Teichman at one point had requested that he certify within the loan documents that the financial statements that he had previously provided were, in fact, accurate.

Q.    All right.  Now I'm trying

Page 125

to find out what is the commercial significance of bothering with a financial statement from Mr. Russack when there's already been a transfer of real estate in excess of twice the value of the $1.5 million loan.  Why bother?

A.    I don't think Mr. Teichman was looking at -- was -- was expecting to hold onto the real estate.

Q.    But he had it; correct?  It was conveyed --

A.    Correct.

Q.    -- to him as of March 12th --

A.    Yes.

Q.    -- right?

A.    Well, I don't -- well, just to correct -- correct myself.

It wasn't conveying as of March 12th.  That's when Mr. Russack was signing documents, it wasn't conveyed that day.

Q.    Well, you have an Assignment which states, and we looked at it, that as of March 12th, when it was executed,

Page 126

he was conveying his interest in Ocean Woodruff to Jest Holdings, right?

A.    Yes, but those documents were not released on March 12th.  It was not conveyed on March 12th.

Q.    But that is the effective date of the Assignment, is the not?

A.    No.  The effective date of the Assignment is the date of delivery, by law.

Q.    And what -- well, what document are you aware of that states that the Assignments were not to be delivered until further instructions from Mr. Russack?

A.    There's no document.  There were also no funds.

Q.    Excuse me?

A.    There were also no funds on March 12th.

Q.    Right, I understand that. We went through the valuable consideration and you were candid enough to acknowledge there was none.

Take a look at the second

page of this exhibit, if you would, please.

A.    I didn't acknowledge that there was no consideration.  I said at the time the document was signed there was no consideration.

Q.    That's correct.

A.    To my knowledge.

Q.    All right.  So take a look at the second page, where you have an e-mail at 4:30 p.m.  You write to Mr. Teichman, I have the signed documents in my office and I am available to review the file with you at your earliest convenience.  It's my understanding the borrower needs the funds as soon as possible.  Please call me as soon as you have a chance.  Correct?

A.    Um-hum.

Q.    Okay.  What review were you anticipating to do with Mr. Teichman?

A.    To review what the loan documents -- what the transactional documents actually say.

Q.    Hadn't you supplied them to

Page 128

Mr. Teichman and Mr. Rubin in advance --

A.    Yes.

Q.    -- of Mr. -- let me finish for the record, please.

-- in advance of having Mr. Russack sign them?

A.    I had not expected Mr. Russack to sign them that day.

Q.    That's not my question.

Had you not --

A.    Yes.

Q.    -- provided them in advance?

A.    Yes.

Q.    Now, did you actually have some meeting with Mr. Teichman to review the file as noted in your March 12th 4:30 p.m. e-mail?

A.    I had a phone call with him.

Q.    On the same day?

A.    I don't recall.

Q.    Would you have kept any notes of any nature in your file which would reflect that you had a phone call and reviewed the documents with Mr. Teichman?

Page 129

A. No.

Q. Sir, I'm going to show you what was marked for identification purposes as Deposition Exhibit JT No. 12. And this appears to be the opinion letter that we've referenced from Mr. Harrison dated March 17, 2020.

A. Yes.

Q. Are you familiar --

A. Um-hum.

Q. Okay. Do you recall receiving this opinion letter from Mr. Harrison?

A. Yes.

Q. Okay. I believe you testified, and correct me if I'm wrong, that before Mr. Harrison signing and sending that letter you had a conversation with him; is that correct?

A. Yes, I believe so.

Q. All right. Do you recall the substance of that conversation?

A. No.

Q. Are there any notes of that conversation?

Page 130

A.    No.

Q.    Did you have more than one conversation with Mr. Harrison?

A.    I don't remember.

Q.    Were you asked to provide Mr. Harrison with any documents?

A.    No.

Q.    Do you recall providing Mr. Harrison with any documents?

A.    I don't recall so, no.

Q.    Do you know if Mr. Harrison had any communications with Mr. Rubin?

A.    I would have no idea, no.

Q.    Prior to March of 2020 did you have any dealings or knowledge of Mr. Harrison as an attorney?

A.    No.

Q.    Did you even know who he was?

A.    Never.

Q.    At any point in time did you learn that Mr. Harrison had been disbarred?

A.    No.

Q.    The look on your face shows

Page 131

a little bit of surprise.

Is this the first time you're learning about that?

A.    This is true, yes.

MR. FRIEDMAN:  In two states.

THE WITNESS:  Really?  A two-fer.

MR. FRIEDMAN:  He's still got New Jersey.

MR. BERNHEIM:  Temporarily.

THE WITNESS:  Doesn't carry over?

MR. FRIEDMAN:  That's confusing to me, but.  I don't know why.

MR. BERNHEIM:  We shouldn't do this on the record, okay.

BY MR. BERNHEIM:

Q.    The letter that Mr. Burton (sic) submitted is almost identical to the one we reviewed that has your electronic signature; correct?

A.    Correct.

Q.    When you reviewed it, did

Page 132

you note any differences in Mr. Burton's
(sic) letter versus your own?

A.    Mr. Harrison's.

Q.    I mean, I'm sorry, Mr.
Harrison's, right.

A.    Yes.  I believe he put in
the caveat of and for subject to the
interpretation of paragraph 7 --

*   *   *

(Reporter interruption for
clarification.)

*   *   *

THE WITNESS:  Sorry.  The
end of paragraph 4.

BY MR. BERNHEIM:

Q.    He put in where it reads --

A.    The caveat of paragraph 7 of
the October 16th, 1985 Agreement.

Q.    And what significance, if
any, did you attribute to that addition?

A.    I already expressed my
opinion as -- as -- as to whether or not
that paragraph 7 of the Agreement was
pertinent and I felt that it was
sufficiently not pertinent.

Q.    Did you bring to the attention of Mr. Rubin and/or Mr. Teichman that Mr. Harrison had added that clause to paragraph 4 and that you did not feel that it impeded upon the ability to proceed with the transaction?

A.    I believe so.

Q.    Was that in writing?

A.    No.

Q.    Do you recall any other changes that Mr. Harrison had from his version to your version?

A.    I don't recall what my version exactly said.  Again --

Q.    Well, I'll -- I'll draw your attention to the last paragraph.

A.    Sure.

Q.    Where it states, This opinion is made for the benefit of and can be relied on by the addresses hereof, their successors and/or assigns in connection with the Assignment; however, you are recommended to obtain your own counsel as well.

A.    Yes.

Page 134

Q. That last clause is in addition, as opposed to your letter.

A. Yes. Yes, yes. Okay.

Q. All right. Did you believe that to have any significance as -- to the opinion letter as to whether it diminished it, changed it in any fashion whatsoever?

A. No. No.

Q. Did you ever express that view one way or the other to Mr. Rubin and/or Mr. Teichman?

A. No.

Q. Sir, I'm going to show you what's been marked for identification purposes during the deposition of Mr. Harrison as Exhibit JH No. 6. And it's a series of e-mails, the first being noted as March 17, 2020.

A. Um-hum.

Q. I'm going to draw your attention to the e-mail of March 9, 2020, which is in the center of the first page.

A. Okay.

Q. Let me know when you've

Page 135

reviewed it.

A.    Um-hum.

Q.    Have you reviewed that e-mail?

A.    Yes.

Q.    Okay.  First of all, is your e-mail address reattorneysesq@Yahoo.com?

A.    No.

Q.    Do you know whose e-mail that is?

A.    No.

Q.    Okay.  Because that e-mail reads, I'm not preparing a draft opinion. I provided a form for whoever will be issuing the opinion.  Do you see that?

A.    Um-hum.

Q.    You have to answer verbally, sir.

A.    Yes.

Q.    Okay.  And you did not draft this?

A.    No.  This e-mail, no.

Q.    Do you have any idea who did?

A.    No.

Page 136

Q.     That's interesting.

MR. LANG:  Oh.  Oh.

MR. BERNHEIM:  Mr. Lang is moaning as if he just had --

MR. LANG:  It's just something we talked about previously.  I'm sure you saw that also.

BY MR. BERNHEIM:

Q.     This e-mail then goes on to state, in the portion I just read, I actually never saw an opinion letter given for these types of transactions.

And again, you have no idea who authored this?

A.     No.

Q.     Sir, I'm going to show you what's been marked previously as Deposition Exhibit JT No. 13.  It's captioned, Certification, and it was presented to us with two pages.

Are you familiar with this document, sir?

A.     I've seen it.  I don't know if I drafted it.

Page 137

Q.    Okay.  This document, which also bears the date of March 12, 2020 and appears to have a signature of Mr. Russack, is notarized again by Mr. Winkler.

A.    Yes.

Q.    Do you have any knowledge as to why was the Certification and the Affidavit of Confession of Judgment were notarized by somebody other than yourself?

A.    I have no idea.

Q.    The second page of the document, at the top says, Ira Russack Personal Financial Statement as of November 14, 2018.

You have to flip the page.

A.    Oh.  Okay.

Q.    Was this the financial statement that you understood Mr. Teichman was seeking to have certified as still being accurate?

A.    I have no idea.

Q.    Okay.  Have you ever seen any other financial statement in

Page 138

connection with Mr. Russack in this transaction?

A.    I don't recall any -- ever seeing any financial statement at all.

Q.    Do you have any recollection of Mr. Teichman indicating that this financial statement was satisfactory for his purposes, whatever they may be?

A.    I think, if I -- if I can recall correctly, I believe that this was a component of what made him satisfied that he had enough to go on.

Q.    Let's see if we can pare that down.

My question to you was: This financial statement, which I'm going to represent is the only one --

A.    Yes.

Q.    -- that's been produced in this litigation, did you have an understanding from Mr. Teichman that this was satisfactory for whatever his needs were in connection with this transaction?

A.    My understanding was he wasn't requesting an additional financial

statement.

Q.    Should I translate that that he was then satisfied?

A.    I don't like using the term satisfied because I think satisfied means that that was the entire sum of what he was relying on.  I think this was a component of what he was relying on in the larger sense of the transaction.

Q.    Okay.  Do you know who prepared this financial statement?

A.    No idea.

Q.    Do you have any recollection of seeing it prior to today?

A.    Never.

Q.    Okay.

A.    I remember there being a Certification, I do remember there being an attachment to the Certification, I don't remember looking at the --

Q.    Is this a financial statement which is in format and substance and details of which you're accustomed of seeing in transactions of this nature?

Page 140

A.    No.

Q.    It's a little bit sparse; would that be a fair assessment?

A.    Yes.

Q.    Sir, I'm going to show you what was previously marked as Deposition Exhibit JT No. 14, the Heter Iska.

A.    Okay.

Q.    Looking at this document, is this something that you drafted?

A.    No.

Q.    Do you know who prepared this?

A.    I don't.

Q.    Is this, using your prior terminology, a boilerplate Heter Iska Agreement?

A.    Is it someone's boilerplate? It is someone's boilerplate.

Q.    Or maybe something that you're familiar with that you have seen it in your work from time to time?

A.    I actually have not seen this particular form, no.

Q.    Okay.  This document is

Page 141

unsigned.  Are you aware of any Heter Iska which was executed?

A.    I'm not aware of one.

Q.    If you recall, earlier we looked at a checklist which included a Heter Iska.  Do you recall that?

A.    Yes.

Q.    But you have no recollection or knowledge one way or the other if such a document was ever executed; is that fair?

A.    I have no idea.

Q.    Okay.  The document does say in the last paragraph, This Agreement shall supercede and take precedent over the sale of shares agreed to by Ocean Woodruff Development Corp., a New York Corporation.  You see that?

A.    Yes.

Q.    What's your understanding of the meaning of that sentence?

A.    My understanding of the meaning of that sentence is, and I think I alluded to this previously, I think from a religious perspective, in order

Page 142

for this document to have validity, it would have to be termed this investment Agreement as opposed to being a Purchase of Shares to be permissible.

Q.    Well, the phraseology superceded is more of a legal term than a religious term; true?

A.    True.  And again, I'm just skimming, this is the first time I've ever read this document, it's not familiar to me, but if you read back there is a sentence three sentences prior, This document has zero validity in secular court, so.

Q.    So you would agree with me, it appears a little bit inconsistent by its own terminology?

A.    No, I believe this was intended to be what it says.  Has zero validity in secular court and also that this Agreement should supercede the sale of shares for the purpose of this document.  I believe those two statements are internally consistent.

Q.    I understand what you're

Page 143

intending to convey, or at least I think I do.  We're not going to belabor it.

Sir, we referenced and you've given testimony of funds being transferred to some of Mr. Rubin's entities, be it Queen Equities or I think Miriam Equities.

Are you aware of any funds that were transferred by you in the course of this transaction, meaning the Ocean Woodruff transaction to Queen Equities or Miriam Equities?

A.    Other than the one wire, which -- the one wire that was referenced previously in this deposition with the instructions from Ira which I do not believe was part of this transaction, no.

Q.    Okay.

MR. BERNHEIM:  This will be No. 4.

                *   *   *

(Whereupon, the court reporter marked Exhibit NB-4 for purposes of identification.)

                *   *   *

Page 144

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 4.  It appears to be a letter dated March 18, 2020 off of stationery from Mr. Russack addressed to yourself with the re line, Ocean Woodruff to Jest.

Are you familiar with this document?

A.    No.

Q.    You ever see it before?

A.    I may have, I just don't remember.  I don't -- I don't -- I'm not familiar with the document.

Q.    The document states in its body, Dear Noah, As you know, I am due to receive an additional 900,000 in this matter.

The this matter is Ocean Woodruff to --

A.    Yes.

Q.    -- Jest; correct?  All right.

Please accept this

irrevocable directive to send $162,500 to Miriam Equities, LLC as per the wiring instructions below.  This is in settlement of what I was obligated under the stipulation of settlement in the matter ATL-L-1391-19.

A.    Okay.

Q.    All right.  Do you know what that's about?

A.    I have no idea.

Q.    Do you have any recollection --

A.    The only -- I mean, all I know is ATL, that's a -- that's a Atlantic County docket number, that's all I know.

Q.    Okay.  But you don't know what the stipulation of settlement that's noted in this letter is about, do you?

A.    No, not at all.

Q.    And do you have any recollection of sending $162,500 to Miriam Equities?

A.    No.

Q.    If that had occurred from

Page 146

your trust account we would be able to --

          A.    Yes.

          Q.    -- trace that; correct?   All right.

               This letter appears to have an electronic signature, similar to the one that we looked at for yourself in the opinion letter; correct?

          A.    Yes.

          Q.    And just as the electronic signature on that letter really wasn't intended to convey something to somebody else, correct me if I'm wrong, you would have no idea who placed this electronic signature on this letter, would you?

          A.    Nor would I rely on it.

          Q.    So if, indeed, there was some direction, as this letter might seem to indicate, you would have then received something in hard copy confirmation?

          A.    I would -- what would I -- I am not sure how to answer the --

          Q.    Yeah, I'm trying to find --

               Look, this letter goes out, it indicates it's supposed to be

Page 147

notarized --

A.    It says my name on it too.

Q.    And you've never seen it --

A.    Never seen it.

Q.    -- and have no knowledge --

A.    It could be some --

*   *   *

(Simultaneous speakers.

Reporter interruption for

clarification.)

*   *   *

BY MR. BERNHEIM:

Q.    You've never seen it and

have no knowledge about it one way or the

other?

A.    It could be someone e-mailed

it to me and I promptly threw it in the

garbage because I would not rely on this.

Q.    Okay.

A.    It's an electronic signature

with a notary block, which is not

notarized, it's supposed to be notarized

ostensibly by me, on a date where I know

I had not seen Ira, so I don't know.

*   *   *

Page 148

(Whereupon, the court reporter marked Exhibit NB-5 for purposes of identification.)

*   *   *

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 5.  It appears to be an e-mail of March 12, 2020 at 1:39 p.m. to yourself and Mr. Teichman from Mr. Rubin, who writes, Can we get this done today?  Borrower really needs the funds tomorrow, meaning March 13.  What are you still missing?  Then it goes on to stay, Jest may only be funding in parts.

Do you recall this e-mail?

A.    Yes.

Q.    And what, if anything, did you do in response to this e-mail?

A.    I don't remember.

Q.    Did you have any understanding as why the borrower, quote, really -- actually, it says really, really needs the funds tomorrow?

A.    No.

Q.    Did you contact Mr. Sprei?

A.    Not unless he was copied on some of the e-mails, I don't think so.

Q.    Do you have any recollection of Mr. Sprei contacting you about the need for the money?

A.    No.

Q.    Did you contact Mr. Russack?

A.    At some point.

Q.    No.  In and around March 12th, saying --

A.    Well, I -- I -- I wired him --

Q.    -- do you really need the money?

A.    I wired him part of the funds on the 13th, so I would have called him personally to verify the wiring instructions, at a minimum.

                    *   *   *

            (Whereupon, the court reporter marked Exhibit NB-6 for purposes of identification.)

                    *   *   *

Page 150

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 6, and we actually looked from another e-mail reference that you make on March 19, 2020 that you are in receipt of wire of 600,000 on 3/13/2020 and 625,000 on 3/19/2020.

A.    Yes.

Q.    And those wire transfers, do you recall came from whom?

A.    From, I believe -- I am usually very specific about this type of e-mail.  If it says Joseph Teichman, then I believe it came from his personal account, as opposed to from Jest Holdings.

Q.    Was there any written arrangement whereby you were to act as a escrow agent or to hold the funds in this transaction?

A.    No.

Q.    Is there any specific reason that the funds weren't just sent directly

Page 151

to Mr. Russack?

    A.    Not that I know of.  I personally would have preferred it that way.

    Q.    Excuse me?

    A.    I personally would have preferred it that way.

    Q.    Yeah.  Are you aware that this arrangement was made by Mr. Sprei?

    A.    No.

                    *    *    *

            (Whereupon, the court reporter marked Exhibit NB-7 for purposes of identification.)

                    *    *    *

BY MR. BERNHEIM:

    Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 7.  It appears to be a series of -- or let me rephrase it.  It appears to be e-mails from Lakeland Bank to yourself regarding some wire transfers.

            Are you familiar with these documents?

Page 152

A.    Yes.

Q.    Okay.  So the first e-mail from Lakeland Bank is dated March 13, 2020 at 5:28 p.m., indicates that the amount of 509,500 was successfully sent to Ira Russack at JPM Chase.  Do you see that?

A.    Yes.

Q.    Do you know --

First of all, where did you get the instructions as to where to send the money?

A.    From Ira directly, or it could have been Mett, I don't know.

                    *    *    *

           (Reporter interruption for
      clarification.)

                    *    *    *

           THE WITNESS:  It could have
      been Mett.

           MR. BERNHEIM:  M-E-T-T.

           THE WITNESS:  M-E-T-T.

BY MR. BERNHEIM:

Q.    Now, I know that there were some wire instructions that you sent to

Page 153

Mr. Spina in your production.

Were those instructions included there?

A.    Most likely.

Q.    What was the reason for which 509,500 was wired on March 13 if you were in receipt of 600,000?

A.    Those are the instructions that I received from Mr. Teichman.

Q.    From whom?

A.    Mr. Teichman.

Q.    And what was to happen with the other amount of that money?  Like 90,500.

A.    I don't recall.  I know it was sent very soon thereafter.

Q.    You're looking at your phone.

A.    Yeah.

Q.    For?

A.    No, I'm just --

Q.    Okay.  All right.  I just want to make sure you're not looking at something referenced here.

A.    Sorry.

Page 154

Q.    And so you stated that -- and I apologize if I missed it, that something was then sent shortly thereafter?

A.    Yeah, this next page.

Q.    Okay.  So --

A.    And I don't -- I don't recall what the reason.  At that point we hadn't yet gotten the opinion from Mr. Harrison, I don't know to what extent Mr. Teichman had disbursed anything on this loan yet, but.

Q.    Okay.  So the next page of Exhibit 7 refers to an $89,000 transfer --

A.    Correct.

Q.    -- right?

So that would be $1,500 short of the full 600?

A.    Yeah.

Q.    Right?  If you include the first transfer.

A.    Yeah.

Q.    Where did the 1,500 go?

A.    I believe that was my fee.

Page 155

Q.    That went to your firm?

A.    Yeah.

Q.    Did your firm ever issue an invoice to anybody for the services that you rendered?

A.    I went looking for and I could not find an invoice.

Q.    Are you aware of any written document which states that your firm was to be paid from loan proceeds in this transaction, as opposed to separately by Jest Holdings or Mr. Rubin?

A.    No.  I believe -- I believe there may have been an e-mail, but I haven't looked at the doc-- I haven't looked through it in a while.

Q.    When you perform services, do you keep time records?

A.    It depends on the transaction.

Q.    Okay.  What about for this transaction --

A.    No.

Q.    -- would you have kept time records?

Page 156

A.    No.   If I would have kept time records, I would have charged much more.

Q.    Would there be a document -- or let me rephrase that.

Where you're not keeping time records and charging hourly, there would be a flat fee arrangement; is that fair?

A.    I had never quoted a fee at all on this -- on this matter.  And to my recollection, I have never even quoted a fee on this matter or kept any time, it was very informal.

Q.    Did you receive anything more than $1,500 in the course of this transaction?

A.    No.

Q.    When you charge hourly, and I assume sometimes you do, what's your hourly rate?

A.    At that time?

Q.    Yes.

A.    At that time I believe it was at $350 an hour.

Page 157

Q.    Staying with Exhibit 7.  On March 20 there's another wire transfer of $625,000?

A.    Correct.

Q.    And that's the entire amount which you had received in the course of this transaction now --

A.    Correct.

Q.    -- is that correct?  Okay.

Did you ever ascertain -- let's rephrase that.

Of the three wire transfers, if my arithmetic's right, it's $1,223,500 which went to Mr. Russack, according to you.  $1,500 went to your legal fees.

A.    Um-hum.

Q.    What happened to the remainder of the $1.5 million in this transaction?

A.    I have no idea how that ever transferred, or if that ever transferred.

Q.    Did you ever ask Mr. Teichman or Mr. Rubin for an accounting?

A.    No.

Q.    Were you ever asked to

Page 158

provide Mr. Teichman or Mr. Rubin of some type of accounting on expenses?

A.    No.

Q.    Were you ever requested to provide any type of accounting by either Mr. Russack or Mr. Sprei?

A.    No.

Q.    Would it be accurate to state that, sitting here today, you do not know what happened with -- or how there was an accounting of the difference between the 1.5 million and approximately 1.2 million?

A.    That is correct.  Only to say that I know, even on my end, it was -- the money was given in stages.  I have no idea if there was money given directly after that point or before that point.

Q.    Which goes back to my question.  You have no knowledge?

A.    Correct.

                    *   *   *

        (Whereupon, the court
        reporter marked Exhibit NB-8 for
        purposes of identification.)

Page 159

*    *    *

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 8.  It's another March 12th, 2020 e-mail.  This one's at 5:06 p.m., Lakeland Bank to yourself.  And this refers to a wire transfer of $32,500 to Queen Equities.

Do you know what this is in reference to?

A.    Yes.

Q.    What?

A.    If you look at the memo, it's for 5218 Atlantic.  This was the Atlantic property that I was referring to.  And this relates to a prior document that you had referenced wherein Queen Equities had sent an e-mail about Ira sending in $100,000, and that 32,5 of that money was supposed to go to Queen Equities, and this was after following those instructions and confirming with Ira that money was wired to Queen Equities.

Page 160

Q.    At the bottom of this it refers to commitment fee reimbursement. Do you see that line?

A.    Yes.

Q.    Do you know specifically what that was about?

A.    I'm going to assume, and I don't remember exactly, that that -- those were the instructions of why this payment was made.

Q.    Okay.  But correct me if I'm wrong, you have not seen any document which spells out what this commitment fee is about?

A.    No.  No.

Q.    Other than transmitting funds, did you have any other involvement in connection with 5218 Atlantic Avenue?

A.    Yes.  We closed that transaction pretty soon thereafter, within the next month or so.

Q.    This was another transaction involving Mr. Sprei?

A.    Yes.  Not involving Mr. Sprei.  Was Mr. Sprei a partner in it?  I

Page 161

don't -- I don't -- I don't recall whether he was involved in it.

MR. LANG:  Excuse me.  We're referring to this one?  The 32,500.

MR. BERNHEIM:  Yes.

THE WITNESS:  I mean, he was -- he definitely communicated with me on it.  I don't remember if he was an actual partner in it.

*    *    *

(Whereupon, the court reporter marked Exhibit NB-9 for purposes of identification.)

*    *    *

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 9.

A.    Yes.

Q.    It appears to be a letter dated April 19, 2020, similar to one that we looked at before in format, with the electronic signature of Mr. Russack, but this one's in reference to Stefansky MT

Page 162

Holdings to Russack.

Are you familiar with this document?

A.    No.

Q.    Ever see it before?

A.    Possibly, I'm just not -- I have no current recollection of it.

Q.    This letter purportedly instructs you by stating, Dear Noah, As you know, I am due to receive an additional $250,000 in this matter. Please accept this irrevocable directive to send $143,385 to Queen Equities per wiring instructions below.

Do you have any idea what that's about?

A.    No.

Q.    Do you have any recollection of actually receiving $250,000?

A.    No.

Q.    Do you know what Stefansky MT Holdings is?

A.    No.

*   *   *

(Whereupon, the court

Page 163

reporter marked Exhibit NB-10 for purposes of identification.)

* * *

BY MR. BERNHEIM:

Q.    Sir, I show you what's been marked for identification purposes as Deposition Exhibit NB No. 10.  And this appears to be an e-mail from Lakeland Bank to yourself of April 30th, 2020. And it states, Your wire transfer on 4/30/2020 in the amount of $300,000 was received from Stefansky MT Holdings, LLC.

Does that refresh your recollection at all regarding Stefansky?

A.    No.

Q.    Again, if we were to get the account records for your trust account, it would show the money in and the money out?

A.    Yes.  I would have to check the ledger and see what that money was for or --

Q.    But sitting here today, you have no recollection of being retained to do anything in connection with Stefansky

Page 164

MT Holdings?

A.    No.

MR. BERNHEIM:  Sir, I think much to everyone's pleasure, I don't have any further questions at this time.

THE WITNESS:  I was looking forward to more.

MR. FRIEDMAN:  You'll get a few more, don't worry.

THE WITNESS:  Okay.

MR. BERNHEIM:  I was just warming you up.

*   *   *

CROSS-EXAMINATION

*   *   *

BY MR. FRIEDMAN:

Q.    Good afternoon, Mr. Burton. My name is Andrew Friedman; I'm the attorney for Henry Weinstein and Ocean Woodruff Corporation in this matter.

I'm going to follow up on some of Mr. Bernheim's questions and I'm going to ask you to acknowledge the same instructions that he gave you.  Okay?

Page 165

A.    Sure.

Q.    Okay.  With respect to Sam Sprei, have you ever met him in person?

A.    Yes.

Q.    When was the first time you ever met him in person?

A.    I'm going to say, it could have been anywhere between 2016, 2019, I just don't remember.  Probably closer to 2019.

Q.    Okay.  Separate and apart from these matters that you've testified to involving Mr. Russack, have you ever represented Mr. Sprei on an individual basis or on any of his entities that he might have owned?

A.    Any entities that Mr. Sprei owned?

Q.    Have you ever represented Mr. Sprei in any capacity separate and apart where you discussed about Mr. Russack?

A.    Yes.

Q.    On how many occasions?

A.    In deals that Mr. Russack

Page 166

was not involved in?

Q.    Correct.

A.    I think two or three times.

Q.    When?

A.    There was a contract that was sent that I -- I did some, like, revisions on a contract maybe a year ago and it never came to fruition.  There were a couple of deals that never came to fruition, and then there was that loan that he brokered as well that I mentioned before.

Q.    That did not involve Mr. Russack?

A.    Right.

Q.    All right.  Did you ever receive any compensation from Mr. Sprei for any of that work?

A.    I think for one -- for that one contract that never came to fruition, I think he paid me for, there was some legal fee, yeah.

Q.    How did he pay you?  Cash? Check?  Something else?

A.    I don't -- I don't remember

Page 167

how he paid me.

Q.    Do you have any records which would reflect receipt of payment for Mr. Sprei?

A.    Yes, I would.

Q.    What types of records would you have?

A.    I would have my -- my QuickBooks and then I might have if it would have been a copy of a check, I don't -- I don't remember.  I'm -- it's possible, I just don't even -- I don't even remember how -- you know, what it --

*    Q.    I'm going to follow up in writing, but upon return of your deposition, I'd ask you to make a search and provide any --

A.    Sure.

Q.    -- information pertaining to payment you've ever received or your firm has ever received from Mr. Sprei.

With respect to any of that representation you just referenced, did you ever have any written retainer agreements with respect to Mr. Sprei?

Page 168

A.    For that one transaction, I don't think so.  It never went anywhere.

Q.    And I understand you don't know exactly when you met Mr. Sprei, but how did you first learn of him?

A.    I don't remember.

Q.    Was it through Mr. Jonathan Rubin?

A.    It's possible that he referred him to me.  I would imagine -- I would imagine it may have come through that.  I know -- I know Jonathan for a while.

Q.    In connection with Jonathan Rubin, are you aware of any connection between Jonathan Rubin and Queen Equities?

A.    I believe he owns Queen Equities.

Q.    And why was it that Ira Russack was sending $32,500 to Queen Equities?

A.    I have no idea.  I think there -- at some point I believe it was -- I was instructed that it was

something to do with some sort of commitment fee for the 5218 transaction.

MR. LANG: Excuse me. What was the --

THE WITNESS: The 5218 transaction. 5218 Atlantic.

BY MR. FRIEDMAN:

Q. And that 5218 Atlantic, I think you indicated that was some sort of a docket number in Atlantic county; was that what you said?

A. No, no, no. That's a property in -- somewhere in Atlantic County. I don't remember if it's Atlantic City or -- I just remember it being south of wherever I am in South Jersey, further south than me.

Q. Do you know an attorney by the name of Frank Seddio?

A. No.

Q. Do you know an attorney by the name of Jeffrey Levitin?

A. Jeff Levitin, I do know who he is, yes.

Q. How do you know him?

Page 170

A.    I don't know him; I know who he is.

Q.    Who do you know -- who do you know him to be?

A.    He's a lawyer in New York.

Q.    And you just know of other lawyers in New York, or what's the source of your information?

A.    He's an Orthodox Jewish lawyer, we know each other.  I mean, we know of each other.

Q.    Have you ever done any transactions where he's been the other side?

A.    I must have.  It's certainly not in the past ten years, I don't think.  Okay, I don't want to say certainly.  I don't recall having any conversations with him in the past ten years.  I feel like I must have done at least one transaction with him, but.

Q.    And with respect to Joseph Harrison, I think you indicated that separate and apart from this particular transaction you did not know who he was;

is that right?

A.    Yes.

Q.    He's another Orthodox Jewish lawyer though, right?

A.    Not to my knowledge.

Q.    The document -- the opinion letter draft that you indicated was not on your letterhead, but there was -- and the signature was somehow -- it was not signed by you, but there was a signature block from the computer, do you know how that was sent to Mr. Harrison?

A.    I have no idea.

Q.    Do you allow clients to send drafts that you have written to other lawyers?

A.    Do I allow?

Q.    Yeah.

I'll withdraw the question.

The opinion letter that Mr. Harrison wrote, which you reviewed with Mr. Bernheim, you indicated was substantially the same as the opinion letter that somehow was on -- that had your signature on it; correct?

Page 172

A.    Um-hum.

Q.    Is that -- I need a yes or a no.

A.    Yes.

Q.    Do you know how it came to be that Mr. Harrison had that as a template?

A.    No, I don't.

Q.    When did you first see Mr. Harrison's opinion letter?

A.    To the best of my recollection, it was after -- it was after the 13th.

Q.    It's dated the 17th of March; correct?

A.    Yeah.

Q.    So would it have been --

Would it be fair to say you saw that opinion letter on or about March 17th, 2020?

A.    Most likely.

Q.    And did you see that opinion letter before the Jest loan to Mr. Russack was funded?

A.    It was partially funded on

the 13th.

Q.    Did you see it before it was fully funded?

A.    Yes.

Q.    When you saw it, did it occur to you that it was substantially the same as what you had drafted?

A.    Yes.

Q.    And what, if anything --

Did you have any inquiry as to why that was?

A.    I assumed that it was -- I -- I -- it's quite possible that I even forwarded it to him, I just don't remember.  I have no idea.  Standing here, I just don't remember how he got it, but I would assume that either someone forwarded it to him or -- or I did.

Q.    Well, who would the someone be?  Who would have access to your work product?

A.    No, I sent the whole package of -- of -- of potential loan documents, including this form of what I thought

would need to be included in the opinion.

Q.    Who did you send it to?

A.    It was probably sent to both Mr. Teichman as well as Mr. Rubin as well as to Ira.  I think I sent every-- I think I included everyone on the chain.

Q.    And with respect to the e-mail --

A.    It wasn't a secret.

Q.    Well, did you send those documents with an understanding that they would be provided to another lawyer to copy your work?

A.    It's very standard -- very standard to include -- from a lender's perspective, to include at least a list of the -- at least some sort of form of what you'd want them to at least at a minimum include in the letter.  So I wouldn't call that copying of work, no. I -- I -- I -- I send very extensive opinion letters on -- on -- on lenders that I represent on a regular basis and I want them to copy my work.

Q.    In this case did you want

Page 175

Mr. Harrison to copy your work?

A.    I wanted all those provisions included.

Q.    And then Mr. Bernheim had showed you a document which I believe was marked at the Harrison deposition as No. 6.  It was a series of e-mails.  I'm just going to just hand that to you.

One of the e-mail addresses, the esq attorney, that is not your e-mail address?

A.    No.

Q.    And you don't know whose it is; is that correct?

A.    No idea.

Q.    If you'd turn to the last page, the attachments that were forwarded, those were your documents that you drafted?

A.    They do look like my documents.

Q.    Okay.  Thank you.

A.    But again, I mean, you're asking me to opine about a -- you know what, I mean, just based on the title, I

Page 176

can tell you that I did not title these documents.

Q.    Okay.

A.    That's -- that's not the format that I use for titling documents in my system so I can tell you that they're not.

Q.    And with respect to Mr. Harrison's opinion letter of March 17th, which you reviewed here, you indicated that you didn't think his interpretation or his paragraph 4 with respect to paragraph 7 of the Weinstein Russack October 1985 letter was relevant; is that correct?

A.    Correct.

Q.    And that was because, in your view, stocks can't be restricted from sale; is that your understanding?

A.    You can't have an absolute restriction under New York law on stocks, you can't have a -- and any attempted restriction would be construed narrowly. That Agreement is particularly an Agreement not with regards to the

ownership of the stocks, but rather, with regards to the conduct of the company based between the membership -- between the owners, so I felt that any Assignment of that Agreement as opposed to the Assignment of Shares is not restricted by the -- by that document in any way.

Q.    So your opinion is that this Agreement has nothing -- has no effect on either Mr. Weinstein or Mr. Russack's ability to assign the shares of the corporate stock?

A.    Correct.

Q.    But you understand that New York -- withdrawn.

Is it your opinion that New York law absolutely prohibits restrictions on shares of stock?

A.    No, I said the -- I did not say that.  I said it restricts the absolute prohibition on the share of stocks.

Q.    It restricts unreasonable restraints?

A.    Unreasonable restraints.  I

said the absolute prohibition.

Q.    That would be --

A.    In other words, the absolute prohibition is -- is deemed by various cases in New York that an absolute prohibition is deemed inherently unreasonable.

Q.    And your -- your opinion is that requiring a writing to reflect a conveyance of an Assignment is unreasonable?

A.    No, that's not what I said.

Q.    Well, do you think that the requirement of a writing that memorializes stock transfer is unreasonable?

A.    No.

Q.    That would be reasonable; correct?

A.    That would be reasonable. And New York case law would support that.

Q.    And that's what paragraph 7 of the 1985 Agreement says; correct?

A.    No.

MR. LANG:    Was that a yes

Page 179

or --

THE WITNESS:  No.

BY MR. FRIEDMAN:

Q.    And with respect to the evaluation, I think you indicated that you did an assessment that the collateral being put up, the shares of -- Mr. Russack's shares --

*   *   *

(Reporter interruption for clarification.)

*   *   *

BY MR. FRIEDMAN:

Q.    I believe you indicated that you did some sort of an assessment as to the evaluation of the shares of stock that Mr. Russack was pledging; correct?

A.    I believe that were -- those were Mr. Bernheim's words, but I did confirm that the way he defined the word assessment, there was some sort of assessment, yes.

Q.    Did you reach out to Mr. Weinstein at all?

A.    No.

Page 180

Q.    Did you reach out to the condominium management at all?

A.    No.

Q.    Did you go to the condominium?

A.    No.

Q.    Did you know whether or not the apartments were rent-regulated in any way?

A.    I don't know if the apartments exist.

Q.    You don't know if the apartments exits?

A.    You can stop there.  Yes.

Q.    And so what did you do? What steps did you do?

A.    I did exactly what I affirmed to Mr. Bernheim in terms of what he termed to be what I -- what -- what you're calling evaluation.  The -- the -- the -- or assessment, I'm sorry.

Q.    With respect to Mr. Rubin -- withdrawn.

Do you know of somebody named -- I think you indicated that

Page 181

Solomon Rubin was Jonathan Rubin's brother?

A.     I believe so.

Q.     And do you know if Solomon Rubin has any connection to Jest Holdings?

A.     I have no idea.

Q.     Do you know if Solomon Rubin is a lawyer?

A.     To the best of my knowledge.

Q.     He is a lawyer?

A.     To the best of my knowledge.

Q.     You ever discuss the matter of Jest Holdings with Solomon Rubin?

A.     Not to my recollection.

Q.     With respect to -- I believe you indicated that at some point on March 12th, 2020 Mr. Russack was in your office when you notarized his signature.

A.     Yes.

Q.     What time of day was that?

A.     I have no idea.

Q.     There was an e-mail that Mr. Bernheim went through from all times throughout the day, morning, noon, and

Page 182

even into the evening where you and Mr. Russack were in e-mail communication. Do you recall seeing those?

A. It would have been -- based on the e-mails, it would have been sometime before 4:30, I believe, in the afternoon, and I believe it was sometime after -- it was sometime in the afternoon, it would not have been the morning.

Q. So sometime between 12:00 and 4:30, that's when Mr. Russack --

A. Most likely.

Q. -- would have been in your office?

A. Most likely, yes.

Q. Do you maintain any kind of calendar or schedule for your daily --

A. No. Depending on -- depending on the day, but sometimes, depending, I -- I might have some meetings scheduled and sometimes not.

Q. How would you know to tell a client to come in if you didn't have a calendar or a diary?

Page 183

A.    I don't -- didn't tell him to come in.

Q.    Then why did he come in?

A.    I have no idea.  He came in because he wanted to sign these documents apparently.

Q.    And I think you indicated -- withdrawn.

With respect to Mr. Rubin, Jonathan Rubin, did you have an understanding of what his role was in the Jest transaction at issue here?

A.    All I know -- all my impression was, he was only brokering this transaction.

Q.    And he was acting on behalf of Mr. Teichman or Jest Holdings throughout; is that correct?

A.    He was brokering the loan for Mr. Teichman at all times, yes.

Q.    So he was acting for the benefit of Mr. Teichman or Jest, right?

A.    Sure.

Q.    When did you first learn that Mr. Harrison was going to be acting

Page 184

as Mr. Russack's attorney?

A.    I don't recall a date.

Q.    How did you learn that?

A.    I don't remember.

Q.    Do you know from whom you learned that?

A.    I don't remember if it was a phone call or an e-mail, I just don't -- I don't know.

Q.    Well, do you know whether it was from Mr. Russack or Mr. Sprei or somebody else?

A.    No, I don't.

Q.    And I just want to show you what was marked earlier today as Exhibit 3 at today's deposition.  It's an e-mail from RubinJ20.  Is that Jonathan Rubin's e-mail?

A.    Yes.

Q.    And it's to you and it's cc'd to a Sam Sam.  Do you see that?

A.    Yes.

Q.    Who is Sam Sam?

A.    That is Sam Sprei.

Q.    Is Mr. Russack on that

Page 185

e-mail?

A.    Does not appear to be.

Q.    Do you know why not?

A.    I have no idea, I haven't sent it.

Q.    And back in -- I think back in March of 2020 what was the name of your law firm?

A.    2020, I was in the process of transitioning, but I think the -- I hadn't transitioned my e-mail address, but I think we had already, yeah, changed it to Burton Law Group at the time.

Q.    Okay.  Can I have that back?

A.    Which one?

Q.    The page that I just gave you.

      Back in March of 2020 were you sending out correspondence as Schwartz and Burton?

A.    No.  If you look at my -- the signature block is already updated, I just hadn't gotten the new e-mail address yet.

Q.    To your knowledge, did Mr.

Page 186

Rubin do any evaluation as to the value of the apartments?

A.    I have no idea.

Q.    Did you ever speak to Mr. Rubin as to the evaluation of any of the apartments?

A.    No.

Q.    Have you ever had any conversations with Mr. Teichman about Mr. Rubin's role, Jonathan Rubin's role in this transaction?

A.    I don't think so.

Q.    When was the last time you spoke to Mr. Teichman concerning the Jest matter?  This Jest matter.

A.    Probably March of 2020.  Oh, no, I think April 2020.  I think I had sent him a package of the originals and I think there was a communication that if I wanted to, like, record the UCC, then his office should take care of it.

Q.    And just to be clear, I think Mr. Bernheim asked you about whether or not you ever did an accounting or anything of this transaction.

Page 187

There's never been a closing statement that you prepared in this transaction?

A.    No, because it was never fully disbursed, as far as I know.

Q.    Did you ever inquire as to whether it was fully disbursed?

A.    No.

Q.    Would your role as attorney be concluded prior to the full disbursement of the funds?

A.    Yes.

Q.    What would have concluded your role as the attorney?

A.    I drafted the documents.

Q.    That's all you did?

A.    That's all I was retained for.

Q.    So then, why did you do any sort of an evaluation, however cursory, as to the value of the collateral?

A.    Your words, not mine.

Q.    What would you characterize it as, what you did --

A.    Exactly what I --

Page 188

                    *    *    *

              (Simultaneous speakers.

         Reporter interruption.)

                    *    *    *

              THE WITNESS:   Exactly what I

         --

BY MR. FRIEDMAN:

         Q.    Let me finish the question.

         A.    Exactly what I told --

         Q.    Let me finish the question.

              Why did you do any kind of

evaluation as to the value of the

collateral?

         A.    Again, the -- the -- the

word that you use as being evaluation is

solely restricted to the way that Mr.

Bernheim defined it, and if you want to

go back in the transcript and see what

was said, that's fine.

         Q.    Why did you do whatever he

defined it as?  Why did you take those

steps if all your role was was to prepare

the documents?

         A.    You can read the transcript.

         Q.    I'm entitled to ask the

Page 189

question --

A.   You want to read back the transcript?

Q.   No, no, no.  Listen, I'm entitled to ask my question and you have to give an answer.  You cannot refuse to answer.  That's a violation of the federal rules.

A.   Asked and answered, but okay.

Q.   It's not asked and answered I'm entitled --

A.   Okay.

Q.   -- to the exact same --

A.   So ask -- ask the question again.

Q.   Why did you do any evaluation whatsoever if your only retention was to prepare documents?

A.   Because I felt like it.

Q.   And did you believe that the scope of your representation was limited -- withdrawn.

         Other than -- withdrawn.

         Did you believe that you had

Page 190

any duties as an attorney beyond the scope of how you defined your limited representation?

A. No.

Q. Why not?

A. Because I wasn't retained as such.

Q. And you believe that your role was solely limited to whatever your retention was?

A. In this instance, yes.

Q. And the ethical rules didn't apply?

A. I don't understand.

Q. Rules of professional responsibility didn't apply to you in this transaction?

A. I don't understand the question. Why shouldn't they?

Q. I'm asking. Did they apply?

A. They did.

Q. They did apply?

A. Yes.

Q. So then, given that, why would your role be limited solely to what

you -- you're characterizing as the scope
of your representation?

A.    The scope of my
representation as defined by the rules.

Q.    Okay.  And there's no
writing defining your scope; is that
correct?

A.    Correct.

MR. FRIEDMAN:  I don't have
anything further.

MR. LANG:  Okay.  I do.  A
lot.  Sorry.

I want to just put this into
-- as an exhibit, all these
e-mails, because I'm going to talk
about them.

THE WITNESS:  Can I use the
restroom?

*   *   *

(Whereupon, a short break
was taken.)

*   *   *

(Whereupon, the court
reporter marked Exhibit NB-11 for
purposes of identification.)

Page 192

*    *    *

CROSS-EXAMINATION

*    *    *

BY MR. LANG:

Q.    My name is Arthur Lang and I represent Jest Holdings, and I guess all the same instructions that everyone else gave you.

A.    Sure.

Q.    I'm just going to start.

Right now I have -- I entered an exhibit with the e-mails here. And if we look at the first page. So let's just go through this because this has over here -- the first one on I guess March 12th.  That's -- who is that e-mail from?  Not the first there, I'm sorry.  The first one would be -- I meant the first one -- the middle one actually.

A.    That's from Ira Russack.

Q.    It's from Ira, okay.  And this is to you; correct?

A.    Correct.

Q.    Did you speak to him previously about the -- anything about

Page 193

the loan before March 12th?  Speak to him in person, on the telephone or anywhere.

A.   I don't remember of any discussions with him, no.

Q.   In any --

A.   That was on March 12th, yes.

Q.   Okay.  But you dealt with Ira previously in other matters, right?

A.   On other matters, unrelated matters, yes.

Q.   Okay.  Did Ira use that same e-mail in the other matters?

A.   Yes.

Q.   He did?

A.   Yes.

Q.   Okay.  Do you have any reason why -- to think that somebody hacked his e-mail and sent these -- sent -- sent this to him?

A.   I have no reason --

Q.   Sent this to you.

A.   -- to think so.

Q.   Okay.  Let's go to the next page.  This one's at 7:19 p.m.

A.   I can just -- I can just

Page 194

tell you, you know, it -- it -- it passed the smell test as well.

Q.    Which means it was him?

A.    It would -- would seem to me this is not hacked.

Q.    Okay.

MR. FRIEDMAN:  Just, can I get clarification?  Which e-mail are you referring to?

MR. LANG:  Oh, it's just the middle one on the first page.

MR. FRIEDMAN:  At the time of 7:19 p.m.?

MR. LANG:  7:19, right, which would be, you know, at night I guess.

BY MR. LANG:

Q.    And then let's go to the second page, 4:28 p.m.  You're sending back to Ira, okay, so that's to -- no question about that.  I'm just going to -- I'm going to try to get these out of the way.

Let's go to the third page. Ira from -- sending to you.  It says 3:25

Page 195

p.m.  It says, Noah, I will print the documents and overnight you the originals.  Let's try to fund tomorrow.

Did he ever do that?

A.    I believe -- I believe that's the -- referring the Certification and the Confession of Judgment I believe.

Q.    And did those -- they come from Sam Sprei's address or from Ira's address?  Whose address did they come from?  Or you have no idea?

A.    I don't remember.

Q.    Okay.  All right.

A.    I don't know if I -- I don't know if the overnight -- they would overnight it to me or not.

Q.    Okay.  And then you're going back to Mr. Russack on March 12th about the loan with Teichman.  Let's just -- I'm just going to go real quickly through --

MR. FRIEDMAN:  What time?  They're all on March 12th.  What time?

MR. LANG:  Oh.  This one is

3:15.  I think it's the third page.

BY MR. LANG:

Q.    Okay.

MR. FRIEDMAN:  Noah Burton sent an e-mail to Ira Russack at 3:15 on March 12th.

MR. LANG:  Right.

MR. FRIEDMAN:  That's what you're referring to?

MR. LANG:  Yeah, that -- that's -- yeah, that was it.

BY MR. LANG:

Q.    See, the point -- you know, in general, all of these e-mails here between Mr. Burton -- you, Mr. Burton, and Ira, I'm trying to establish that there's no -- there's no reason to think that this is not really Ira Russack sending these e-mails, or do you have some kind of suspicion that there is?

A.    Well, I know --

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Page 197

Q.     Do you have any suspicion that it's not Ira Russack sending these e-mails?

A.     No, because I had verbal conversations with him about these e-mails.

Q.     Oh, okay.  So you spoke to him about these e-mails also?

A.     Yes.

Q.     Now, did he -- was -- did -- was his voice cracking or something like someone was holding a gun to his head or something like that?

MR. BERNHEIM:  Object to the form of the question.

MR. LANG:  What's wrong with it?  Why?

BY MR. LANG:

Q.     Was his voice crackling when he spoke to you?

A.     I don't recall anything unusual about the phone call.

Q.     Did he say that Sam Sprei is -- is -- is forcing him to borrow the money?

Page 198

A.    I was never told anything --

Q.    Did he say he was under duress?

                    *   *   *

            (Simultaneous speakers.
    Reporter interruption for
    clarification.)

                    *   *   *

            THE WITNESS:  I was never
    told anything of that sort.

BY MR. LANG:

Q.    Did you get any kind of impression that he was under duress?

A.    Not at all.

Q.    Not at all.

            And when you spoke to him on the phone, it was very consistent with the e-mails he sent; correct?  Is that correct?

A.    Yes.

Q.    Okay.  And --

A.    I can just say --

            MR. BERNHEIM:  Well, there's no question pending, sir.

BY MR. LANG:

Q.    Okay.  So the -- is there -- I'm going to ask the same thing again but a little bit more specific.

Is there any reason to think that these e-mails originated or was hacked or whatever by -- and sent by Sam Sprei?  The e-mails that are saying Ira Russack.

A.    I know they weren't sent by Sam.

Q.    Okay.  That's all I wanted to get out of this.

A.    Sam doesn't spell that way.

Q.    Sam doesn't what?

A.    Doesn't spell that way.

Q.    He doesn't spell that way, that's what you were saying.  Okay.

A.    There's no way Sam could write an e-mail like this.

Q.    Okay.  That's good.  Okay. That's what I wanted to get at.  All right.  So -- all right.

Now, you referred earlier, and I didn't even know about this stuff, about some monies were going to Queen

Page 200

Equities and I -- and there was $162,000 but you don't remember, but there was actually a $32,000 that did go to Queen Equities.

A.    Yes.

Q.    And was -- I think you indicated that was because of the Atlantic -- the case in Atlantic County with the docket.

A.    That was a trans-- that was relating to a transaction in Atlantic County.

Q.    But -- yeah, okay.  It wasn't because -- it wasn't like -- was it -- was it -- was it -- it wasn't anyone's fee or commission for this transaction; correct?

A.    To my knowledge it was not related to this transaction.

Q.    Okay.  Now, was it just 32,000 or is it possible it was more than 32,000?

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Q.    Okay.  Was it -- was there more than 32,000?

A.    Was it more than 32,000 what?

Q.    Dollars.

A.    What?

Q.    That -- that you sent, that you wired to Queen Equities.

A.    I don't think so, no.

Q.    Okay.  All right.  Okay. When Ira spoke to you about this transaction with Jest, did he give you any reason why he needed the money?

A.    No.

Q.    Okay.  He did say though that he needed the 32,000 to pay off Queen Equities though?

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Q.    Did he -- okay.

MR. LANG:  Why?  What's wrong with it?

MR. BERNHEIM:  Well, you're -- 1, you have documents, you're

Page 202

leading the -- it's a leading question.

MR. LANG:  Oh, okay.  All right.

MR. FRIEDMAN:  Calls for hearsay, and about six other objections.

MR. LANG:  Okay.  All right. Let me rephrase it.

BY MR. LANG:

Q.    So it was just 32,000 that did not go straight to Ira's account; correct?  It was just that?

A.    I'm confused.  I'm sorry.

Q.    I'm asking, did all the money go to Ira's account except the 32,000?

A.    Well, it came from Ira's account.

Q.    It came from Ira's account?

A.    The $32,500 came from Ira's account --

Q.    Oh.

A.    -- to my account.  It was a $100,000 wire that Ira sent to me from

Page 203

his account, to my account, of which he instructed me to pay $32,500 to Queen Equities for the 5218 Atlantic transaction.

Q.    Oh.    It had nothing to do with this?

A.    Had nothing to do with this.

Q.    Oh, okay.  Thank you.  Okay. I thought it was part of the --

A.    No.

Q.    -- 1.2 million.  Okay, good. Good, good, good.

A.    The entire money that was disbursed, and I think we just -- basically it was four transactions, I think we went through every one of them already.

Q.    Let me ask you this question, okay.  When you were doing this transaction -- well, when you're doing this transaction, and you obviously met Mr. Russack, did he represent himself as an officer of the corporation or that -- you know --

A.    No.

Page 204

Q.    -- or just as an owner?

A.    An owner.

Q.    Just an owner, okay.

A.    Yes.

Q.    All right.  And he came to your office.  Did he come to your office only on March 12th?  Or I mean --

A.    I don't remember him coming to my office after that point, no.

Q.    Okay.  So, like, for instance, on these documents where you notarized, he appeared in your office; is that correct?

A.    I'm just thinking for a minute.  March 12th.  Well, March, was that COVID year?

Q.    Yeah.

A.    That was the first year of COVID?

Q.    Yeah.

A.    I remember distinctly because we actually met outside, I believe in the parking lot.

Q.    Oh, okay.

A.    I think I remember signing

Page 205

documents on the back of a car, and the -- yeah, I think that -- that was the time that Ira --

Q.    Signing -- signing -- you signing or he signing?

A.    Ira signed those documents on the back of a car.

Q.    So you saw with your own eyes he signed --

A.    Oh, yeah.

Q.    -- the documents?  The ones that you --

A.    The ones I notarized --

Q.    -- notarized?

A.    -- yeah.  Yes, yes, yes. Absolutely.

Q.    Okay.  You wouldn't know if -- obviously, if you didn't notarize it that --

A.    Yeah, I distinctly remember the conversation that we had because Ira's a bit of a health freak and he was telling me how he was going to cure COVID with some vitamins I believe.

Q.    Okay.  All right.  So, like,

Page 206

the -- we all know what the Membership Sales Agreement, that's the big thing that --

A.    Yes.

Q.    -- we're here about.

Now, you've been asked why was it just Ira who signed it, or whatever, but my question is, is that -- those -- those -- were those documents signed in New York and then faxed or e-mailed to you?

A.    The ones --

MR. BERNHEIM:  Object to the form of the question.  I don't understand what you're asking.

BY MR. LANG:

Q.    Ira signed the Membership Sales Agreement.  You -- did you get a copy of the Membership Sales Agreement after it was signed?

A.    I believe he signed that in my off-- at -- at my office.

Q.    Oh, even though -- but it wasn't --

A.    Was that the one -- I forget

Page 207

-- I forget if that was one of the documents.

Q.    Right here.  But it's not notarized though.

A.    Yeah, I believe he -- he -- I believe he signed that one.

Q.    Oh, he signed this in front of you?  Okay.

A.    Yeah.

Q.    Because some of them aren't notarized.

A.    Correct.

Q.    How about, like over here also -- oh, you notarized that.

There was another one that wasn't notarized.  That one there.

A.    My recollection is that he signed the Assignment of Shares, the Membership Agreement, the Membership Sales Agreement.

Q.    Well, you -- you notarized those.

A.    Right.  No, there's some -- no, the Membership Sales Agreement I did not notarize.  It was -- I believe there

Page 208

was one or two other of the Agreements that he signed in my office.  It wasn't all of them.

Q.    Okay.  I'll get to that then.  Okay.  So the -- the Membership Sales Agreement you're saying that he signed are these other Agreements that I'll get to.  On a Certification it has a different notary.

MR. BERNHEIM:  Mr. Lang, without intending to be disrespectful, can I suggest you don't talk to yourself and just wait until you have your question phrased --

MR. LANG:  Yeah.

MR. BERNHEIM:  -- because the transcript will be very hard to follow.

BY MR. LANG:

Q.    And of course a Declaration of the Restrictions, you obviously notarized it.

A.    Yes.

Q.    Would that be signed at that

same time?

A.    Yes.

Q.    So basically, the documents -- would you say that the documents, because there's a lot of them, signed on March 12th, 2000 (sic), which is right when COVID was starting, those were signed in front of you during that encounter; is that correct?

A.    Yes.

Q.    Okay.  Was Sam Sprei with him?

A.    I'm thinking.  I don't remember.

Q.    Okay.  Did Ira seem, just by your own impression, did he seem under duress when he was signing these?

MR. BERNHEIM:  Object to the form --

MR. LANG:  What's wrong?

MR. BERNHEIM:  -- of the question.

MR. LANG:  Why?

MR. BERNHEIM:  You're asking for a conclusion.  You can ask him

what he observed.

BY MR. LANG:

Q.    What -- did you observe him to be anything -- did you observe anything strange about him?

MR. BERNHEIM:  Same -- object to the form of the question.

BY MR. LANG:

Q.    Did you observe --

MR. FRIEDMAN:  What did you observe about him?

BY MR. LANG:

Q.    What did you observe about him?

A.    I don't recall anything unusual.

Q.    Thank you.  Okay.  Thank you.  All right.  In this transaction with Jest -- with Jest, does -- did it -- did -- did -- did Ira have a command of what he was doing?

MR. BERNHEIM:  Object to the form of the question.

MR. LANG:  Oh, my gosh.

Page 211

BY MR. LANG:

Q.    Oh.   Did he -- okay.  Did he seem like -- in your eyes, did he have a command over what he was doing -- over what he was doing or did it seem like he was just doing this for somebody else?

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Q.    Okay.  Did it seem like Ira was doing this for somebody else?

MR. BERNHEIM:  Object to the form of the question.

MR. LANG:  What?

MR. BERNHEIM:  Look, I'm not going to -- I don't --

MR. LANG:  What's wrong with the form of the question?

MR. BERNHEIM:  I'm not -- I'm not going to be disrespectful, but --

MR. LANG:  I didn't object to a single thing that either of you two --

MR. BERNHEIM:  Well, there

Page 212

was no cause to.

MR. LANG:  Yes, there was.

MR. BERNHEIM:  Sir --

MR. LANG:  There were things that were said and --

MR. BERNHEIM:  Please, please don't interrupt --

MR. LANG:  -- already answered.

MR. BERNHEIM:  Mr. Lang, you can't interrupt.

BY MR. LANG:

Q.  Okay.  Here's the question. Here's the question.  Did -- was there any indication that Ira was just following the directions of somebody else and not in command of the matter?

MR. BERNHEIM:  Same.  Object to the form of the question.

MR. LANG:  Well why don't you let him answer it.

THE WITNESS:  I can answer.

MR. BERNHEIM:  I didn't say he --

MR. LANG:  Call the judge.

Page 213

MR. BERNHEIM: I didn't say he cannot answer it, but I object to the manner in which you're asking.

BY MR. LANG:

Q. What's the answer?

A. Now that we've preserved the objection, I have no indication from Mr. Russack's behavior or from my interactions with him that he was under any duress or did not comprehend in any way what he was doing.

Q. Okay. All right. Okay. That's the major stuff. Some -- some basic questions.

Are you familiar with any kind of loan from Mr. Weinstein to Mr. Russack in 2018?

A. No.

Q. Okay. You never heard of that. Okay. Okay. So who did you represent in this transaction? Who was your client?

A. Joseph Teichman.

Q. Jest is -- you mean Jest?

Page 214

A.    Jest.

Q.    Okay.  All right.  Now, what was the -- you -- you previously -- you said you've done legal work for Ira.

A.    Yes.

Q.    How did Mr. Teichman, Jest, how did they come to you?

A.    I was approached by Mr. Rubin.  Again, I -- he asked me, I believe it was a rush so he had approached me to draft documents, I had assumed that I would be representing Mr. Russack, but ultimately he did not retain me, and at -- then Mr. Rubin asked and copied -- I don't know if he asked and copied him by e-mail, but he asked that I represent -- I -- that I explain the documents to Joseph Teichman.  And at that point I said, if I am going to be explaining the documents to Joseph Teichman, then I will not be representing Ira in this matter.  I had not spoken to Ira yet about the matter.  And at that point I said, look, if I'm going to explain the documents and draft the

Page 215

documents and explain them to Joseph Teichman, then I'm not going to represent Ira in this matter.

Q.    And is that why they had to go to Harrison?

A.    I have no idea.  I had recommended to them that they retain separate counsel.

Q.    Okay.

A.    Again, there was no conflict of interest, it was just separate -- it was not a -- it was not a -- any -- you know, by the New Jersey rules, any transactional matter that has no bearing -- has no bearing on something else is not considered a conflict, but at the same time, I did recommend to Ira that he does retain separate counsel.

Q.    Okay.  Did you have any conversation with Sam Sprei concerning this Jest transaction?

A.    I know he was on some of the e-mails, that's the best of my recollection.  I don't remember any specific conversations about it.  I would

Page 216

imagine that they -- I believe there may have been e-mails from him about the transaction.

Q.    Copies or straight from him?

A.    Straight from Sam, yeah.

Q.    All right.  Do you have any indication of whether Ira Russack informed Henry Weinstein of the transaction?

A.    I have no idea.

Q.    Okay.  There -- there is something that -- that bothered me from the beginning, and I want to -- it's already in the exhibits, but it's the Declaration of Restrictions, something about that.  Oh, it's on the top.

All right.  The Declaration of Restrictions, and, you know, you notarized it also, just a general question, something just bothers me, I don't even know if anything will come of it, but here Ira -- right here, right there, the -- I have it right here.

A.    Okay.

Q.    So who is making this

Page 217

Declaration of Restriction, is it a corporation or is it Ira in his personal capacity?

A.    The Corp.

Q.    The corporation?

A.    Um-hum.

Q.    And who signed for the corporation here?

A.    Ira.

Q.    Ira did.

Was it your understanding that Ira had authority to represent the corporation when he signed this?

A.    My understanding is if Ira did it, then he had an authority -- that he -- if he represented that he had authority, then it wasn't my obligation to inquire further than that, other than to apprise -- apprise Mr. Teichman of my opinion on the matter.

Q.    And as the lawyer for -- I'm not going to ask you anything really privileged, but when you -- you -- it -- it was your understanding that he's signing this as someone with authority

Page 218

from the corporation; correct?

A.    That was my assumption, yes.

Q.    Okay.

A.    That's the representation of the document.

Q.    Yeah, right.  So you see a lot of these questions were already answered.

Now, in -- I don't know if you know the answer, but in the original Sales Membership Agreement there's some kind of clause there saying that they could close -- extend the closing date after a certain time, that there's a closing date and then they could agree to extend it so that it would go further. It actually says June 15th.  Do you know anything about that?  Do you recall anything about that?

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Q.    Okay.

A.    I don't -- I honestly don't understand the question.

Page 219

Q.    The question is, is that the -- you know the -- obviously the -- this whole Agreement, it's -- it was constructed in -- not as a -- as a loan. It -- you know, the papers speak for themselves.  But there -- it spoke about a closing date that the money has to be paid back by, and that was June 15th, and then it also had a clause saying that it could be extended.  Do you recall any of that?  Without looking at the --

A.    That's what it says in the document.

Q.    Yeah.

A.    Yes, it says that in the document.

Q.    Do you know what that means?

A.    That they could extend the right to repurchase the shares.

Q.    Okay.

A.    That Ira could extend the right to repurchase the shares.

Q.    Okay.  So it -- it is your testimony that you -- you did your own diligence with -- with basically finding

Page 220

the same things as Harrison; is that correct?

MR. BERNHEIM:  Object to the form of the question.

THE WITNESS:  I don't understand the question.

BY MR. LANG:

Q.    Okay.  Harrison's letter said that it could be relied upon -- that it could be relied upon by Jest Holdings that Mr. Russack, the assignor, is the sole owner of 50 percent of the shares in the company.

Did you rely on just Mr. Harrison or you did some research on your own?

MR. FRIEDMAN:  Object to the -- the document speaks for itself, and I don't understand the question.

MR. LANG:  The question is --

MR. FRIEDMAN:  If the witness understands, obviously he can answer, but.

MR. LANG:  Right, right, okay.

BY MR. LANG:

Q.    So did you research on your own whether Mr. Russack owns 50 percent of the Woodruff company?

A.    I have seen other materials indicating that Mr. Russack is in ownership of 50 percent of the company.

Q.    Okay.  Do you -- we spoke about Jonathan Rubin, we -- there are a whole bunch of names here.  Any there any other names of individuals who might have participated in this transaction?

MR. BERNHEIM:  Object to the form of the question.

BY MR. LANG:

Q.    Did anyone else --

A.    I'll answer.

MR. BERNHEIM:  I can't instruct you not to answer, but --

THE WITNESS:  I know, I know, I'm just trying to figure out if I can --

The answer is simply no.

Page 222

BY MR. LANG:

Q.    Okay.

A.    Oh, sorry.  Mett.

Q.    Who?

A.    Possibly Mett.  Ira has a secretary, slash, I don't know what her official role is, but he has someone who works in his office named Mett who is regularly involved in most of his business, so it's quite possible -- so I would imagine that I had some sort of communications with Mett about it.

Q.    Okay.  But you don't know her last name, do you?

A.    I forget.  It's a -- I forget.  I forgot her last name.

Q.    When -- and when -- did you represent Jest just during that March of 2020 or you stayed on afterwards?

A.    I represented Jest only for those ten minutes that I was drafting -- I mean, I -- I -- I never represented them before that or represented them after that.

Q.    Now, we spoke about -- I

Page 223

mean, this could have already been answered, but do you -- are you aware of any other communications of Russack with any other party that we might not have spoken about?

A.    No.

Q.    Okay.  So at first you might have represented Ira; is that correct?  How did -- you represented Jest; correct?

MR. FRIEDMAN:  Asked and answered.

MR. BERNHEIM:  Yeah.

BY MR. LANG:

Q.    It's not really that important anyway.

MR. FRIEDMAN:  I mean, answer the question.  I can't --

THE WITNESS:  I'm not sure what the question is.  No, I'm not sure what the question is.

MR. LANG:  No, I'm --

MR. BERNHEIM:  The question was:  Did you represent Jest?

MR. LANG:  He said -- he answered that already.

Page 224

BY MR. LANG:

Q.    Did you represent at any point Ira or think that you were representing Ira?

A.    In this transaction?

Q.    Yeah.

A.    No.

Q.    Okay.  All right.  So that paragraph 7 that everyone's talking about with the 1985 Agreement, why -- why -- why did -- why -- did you -- did you know about that paragraph 7?

MR. BERNHEIM:  Object to the form of the question.

THE WITNESS:  I've already answered the question.

BY MR. LANG:

Q.    Okay.

A.    And yes, I was aware of it.

Q.    Okay.  Good.

MR. BERNHEIM:  Aware of it as of when, sir?  Which is why I objected.

THE WITNESS:  Oh.  I was aware of it, I believe prior to

Page 225

even March 12th.

BY MR. LANG:

Q.    Good.  So when you got the Harrison, you knew about that, did you -- even before Harrison's thing, you said you knew about it before March 12th.  Did you point that out to Mr. Teichman?

A.    I believe so.

Q.    Okay.  You have any idea what he might have said to you?

A.    I don't remember.

Q.    Or any record?

A.    No.  He's not a great e-mailer.

Q.    Who?

A.    Mr. Teichman.

Q.    Oh, okay.  Do you have any original signatures in your possession on any of these documents?

A.    No.  We sent the full package, I believe, to Mr. Teichman's office.

MR. LANG:  All right.  I think that's all.

MR. BERNHEIM:  I have just a

Page 226

few follow-up.

*   *   *

REDIRECT-EXAMINATION

*   *   *

BY MR. BERNHEIM:

Q.    Sir, can you find what I provided to you before, which was marked as Deposition Exhibit JH No. 6.  It looks like this.

A.    Yeah.

Q.    This is the e-mail which includes -- or a series of e-mail which include something coming from somebody esq atty and you were unable to identify who that was.

At the bottom of the first page of that document there appears to be an e-mail on March 9, 2020 at 9:39 a.m. from Mr. Rubin.

A.    Um-hum.

Q.    And if you look on the next page, Mr. Rubin writes, three points are to be paid to loan broker, parentheses, Joseph Teichman, end parentheses, at closing of loan, not payoff/option

Page 227

exercise.  Do you see that?

A.    Yes.

Q.    All right.  Do you have an understanding of what that means?

A.    Not a word.

Q.    Do you know if Mr. Teichman was paid any fee as a loan broker?

A.    I have no idea.

Q.    Do you know if Mr. Rubin was paid any fee as a loan broker?

A.    I don't know.

Q.    Correct me if I'm wrong, but you appeared to indicate that your work in this matter was completed once the documents were executed at least by Mr. Russack and then you wire transferred funds; is that correct?

A.    Yes.

Q.    All right.  So after that last wire transfer, I think $625,000, you did not perform any more services in connection with this matter?

A.    Other than mailing the originals to Mr. Teichman's office.

Q.    There was a first amendment

Page 228

and a second amendment to the Membership Sale Agreement. Were you involved in that in any fashion whatsoever?

A. I don't remember anything like that.

Q. Okay. You were asked questions regarding the issuance of e-mails under the name of Ira Russack. And were you aware -- excuse me, by Sam Sprei.

Were you aware of Mr. Sprei having set up a account under the name of Ira Russack? And I forget if it's Ira Russack 24 or 42 at Gmail.com?

A. No.

Q. Okay. Are you -- did you review any of the testimony of Mr. Russack in connection with this matter that was provided during his deposition?

A. No.

Q. Were you aware of -- from any other source, then, of Mr. Russack stating that Mr. Sprei had the habit of borrowing his cell phone and sending e-mails from it?

A.    I have no idea what Mr. Russack testified to.

Q.    That's why I said from, not just his testimony, from any other source, that that was a habit of Mr. Sprei's, to take his cell phone and send e-mails?

A.    I haven't had that personal experience.

Q.    Okay.  Well, you may not have had it.  I'm asking if you had any knowledge about Mr. Russack explaining that that was something that Mr. Sprei did.

A.    I don't recall Mr. Russack ever telling me anything like that.

Q.    Now, the e-mail that you were asked to look at on the front page of Exhibit No. 11 is from -- it appears to be from Ira Russack to yourself, and then it says, COJ is only 750K.  The O and J are not capitalized.

A.    I'm sorry, which doc-- is this still in JH 6?

Q.    No. 11, the one that Mr.

Page 230

Lang gave you.

A.    Okay.  Yes.

Q.    So the COJ is only 750K.

A.    Um-hum.

Q.    COJ, guessing means Confession of Judgment?

A.    That's what it looks like.

Q.    Okay.  And is that something that you would anticipate Mr. Russack to be familiar with or Mr. Sprei or neither of them?

A.    I would expect equally just -- well, honestly, I -- it doesn't --

Q.    Don't guess.  If you don't know, you don't know.

A.    I have no impression one way or the other.

Q.    All right.  And you indicated that, from your experience, Mr. Sprei wasn't the best typist or speller; correct?

A.    Correct.

Q.    Okay.  So -- you know what, strike that.

Page 231

There was also a question asked of you if Mr. Russack represented himself as an officer versus an owner of Ocean Woodruff. Do you recall that question?

A.    Yes.

Q.    What does one do where they represent them self as an officer versus an owner? Was there some different act or --

A.    No, I -- my -- the way I understood the question was whether or not he was merely a shareholder or did he ever represent that he had any capacity as an officer of the company. That's the way I understood the question.

Q.    Did you have any understanding as to whether there were any officers that had been selected at any point in time regarding Ocean Woodruff Development Corp.?

A.    Yes.

Q.    And what was your understanding?

A.    My understanding is that at

Page 232

least at one point in time -- let me -- let me rephrase that.

My understanding is that there were portions of the letter from Ira to Henry where he told Henry that Henry was elected as a director and officer of the corporation.

Q.    And did you see anything where it indicated that any one of the owners, regardless of their designation as corporate officer, had the ability to act unilaterally without the consent of the other?

A.    Not in this -- not in this document, no.

Q.    Not in any document; correct?

A.    Correct.

Q.    You also opined that Mr. Russack did not appear not to comprehend what was taking place in this transaction.

Are you able to tell us where the money actually went, how it was utilized?

MR. LANG:  Wait.  Objection. Wait.  Wait, wait.  Wait. Before --

THE WITNESS:  I'm sorry, can I -- let me answer the question.

MR. LANG:  But -- but the first part --

THE WITNESS:  Are you objecting?

MR. LANG:  Yeah, yeah, but --

MR. FRIEDMAN:  You say objection and then he's got a decision to make to answer or not.

MR. LANG:  No, but I wanted the first part -- he said that he opined that something that --

MR. FRIEDMAN:  He understood.

MR. LANG:  Well, yeah. What?  What did he understand?

BY MR. BERNHEIM:

Q.    Sir, do you know where the money went?

A.    I know that the money went

Page 234

to Ira's bank account.

Q.    Okay.  It went to an account which you understood to be in Ira's name; correct?

A.    Yes.

Q.    Okay.  Do you know who had access to that account?  Ira?  Mett?  Sam?  Anybody?

A.    Other than confirming with Ira verbally that it was his account, no.

Q.    Okay.  So let's go back to my question and only my question without the ad lib.

Do you know who had access to that account?

A.    That's a different question, but no.

Q.    Okay.  All right.  So would you have any knowledge one way or the other if Sam Sprei had access to the account and then utilized those funds in some fashion?

A.    I have no idea.

MR. BERNHEIM:  All right.  I don't have any further questions.

Page 235

Thank you.

MR. FRIEDMAN:  I have nothing further.

*   *   *

RECROSS-EXAMINATION

*   *   *

BY MR. LANG:

Q.    Let me just ask one thing as follow-up to Mr. Bernheim, and it's very short, very short, very short, very short.

You did -- it is your testimony that after you wired the money Ira -- Ira -- you spoke to him on the phone and he confirmed that he received that money?

A.    No.  I confirmed before sending it that it was -- they were the correct wire instructions.  I don't recall a conversation after that confirming that he received the wire, no.

Q.    Okay.  But you did speak to him beforehand to tell him that you were sending the money; is that correct?

A.    No.  I spoke to him

beforehand to confirm that I -- those were the correct wire instructions and I should wire to that account.

MR. LANG:  Okay.  All right. That's it.

THE WITNESS:  Anything further?

MR. BERNHEIM:  No.

THE WITNESS:  Okay, good.

MR. BERNHEIM:  Thank you.

*   *   *

(Whereupon, the witness was excused and the deposition concluded at 5:33 p.m.)

*   *   *

Page 237

CERTIFICATE

I, BRANDY M. CHRISTOS, a Certified Court Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, NOAH BURTON was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

*Brandy M. Christos, CCR*

BRANDY M. CHRISTOS, CCR

CCR NO. 30XI 00228200

Page 238

LAWYER'S NOTES

PAGE   LINE

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

[& - 2019]                                                                    Page 1

**&**

**&**   1:16 2:7

**0**

**0**   93:5
**00228200**
  237:22
**04260**   1:3
**07095**   2:9
**08701**   2:4

**1**

**1**   3:13 6:22
  11:10,13,19
  12:16 66:20
  74:24 84:20
  90:6 201:25
**1,223,500**
  157:13
**1,500**   154:18,24
  156:16 157:15
**1,500,000**   49:15
  79:23,25 96:12
**1,545,000**   82:5
  83:6
**1.2**   58:14
  158:13 203:11
**1.5**   58:20 60:6
  78:14,19 79:9
  84:18,19,22,24
  85:2,12 88:7
  88:17 89:22
  90:16 97:22
  125:6 157:18

158:12
**1.545**   81:17
**1.545.**   85:3
**10**   2:9 3:24
  117:6 163:1,7
**100**   67:23 89:9
**100,000**   117:24
  118:8 159:20
  202:25
**11**   3:13,25
  121:8 191:24
  229:19,25
**11241**   2:14
**114**   3:15
**11:32**   121:10
**12**   1:11 83:25
  84:2,13 91:15
  92:6 106:12
  108:13 113:17
  121:9 122:3,15
  129:4 137:2
  148:9
**12th**   35:4 54:13
  55:14,24 59:25
  60:5,14 62:17
  69:7,24 70:19
  71:1 72:20
  82:9 83:3
  101:19 115:17
  117:7,21
  125:14,20,25
  126:4,5,20
  128:16 149:12
  159:6 181:18

192:16 193:1,6
  195:18,23
  196:7 204:7,15
  209:6 225:1,6
**13**   136:19
  148:13 152:3
  153:6
**1391-19**   145:6
**13th**   60:3 80:15
  82:11 105:25
  149:18 172:13
  173:1
**14**   4:15 137:16
  140:7
**143**   3:16
**143,385**   162:13
**148**   3:17
**149**   3:19
**15,000**   80:25
  81:18 85:19
  89:23 91:14
**151**   3:21
**158**   3:22
**15th**   218:17
  219:8
**16**   2:13 71:25
  72:17
**161**   3:23
**162,000**   200:1
**162,500**   145:1
  145:22
**1621**   237:21
**163**   3:24

**164**   3:8
**167**   4:15
**16th**   132:18
**17**   55:2,9 129:7
  134:19
**17th**   172:14,20
  176:9
**18**   144:5
**19**   105:13
  150:6 161:22
**191**   3:25
**192**   3:9
**1985**   72:1,17
  107:25 132:18
  176:14 178:23
  224:10
**1:12**   1:17
**1:23**   1:3

**2**

**2**   3:14,19,23
  21:12 49:7,13
  77:15
**20**   157:2
**2000**   209:6
**2005**   8:14 9:9
**2011**   9:16
**2016**   165:8
**2017**   15:1
**2018**   137:16
  213:18
**2019**   15:1
  165:8,10

**2020** 15:6 35:4 54:13,18 55:2 55:9 69:7,24 70:19 71:1 75:19 80:15 82:9,11 83:3 83:25 84:3,13 89:5 91:21 94:5 101:19 105:14 106:12 108:13 113:17 114:20 116:17 117:7 120:2 121:9 122:4,15 129:7 130:14 134:19,22 137:2 144:5 148:9 150:6 152:4 159:6 161:22 163:9 172:20 181:18 185:7,9,18 186:16,17 222:19 226:18
**2023** 31:8,9
**2025** 1:11
**226** 3:7
**23** 12:3
**235** 3:9
**24** 12:4 228:14
**25,000** 117:14
**250,000** 162:11 162:19

**2600** 2:13

**3**

**3** 3:15,21 53:5 67:19 74:25 78:13 79:20 81:4 92:3 114:13,19 184:16
**3/12/20** 3:17,22
**3/13/2020** 105:18 150:8
**3/18/20** 3:16
**3/19/20** 3:18
**3/19/2020** 105:19 150:9
**3/8/20** 3:15
**300,000** 163:11
**30th** 163:9
**30xi** 237:22
**32,000** 200:3,21 200:22 201:2,3 201:16 202:11 202:17
**32,5** 159:20
**32,500** 118:9,13 118:20 159:9 161:5 168:21 202:21 203:2
**350** 156:25
**3:15** 122:4 196:1,7
**3s** 92:2

**4**

**4** 3:16 68:18 70:8 71:25 89:12,21 90:15 98:1 132:14 133:4 143:20 143:23 144:4 176:12
**4/19/20** 3:23
**4/30/20** 3:24
**4/30/2020** 163:11
**42** 228:14
**45** 81:9,17 84:22
**45,000** 79:23 80:5,10 81:3 81:14 83:7,13 83:16,21 84:4 84:12 85:11,18 86:14 91:14
**49** 3:14
**4:28** 194:19

**5**

**5** 3:7,13,17 51:1 80:12,23 85:22 96:2 148:2,8
**50** 68:12 70:22 71:5 73:2 74:19 76:17 220:12 221:5,9

**500** 5:22 8:19
**509,500** 152:5 153:6
**5218** 159:15 160:18 169:2,5 169:6,8 203:3
**5:06** 159:7
**5:28** 152:4
**5:33** 236:14

**6**

**6** 3:18 94:25 103:12 134:17 149:23 150:4 175:7 226:8 229:24
**600** 154:19
**600,000** 105:17 150:8 153:7
**609-5530** 2:5
**625** 105:18
**625,000** 150:8 157:3 227:20
**636-8000** 2:10

**7**

**7** 3:20,25 5:15 73:22 106:5 132:8,17,23 151:13,19 154:14 157:1 176:13 178:22 224:9,12
**718** 2:14

**[732 - actually]**

**732** 2:5,10
**750** 104:22
**750,000** 96:10
  96:21 97:3,7
  97:13 98:2
  103:14,21
**750k** 229:21
  230:3
**797-2488** 2:14
**7:19** 193:24
  194:13,14

**8**

**8** 3:22 89:10
  108:8 114:20
  115:9,12
  116:17 158:24
  159:5
**877.370.3377**
  1:24
**89,000** 154:14

**9**

**9** 3:23 113:16
  134:22 161:13
  161:19 226:18
**90** 1:16 2:8
**90,500** 153:14
**900** 1:17 2:9
**900,000** 144:18
**917.591.5672**
  1:24
**918** 2:4
**9:07** 103:25

**9:26** 115:4
**9:39** 226:18
**9:51** 113:17
**9:58** 117:8

**a**

**a.m.** 113:17
  117:8 226:18
**ability** 6:13
  76:7,17 133:5
  177:11 232:11
  237:13
**able** 48:23,25
  65:13 78:5
  94:1 98:13,22
  98:23 146:1
  232:23
**above** 1:18
**absent** 102:7
**absolute**
  176:20 177:21
  178:1,3,5
**absolutely**
  110:23 177:17
  205:16
**accept** 60:1
  62:4,7 144:25
  162:12
**access** 173:21
  234:7,14,20
**accommodate**
  6:25
**accordance**
  69:1 74:1

**account** 119:1
  119:5,11,12,13
  119:16,23
  120:3,16 146:1
  150:17 163:17
  163:17 202:12
  202:16,19,20
  202:22,24
  203:1,1 228:12
  234:1,2,7,10,15
  234:21 236:3
**account's**
  119:18
**accounting**
  59:13 157:23
  158:2,5,11
  186:24
**accuracy**
  122:11 124:7
**accurate**
  124:24 137:22
  158:8
**accurately**
  48:24 64:1
  69:3 74:3
**accustomed**
  139:24
**acknowledge**
  126:24 127:3
  164:24
**acknowledged**
  55:21
**acquaintance**
  23:7

**acquire** 78:6
**acquired** 97:8
  98:14 104:18
**acquiring**
  16:18
**acquisition**
  15:21 89:6
**act** 25:13,17
  150:20 231:9
  232:12
**acted** 110:13
**acting** 44:11
  110:17 183:16
  183:21,25
**action** 7:6
  24:12 27:13
  237:16,19
**actions** 95:12
**actual** 23:3,9
  23:23 43:1
  91:6 161:10
**actually** 12:24
  20:15 28:1
  31:15 50:22
  62:12 64:18
  65:19 66:13
  84:19,21 87:1
  95:18,22 97:5
  127:24 128:14
  136:12 140:23
  148:24 150:5
  162:19 192:19
  200:3 204:22
  218:17 232:24

**[ad - apparently]**                                                       Page 4

**ad**  234:13
**added**  133:3
**addition**
  132:20 134:2
**additional**
  138:25 144:18
  162:11
**address**  5:13,18
  5:21 104:4,6
  135:7 175:11
  185:11,23
  195:9,10,10
**addressed**
  144:6
**addresses**
  133:20 175:9
**adjudication**
  30:21
**advance**  35:5
  128:1,5,12
**advanced**
  85:19 86:13
**advantages**
  46:16
**adverse**  45:17
**advise**  93:8
**advising**  93:23
  102:6
**affecting**  25:8
**affidavit**  47:7
  96:3 99:2
  101:23 102:1,9
  137:9

**affiliated**  14:17
  14:24
**affiliations**
  10:18
**affirmed**  5:3
  180:18
**afriedman**  2:15
**afternoon**
  164:18 182:7,9
**agent**  37:20,21
  37:25 44:11
  150:21
**ago**  7:25 8:1
  23:6 27:11
  166:7
**agree**  52:11
  97:11 104:23
  142:15 218:15
**agreed**  141:16
**agreement**
  31:23 32:4,13
  34:5 47:5
  48:10,20 60:12
  71:12,13,15,17
  73:24 75:1,2
  77:16 78:13
  82:8 83:6,20
  86:5,6,23 94:9
  97:10 107:25
  121:13,18
  132:18,23
  140:17 141:14
  142:3,21
  176:24,25

  177:5,9 178:23
  206:2,18,19
  207:19,20,24
  208:6 218:11
  219:3 224:10
  228:2
**agreements**
  71:18 167:25
  208:1,7
**ahold**  58:11
**albeit**  6:8
**allow**  43:12
  171:14,17
**alluded**  141:24
**aloud**  109:14
**amendment**
  227:25 228:1
**amount**  9:22
  19:14 56:23,25
  57:9,15 58:12
  59:5 78:20,24
  94:12 96:10,21
  103:13 119:4
  152:5 153:13
  157:5 163:11
**amounts**  56:15
  57:4,8
**analogy**  64:18
**analysis**  74:6
  87:20
**andrew**  2:13
  164:19
**answer**  4:17
  6:12 7:2 48:24

  135:17 146:22
  189:6,7 212:21
  212:22 213:2,6
  218:10 220:25
  221:19,21,25
  223:17 233:5
  233:14
**answered**
  189:9,11 212:9
  218:8 223:2,11
  223:25 224:16
**answers**  7:22
**anticipate**  6:19
  230:9
**anticipating**
  79:14 127:21
**anybody**  18:13
  75:18 155:4
  234:8
**anybody's**
  38:15
**anyone's**
  200:16
**anytime**  85:1
**anyway**  223:15
**apart**  165:11
  165:21 170:24
**apartments**
  180:8,11,13
  186:2,6
**apologize**  48:9
  154:2
**apparently**
  81:16 183:6

**appear** 15:5 62:13 185:2 232:20

**appearances** 2:1

**appeared** 204:12 227:13

**appearing** 94:23

**appears** 61:2 104:15 106:12 108:12 114:19 115:4 121:8 129:5 137:3 142:16 144:4 146:5 148:8 151:19,21 161:21 163:8 226:17 229:19

**apply** 93:19 190:13,16,20 190:22

**appraisals** 88:20

**apprise** 217:19 217:19

**approached** 15:22 214:8,11

**appropriate** 111:5 112:8

**approximately** 89:10 158:12

**april** 83:5 161:22 163:9

186:17

**area** 18:24 69:15

**argumentative** 42:4

**arithmetic's** 157:13

**arrangement** 150:20 151:9 156:8

**arrangements** 75:5

**arthur** 2:3 192:5

**articles** 10:25

**ascertain** 41:8 44:22 79:17 88:20 157:10

**ascertaining** 73:1

**aside** 116:23

**asked** 32:21 35:22 38:22,25 41:18 42:1 89:16 130:5 157:25 186:23 189:9,11 206:6 214:9,14,15,16 223:10 228:6 229:18 231:2

**asking** 83:2 112:18,19 175:24 190:20 202:15 206:15

209:24 213:4 229:11

**assess** 90:13 124:13

**assessment** 24:19 70:20 71:4 77:9 88:6 88:9 89:20 103:4 107:20 140:3 179:6,15 179:21,22 180:21

**asset** 88:17

**assets** 88:12

**assign** 63:21 64:10,12 66:22 70:21 177:11

**assignable** 75:16

**assigned** 67:21 73:25 75:3

**assigning** 60:16 64:6

**assignment** 34:7 47:2 53:5 54:1 55:13,16 59:24 62:5,8 63:14 64:4 65:5,8,11 67:22 68:23,24 74:11 76:5,13 77:4 105:25 125:23 126:7,9 133:22 177:4,6

178:10 207:18

**assignments** 74:22 126:13

**assignor** 63:20 66:21 67:5,6,7 68:25 111:2,9 111:13 220:11

**assignor's** 68:10

**assigns** 133:21

**associate** 13:18

**assume** 28:10 35:18 37:8 91:11 92:18 156:20 160:7 173:17

**assumed** 36:16 173:12 214:12

**assuming** 35:19 38:6 55:8

**assumption** 92:20 93:25 100:2 218:2

**atl** 145:6,14

**atlantic** 14:2 15:14 17:20 20:9 29:13 118:15 145:15 159:15,16 160:18 169:6,8 169:10,13,15 200:8,8,11 203:3

**[attached - believe]**

**attached** 96:14
**attachment**
 139:19
**attachments**
 175:17
**attempted**
 176:22
**attention** 51:1
 133:2,16
 134:22
**attorney** 5:24
 6:3 8:10 14:14
 17:4 53:20
 69:8 70:5
 86:21 107:13
 108:18 109:4
 110:8 114:5
 116:16,20
 119:13 130:16
 164:20 169:18
 169:21 175:10
 184:1 187:9,14
 190:1 237:15
 237:18
**attribute**
 132:20
**atty** 226:14
**authored**
 136:15
**authority** 22:19
 25:13,17 68:21
 70:21 71:5
 73:2 107:5,18
 107:21 217:12

 217:15,17,25
**authorization**
 70:16,17
**authorized**
 69:19 70:11
**automatic** 86:4
**available** 93:13
 121:3 127:13
**avenue** 5:22
 8:19 160:18
**avoid** 67:13
 93:11
**awaiting**
 107:11,12
**aware** 7:8 17:3
 45:12,24 46:3
 46:6,14 56:9
 56:13,15 84:3
 86:16 91:24
 93:12,14 94:24
 95:2,3,6 100:9
 100:14,20
 116:15 124:18
 126:12 141:1,3
 143:8 151:8
 155:8 168:15
 223:2 224:19
 224:21,25
 228:9,11,21
**awhile** 51:19

**b**

**b** 3:11 5:12

**back** 22:7 32:6
 36:11 38:13
 40:12,20,23
 51:19 57:5
 59:23 67:15
 69:21 84:24
 89:16 90:13
 91:21 105:21
 142:11 158:19
 185:6,6,14,18
 188:18 189:2
 194:20 195:18
 205:1,7 219:8
 234:11
**ballpark** 88:16
**bank** 3:20 80:1
 119:21,25
 120:3,4 151:22
 152:3 159:7
 163:9 234:1
**bar** 10:17
 27:10
**based** 175:25
 177:3 182:4
**basic** 213:15
**basically**
 203:15 209:3
 219:25
**basis** 25:25
 74:18 80:4
 107:3,7,8,10,13
 107:16 165:15
 174:23

**beach** 18:23,24
 19:19,21,22,23
 20:10
**bearing** 108:14
 215:15,15
**bears** 137:2
**began** 12:23
**beginning** 1:17
 216:13
**behalf** 14:23
 17:6 22:19
 25:17 32:9
 37:23 38:2,4,5
 61:10 70:5
 72:14 86:21
 106:25 107:5
 107:21 109:4
 183:16
**behavior** 213:9
**belabor** 143:2
**believe** 8:7 14:3
 14:5 15:1,16
 17:2 18:21
 19:9,18 23:20
 23:25 26:21
 28:17 29:12
 33:25 35:3,21
 36:7 37:16,22
 39:21 41:10
 47:3,6 49:21
 51:14 52:2
 54:22 56:7
 60:20 71:17
 81:9 83:7

86:24 88:5,10
96:24 102:3,11
104:3 106:20
115:10 116:7,8
117:19 118:15
119:5 129:15
129:20 132:6
133:7 134:4
138:10 142:18
142:23 143:17
150:13,16
154:25 155:13
155:13 156:24
168:18,24
175:5 179:14
179:18 181:3
181:16 182:6,7
189:21,25
190:8 195:5,5
195:7 204:23
205:24 206:21
207:5,6,25
214:10 216:1
224:25 225:8
225:21
**benefit** 59:16
133:19 183:22
**bernheim** 2:8
3:7 5:8 11:7,16
12:13 19:25
24:6 39:12
40:18 41:1
49:10 53:9,16
53:25 54:4

73:14,20 82:16
114:16 121:2
123:23 124:5
131:11,17,19
132:15 136:3,9
143:19 144:1
147:12 148:5
150:1 151:16
152:21,23
159:2 161:6,16
163:4 164:3,12
171:22 175:4
180:18 181:24
186:23 188:17
196:23 197:14
198:23 200:23
201:18,24
206:13 208:10
208:17 209:18
209:21,24
210:6,23 211:7
211:12,15,19
211:25 212:3,6
212:10,18,23
213:1 218:20
220:3 221:15
221:20 223:12
223:22 224:13
224:21 225:25
226:5 233:22
234:24 235:9
236:8,10
**bernheim's**
164:23 179:19

**best** 6:13,16
25:14 172:11
181:10,12
215:23 230:21
237:13
**beyond** 190:1
**big** 206:2
**binding** 68:25
**bit** 29:20 31:9
37:25 48:3
91:5 131:1
140:2 142:16
199:3 205:22
**black** 121:21
**block** 147:21
171:11 185:22
**body** 144:17
**boggs** 9:15
**boilerplate**
66:16 140:16
140:18,19
**borr** 24:1
**borrow** 197:24
**borrowed**
26:18
**borrower** 24:3
28:3 37:13
38:2,6 111:3
111:10,20
112:2,10,12
113:2 127:16
148:12,23
**borrowers** 90:6

**borrowing**
228:24
**bother** 125:6
**bothered**
216:12
**bothering**
125:2
**bothers** 216:20
**bottom** 96:11
105:13 115:3
117:12 160:1
226:16
**boulevard** 2:4
**box** 2:9
**brandy** 1:18
237:3,22
**breach** 98:9
**break** 6:24
12:10 114:9
191:20
**bridge** 92:17
93:17
**brief** 9:11
**briefly** 11:6
**bring** 133:1
**brings** 11:20
12:19 15:3
18:3,17 26:25
27:18 28:24
120:2
**broken** 82:5,6
**broker** 37:2,7
37:10 42:12
226:23 227:7

227:10
**brokered** 23:5 166:11
**brokering** 36:24 183:14 183:19
**brooklyn** 2:14
**brother** 28:18 181:2
**brother's** 27:10
**brought** 7:6 32:15
**building** 14:5
**bunch** 95:14 221:12
**burton** 1:15 3:4 5:2,9,12 8:23 113:23 122:14 131:20 164:18 185:13,20 196:5,16,16 237:6
**burton's** 132:1
**business** 9:2,19 10:2,4 20:16 22:22,25 23:2 25:5 26:14 27:19 222:10
**buy** 40:9
**buying** 84:17 84:18
**bylaws** 71:20

**c**

**calendar** 182:18,25
**call** 12:15 38:18 39:13 86:24 97:23 127:17 128:18 128:23 174:20 184:8 197:22 212:25
**called** 14:7 27:25 34:18 149:18
**calling** 12:7 78:18 180:20
**calls** 41:11,13 202:5
**cancel** 86:6
**cancelled** 51:3
**candid** 126:23
**capacity** 19:2 110:25 165:20 217:3 231:14
**capitalized** 111:11 229:22
**capitals** 55:17
**captioned** 49:14 53:5 77:15 106:5 136:20
**car** 205:1,7
**care** 186:21

**careful** 25:7
**carrier** 29:24
**carry** 29:21 131:12
**case** 25:25,25 26:6 174:25 178:21 200:8
**cases** 178:5
**cash** 166:23
**cashier** 80:1
**cause** 212:1
**caveat** 6:25 132:7,17
**cc'd** 184:21
**ccr** 237:22,22
**ceiling** 104:22
**cell** 228:24 229:6
**centennial** 14:6 15:14,17,21 16:2,15 17:15 20:6,14
**center** 1:17 2:8 134:23
**certain** 40:13 43:12 49:23 90:11 111:2 218:14
**certainly** 28:4 54:17 70:25 170:15,17
**certainty** 107:17

**certificate** 237:1
**certification** 48:4 122:10,13 136:20 137:8 139:18,19 195:6 208:8
**certified** 1:19 80:2 137:21 237:3
**certify** 124:21 237:5,9,14
**chain** 174:6
**chance** 127:18
**change** 87:4
**changed** 73:24 113:12 134:7 185:12
**changes** 87:9 133:11
**characterize** 33:3,5 187:23
**characterizing** 191:1
**charge** 80:20 156:19
**charged** 156:2
**charging** 156:7
**chase** 152:6
**cheaper** 92:13
**check** 79:24 80:2 163:20 166:24 167:10

checklist 3:14 49:14 141:5
christopher 13:18
christos 1:18 237:3,22
circulated 110:2
circumstances 8:3 57:13
city 14:3 29:13 169:15
claim 30:5 31:24
clarification 23:18 39:8 120:25 132:11 147:10 152:17 179:11 194:8 198:7
clarify 85:5
clause 74:25 99:21 101:7 102:9 133:4 134:1 218:12 219:9
clear 65:3 87:25 93:22 113:23 118:7 186:22
clearing 80:3
client 17:7,11 42:7 87:8 120:8 182:24

213:23
clients 26:18 28:2 171:14
close 218:13
closed 27:22 87:2 160:19
closer 165:9
closing 44:11 80:1,13 82:9 119:2 187:1 218:13,15 219:7 226:25
coj 229:21 230:3,5
collateral 19:17 90:11 106:23 179:6 187:21 188:13
collect 7:17,18
collection 79:25
colloquially 67:4 112:4
colon 105:16
column 49:22 51:2,3
combination 13:8
come 30:16,17 69:16 94:14 105:21 116:19 168:11 182:24 183:2,3 195:8 195:10 204:6

214:7 216:21
comes 104:6
coming 42:13 62:23 74:6 85:6 104:15 204:8 226:13
command 210:21 211:4 212:17
commencem... 237:5
commencing 11:6
comment 21:22
comments 38:14
commercial 87:20 89:17,20 90:9,14 91:25 125:1
commission 200:16
commitment 160:2,13 169:2
common 6:11 46:2
communicate 21:24 105:14
communicated 161:8
communication 22:3,6 26:9 182:2 186:19

communicati... 130:12 222:12 223:3
community 112:5,6
company 40:10 42:14 65:15,18 67:24 68:7 72:8 75:6 88:13,15 104:3 104:8,9 106:22 177:2 220:13 221:6,9 231:15
compensation 166:17
complaint 7:21
completed 227:14
component 138:11 139:8
comprehend 213:11 232:20
computer 171:11
concern 44:5
concerned 25:4 41:17 43:24 44:15 74:8
concerning 32:22 186:14 215:20
concluded 187:10,13 236:14

**[conclusion - convey]**

**conclusion**
33:15 73:6,9
73:10 74:16
209:25
**concurrent**
44:1
**condominium**
180:2,5
**condos** 116:1
**conduct** 43:25
44:17,22 45:14
45:25 46:7
177:2
**conducted**
88:23
**conducts** 25:5
**confess** 98:19
98:24
**confession** 34:9
47:8 96:3,9,20
97:2,6,12,15
99:2,14,15,19
100:12,16,22
101:6,9,18,24
102:1,8 103:5
103:13,21
104:23 115:7
137:9 195:7
230:6
**confessions**
100:3
**confidence**
25:12

**confidentiality**
46:10
**confirm** 35:23
38:22,25 124:7
179:20 236:1
**confirmation**
146:20
**confirmed** 44:6
115:25 235:15
235:17
**confirming**
118:4 159:23
234:9 235:21
**conflict** 41:20
44:8,16 45:1
45:10,19 46:18
215:10,16
**conflicts** 44:2
**confused**
202:14
**confusing**
131:15
**connection**
14:12 17:15,22
18:13 42:12
70:6 89:17
97:3 100:15
133:22 138:1
138:23 160:18
163:25 168:14
168:15 181:5
227:22 228:18
**consent** 232:12

**consideration**
55:18,22
126:23 127:4,6
**considered**
215:16
**consistent** 15:9
51:13,24 89:13
142:24 198:17
**constitute**
68:24
**constitutional**
100:7
**constructed**
219:4
**construed** 74:1
75:11,14
176:23
**consult** 44:17
44:20
**contact** 38:16
38:17 39:19
41:7 54:17,21
59:19 72:13
149:2,9
**contacted**
34:17,25 35:6
36:14,20 37:6
41:5 77:23
115:14
**contacting**
149:6
**contents** 45:6
**context** 86:11

**contingent**
67:16
**continue** 45:18
**continuing**
11:1 46:17
**continuum**
43:10
**contract** 166:5
166:7,20
**contributing**
43:2
**contribution**
42:25
**convenience**
127:15
**conventional**
92:12,15
**conversation**
31:21 32:19
58:7 90:23
117:13 129:19
129:22,25
130:3 205:21
215:20 235:20
**conversations**
40:1 170:18
186:9 197:5
215:25
**convey** 63:21
64:10,11 66:22
71:5 73:2
74:19 76:8,17
89:21 90:15
143:1 146:12

| | | | |
|---|---|---|---|
| **conveyance** 178:10 | 217:8,13 218:1 232:7 | 127:7,18 129:16,19 | 133:24 215:8 215:18 237:16 |
| **conveyed** 67:21 98:1 125:11,21 126:5 | **correct** 5:25 7:9 12:22 13:1 14:18 16:20 | 131:23,24 144:23 146:3,8 146:13 154:16 | 237:18 **counting** 24:24 **county** 145:15 |
| **conveying** 64:6 65:12 125:19 126:1 | 20:1 33:18 34:5,6,8,10 42:8,15,16 | 157:4,8,9 158:14,21 160:11 166:2 | 169:10,14 200:8,12 **couple** 111:18 |
| **copied** 38:20 39:21 117:9 122:5 149:3 214:15,16 | 43:6,21 49:24 50:24 52:14 53:10 57:18,22 58:21,22 59:1 | 171:25 172:15 175:14 176:15 176:16 177:13 178:19,23 | 166:9 **course** 24:15 35:13 52:16 77:3 143:10 |
| **copies** 56:6 216:4 | 60:12,13,20 61:4,5,8,10,11 | 179:17 183:18 191:7,8 192:22 | 156:16 157:6 208:21 |
| **copy** 11:19 13:7 31:3 61:13 72:17 | 61:24,25 65:16 66:5,6 67:3,10 68:14,16 69:9 70:3,9,13 76:9 | 192:23 198:18 198:19 200:17 202:13 204:13 207:12 209:9 | **courses** 11:1 **court** 1:1,19 2:13 5:15 11:8 11:12 30:10,14 30:16,18 32:4 |
| 96:13 108:5,22 117:19 123:20 146:20 167:10 174:13,24 | 77:1,7,10,11 78:15,20 82:2 83:25 84:1 85:12,13,20,21 | 218:1 220:2 223:8,9 227:12 227:17 230:22 230:23 232:17 | 32:16 40:22 49:6 65:10 94:11 100:11 100:17 114:12 |
| 175:1 206:19 **copying** 174:20 **corp** 1:7 60:17 | 92:8,9 93:5,6 96:18,19 99:23 100:1,24 101:2 | 232:18 234:4 235:19,24 236:2 | 142:14,20 143:22 148:1 149:22 151:12 |
| 107:1,6,22 116:1 141:17 217:4 231:21 | 101:3,7,8 104:24 106:2 107:1 110:19 | **correctly** 19:3 138:10 **corresponden...** | 158:23 161:12 162:25 191:23 237:4 |
| **corporate** 66:2 71:16 115:25 177:12 232:11 | 112:13,14 113:2,3 114:7 118:10,11 | 185:19 **counsel** 2:11 36:7 54:7 | **courts** 10:14 **covid** 204:16 204:19 205:23 |
| **corporation** 71:20 74:23 141:18 164:21 203:23 217:2,5 | 119:16 123:3 123:17 125:10 125:12,18,18 | 69:13 70:2 110:13,17 115:24 116:4 | 209:7 |

**[cracking - described]**

**cracking** 197:11

**crackling** 197:19

**credit** 97:8 104:17

**creditworthin...** 124:14

**crook** 24:17

**cross** 164:15 192:2

**cure** 205:23

**curiosity** 94:7

**curiously** 87:5 87:6

**current** 162:7

**cursory** 187:20

**cut** 66:8

**cv** 1:3

**d**

**d** 3:2

**daily** 182:18

**damages** 86:8 86:11,15,18

**daniel** 2:8

**date** 1:18 35:3 63:3 79:24 80:13 82:10 83:22,24 101:19 113:9 123:17 126:7,8 126:9 137:2 147:23 184:2

218:13,15 219:7 237:12

**dated** 3:15,16 3:17,18,22,23 3:24 55:2 82:9 106:11 108:13 129:7 144:5 152:3 161:22 172:14

**dates** 54:19

**day** 38:23,23 64:20 65:7 69:17 90:6 105:25 122:21 125:22 128:8 128:19 181:21 181:25 182:20

**days** 35:8 115:19

**dbernheim** 2:10

**deal** 22:10 91:9 104:10 105:2

**dealing** 67:1

**dealings** 16:3 18:19 27:19 130:15

**deals** 112:5 165:25 166:9

**dealt** 100:2 193:7

**dear** 144:17 162:9

**debt** 7:18 96:12

**december** 12:3

**decided** 44:14

**decision** 25:8 83:3 233:14

**declaration** 47:12 53:24 106:5 208:21 216:15,17 217:1

**deemed** 83:14 83:17 86:3 111:5 178:4,6

**deep** 16:15

**defendants** 1:8 2:11,15

**defended** 6:6

**deficiency** 52:24

**defined** 67:5,7 111:13 112:13 179:20 188:17 188:21 190:2 191:4

**defines** 86:17

**defining** 191:6

**definitely** 18:8 50:20 94:22 161:8

**definition** 112:9

**definitive** 62:11

**degree** 97:18 97:20

**delivered** 126:14

**delivery** 126:9

**depending** 22:2 22:9 182:19,20 182:21

**depends** 155:19

**deposed** 27:12

**deposited** 86:7

**deposition** 1:15 4:2 6:3 11:19 24:14,16 26:3 26:5 49:13 52:17 53:4,4 71:24 77:14 96:2 103:11 106:4 108:8 113:16 114:19 117:4,6 121:7 124:1 129:4 134:16 136:19 140:6 143:15 144:4 148:8 150:4 151:19 159:5 161:19 163:7 167:16 175:6 184:16 226:8 228:19 236:13

**depositions** 6:5

**deps** 1:24

**describe** 46:8

**described** 24:16 41:3

43:11
**description**
3:12 25:21
**designation**
232:10
**details** 139:23
**determination**
78:18 108:1
**determined**
107:4
**development**
1:6 60:17
107:1,6,22
141:17 231:21
**dg** 1:4
**diary** 182:25
**difference**
158:11
**differences**
132:1
**different** 113:2
120:21 208:9
231:9 234:16
**difficulty** 58:9
**diligence**
219:25
**diminished**
134:7
**direct** 5:6
**direction**
146:18
**directions**
212:16

**directive** 145:1
162:12
**directly** 56:5,10
57:22,25
117:24 150:25
152:13 158:17
**director** 232:6
**disbarred**
130:23
**disburse** 56:24
**disbursed** 87:2
154:11 187:5,7
203:14
**disbursement**
187:11
**discharges**
27:24
**discuss** 181:13
**discussed** 13:17
103:7 165:21
**discussion**
27:15 51:11,22
53:13 73:17
82:13 86:21
102:12 116:9
116:12
**discussions**
26:4 27:6
33:10 55:12
105:4 193:4
**dispute** 32:14
**disrespectful**
208:12 211:20

**distinctly**
204:21 205:20
**district** 1:1,1
10:16
**doc** 155:15
229:23
**docket** 145:15
169:10 200:9
**docs** 115:5,25
**document**
11:25 30:25
47:10 48:6,11
49:17,20 50:5
50:10,15,18,20
53:18,22 55:14
60:5,9,15,18,21
60:24 61:18
62:13 63:2
64:14 65:18
66:9 67:15
69:24 70:12
75:12,16 77:18
77:21 85:23
86:17 96:6
98:21 99:1
106:9,19,21,24
109:15 111:23
112:2 126:12
126:16 127:5
136:23 137:1
137:14 140:9
140:25 141:10
141:13 142:1
142:10,13,23

144:10,15,16
155:9 156:4
159:17 160:12
162:3 171:6
175:5 177:7
218:5 219:13
219:16 220:18
226:17 232:15
232:16
**documentation**
105:24
**documents**
4:13 11:22
12:8,18,25
15:4 31:1
32:22,24,25
33:21 34:1,4
34:23 35:2,16
35:17,21,24
36:5,10 38:9
39:1 41:15,19
41:23,23 42:2
42:5,7,9 43:9
44:10 46:24
48:13,16 49:24
59:9 60:2
62:21 63:12
66:15 71:11
79:13 101:20
103:8 106:1
111:1 112:17
115:9,15
123:15 124:22
125:21 126:3

127:12,23,24 128:24 130:6,9 151:25 173:24 174:11 175:18 175:21 176:2,5 183:5 187:15 188:23 189:19 195:2 201:25 204:11 205:1,6 205:11 206:9 207:2 209:3,4 214:11,18,20 214:25 215:1 225:19 227:15

**doing** 37:22 44:12 67:9 89:24 203:19 203:20 210:22 211:4,5,6,11 213:12

**dollars** 201:5

**dovetailing** 38:13

**dozen** 10:10

**draft** 47:1,4,7 47:11 48:5,10 76:5,12 77:3 96:6 109:2,15 111:14 112:11 112:23 115:5 135:13,20 171:7 214:11 214:25

**drafted** 35:21 41:23 47:10,14 47:15 77:18 83:21 109:10 136:25 140:10 173:7 175:19 187:15

**drafting** 41:14 49:2 77:9 79:13 222:21

**drafts** 171:15

**drag** 13:3

**draw** 34:23 50:25 133:15 134:21

**drawn** 80:2

**drill** 87:24

**drive** 1:17 2:8

**dropbox** 12:24 13:3

**due** 86:3 144:17 162:10

**duly** 5:3 237:6

**duress** 198:3,13 209:17 213:11

**duties** 46:9 190:1

**duty** 79:17

---

**e**

**e** 3:2,11,15,17 3:18,20,22,24 3:25 38:20 39:22 41:12

45:3,6 54:22 96:24 97:10 103:12,16,18 103:25 104:4,5 104:8,9,15,20 105:11 113:16 113:20,22 114:2,20,22,23 115:1,3,11 117:7,9,11,15 118:6 121:9 122:3,24 123:20 127:11 128:17 134:18 134:22 135:4,7 135:9,12,22 136:10 147:16 148:9,17,20 149:4 150:5,15 151:21 152:2 152:21,22 155:14 159:6 159:19 163:8 174:8 175:7,9 175:10 181:23 182:2,5 184:8 184:16,18 185:1,11,23 191:15 192:12 192:17 193:12 193:18 194:8 196:6,15,20 197:3,6,8 198:18 199:5,7

199:19 206:11 214:16 215:23 216:2 225:14 226:11,12,18 228:8,25 229:7 229:17

**earlier** 8:19 15:8 31:9 38:14 54:5 141:4 184:15 199:23

**earliest** 127:14

**east** 2:4

**eastern** 1:1

**edited** 113:13

**education** 11:1

**effect** 45:4,17 85:11 96:25 177:9

**effective** 126:6 126:8

**either** 16:24 17:22 20:3 29:16 57:1 74:22 88:11 90:20 97:1 112:3 158:5 173:17 177:10 211:23

**elected** 232:6

**election** 85:16

**electronic** 13:8 13:10 108:21 108:22 109:19

109:23 131:23 146:6,10,14 147:20 161:24
**else's** 25:16
**employee** 21:11 37:17 237:15 237:17
**employment** 9:12 21:15 37:16,17,19
**encounter** 209:9
**ends** 65:19
**endurance** 6:23
**enforceable** 35:24 69:1 100:19,22
**engage** 38:1,7
**engaged** 15:19 38:4 54:15 76:3,10,12
**engagement** 16:23 17:5,10 17:14,21,25 18:7,12 20:2 21:16 87:11,18
**engaging** 38:5
**english** 43:17
**enter** 34:20 63:3 68:21
**entered** 192:12
**entire** 13:13,14 56:25 57:15 139:6 157:5

203:13
**entirely** 13:10 111:21
**entities** 27:20 27:25 29:5 143:6 165:15 165:17
**entitled** 188:25 189:5,12
**entity** 14:16,24 15:20 16:19,24 19:1 20:17 23:22,24,24 29:1 40:11 63:23 67:1,8 104:11
**equal** 56:24 57:9
**equally** 230:12
**equities** 27:25 28:7,12,14,15 29:2,7,13,15 78:2,2 117:14 118:2,9,14 119:8 143:6,7 143:12,12 145:2,23 159:9 159:19,22,25 162:13 168:17 168:19,22 200:1,4 201:8 201:17 203:3
**equity** 43:1 69:3

**equivalent** 94:10
**error** 68:1,4
**escrow** 150:21
**especially** 70:6
**esq** 1:7 175:10 226:14
**esquire** 2:3,8 2:13
**essence** 80:20
**essentially** 40:6 81:17 83:18 85:2
**establish** 196:17
**established** 96:18
**estate** 9:3,20 10:5 13:24,25 14:1 16:13 66:1 88:20 89:22 92:1 125:5,9
**estimate** 88:16
**estimating** 15:2
**ethical** 190:12
**evaluation** 179:5,16 180:20 186:1,5 187:20 188:12 188:15 189:18
**evening** 182:1
**event** 27:9

**everyone's** 164:4 224:9
**evian** 5:15
**evidenced** 96:12
**exact** 16:9 189:14
**exactly** 83:23 133:14 160:8 168:4 180:17 187:25 188:5,9
**examination** 3:6 5:6 164:15 192:2 226:3 235:5 237:6
**examined** 5:3 111:1
**example** 120:15
**except** 202:16
**excess** 88:17 125:5
**excuse** 97:19 99:8 123:19 126:18 151:5 161:3 169:3 228:9
**excused** 236:13
**executed** 15:5 35:3,9 52:14 65:20 99:4,10 101:25 106:1 125:25 141:2 141:10 227:15

**executing** 64:4
**exercise** 227:1
**exercising** 90:4
**exhibit** 11:13
11:19 12:16
49:7,13 53:4
71:24 77:15
96:2 103:11
106:4 108:8
113:16 114:13
114:19 117:4,6
121:7 122:2
123:25 127:1
129:4 134:17
136:19 140:7
143:23 144:4
148:2,8 149:23
150:4 151:13
151:19 154:14
157:1 158:24
159:5 161:13
161:19 163:1,7
184:15 191:14
191:24 192:12
226:8 229:19
**exhibits** 216:14
**exist** 61:14
180:11
**exists** 52:7
**exits** 180:13
**expect** 230:12
**expected**
113:12 128:7

**expecting**
125:8
**expenses** 52:19
158:2
**experience** 87:7
90:5 229:9
230:20
**expert** 44:20
**expiration** 86:1
**explain** 13:5
30:12 74:14
214:17,25
215:1
**explained** 41:4
**explaining**
32:23 44:10
104:25 105:1
214:20 229:12
**explanation**
45:9
**express** 74:15
75:17 134:10
**expressed**
132:21
**expressing** 25:1
**extend** 218:13
218:16 219:18
219:21
**extended**
219:10
**extension** 22:14
22:15 85:25
86:2

**extensive**
174:21
**extent** 154:10
**eye** 94:4,4
**eyes** 205:9
211:3

**f**

**face** 130:25
**fact** 90:21 93:3
118:3 124:24
**failure** 85:24
86:2
**fair** 9:21 33:9
33:17 54:12
90:7,8 94:12
110:3 115:20
119:4 140:3
141:11 156:9
172:18
**fairly** 35:21
**fall** 31:9
**familiar** 11:23
24:7 27:3 29:2
72:5 100:6
103:15 113:19
114:25 129:9
136:22 140:21
142:11 144:9
144:15 151:24
162:2 213:16
230:10
**far** 21:7 35:5
75:24 82:17

91:18 112:21
187:5
**fashion** 29:7
37:19 58:25
74:9 134:7
228:3 234:22
**faster** 115:21
**faxed** 206:10
**federal** 10:14
189:8
**fee** 85:25
154:25 156:8
156:10,13
160:2,13
166:22 169:2
200:16 227:7
227:10
**feel** 133:5
170:19
**fees** 157:15
**felt** 132:24
177:4 189:20
**fer** 131:8
**field** 44:21
**figure** 64:16
221:23
**file** 13:8,8,13
13:14 17:18
26:23 28:19
47:15 52:5
61:16 127:14
128:16,22
**filed** 7:23

**[files - fully]**

**files** 13:4,4 18:1 26:22 28:1

**financial** 75:5 122:11 124:8 124:17,18,22 125:3 137:15 137:19,25 138:4,7,16,25 139:11,21

**financially** 237:18

**financing** 94:2

**find** 37:24 39:5 47:1 57:10 58:18 61:13 64:23 101:5 125:1 146:23 155:7 226:6

**finding** 219:25

**fine** 188:19

**finish** 84:8 128:3 188:8,10

**firm** 8:16,22 155:1,3,9 167:20 185:8

**first** 5:2 14:22 15:6,13 16:5 34:16 36:13 41:5 57:5 60:3 63:17,19 64:5 69:21 72:16 77:23 78:8 81:2 103:19 105:16,23

110:12 121:10 131:2 134:18 134:23 135:6 142:9 152:2,10 154:22 165:5 168:5 172:9 183:24 192:13 192:15,17,18 192:19 194:11 204:18 223:7 226:16 227:25 233:7,16

**fish** 94:10

**five** 85:23

**flat** 156:8

**flip** 137:17

**fly** 38:9

**focal** 10:8,9

**focus** 81:3

**follow** 91:18 164:22 167:14 208:19 226:1 235:9

**following** 58:10 159:22 212:16

**follows** 5:4 79:23

**font** 50:1,17 96:8

**forcing** 197:24

**foregoing** 237:10

**forget** 14:8 54:9 206:25

207:1 222:15 222:16 228:13

**forgot** 222:16

**form** 93:17 109:3 110:9 135:14 140:24 173:25 174:17 196:24 197:15 200:24 201:19 206:14 209:19 210:7,24 211:8 211:13,18 212:19 218:21 220:4 221:16 224:14

**formal** 21:15

**format** 139:22 161:23 176:5

**formation** 71:17

**forms** 50:19

**forth** 45:8,15 45:22 46:1 67:15 75:15 237:12

**forward** 164:8

**forwarded** 173:14,18 175:18

**found** 78:13

**four** 203:15

**frame** 40:13

**frank** 169:19

**frankel** 23:10 23:21 24:2

**fraud** 65:23

**freak** 205:22

**free** 92:20 93:4 93:21

**frequently** 101:5

**friedman** 2:12 2:13 3:8 19:20 53:7 123:21 131:5,9,14 164:9,17,19 169:7 179:3,13 188:7 191:9 194:7,12 195:22 196:5,9 202:5 210:11 220:17,23 223:10,16 233:12,18 235:2

**friedmansanc...** 2:15

**front** 207:7 209:8 229:18

**fronted** 118:19

**fruition** 166:8 166:10,20

**full** 5:10 84:24 98:13 154:19 187:10 225:20

**fully** 173:3 187:5,7

| | | | |
|---|---|---|---|
| **fund** 195:3 | **garbage** 147:18 | 91:21 93:19 | 160:7 164:22 |
| **funded** 172:24 | **gender** 67:12 | 98:18 102:14 | 164:24 165:7 |
| 172:25 173:3 | **general** 69:2 | 111:25 138:12 | 167:14 175:8 |
| **funding** 148:15 | 196:15 216:19 | 154:24 159:21 | 183:25 191:15 |
| **funds** 42:19 | **generally** 17:12 | 180:4 188:18 | 192:10 194:21 |
| 56:2,4,9,17,19 | 28:17 37:11 | 192:14 193:23 | 194:22 195:17 |
| 57:20 58:2,8 | **generated** 50:2 | 194:18,24 | 195:20 199:2 |
| 58:19,24 59:14 | **getting** 65:19 | 195:20 200:3 | 199:25 205:23 |
| 59:21 79:2,18 | 115:6 | 202:12,16 | 211:16,20 |
| 92:23 118:25 | **gibberish** 118:7 | 215:5 218:16 | 214:19,24 |
| 126:17,19 | **give** 9:11 43:11 | 234:11 | 215:2 217:22 |
| 127:16 143:4,8 | 49:3 97:8 | **goes** 65:6 66:20 | **goldman** 1:16 |
| 148:13,25 | 104:17 189:6 | 136:10 146:24 | 2:7 |
| 149:18 150:21 | 201:12 | 148:14 158:19 | **golkow** 1:23 |
| 150:25 160:17 | **given** 10:25 | **going** 6:11,20 | **golkow.com** |
| 187:11 227:17 | 57:1 64:12 | 11:7 16:14 | 1:24 |
| 234:21 | 74:9 83:14,15 | 22:1 23:10 | **good** 80:2 |
| **further** 26:13 | 83:17,17 90:21 | 27:12 31:7 | 164:18 199:20 |
| 65:23 66:18 | 99:7 136:13 | 35:18 36:1,2,3 | 203:11,12,12 |
| 102:14 110:24 | 143:4 158:16 | 36:16 38:4,11 | 203:12 224:20 |
| 122:10 126:14 | 158:17 190:24 | 39:3 43:11 | 225:3 236:9 |
| 164:5 169:17 | **giving** 45:18 | 46:25 50:25 | **googling** 95:11 |
| 191:10 217:18 | 90:10 | 53:2 54:24,25 | **gosh** 210:25 |
| 218:16 234:25 | **glad** 6:24 | 57:3,16 58:13 | **gotten** 154:9 |
| 235:3 236:7 | **gmail** 104:6 | 60:1 64:20,25 | 185:23 |
| 237:9,14 | **gmail.com** 2:5 | 71:22 77:12 | **graduate** 9:8 |
| **furthermore** | 228:14 | 91:12 92:15 | **graduating** |
| 75:8 | **go** 9:5 13:7 | 95:25 103:9 | 9:10 |
| **future** 64:9 | 22:7 34:11 | 105:21 108:6 | **great** 225:13 |
| 113:9 | 36:11 46:25 | 117:2 118:14 | **greater** 97:17 |
| | 56:17,20 57:5 | 120:6,7 129:2 | 97:20 |
| **g** | 59:23 67:15,19 | 134:14,21 | **group** 1:8 8:24 |
| **gained** 95:4 | 69:21 80:25 | 136:17 138:16 | 9:15 185:13 |
| | 89:16 90:12 | 140:5 143:2 | |

**guarantor** 111:4,10 112:24 113:4,5
**guess** 192:6,16 194:16 230:15
**guessing** 35:7 230:5
**gun** 197:12
**guy** 86:25

**h**

**h** 2:3 3:11
**habit** 228:23 229:5
**hacked** 193:18 194:5 199:6
**half** 7:25 8:1 27:11
**hand** 49:1,22 175:8
**happen** 90:12 153:12
**happened** 33:9 157:17 158:10
**happy** 121:4
**hard** 13:7 26:16,23 28:9 146:20 208:18
**harrison** 1:7 47:19 54:11,14 54:21 86:25 87:3 113:10 116:22,24 129:6,13,17

130:3,6,9,11,16 130:22 133:3 133:11 134:17 154:10 170:23 171:12,21 172:6 175:1,6 183:25 215:5 220:1,15 225:4
**harrison's** 87:11 132:3,5 172:10 176:9 220:8 225:5
**hastily** 35:9
**head** 14:10 100:13 197:12
**health** 205:22
**hear** 48:21 50:13
**heard** 213:20
**hearsay** 202:6
**held** 1:16 53:14 73:18 82:14
**henry** 1:5 72:2 164:20 216:8 232:5,5,6
**hereinbefore** 237:12
**hereof** 79:24 83:22,23,24 133:20
**hereto** 96:14
**hereunder** 86:7
**heter** 48:9,20 111:23 112:1,6

112:15 140:7 140:16 141:1,6
**history** 9:12 120:17
**hold** 12:6 31:25 67:18 125:9 150:21
**holding** 197:12
**holdings** 1:3 7:7 18:4,14 19:8 24:11 26:15 27:17 30:24 32:5,10 32:14 42:14 43:20 49:14 56:11 59:15 60:6,19 61:7 61:19,24 62:4 62:7 98:12,22 98:23 104:12 110:7 114:5 126:2 150:18 155:12 162:1 162:22 163:12 164:1 181:6,14 183:17 192:6 220:10
**honestly** 218:24 230:13
**hour** 156:25
**hourly** 156:7 156:19,21
**hours** 55:5

**house** 64:19,21 80:3
**hsk** 1:8
**hum** 30:6 55:3 55:10 63:18 66:4,24 91:22 97:24 106:7 108:9 123:18 127:19 129:10 134:20 135:2 135:16 157:16 172:1 217:6 226:20 230:4

**i**

**idea** 21:13,18 54:16 87:12,17 90:25 101:22 116:6 118:23 130:13 135:23 136:14 137:12 137:23 139:12 141:12 145:10 146:14 157:20 158:17 162:15 168:23 171:13 173:15 175:15 181:7,22 183:4 185:4 186:3 195:11 215:6 216:10 225:9 227:8 229:1 234:23

**identical** 131:21

**identification** 11:14,18 49:8 49:12 63:3 71:24 77:13 108:7 114:14 114:18 117:3 129:3 134:15 143:24 144:3 148:3,7 149:24 150:3 151:14 151:18 158:25 159:4 161:14 161:18 163:2,6 191:25

**identified** 8:19 114:4

**identifies** 49:23

**identify** 13:23 226:14

**identifying** 52:18

**iii** 2:8

**imagine** 115:18 168:10,11 216:1 222:11

**imparted** 77:22

**impeded** 133:5

**impertinent** 29:20

**implications** 46:1

**important** 223:15

**imposed** 100:10

**impression** 183:14 198:13 209:16 230:17

**incident** 30:2

**include** 76:23 86:14 154:21 174:15,16,19 226:13

**included** 76:6 76:15 80:5 141:5 153:3 174:1,6 175:3

**includes** 226:12

**including** 173:25

**inconsistent** 77:6 142:16

**incumbrances** 92:8

**independent** 36:7

**index** 4:2

**indicate** 60:2 91:13 146:19 227:13

**indicated** 8:9 10:11 12:3,23 20:5,15 43:15 43:19 54:5 60:10 64:4

87:15 169:9 170:23 171:7 171:22 176:10 179:5,14 180:25 181:17 183:7 200:7 230:20 232:9

**indicates** 58:24 60:15 80:12 146:25 152:4

**indicating** 89:1 138:6 221:8

**indication** 212:15 213:8 216:7

**indirectly** 58:1

**individual** 19:2 63:4 67:1,7 90:15 165:14

**individually** 19:1 34:12

**individuals** 221:13

**informal** 156:14

**information** 21:21 167:19 170:8

**informed** 57:19 80:18 216:8

**informing** 122:16

**inherently** 178:6

**initial** 16:21 34:13

**initially** 9:25

**inquire** 79:5 187:6 217:18

**inquires** 103:20

**inquiries** 111:3

**inquiring** 92:11 115:24

**inquiry** 173:10

**insisting** 104:22

**instance** 190:11 204:11

**instances** 27:22

**instruct** 221:21

**instructed** 4:17 168:25 203:2

**instructions** 118:1,10 126:14 143:16 145:3 149:20 152:11,25 153:2,8 159:23 160:9 162:14 164:25 192:7 235:19 236:2

**instructor** 11:2

**instructs** 162:9

**insurance** 29:22

**intelligent** 100:23

**intend** 90:6
**intended**
  112:22 142:19
  146:12
**intending**
  143:1 208:11
**intention** 90:2
**interaction**
  29:12
**interactions**
  213:10
**interest** 25:14
  40:10 41:20
  60:16 64:6
  65:13 67:23
  68:7,9,11
  70:22 71:6
  73:3 74:20
  76:8,17 78:4
  79:22 80:21
  83:4 91:16,25
  93:5,10,14
  98:1,14,25
  126:1 215:11
**interested**
  237:19
**interesting**
  136:1
**internally**
  142:24
**interpretation**
  132:8 176:11
**interrupt** 212:7
  212:11

**interruption**
  23:17 39:7
  120:24 132:10
  147:9 152:16
  179:10 188:3
  198:6
**investment**
  48:10 142:2
**invitation**
  30:15,17 31:6
  31:11,13 32:3
  32:7,20
**invoice** 155:4,7
**involve** 166:13
**involved** 6:2
  9:24 15:20
  20:6,8 22:3
  29:16 34:17
  53:21 58:3
  77:25 78:9
  94:19 95:22
  96:23 111:23
  118:13 161:2
  166:1 222:9
  228:2
**involvement**
  15:6 20:19
  34:14 36:9
  160:17
**involving**
  160:23,24
  165:13
**ira** 1:5 7:5
  12:21 13:20

18:10 35:19
49:15 56:21
90:24 96:25
110:13 117:13
117:21,24
118:4,18 119:8
123:11,13
137:14 143:16
147:24 152:6
152:13 159:19
159:24 168:20
174:5 192:20
192:21 193:8
193:11 194:20
194:25 196:6
196:17,19
197:2 199:7
201:11 202:25
205:3,6 206:7
206:17 209:15
210:21 211:10
212:15 214:4
214:22,23
215:3,17 216:7
216:22 217:2,9
217:10,12,14
219:21 222:5
223:8 224:3,4
228:8,13,13
229:20 232:5
234:7,10
235:14,14
**ira's** 195:9
  202:12,16,18

202:20,21
205:22 234:1,3
**irrevocable**
  145:1 162:12
**iska** 48:10,20
  111:23 112:1,7
  112:15 140:7
  140:16 141:2,6
**island** 19:22
**issuance** 44:16
  228:7
**issue** 68:15
  87:14 110:5,10
  155:3 183:12
**issued** 100:15
**issuing** 135:15
**it'll** 92:12
**item** 51:1

**j**

**j** 101:11 229:22
**jaakov** 101:11
**jacobovitch**
  8:23
**jeff** 169:23
**jeffrey** 169:22
**jersey** 1:17 2:4
  2:9 5:16,23
  8:12 10:12,16
  14:4 131:10
  169:17 215:13
  237:4
**jest** 1:3 7:6
  18:3,14 19:7

**[jest - know]**                                                          Page 22

24:11 26:14
27:17 30:24
32:5,10,13
42:14 43:20
49:14 56:11
59:15 60:6,18
61:7,18,23
62:4,6 98:12
98:22,22
103:25 104:1,8
104:11,11
106:23 110:7
113:25 114:5
126:2 144:8,23
148:15 150:17
155:12 172:23
181:5,14
183:12,17,22
186:14,15
192:6 201:12
210:20,20
213:25,25
214:1,6 215:21
220:10 222:18
222:20 223:9
223:23
**jewish** 112:6
170:9 171:3
**jh** 134:17 226:8
229:24
**job** 6:12
**jonathan** 27:4
34:18 168:7,12
168:14,16

181:1 183:10
184:17 186:10
221:11
**joseph** 1:7 24:8
105:17 150:15
170:22 213:24
214:18,20
215:1 226:24
**josephteichm...**
104:7
**jpm** 152:6
**jt** 53:4 71:24
77:15 96:2
103:11 106:5
108:8 113:16
117:6 121:8
129:4 136:19
140:7
**judge** 212:25
**judgment** 34:9
47:8 94:25
95:16,24 96:4
96:9,21 97:2,7
97:12,16 98:19
98:24 99:2,14
99:21 100:3,16
100:22 101:7,9
101:18,24
102:1,9 103:5
103:13,21
104:24 115:7
137:9 195:7
230:6

**judgment's**
99:16
**judgments** 95:4
95:7,10 100:12
**jump** 16:14
**june** 80:14
82:11 218:17
219:8

**k**

**k** 101:11
**keep** 63:5
155:18
**keeping** 156:6
**kennedy** 2:4
**kept** 31:3
120:11 128:21
155:24 156:1
156:13
**kind** 11:9 36:12
40:19 84:10
182:17 188:11
196:21 198:12
213:17 218:12
**knew** 21:8 70:1
77:5 124:19
225:4,6
**know** 6:15,24
7:5 13:2 15:8
15:17 21:7,14
24:20,22 26:16
29:4 37:3
47:14 51:7,9
51:18,19,22

52:3 55:25
56:2,4 60:8
62:9 69:8 80:7
84:6,11 87:10
87:13 94:6
95:14,18
101:14,17
104:1 111:24
115:16 117:17
118:12,20
119:9 122:20
122:20,22
124:11 130:11
130:18 131:16
134:25 135:9
136:24 139:10
140:12 144:17
145:8,14,16,17
147:23,24
151:2 152:9,14
152:24 153:15
154:10 158:10
158:15 159:10
160:5 162:10
162:21 167:13
168:4,12,12
169:18,21,23
169:25 170:1,1
170:3,4,6,10,11
170:25 171:11
172:5 175:13
175:24 180:7
180:10,12,24
181:4,8 182:23

183:13 184:5,9
184:10 185:3
187:5 194:1,15
195:14,15
196:14,22
199:9,24
203:24 205:17
206:1 214:15
215:13,22
216:18,21
218:9,10,17
219:2,5,17
221:22,23
222:6,13
224:11 227:6,9
227:11 230:16
230:16,24
233:23,25
234:6,14
**knowing**
100:23
**knowledge**
56:19 62:25
71:14,19
117:22 127:8
130:15 137:7
141:9 147:5,14
158:20 171:5
181:10,12
185:25 200:18
229:12 234:19
**known** 122:18

**l**

**l** 145:6
**lack** 25:12
70:17 99:18
**lakeland** 3:20
119:20,24
120:4 151:22
152:3 159:7
163:8
**lakewood** 2:3,4
5:15,22
**lakewoodlaw**
2:5
**lang** 2:3 3:9
31:16,22 32:19
33:20 40:14
53:23 123:19
124:3 136:2,3
136:5 161:3
169:3 178:25
191:11 192:4,5
194:10,14,17
195:25 196:3,8
196:11,13,25
197:16,18
198:11,25
200:25 201:20
201:22 202:3,8
202:10 206:16
208:10,16,20
209:20,23
210:2,9,13,25
211:1,9,14,17

211:22 212:2,4
212:8,10,12,20
212:25 213:5
218:22 220:7
220:21 221:1,3
221:17 222:1
223:13,21,24
224:1,17 225:2
225:23 230:1
233:1,6,10,15
233:20 235:7
236:4
**language** 66:17
74:9 109:9
**larger** 97:12,17
139:9
**latham** 9:13
**law** 1:8,16 2:3
8:11,23 9:5,10
9:14 11:3
74:21,24 75:10
77:6 126:10
176:21 177:17
178:21 185:8
185:13
**laws** 74:1
**lawsuit** 7:9,12
**lawsuits** 95:14
**lawyer** 54:10
87:8 100:4
170:5,10 171:4
174:12 181:9
181:11 217:21

**lawyer's** 238:1
**lawyers** 94:9
170:7 171:16
**leading** 202:1,1
**leads** 21:22
**learn** 42:22,24
88:2,22 116:20
130:22 168:5
183:24 184:3
**learned** 89:13
184:6
**learning** 131:3
**leaving** 116:23
**ledger** 120:12
120:21 121:5
163:21
**left** 49:22 51:2
61:3
**legal** 11:1
14:22 33:7,7
33:14 39:10
68:24 71:4
74:16 78:17
99:16 112:4,19
112:21 142:6
157:15 166:22
214:4
**lend** 23:9
**lender** 19:11
23:11 24:1
26:23 28:2
37:13 38:1
51:4 113:24
122:9

lender's 174:15
lenders 23:21
  174:22
lends 26:16
letter 3:16,23
  16:24 17:5,11
  17:15,21 18:7
  18:13 20:2
  47:17,21,22
  48:1 54:10,23
  55:6 71:25
  72:18,22 73:22
  75:24 87:15
  104:17 107:12
  107:15,25
  108:5,13,14,17
  108:25 109:2
  109:16 110:4,6
  110:6,9 111:14
  112:12,23
  129:5,12,18
  131:20 132:2
  134:2,6 136:12
  144:5 145:19
  146:5,8,11,15
  146:18,24
  161:21 162:8
  171:7,20,24
  172:10,19,23
  174:19 176:9
  176:14 220:8
  232:4
letter's 55:1

letterhead
  171:8
letters 17:25
  174:22
levitin 169:22
  169:23
liability 30:22
lib 234:13
licensed 8:10
  10:12
lien 29:16
liens 88:14 92:7
likely 153:4
  172:21 182:13
  182:16
limit 36:8
limited 44:10
  189:22 190:2,9
  190:25
line 4:6,10,14
  4:18 67:20
  144:7 160:3
  238:2
lined 121:21,21
lines 85:24
link 13:3
liquidated 86:8
  86:11,15,18
list 52:18,25
  174:16
listen 189:4
litigation 1:23
  9:22,23 10:1,2
  13:16 31:25

89:9 94:12,15
  94:18 138:20
little 31:9 48:2
  67:20 131:1
  140:2 142:16
  199:3
live 26:11
llc 1:3,8 74:22
  117:14 118:9
  145:2 163:12
llp 2:12
loan 18:22 23:5
  23:23 28:9
  30:19 32:22
  33:4,6,11,13,20
  34:1 37:11
  40:8 42:13
  60:12 78:18,20
  78:23 80:19
  90:1,7 91:16
  92:12,25 93:2
  93:9,18,20,24
  97:23 99:7
  110:21 111:4
  111:19 112:7
  122:8,17
  124:20,21
  125:6 127:22
  154:12 155:10
  166:10 172:23
  173:24 183:19
  193:1 195:19
  213:17 219:4
  226:23,25

227:7,10
loans 93:13
locate 52:21
log 62:19 63:5
long 8:13 10:7
  18:23,24 19:19
  19:21,22,23
  20:10
longer 63:11
  65:1 93:20
look 48:2 50:1
  50:16,19 54:25
  57:3 60:23
  67:19 68:17
  72:3 73:21
  85:22 88:25
  89:4 92:11
  93:8 96:7
  105:10 107:24
  108:19 122:1
  126:25 127:9
  130:25 146:24
  159:14 175:20
  185:21 192:13
  211:15 214:24
  226:21 229:18
looked 7:20 8:6
  8:7 61:12
  125:24 141:5
  146:7 150:5
  155:15,16
  161:23
looking 22:11
  22:13,15 51:16

**[looking - march]**                                        Page 25

| | | | |
|---|---|---|---|
| 88:11,12,13 110:4 125:8 139:20 140:9 153:17,23 155:6 164:7 219:11 | 115:1,3,11 117:7,9,11,15 118:6 122:3,24 127:11 128:17 134:22 135:4,7 135:9,12,22 136:10 148:9 | 197:3,6,8 198:18 199:5,7 215:23 216:2 228:8,25 229:7 **maintain** 62:19 119:23 120:5 182:17 | 59:25 60:3,4 60:14 62:17 69:7 70:19 71:1 72:20 75:18 82:9 83:3,24 84:2 84:13 89:5 |
| **looks** 108:22 226:8 230:7 | 148:17,20 150:5,15 152:2 | **maintained** 119:19 | 91:20 94:5 101:19 105:13 |
| **lose** 85:20 | 155:14 159:6 | **major** 213:14 | 105:25 106:11 |
| **lot** 92:13 95:12 191:12 204:23 209:5 218:7 | 159:19 163:8 174:8 175:9,10 181:23 182:2 | **make** 6:10 13:6 15:10 70:20 71:3 87:25 | 108:13 113:17 114:20 115:9 115:12,17 |
| **low** 93:14 | 184:8,16,18 | 88:8,15 89:14 | 116:17 117:7 |
| **loyalty** 46:9 | 185:1,11,23 | 89:19 91:10 | 117:21 121:9 |
| **m** | 192:17 193:12 193:18 194:8 196:6 199:19 | 107:19 108:1 109:7 112:2 118:7 150:6 | 122:3,15 125:13,20,25 126:4,5,20 |
| **m** 1:18 2:13 152:21,22 237:3,22 | 214:16 226:11 226:12,18 229:17 | 153:23 167:16 233:14 | 128:16 129:7 130:14 134:19 134:22 137:2 |
| **made** 25:9 52:9 77:9 83:3 88:5 88:13 90:20 | **mailed** 54:22 147:16 206:11 | **makes** 90:14 104:21 | 144:5 148:9,13 149:11 150:6 |
| 105:1,2 111:2 121:17 124:8 | **mailer** 225:14 | **making** 87:9 90:18 216:25 | 152:3 153:6 157:2 159:6 |
| 133:19 138:11 151:9 160:10 | **mailing** 227:23 **mails** 3:18,25 | **malpractice** 29:22 | 172:15,19 176:9 181:17 |
| **mail** 3:15,17,20 3:22,24 45:3,6 96:24 97:10 | 38:20 39:22 41:12 103:16 114:23 121:9 | **management** 180:2 | 185:7,18 186:16 192:16 |
| 103:12,18,25 104:4,5,8,9,15 | 123:20 134:18 149:4 151:21 | **manner** 25:4 213:3 | 193:1,6 195:18 195:23 196:7 |
| 104:20 105:11 113:16,20,22 114:2,20,22 | 175:7 182:5 191:15 192:12 196:15,20 | **march** 1:11 15:5 35:3 54:13,18 55:2 55:9,14,24 | 204:7,15,15 209:6 222:18 225:1,6 226:18 |

**[mark - money]**

mark  11:9
marked  4:9
  11:13,18 49:7
  49:12 53:3
  71:23 77:13
  96:1 103:10
  106:4 108:7
  113:15 114:13
  114:18 117:3
  121:7 123:24
  129:3 134:15
  136:18 140:6
  143:23 144:3
  148:2,7 149:23
  150:3 151:13
  151:18 158:24
  159:4 161:13
  161:18 163:1,6
  175:6 184:15
  191:24 226:7
materials  52:22
  61:14 221:7
matter  7:23
  12:19 13:15,21
  15:3 16:1,2
  17:16 18:2
  19:8 20:7
  26:24 27:15
  34:14,17 77:3
  88:4 94:7
  116:16 120:8
  144:19,20
  145:6 156:11
  156:13 162:11

  164:21 181:13
  186:15,15
  212:17 214:22
  214:23 215:3
  215:14 217:20
  227:14,22
  228:18
matters  12:20
  13:19,23 17:23
  20:18 165:12
  193:8,9,10,12
mean  23:23
  29:20 30:13
  50:8 75:14
  83:11 86:10
  108:17,20
  132:4 145:13
  161:7 170:10
  175:23,25
  204:7 213:25
  222:22 223:1
  223:16
meaning  31:5
  80:13 89:11
  141:21,23
  143:10 148:13
means  139:5
  194:3 219:17
  227:4 230:5
meant  192:18
meeting  128:15
meetings
  182:22

member  10:13
  10:15,22 20:21
  21:1,4,6
membership
  34:5 47:4
  67:23 68:7,10
  77:16 82:8
  94:8 121:13
  177:3 206:1,17
  206:19 207:19
  207:19,24
  208:5 218:11
  228:1
memo  159:14
memorializes
  178:15
mentioned
  166:11
mere  80:15
merely  231:13
message  51:4,8
  51:16,21
met  24:4 27:9
  165:3,6 168:4
  203:21 204:22
mett  152:14,20
  222:3,5,8,12
  234:7
middle  192:19
  194:11
million  58:14
  58:20 60:6
  78:14,19 79:9
  81:16 84:19,20

  88:7,18 89:10
  89:12,22,23
  90:15,16 94:25
  97:22 98:2
  125:6 157:18
  158:12,13
  203:11
mind  99:12
mine  40:15
  187:22
minimum
  149:20 174:19
minus  84:22
minute  204:15
minutes  222:21
miriam  29:2,7
  29:12,15 78:2
  143:7,12 145:2
  145:23
mispronounce
  48:9
missed  154:2
missing  148:14
mitzvah  27:11
moaning  136:4
moment  62:25
money  26:16
  26:18,23 28:9
  43:1 56:8,23
  57:1,15 58:12
  60:4 85:6,8
  86:13 92:20
  93:4 118:2,19
  118:22 119:4,8

120:6,7,17,18
149:7,16
152:12 153:13
158:16,17
159:21,24
163:18,18,21
197:25 201:13
202:16 203:13
219:7 232:24
233:24,25
235:13,16,24
**monies** 86:6
199:25
**month** 27:11
80:25 81:18
83:4 85:17,19
89:23 91:14
93:2 160:21
**months** 80:15
81:1,8,16 85:1
**morning**
181:25 182:10
**motions** 7:22
**moved** 9:15
**mt** 161:25
162:22 163:12
164:1

**n**

**n** 3:2 5:12
**name** 5:11 8:21
14:6,8 23:7,9
23:11,21,25
24:2 54:9

94:22 101:10
116:1 147:2
164:19 169:19
169:22 185:7
192:5 222:14
222:16 228:8
228:12 234:3
**named** 180:25
222:8
**names** 94:18
221:12,13
**narrowly**
176:23
**nature** 7:12,19
9:18 10:3
29:18 33:16
40:3,4 41:2
45:9 57:2 58:1
62:20 63:10
71:13 80:9
128:22 139:25
**nb** 3:13,14,15
3:16,17,18,20
3:22,23,24,25
11:10,13,19
49:7,13 114:13
114:19 143:23
144:4 148:2,8
149:23 150:4
151:13,19
158:24 159:5
161:13,19
163:1,7 191:24

**necessarily**
38:3 44:13
**necessary**
111:5
**need** 6:23 39:4
63:2 79:9
82:19 149:7,15
172:2 174:1
**needed** 27:23
28:19 92:23
201:13,16
**needs** 127:16
138:22 148:12
148:25
**negotiated** 97:1
**negotiations**
96:23
**neither** 230:10
237:15,17
**net** 85:11
**never** 24:4
25:25 26:1
52:12 71:19
99:3,9,10
103:7 130:20
136:12 139:15
147:3,4,13
156:10,12
166:8,9,20
168:2 187:1,4
198:1,9 213:20
222:22
**nevertheless**
6:22 43:8

**new** 1:1,17 2:4
2:9,14 5:15,23
8:12,12 10:12
10:12,16 19:21
19:24 40:11
65:21 74:2,21
74:24 75:10
77:6 80:2
88:11 94:11
131:10 141:17
170:5,7 176:21
177:14,16
178:5,21
185:23 206:10
215:13 237:4
**news** 43:6,7
**night** 194:15
**nine** 81:1
**noah** 1:15 3:4
5:2,12 113:23
122:13 144:17
162:9 195:1
196:5 237:6
**non** 24:3
**nonpayment**
96:11
**noon** 181:25
**notarize** 62:20
63:11 205:18
207:25
**notarized** 61:9
61:24 62:3
101:10,20,20
106:15 137:4

137:10 147:1
147:22,22
181:19 204:12
205:13,14
207:4,11,14,16
207:21 208:23
216:19
**notarizes**  63:2
**notarizing**  63:5
**notary**  1:19
62:8,20 63:7
63:10 147:21
208:9
**note**  51:2,10,12
51:23 52:1,3,5
52:13 60:11
96:13,18 99:3
99:10,13,19
101:6 102:8
115:6 132:1
**noted**  111:18
113:10 128:16
134:18 145:19
**notes**  128:22
129:24 238:1
**notice**  1:15
29:25 30:5,10
30:13
**notification**
39:15
**notwithstandi...**
46:18
**november**
137:16

**null**  74:25
102:10
**number**  3:12
18:21 145:15
169:10

**o**

**o**  5:12 101:11
229:21
**object**  196:23
197:14 200:23
201:18 206:13
209:18 210:7
210:23 211:7
211:12,22
212:18 213:2
218:20 220:3
220:17 221:15
224:13
**objected**
224:23
**objecting**  233:9
**objection**  213:8
233:1,13
**objections**
202:7
**obligated**  145:4
**obligates**  60:5
60:9
**obligating**
60:18
**obligation**
68:25 217:17

**obligations**
43:24 68:22
79:17
**observe**  210:3,4
210:10,12,14
**observed**  210:1
**obtain**  27:23
133:23
**obtained**  54:7
94:25
**obtaining**
72:17
**obviously**
109:16 203:21
205:18 208:22
219:2 220:24
**occasion**  100:5
**occasions**
165:24
**occur**  46:4,12
46:21 65:14
173:6
**occurred**  19:5
30:7 31:5
57:11 58:19
91:23 121:24
145:25
**ocean**  1:6 2:16
60:17 64:7
70:23 71:11
72:9,10 73:3
76:8,18 88:3
94:4,21 98:14
98:25 106:25

107:5,21 126:1
141:16 143:11
144:7,20
164:20 231:4
231:20
**october**  71:25
72:17 107:25
132:18 176:14
**odd**  37:25
**office**  8:16,18
12:7,24 14:5
27:22 31:2
34:2 50:4,7,11
50:16 54:23
62:16 69:7,16
111:24,25
122:22 123:6
123:12 127:13
181:18 182:15
186:21 204:6,6
204:9,12
206:22 208:2
222:8 225:22
227:24
**officer**  203:23
231:3,8,15
232:7,11
**officers**  231:19
**offices**  1:16
**official**  110:6
222:7
**oh**  22:9 29:10
95:18 124:3
136:2,2 137:18

186:16 194:10
195:25 197:7
202:3,23 203:5
203:8 204:24
205:10 206:23
207:7,14
210:25 211:2
216:16 222:3
224:24 225:17

**okay** 5:20 6:19
11:4 13:22,25
17:19 22:14
28:16 29:1,9
32:12 33:19
37:24 42:11,17
43:23 44:4
45:21 48:18
50:21 54:24
55:7,8 57:3
58:17,23 60:14
60:21,23 61:21
62:23 64:3
66:7 68:1,5
73:5,13 77:8
77:17 81:5
82:2 85:14
89:15 90:9
92:6,10,24
96:5 98:17
99:25 103:9,18
104:20 105:9
106:8,11 108:4
108:12 109:12
111:17 112:11

115:11 116:19
117:11 118:5
120:5,15 124:3
127:20 129:11
129:15 131:18
134:3,24 135:6
135:12,20
137:1,18,24
139:10,16
140:8,25
141:13 143:18
145:7,17
147:19 152:2
153:22 154:6
154:13 155:21
157:9 160:11
164:11,25
165:2,11
170:17 175:22
176:3 185:14
189:10,13
191:5,11
192:21 193:7
193:11,16,23
194:6,20
195:13,17
196:4 197:7
198:21 199:1
199:11,17,20
199:20 200:13
200:20 201:1
201:10,10,15
201:21 202:3,8
203:8,8,11,19

204:3,10,24
205:17,25
207:8 208:4,5
209:11,15
210:18 211:2
211:10 212:13
213:13,13,20
213:21,21
214:2 215:9,19
216:11,24
218:3,23
219:20,23
220:8 221:2,10
222:2,13 223:7
224:8,18,20
225:9,17 228:6
228:16 229:10
230:2,8,24
234:2,6,11,18
235:22 236:4,9

**once** 28:8 38:17
65:14,15 95:11
227:14

**one's** 159:7
161:25 193:24

**onerous** 91:5,7

**ones** 14:9 20:9
20:12 33:24
34:2 205:11,13
206:12

**opened** 9:16

**operating**
71:12 119:15

**opine** 175:24
**opined** 232:19
233:17
**opinion** 25:2
33:7,8 47:17
47:21,22,25
54:10,23 55:1
55:6 74:18
75:17,23 87:14
90:18 99:17
102:16 107:12
107:15 108:5
108:13,25
110:6,9 111:6
112:12,19,20
112:21 129:5
129:12 132:22
133:19 134:6
135:13,15
136:12 146:8
154:9 171:6,20
171:23 172:10
172:19,22
174:1,22 176:9
177:8,16 178:8
217:20
**opinions**
100:15
**opportunity**
49:4
**opposed** 56:12
75:6,6 104:11
134:2 142:3
150:17 155:11

**[opposed - particular]**                                    Page 30

177:5
**option**  40:5,9
  226:25
**oral**  1:15
**orally**  73:25
**order**  13:6
  30:20 40:8
  41:8 44:22
  65:22 97:7
  100:21 107:25
  115:14 124:14
  141:25
**organizational**
  71:10
**organizations**
  10:21
**original**  71:16
  83:8,10,11
  218:10 225:18
**originally**  50:2
  115:14
**originals**  102:4
  186:18 195:3
  227:24
**originated**
  199:5
**orthodox**  112:5
  170:9 171:3
**ostensibly**
  147:23
**outlined**  48:14
**outset**  90:25
**outside**  204:22

**overnight**
  195:2,15,16
**overview**  9:11
**owed**  118:22
  119:8
**own**  8:6,17
  9:17 38:15
  65:1 132:2
  133:23 142:17
  205:8 209:16
  219:24 220:16
  221:5
**owned**  70:23
  165:16,18
**owner**  204:1,2
  204:3 220:12
  231:3,9
**owners**  177:4
  232:10
**ownership**
  68:13 177:1
  221:9
**owns**  168:18
  221:5

|     **p**     |

**p.a.**  1:16 2:7
**p.m.**  1:17 6:22
  103:25 114:21
  115:4 121:10
  122:4 127:11
  128:17 148:10
  152:4 159:7
  193:24 194:13

194:19 195:1
  236:14
**pacer**  8:8 94:10
**package**  173:23
  186:18 225:21
**packet**  3:25
**page**  3:6,12 4:6
  4:10,14,18
  60:24 63:17
  73:23 85:23
  103:19 105:11
  121:10 122:2
  127:1,10
  134:23 137:13
  137:17 154:5
  154:13 175:17
  185:16 192:13
  193:24 194:11
  194:19,24
  196:2 226:17
  226:22 229:18
  238:2
**pages**  3:13,19
  3:21,23,25
  136:21
**paid**  38:11 83:8
  84:12,20 85:11
  155:10 166:21
  167:1 219:8
  226:23 227:7
  227:10
**pandemic**
  91:21

**paper**  108:25
  113:7
**papers**  219:5
**paragraph**
  63:16 64:5
  66:20 67:19
  73:22,23 78:13
  79:20 80:12,23
  81:4 85:22
  110:12,25
  111:7 132:8,14
  132:17,23
  133:4,16
  141:14 176:12
  176:13 178:22
  224:9,12
**pare**  138:13
**parentheses**
  96:13,14
  113:24,25
  226:23,24
**parking**  204:23
**part**  59:14
  79:16 105:4
  143:17 149:17
  203:9 233:7,16
**partially**
  172:25
**participant**
  42:19
**participated**
  221:14
**particular**  8:16
  8:25 47:10

50:18 75:2,21
80:21 140:24
170:24
**particularly**
176:24
**parties** 90:17
237:16
**partner** 8:20
13:20 15:22,24
16:8 20:16,22
72:8 94:3
95:23 160:25
161:10
**partners** 16:19
**parts** 148:16
**party** 24:4
94:20 95:12,13
223:4
**passed** 194:1
**past** 10:10
170:16,19
**paste** 66:8
**pasted** 108:23
**patton** 9:15
**pay** 60:9 83:5
84:19,24 85:25
86:2 89:23
166:23 201:16
203:2
**payable** 79:23
79:24 80:1
83:22
**paying** 84:3,16
85:2,8 90:3

106:23
**payment** 85:20
86:7 91:7
160:10 167:3
167:20
**payoff** 226:25
**pdf** 33:25
**pending** 7:1
31:25 198:24
**pennsylvania**
62:25
**people** 33:10
62:21
**percent** 67:23
68:13 70:22
71:5 73:2
74:19 76:17
89:9 91:15
92:7 220:12
221:5,9
**perform** 68:21
155:17 227:21
**performance**
30:22
**performed**
14:22
**performing**
17:6
**period** 81:1
86:2 92:21
**permissible**
77:10 142:4
**permit** 6:10

**permitted**
25:23
**person** 23:8,9
63:23 165:3,6
193:2
**personal**
137:15 150:16
217:2 229:8
**personally** 91:9
95:22 149:19
151:3,6
**perspective**
141:25 174:16
**pertaining**
12:18 167:19
**pertinent**
132:24,25
**ph** 1:24
**philadelphia**
62:24
**phone** 41:11,13
86:24 128:18
128:23 153:18
184:8 197:22
198:17 228:24
229:6 235:15
**phrased** 208:15
**phraseology**
43:13 142:5
**piece** 66:1
108:25 113:7
**pieces** 14:1
**place** 82:10
89:5 232:21

237:12
**placed** 29:24
30:4 146:14
**places** 93:5
**plaintiff** 1:3 2:6
24:12
**playing** 79:12
**plaza** 14:6
15:14,17,21
16:2,15 17:16
20:6
**pleadings** 7:15
7:21,25 8:5
94:23
**please** 5:10
30:13 57:18
59:24 72:4
73:22 117:13
118:8 121:12
122:3 127:2,17
128:4 144:25
162:12 212:6,7
**pleasure** 164:4
**pled** 89:8
**pledge** 63:21
64:10,11,15,19
64:25 66:21
**pledging**
179:17
**point** 10:8,9
36:5 39:3
41:25 43:14,18
43:23 51:9,20
52:2,5 56:1

**[point - produced]**

57:6 59:13
69:14,18 83:8
83:9,11,12
87:1 88:1,10
102:2,12
105:22 110:20
116:8 122:21
124:20 130:21
149:10 154:8
158:18,18
168:24 181:17
196:14 204:9
214:19,24
224:3 225:7
231:20 232:1
**points** 91:10
226:22
**portion** 40:24
60:25 63:22
66:22 118:1
136:11
**portions** 232:4
**position** 110:16
**possess** 41:21
52:23
**possesses** 64:18
**possession**
71:10,16
225:18
**possibility**
109:13
**possible** 51:18
109:18 127:17
167:12 168:9

173:13 200:21
222:10
**possibly** 109:6
162:6 222:5
**potential** 30:5
30:22 31:24
45:16 88:14
173:24
**potentially**
113:8
**power** 68:20
**practice** 8:10
8:15,18 9:1,4
9:14,19 10:1,4
10:8 17:9
25:11 63:12
**precedent**
141:15
**predicated**
44:5
**predict** 90:12
**preferred**
151:3,7
**preparation**
53:21
**prepare** 41:19
42:2 49:19
51:25 53:17
62:1 115:15
188:22 189:19
**prepared** 35:17
48:16 50:22,23
61:21 106:8
110:7 139:11

140:12 187:2
**preparing** 42:5
42:6,9 43:9
47:20 135:13
**present** 1:19
**presented**
52:13 102:2
136:21
**presently** 10:3
**preserved**
213:7
**pressure** 66:12
**presumably**
6:9
**presume** 7:9
**pretty** 160:20
**prevent** 65:23
**previously**
71:23 86:13
105:23 106:4
113:15 114:3
121:7 124:23
136:7,18 140:6
141:24 143:15
192:25 193:8
214:3
**price** 78:12
79:21,22 80:6
80:23,24 81:3
82:4 86:3 89:2
**prices** 89:6
**primarily** 9:2
10:4

**principal** 24:11
**principals** 69:2
**print** 195:1
**prior** 13:20
16:1 26:3 27:2
35:8 41:14
55:14 99:25
130:14 139:14
140:15 142:13
159:17 187:10
224:25 237:5
**private** 10:1
**privilege** 89:24
**privileged**
217:23
**probably** 35:7
48:19,23,25
102:19,22
103:5 109:17
113:6 115:21
165:9 174:3
186:16
**problems** 46:9
**proceed** 133:6
**proceeds**
155:10
**process** 6:9
185:9
**produce** 12:18
13:12,21
**produced**
13:14 41:12,22
96:25 138:19

**product** 173:22
**production**
11:22 13:6,12
52:8 153:1
**professional**
1:18 10:21,25
43:25 44:17,21
45:14,25 46:7
190:15
**prohibited**
74:23
**prohibition**
177:21 178:1,4
178:6
**prohibits**
177:17
**promissory**
51:2,10,12,23
52:1,3,5,13
60:11 96:12
99:3,10,13
101:5 102:8
**promptly**
147:17
**proof** 62:11
**properly** 67:10
**property** 16:18
17:20,21 18:23
19:19 29:13,17
78:5 90:16
92:7 93:21
94:2 98:1
159:16 169:13

**provide** 33:19
60:6 103:3
121:5 130:5
158:1,5 167:17
**provided** 13:3
31:1 33:24
34:1 55:23
59:4,8 107:15
107:17 111:1
115:8 124:23
128:12 135:14
174:12 226:7
228:19
**provides** 79:21
**providing** 17:1
22:6 33:15
42:19 130:8
**provisions**
175:3
**prudent** 65:24
**public** 1:19
**purchase** 15:23
40:5,9,12 78:4
78:12 79:21,21
80:6 81:3 82:4
86:3 89:2
142:3
**purchaser**
14:15 85:25
**purchaser's**
14:13 86:4
**purchases**
13:24,25

**purchasing**
16:13 40:7,7
**purport** 75:12
**purportedly**
59:17 162:8
**purports** 72:1
**purpose** 30:18
72:25 92:16
106:18,21
142:22
**purposes** 11:14
11:18 37:12
49:8,12 77:14
108:8 111:6
114:14,18
117:4 129:4
134:16 138:8
143:24 144:3
148:3,7 149:24
150:3 151:14
151:18 158:25
159:4 161:14
161:18 163:2,6
191:25
**pursuant** 1:15
67:22
**put** 31:24 66:10
101:23 102:25
108:25 132:6
132:16 179:7
191:13

**q**

**quarter** 92:3
**queen** 27:25
28:7,12,13,15
78:1 117:14
118:2,9,14
119:8 143:6,11
159:9,18,21,24
162:13 168:16
168:18,21
199:25 200:3
201:8,17 203:2
**question** 6:14
7:1 29:21
36:12 37:12
57:14 66:7
69:22 70:24
76:11 82:24
83:1 84:9
87:23 89:16
90:13 128:9
138:15 158:20
171:19 188:8
188:10 189:1,5
189:15 190:19
194:21 196:24
197:15 198:24
200:24 201:19
202:2 203:19
206:8,14
208:14 209:22
210:8,24 211:8
211:13,18

212:13,14,19 216:20 218:21 218:25 219:1 220:4,6,20,21 221:16 223:17 223:19,20,22 224:14,16 231:1,5,12,16 233:5 234:12 234:12,16

**questioned** 56:23 57:7

**questions** 4:9 6:12 32:23 48:24 164:5,23 213:15 218:7 228:7 234:25

**quickbooks** 120:12 167:9

**quickly** 28:20 34:21 35:22 195:20

**quite** 6:20 18:21 22:25 51:18 173:13 222:10

**quote** 24:17,17 81:21 148:23

**quoted** 156:10 156:12

**r**

**r** 5:12 104:17

**rabbinical** 30:10,14,16,18 32:3,15

**rarely** 63:12 100:5,19

**rate** 80:21 93:10,14 156:21

**rates** 91:25

**rather** 75:4 177:1

**reach** 73:5 179:23 180:1

**reached** 31:23

**read** 40:19 64:1 69:3 74:3 136:11 142:10 142:11 188:24 189:2

**reads** 40:23 73:24 122:7 132:16 135:13

**real** 9:3,19 10:5 13:24,25 14:1 16:13 66:1 88:20 89:22 91:25 125:4,9 195:20

**really** 64:21 66:10 81:12 111:19 131:7 146:11 148:12 148:24,24,25 149:15 196:19

217:22 223:14

**realm** 112:8

**reason** 6:14 17:13 22:7 25:3 28:21 65:2 75:21 92:23 118:24 150:24 153:5 154:8 193:17 193:20 196:18 199:4 201:13

**reasonable** 178:18,20

**reasonableness** 87:21 89:18,21

**reattorneysesq** 135:7

**recall** 7:16 14:9 14:21 15:12 17:17,24 26:12 28:1,8,22,25 31:4 32:11,25 33:24 34:24 39:25 45:5,11 47:20,25 48:7 48:14,17 56:16 57:23 58:2 72:16 94:19 108:3 128:20 129:11,21 130:8,10 133:10,13 138:3,10 141:4 141:6 148:17

150:12 153:15 154:8 161:1 170:18 182:3 184:2 197:21 210:16 218:18 219:10 229:15 231:4 235:20

**receipt** 55:20 105:15 118:8 150:7 153:7 167:3

**receive** 12:1 107:15 144:18 156:15 162:10 166:17

**received** 32:3 38:17 39:15 57:8 58:13 59:20 85:12 117:21,24,25 146:19 153:9 157:6 163:12 167:20,21 235:15,21

**receiving** 129:12 162:19

**recent** 28:1

**recipients** 103:24

**recognize** 48:19 49:1,16 50:20 108:15 108:16,17 109:8

**recollection** 15:9 19:4,10 19:13,16 35:4 54:3 55:12 58:15 61:17 69:13 86:19 102:5 110:5 115:13 119:7 121:16,23 138:5 139:13 141:8 145:12 145:22 149:5 156:12 162:7 162:18 163:14 163:24 172:12 181:15 207:17 215:24

**recommend** 66:17 215:17

**recommended** 69:12 133:23 215:7

**recommending** 44:13

**record** 5:9 19:21 53:11,14 73:15,18 82:14 84:9 128:4 131:18 186:20 225:12

**recorded** 64:13 65:15,18,20 71:18 106:21

**recording** 65:25

**records** 88:12 89:1 120:6 155:18,25 156:2,7 163:17 167:2,6

**recross** 235:5

**red** 121:21

**redirect** 226:3

**refer** 33:12

**reference** 20:14 104:21 117:18 150:6 159:11 161:25

**referenced** 11:6 46:24 59:21 93:11 105:24 129:6 143:3,14 153:24 159:18 167:23

**references** 124:16

**referred** 33:11 96:3 168:10 199:23

**referring** 39:16 54:8 114:3 116:5 117:5 124:2 159:16 161:4 194:9 195:6 196:10

**refers** 66:25 78:13 112:24

117:11 154:14 159:8 160:2

**reflect** 38:9 128:23 167:3 178:9

**refresh** 115:12 163:13

**refund** 85:18

**refuse** 189:6

**regarding** 18:3 30:2,21 151:22 163:14 228:7 231:20

**regardless** 232:10

**regards** 17:25 21:25 22:1 30:19 110:21 122:13 176:25 177:2

**registered** 1:18

**registry** 65:21

**regular** 174:23

**regularly** 222:9

**regulated** 180:8

**reimbursement** 160:2

**related** 9:3 23:13 24:3 44:1 48:15 118:21,22 200:19

**relates** 25:6 91:5 99:13 100:12 103:12 159:17

**relating** 13:15 75:5 120:18 200:11

**relation** 23:14

**relationship** 16:10,12 25:21 37:17

**relative** 237:15 237:17

**release** 69:17 69:19 70:11

**released** 126:4

**relevant** 176:14

**relied** 26:1 133:20 220:9 220:10

**religious** 112:18 141:25 142:7

**rely** 146:16 147:18 220:14

**relying** 139:7,8

**remainder** 157:18

**remember** 7:24 19:3 23:8 26:17,20 27:1 35:9 47:9,13 47:15 54:19,20 56:1 57:12,13

58:6 71:7
75:25 76:2
90:22,23 94:17
94:22 95:10,10
115:17 118:17
118:18 130:4
139:17,18,20
144:14 148:21
160:8 161:9
165:9 166:25
167:11,13
168:6 169:14
169:15 173:15
173:16 184:4,7
193:3 195:12
200:2 204:8,21
204:25 205:20
209:14 215:24
225:11 228:4
**render** 102:16
**rendered** 155:5
**rent** 180:8
**repay** 90:6
**repeat** 70:24
82:19
**rephrase** 6:16
34:15 81:10
100:8 151:20
156:5 157:11
202:9 232:2
**reporter** 1:18
1:19 11:8,13
23:17 39:7
40:23 49:7

114:13 120:24
132:10 143:23
147:9 148:2
149:23 151:13
152:16 158:24
161:13 163:1
179:10 188:3
191:24 198:6
237:4
**reports** 89:1
**repre** 43:16
**represent** 7:5
15:19 18:10
29:10 36:2,3
54:25 91:12
138:17 174:23
192:6 203:22
213:22 214:17
215:2 217:12
222:18 223:23
224:2 231:8,14
**representation**
15:23 38:15
39:11 44:9
45:18 46:2,17
60:2 64:8,24
70:7 76:19
167:23 189:22
190:3 191:2,4
218:4
**representations**
63:15 71:3
76:6,16,24
77:4

**representative**
61:23
**represented**
18:22 28:6,9
28:18,21 29:6
30:3 38:10
52:17 69:8,13
70:2 91:14
105:23 165:14
165:19 217:16
222:20,22,23
223:8,9 231:2
**representing**
2:6,15 18:25
35:13 36:15
39:3 42:1
43:20 113:24
116:9,13
214:12,21
224:4
**repurchase**
80:14,24 81:8
81:15,19 83:4
84:25 85:16
90:4 98:11
219:19,22
**request** 6:21
11:21 12:17
42:7,10 124:7
124:9
**requested** 33:1
40:23 124:21
158:4

**requesting**
138:25
**requests** 4:13
**require** 45:25
46:15
**required** 46:7
98:3
**requirement**
17:4,8 45:15
63:1,7 178:14
**requirements**
44:18,23 100:7
100:10
**requiring**
122:9 178:9
**requisite** 68:20
**research**
220:15 221:4
**residence** 5:17
5:19
**respect** 111:3
165:2 167:22
167:25 170:22
174:7 176:8,12
179:4 180:22
181:16 183:9
**respective**
68:22
**responds**
115:23
**response** 35:25
104:14 148:20
**responsibilities**
79:16

| | | | |
|---|---|---|---|
| **responsibility** 190:16 | **return** 89:22 90:16 167:15 | 91:17 92:4 99:11 105:3 | **risk** 91:7,8 93:11 |
| **responsive** 13:4 | **review** 34:3 | 108:20 111:11 | **risks** 46:16 |
| **restraints** 177:24,25 | 72:22,24 74:5 127:13,20,22 | 113:22 118:16 120:20 123:1 | **river** 5:22 8:19 **rml** 1:4 |
| **restrict** 75:13 | 128:15 228:17 | 123:16 124:4 | **role** 14:11 21:6 |
| **restricted** 176:18 177:6 188:16 | **reviewed** 7:14 8:4 115:24 128:24 131:22 | 124:25 125:16 126:2,21 127:9 129:21 132:5 | 36:21 79:12 114:4 183:11 186:10,10 |
| **restriction** 75:7 75:9 176:21,23 217:1 | 131:25 135:1,3 171:21 176:10 **reviewing** 36:9 | 134:4 144:24 145:8 146:4 153:22 154:17 | 187:9,14 188:22 190:9 190:25 222:7 |
| **restrictions** 47:12 106:6 177:18 208:22 216:15,18 | **revised** 121:13 122:12 **revisions** 121:17,20 166:7 | 154:21 157:13 166:15,16 171:1,4 183:22 192:11 193:8 | **rubin** 27:4,7,20 28:11,18 34:18 34:25 35:6,22 35:25 36:20 |
| **restricts** 177:20 177:23 | **right** 6:8 7:4 10:20 21:14 | 194:14 195:13 196:8 199:22 | 37:2 38:10,18 38:22 39:17 |
| **restroom** 191:18 | 22:5 29:19 33:23 37:18 | 199:22 201:10 202:4,8 204:5 | 41:4 42:10,12 42:18 43:2,15 |
| **result** 51:14 64:14 | 40:12 46:12,20 47:16 51:3 | 205:25 207:3 207:23 209:6 | 43:19 77:22 78:1 79:6 97:6 |
| **retain** 36:6 79:15 98:13,24 214:13 215:7 215:18 | 60:10 61:2 63:14 64:19 65:8 66:3 67:2 67:18 68:5,12 | 210:19 213:13 214:2 216:6,17 216:22,22,23 218:6 219:19 | 102:6 104:16 104:21 105:15 113:18 114:21 114:24 115:4,8 |
| **retained** 17:11 35:19 36:17,18 37:1,4 41:24 55:5,9 163:24 187:17 190:6 | 68:16 69:5 70:4,14,15 72:6 77:6 78:22 79:7 83:1,20 84:2 | 219:22 221:1,1 224:8 225:23 227:3,19 230:19 234:18 234:24 236:4 | 115:24 117:8 117:15 118:6 121:11 122:5 128:1 130:12 133:2 134:11 |
| **retainer** 167:24 **retention** 189:19 190:10 | 86:20 88:19 89:15 90:24 | **rights** 86:5 100:24 | 148:11 155:12 157:23 158:1 168:8,15,16 |

**[rubin - says]** Page 38

174:4 180:22
181:1,5,8,14
183:9,10 186:1
186:5 214:9,14
221:11 226:19
226:22 227:9
**rubin's** 27:24
29:5 143:5
181:1 184:17
186:10,10
**rubinj20**
184:17
**rules** 43:25
44:17,21 45:13
45:24 46:6,14
189:8 190:12
190:15 191:4
215:13
**run** 118:25
**rush** 115:18
214:10
**russack** 1:5 7:5
7:17 12:21
14:16,23 15:7
15:20 16:17,25
18:19 19:1
21:2,3,6,9,11
21:17,20 22:4
22:8,16,20
25:6,9,9,10,14
25:20 26:2
34:19 36:2,3,6
36:17 38:7,17
38:20,24 39:5

39:14 40:11
43:21 44:7,7
45:1,10,22
48:5 49:15
54:6 55:23
56:4,6,11
57:21 59:1,6
59:10,16,20
60:16 61:10,23
62:12 63:20
64:5 69:6,15
69:18,23 70:6
70:11,21 71:2
72:1 73:1
74:19 79:6,14
83:18 84:3,12
84:21,24,25
85:7,9 86:22
90:1 91:5
92:11,21,23
93:8,18,24,25
97:11 102:7
103:4,8 104:22
106:13,25
107:4,20 109:4
110:14,18
111:15 114:6
120:19 121:12
122:5,7,16
124:19 125:3
125:20 126:15
128:6,8 137:4
137:14 138:1
144:6 149:9

151:1 152:6
157:14 158:6
161:24 162:1
165:13,22,25
166:14 168:21
172:24 176:13
179:17 181:18
182:2,12
184:11,25
192:20 195:18
196:6,19 197:2
199:8 203:22
213:18 214:13
216:7 220:11
221:5,8 223:3
227:16 228:8
228:13,14,18
228:22 229:2
229:12,15,20
230:9 231:2
232:20
**russack's** 16:8
40:10 61:3
68:9 89:11
124:14 177:10
179:8 184:1
213:9
**rutgers** 9:7

| s |
|---|

**s** 3:11
**sale** 47:5 64:20
66:2 75:7,9,13
77:16 94:8

121:13 141:16
142:21 176:19
228:2
**sales** 34:5 82:8
206:2,18,19
207:20,24
208:6 218:11
**sam** 15:25
114:21,22
117:8,15 165:2
184:21,21,23
184:23,24
195:9 197:23
199:6,10,13,14
199:18 209:11
215:20 216:5
228:9 234:8,20
**sanchez** 2:12
**satisfactory**
138:7,22
**satisfied** 138:11
139:3,5,5
**saved** 61:16
**saw** 48:20,25
71:21 136:7,12
172:19 173:5
205:8
**saying** 51:11
81:11 115:5
149:12 199:7
199:17 208:6
218:12 219:9
**says** 51:1,3
55:17 67:20

68:18 104:16 117:12 121:12 137:14 142:19 147:2 148:24 150:15 178:23 194:25 195:1 218:17 219:12 219:15 229:21

**scenario** 37:11

**schedule** 182:18

**scheduled** 182:22

**school** 9:6,11 9:14 11:3

**schwartz** 185:20

**scope** 87:10,18 189:22 190:2 191:1,3,6

**search** 95:24 115:6 167:16

**second** 12:6 49:25 60:24 63:16 65:8 73:15,23 85:23 105:10,18 110:25 126:25 127:10 137:13 194:19 228:1

**secret** 174:9

**secretary** 222:6

**secular** 142:14 142:20

**secured** 97:25

**security** 97:14 97:18,21

**seddio** 169:19

**see** 17:18 51:5 52:21 55:18 61:7 63:23 67:24 80:16 82:10 86:8 94:4 96:15 101:11 103:22 104:18 105:19 111:6 116:2 121:12,14 135:15 138:13 141:18 144:12 152:6 160:3 162:5 163:21 172:9,22 173:2 184:21 188:18 196:14 218:6 227:1 232:8

**seeing** 7:24 61:18 95:11 115:11 138:4 139:14,24 182:3

**seek** 25:19 87:3 88:19

**seeking** 38:1 93:20 137:21

**seem** 28:8 89:12 146:18 194:4 209:15

209:16 211:3,5 211:10

**seemed** 91:4,13

**seemingly** 98:5

**seems** 114:22

**seen** 24:4 26:10 47:17 50:4 59:12 94:18 136:24 137:24 140:21,23 147:3,4,13,24 160:12 221:7

**selected** 231:19

**self** 231:8

**sell** 64:19,21 106:22

**seller** 29:14,17 86:5

**sells** 65:7

**send** 22:12 32:9 113:7 121:20 145:1 152:11 162:13 171:14 174:2,10,21 229:6

**sending** 122:23 129:18 145:22 159:20 168:21 185:19 194:19 194:25 196:20 197:2 228:24 235:18,24

**sense** 15:10 87:22 89:14

90:14,20 91:10 109:7 139:9

**sent** 8:5 12:24 13:2 30:9,15 31:5 32:7 50:9 50:11,15 56:4 56:5,6,12,24 57:21,21,25 58:3 109:20 117:19 150:25 152:5,25 153:16 154:3 159:19 166:6 171:12 173:23 174:3,5 185:5 186:18 193:18 193:18,19,21 196:6 198:18 199:6,9 201:7 202:25 225:20

**sentence** 74:5 74:10 141:21 141:23 142:12

**sentences** 142:12

**separate** 119:15 120:7 165:11,20 170:24 215:8 215:11,18

**separately** 155:11

**series** 46:23 134:18 151:20

**[series - sir]** Page 40

175:7 226:12
**services** 1:23
14:23 17:1,6
155:4,17
227:21
**servicing** 104:1
104:8,11
**serving** 104:1
**set** 45:8,15,21
46:1 75:15
228:12 237:12
**settled** 98:6
**settlement**
145:4,5,18
**several** 63:15
**share** 24:18
177:21
**shared** 70:4
**shareholder**
231:13
**shareholders**
71:12,15
**shares** 47:2
53:6 54:1
55:13,16 63:22
65:14,22 66:23
67:20,22 68:23
68:24 74:22
76:6,13 80:14
81:8,15,19
84:17,18,25
85:16 97:8,14
98:11 104:18
141:16 142:4

142:22 177:6
177:11,18
179:7,8,16
207:18 219:19
219:22 220:12
**short** 12:10
85:7 93:9,13
114:9 154:19
191:20 235:10
235:10,10,11
**shortfall** 57:11
**shortly** 154:3
**show** 11:17
49:11 53:2
60:1 63:3
71:22 77:12
87:8 95:25
103:10 106:3
108:6 113:14
114:17 117:2
120:6 121:6
129:2 134:14
136:17 140:5
144:2 148:6
150:2 151:17
159:3 161:17
163:5,18
184:14
**showed** 59:9
175:5
**shows** 130:25
**sic** 131:21
132:2 209:6

**side** 90:20
170:14
**sign** 62:13 69:6
69:16 71:2
97:2 107:5,21
128:6,8 183:5
**signature** 47:18
47:23 48:1
60:25 61:3,6,9
62:6 63:4
108:6,14,21,23
109:19,23
131:23 137:3
146:6,11,15
147:20 161:24
171:9,10,25
181:19 185:22
237:21
**signatures**
61:22 62:2
225:18
**signed** 54:10
55:5 60:21
61:13,18 62:11
65:19 69:20,24
106:12,24
107:9 108:18
109:22 110:2
123:14 127:5
127:12 171:10
205:6,9 206:7
206:10,17,20
206:21 207:6,7
207:18 208:2,7

208:25 209:5,8
217:7,13
**significance**
64:8,17,22
99:12 125:2
132:19 134:5
**signing** 109:22
113:8 125:21
129:17 204:25
205:4,4,5,5
209:17 217:25
**similar** 78:2,6
146:6 161:22
**simply** 221:25
**simultaneous**
23:16 120:23
147:8 188:2
198:5
**single** 67:16,16
211:23
**sir** 5:14 7:4
8:13 9:6 11:17
12:14 29:19
42:4 47:24
49:11 53:2,18
58:10 66:8
71:22 77:12
91:4 95:17,25
97:5 103:9
106:3 108:4,10
110:16 113:14
114:17 117:2
121:6 129:2
134:14 135:18

136:17,23
140:5 143:3
144:2 148:6
150:2 151:17
159:3 161:17
163:5 164:3
198:24 212:3
224:22 226:6
233:23
**sit** 22:23 43:5
**sitting** 45:12
158:9 163:23
**situation** 22:10
93:7
**six** 55:5 202:6
**size** 93:13
**skimming**
142:9
**slash** 222:6
**small** 26:11
**smell** 194:2
**social** 27:9
**socially** 26:11
**sole** 20:21 21:1
21:3,6 220:12
**solely** 188:16
190:9,25
**solomon** 28:18
181:1,4,8,14
**somebody**
37:20 63:2
65:7 89:21
90:10 101:21
113:1,7 137:10

146:12 180:24
184:12 193:17
211:6,11
212:16 226:13
**somebody's**
78:4
**someone's**
65:12 140:18
140:19
**son's** 27:10
**soon** 38:21
127:16,17
153:16 160:20
**sooner** 115:22
**sorry** 18:9 33:2
40:16 48:21
73:11 76:4
92:18 95:19
116:11 132:4
132:13 153:25
180:21 191:12
192:18 202:14
222:3 229:23
233:4
**sort** 88:6 104:9
112:1 169:1,9
174:17 179:15
179:21 187:20
198:10 222:11
**sound** 92:4
**sounds** 54:12
54:12
**source** 21:21
56:18,21 170:7

228:22 229:5
**south** 14:4
169:16,16,17
**sparse** 140:2
**speak** 22:4,16
22:19 39:13
62:24 78:20
186:4 192:24
193:1 219:5
235:22
**speakers** 23:16
120:23 147:8
188:2 198:5
**speaks** 220:18
**specialty** 9:1
**specific** 58:7
67:12 75:4
124:17 150:14
150:24 199:3
215:25
**specifically**
45:16 75:15
100:18 160:5
**specifics**
118:18
**spell** 46:15
199:13,15,16
**spelled** 101:1
**speller** 230:21
**spells** 160:13
**spina** 13:18
31:1 153:1
**spitzer** 1:16 2:7

**spoke** 186:14
197:7,20
198:16 201:11
219:6 221:10
222:25 235:14
235:25
**spoken** 31:15
35:20 38:24
113:10 214:22
223:5
**spreadsheet**
120:12
**sprei** 15:25
16:3,8,17,25
20:5,24 21:16
22:5,12,13,18
22:23 23:2
24:16 25:5,12
25:20,22 26:1
39:20,24 79:6
94:16,19,20
95:1,5 149:2,6
151:9 158:6
160:23,25,25
165:3,14,17,20
166:17 167:4
167:21,25
168:4 184:11
184:24 197:23
199:7 209:11
215:20 228:10
228:11,23
229:13 230:10
230:21 234:20

**sprei's** 21:5 195:9 229:6

**stages** 158:16

**standard** 174:14,15

**standing** 173:15

**start** 7:2 17:6 43:17 192:10

**started** 50:3,7

**starting** 6:21 103:19 209:7

**starts** 55:17 85:24

**state** 5:10 16:7 31:10 32:2 44:25 70:10 74:2 81:21 124:6 136:11 158:9 237:4

**stated** 97:6 154:1

**statement** 33:3 57:5,24 122:11 124:8,17 125:3 137:15,20,25 138:4,7,16 139:1,11,22 187:2

**statements** 124:22 142:23

**states** 1:1 63:19 83:21 96:11 98:21 100:11

110:13,24 113:23 125:24 126:12 131:6 133:18 144:16 155:9 163:10

**stating** 33:7,13 105:15 162:9 228:23

**stationery** 108:24 109:17 109:25 144:6

**stay** 148:15

**stayed** 109:24 222:19

**staying** 157:1

**stefansky** 161:25 162:21 163:12,14,25

**stenographic...** 237:11

**steps** 180:16 188:22

**stipulate** 122:10

**stipulation** 145:5,18

**stipulations** 4:5

**stock** 65:14 66:3 75:9 101:23 177:12 177:18 178:15 179:16

**stocks** 75:3,7 176:18,21

177:1,22

**stop** 180:14

**straight** 202:12 216:4,5

**strange** 210:5

**street** 2:13

**strict** 37:19

**strictly** 75:10 75:14

**strike** 91:3 230:25

**structure** 34:22 44:13 90:20

**structured** 51:14 84:15

**structuring** 40:8

**stuff** 94:21 199:24 213:14

**subject** 25:2 69:2 75:24 79:25 88:3 132:7

**submitted** 122:12 124:18 131:21

**subparagraph** 68:18 70:8

**subpoena** 3:13 11:5,20 12:2 12:16

**subsequent** 13:20 26:24 27:2

**subsequently** 30:11 31:17 118:3

**substance** 32:18,24 129:22 139:23

**substantially** 93:10 171:23 173:6

**substantive** 27:14

**successfully** 152:5

**successors** 133:21

**sufficiency** 55:20

**sufficient** 107:10

**sufficiently** 132:25

**suggest** 93:18 208:12

**suing** 7:17

**suite** 1:17 2:9 2:13

**sum** 60:7 139:6

**supercede** 112:16 141:15 142:21

**superceded** 142:6

**supplied** 127:25

**[supply - tendered]**

**supply** 107:13

**support** 4:2 178:21

**suppose** 82:7 83:2

**supposed** 112:16 146:25 147:22 159:21

**supreme** 100:11,16

**sure** 6:10 7:3 9:13 50:21 51:15 133:17 136:7 146:22 153:23 165:1 167:18 183:23 192:9 223:18 223:20

**surprise** 95:13 131:1

**surprised** 95:15

**survey** 22:11 22:12

**suspicion** 196:21 197:1

**sweat** 43:1

**sworn** 1:15 237:6

**system** 94:11 176:6

**t**

**t** 3:11 5:12 152:21,21,22 152:22

**tail** 67:14

**take** 12:15 24:7 25:16 38:14 48:2 60:23 67:19 68:17 72:3 73:21 82:10 85:22 88:25 91:9 105:10 107:24 122:1 126:25 127:9 141:15 186:21 188:21 229:6

**taken** 1:15 6:5 12:11 24:15 114:10 191:21 237:11

**takes** 92:25

**talk** 191:15 208:13

**talked** 39:23 105:8 136:6

**talking** 12:15 28:13 37:18 91:20 224:9

**technically** 112:1

**teichman** 7:17 24:8 26:5,9,14

26:19 30:4 32:8,13 34:19 35:23 36:4,10 37:23 39:1 40:6 41:8 44:9 50:23 51:11,22 56:3,10,22 57:7,19 58:12 58:23 59:21 78:1 79:7 84:16,17,18 85:8 90:24 91:13 97:13 98:4,5 102:6 102:12 103:19 104:4,5 105:14 105:17,19 113:18 114:24 115:23 116:10 116:14 121:11 122:6,8,18 124:10,20 125:7 127:12 127:21 128:1 128:15,25 133:3 134:12 137:21 138:6 138:21 148:10 150:15 153:9 153:11 154:11 157:23 158:1 174:4 183:17 183:20,22 186:9,14

195:19 213:24 214:6,18,21 215:2 217:19 225:7,16 226:24 227:6

**teichman's** 24:14 42:14 50:4,7,11,16 52:17 53:3 77:14 96:1 103:11 104:15 113:15 116:5 123:25 225:21 227:24

**telephone** 193:2

**tell** 22:13 58:13 108:20 176:1,6 182:23 183:1 194:1 232:23 235:23

**telling** 205:23 229:16

**template** 109:3 109:16,24 172:7

**temporarily** 131:11

**ten** 35:8 115:19 170:16,19 222:21

**tend** 67:11

**tendered** 84:21

| | | | |
|---|---|---|---|
| **term** 33:6 37:14,16 67:5 67:17 86:11,17 93:9,13,20 112:12 139:4 142:6,7 | **theory** 104:25 **thereof** 13:9 **thing** 26:20 87:1 199:2 206:3 211:23 225:5 235:8 | 204:25 205:2 224:3 225:24 227:20 **thinking** 109:14 204:14 209:13 | 93:1 102:2 107:9 108:19 110:20 112:3 113:11 116:7 119:20 127:5 130:21 131:2 |
| **termed** 80:24 142:2 180:19 | **things** 72:25 90:11 212:4 220:1 | **third** 122:1 194:24 196:1 | 140:22,22 142:9 155:18 |
| **termination** 86:4 | **think** 7:16 27:10 28:19,21 | **thought** 66:10 67:18 173:25 203:9 | 155:24 156:2,7 156:13,22,24 164:6 165:5 |
| **terminology** 140:16 142:17 | 29:8,15 31:3 48:12 52:4,4 | **three** 14:19 15:8,12 18:16 | 181:21 185:13 186:13 194:12 |
| **terms** 67:12 69:1 75:4,15 77:21 86:22 87:4 91:7 180:18 | 66:13 79:11 92:10 95:20 98:6 99:6,15 102:13,15,18 125:7 138:9 | 80:15 81:8,16 85:1 93:2 142:12 157:12 166:3 226:22 | 195:22,24 205:3 209:1 215:17 218:14 231:20 232:1 237:12 |
| **test** 6:23 194:2 | 139:5,7 141:23 | **threw** 113:6 | **times** 25:8 |
| **testified** 5:3 55:4 129:16 165:12 229:2 | 141:24 143:1,6 149:4 164:3 166:3,19,21 | 147:17 **tied** 19:19 **time** 6:21 12:2 | 111:18 166:3 181:24 183:20 |
| **testify** 237:7 | 168:2,24 169:9 170:16,23 | 23:1 26:8,19 35:15 36:19 | **title** 88:12 89:1 115:6 116:1 |
| **testifying** 52:20 | 174:5,6 176:11 | 37:6 40:13 | 175:25 176:1 |
| **testimony** 27:7 54:6,8 57:18 143:4 219:24 228:17 229:4 235:13 237:10 | 178:13 179:5 180:25 183:7 185:6,10,12 186:12,17,17 186:19,23 193:17,22 | 41:18,22 43:8 43:14,18,23 56:22 57:6 59:13 66:11 68:19 69:7,10 69:11,20,23 | **titling** 176:5 **today** 11:5,21 12:19 15:4 18:3,18 22:23 26:25 27:8,18 28:24 43:5 |
| **text** 51:4,7,16 51:20 | 196:1,18 199:4 | 71:8,9 72:20 | 45:13 59:13 |
| **thank** 117:1 175:22 203:8 210:18,18 235:1 236:10 | 200:6 201:9 203:14,16 | 72:21 78:8 83:15,19 84:22 88:1,5 92:1 | 78:17 102:17 120:2 139:14 148:12 158:9 |

163:23 184:15
**today's** 26:3
 184:16
**together** 16:13
**told** 34:19 36:5
 44:8 56:25
 90:17 108:4
 188:9 198:1,10
 232:5
**tomorrow**
 148:13,25
 195:3
**top** 14:9 100:13
 118:5 137:14
 216:16
**tort** 9:25
**towards** 86:7
**town** 26:11
**toxic** 9:25
**trace** 146:3
**trade** 8:21
**traditional**
 94:1
**trailed** 50:12
**trans** 200:10
**transaction**
 16:6 20:3
 21:25 22:2
 23:3 26:15
 27:18 28:23
 33:8,12,16,20
 34:20 35:10,14
 36:21,24 38:10
 39:14,20,24

40:3,5 41:3,9
 42:20 43:3
 51:13,24 52:1
 52:6,12 57:9
 58:20 59:15
 66:2 78:3,10
 78:19 79:8
 80:19 83:19
 84:15,23 86:18
 86:23 87:4,21
 88:4 91:4
 95:19,21 97:4
 100:1 114:1
 117:23 118:12
 118:16,20
 119:3,5 120:1
 120:19 124:15
 133:6 138:2,23
 139:9 143:10
 143:11,17
 150:22 155:11
 155:20,22
 156:17 157:7
 157:19 160:20
 160:22 168:1
 169:2,6 170:21
 170:25 183:12
 183:15 186:11
 186:25 187:3
 190:17 200:11
 200:17,19
 201:12 203:4
 203:20,21
 210:19 213:22

215:21 216:3,9
 221:14 224:5
 232:22
**transactional**
 9:3,20 10:5
 13:19 48:15
 49:23 52:19
 100:4 127:23
 215:14
**transactions**
 14:12,14 15:12
 18:17 20:24
 21:23 27:23
 92:1 136:13
 139:24 170:13
 203:15
**transcript**
 40:24 188:18
 188:24 189:3
 208:18 237:10
**transfer** 60:3
 63:22 65:22
 66:22 80:3
 125:4 154:15
 154:22 157:2
 159:9 163:10
 178:15 227:20
**transferred**
 56:3 58:8,25
 59:5,10 60:4
 67:21 143:5,9
 157:21,21
 227:16

**transferring**
 114:23
**transfers** 56:16
 57:4 150:11
 151:23 157:12
**transitioned**
 185:11
**transitioning**
 185:10
**translate** 91:15
 139:2
**transmitting**
 160:16
**treat** 112:6
**treated** 90:1
**tried** 33:12
**true** 111:21
 131:4 142:7,8
**truly** 111:19,19
**trust** 119:13,23
 120:16 146:1
 163:17
**truth** 237:7,7,8
**try** 43:16 87:24
 194:22 195:3
**trying** 16:16
 26:17 42:4
 52:21 57:10
 64:16,23 80:20
 81:2 92:16
 95:20 124:13
 124:25 146:23
 196:17 221:23

**[turn - valid]** Page 46

| | | | |
|---|---|---|---|
| **turn** 175:16 | **unable** 226:14 | 85:15 86:12 | 178:7,11,16 |
| **twice** 125:5 | **under** 8:16 | 89:25 92:14,19 | **unrelated** |
| **two** 17:23 23:5 | 43:25 45:13 | 92:22 93:16 | 117:22 193:9 |
| 26:22 41:11 | 66:11 68:22 | 94:3 96:22 | **unsigned** 141:1 |
| 94:13 131:5,8 | 74:21,24 75:10 | 97:9 98:12,18 | **unusual** 37:25 |
| 136:21 142:23 | 84:7 86:5 | 104:7 111:22 | 197:22 210:17 |
| 166:3 208:1 | 145:4 176:21 | 119:6 127:15 | **updated** 185:22 |
| 211:24 | 198:2,13 | 138:21,24 | **use** 37:11 43:12 |
| **type** 9:23 20:16 | 209:16 213:10 | 141:20,22 | 43:13 66:15,16 |
| 21:15 30:21 | 228:8,12 | 148:23 174:11 | 67:12 176:5 |
| 74:10 78:3 | **understand** 6:9 | 176:19 183:11 | 188:15 191:17 |
| 120:11 150:14 | 6:14,17 24:10 | 217:11,14,24 | 193:11 |
| 158:2,5 | 33:14 36:14,21 | 227:4 231:18 | **used** 9:21 50:17 |
| **types** 136:13 | 36:25 37:1,5 | 231:24,25 | 67:3 79:3,18 |
| 167:6 | 37:14,15 40:2 | 232:3 | 102:18,20 |
| **typist** 230:21 | 42:18 57:7,17 | **understands** | 112:9 |
| **u** | 72:7 74:17 | 220:24 | **using** 33:5 |
| **u** 5:12 | 76:21 77:20 | **understood** | 66:17 67:4 |
| **ucc** 186:20 | 81:12,22 84:23 | 42:11 75:8 | 68:19 123:24 |
| **ultimately** | 87:23 126:21 | 137:20 231:12 | 139:4 140:15 |
| 36:18 38:7 | 142:25 168:3 | 231:16 233:19 | **usually** 66:25 |
| 214:13 | 177:14 190:14 | 234:3 | 150:14 |
| **um** 30:6 55:3 | 190:18 206:15 | **unenforceable** | **utilize** 109:5 |
| 55:10 63:18 | 218:25 220:6 | 102:17,23 | **utilized** 232:25 |
| 66:4,24 91:22 | 220:19 233:21 | 103:6 | 234:21 |
| 97:24 106:7 | **understanding** | **unilaterally** | **utilizing** 78:16 |
| 108:9 123:18 | 6:11 7:11,13 | 232:12 | 93:21 |
| 127:19 129:10 | 16:9,11,16,22 | **united** 1:1 | **v** |
| 134:20 135:2 | 22:18 35:12 | 100:11 | **v** 1:4 101:11 |
| 135:16 157:16 | 36:23 41:9 | **units** 68:15 | **vague** 119:7 |
| 172:1 217:6 | 56:14 59:2 | 70:23 88:2 | **valid** 62:10 |
| 226:20 230:4 | 75:1 78:23 | 89:2,6,10 | 65:9 68:25 |
| | 79:2 80:9,22 | **unreasonable** | |
| | 81:6,13 84:14 | 177:23,25 | |

**validity** 142:1 142:13,20
**valuable** 55:18 55:22 126:22
**value** 88:2,16 89:9,11 125:5 186:1 187:21 188:12
**various** 178:4
**verbal** 197:4
**verbally** 118:4 135:17 234:10
**verbatim** 237:10
**verify** 59:20 149:19
**version** 133:12 133:12,14
**versions** 121:21
**versus** 132:2 231:3,8
**view** 102:7 107:14 134:11 176:18
**violation** 189:7
**virtue** 11:5
**vitamins** 205:24
**voice** 50:12 197:11,19
**void** 74:25 99:16 102:10
**voluntary** 100:24

**w**

**w** 21:12
**wait** 208:14 233:1,2,2,2,2
**waive** 44:8
**waiver** 45:1,2 100:24
**want** 33:2 34:21,22 46:25 64:14 66:18 74:15,17 82:21 93:19 94:9 153:23 170:17 174:18,24,25 184:14 188:17 189:2 191:13 216:13
**wanted** 34:20 69:16 98:5 120:16 175:2 183:5 186:20 199:11,21 233:15
**wants** 87:8
**warming** 164:13
**warrant** 64:24
**warranties** 63:16 76:7,16 76:20 77:1,5
**warrants** 71:2
**warranty** 64:9 66:19 70:7

**watkins** 9:14
**way** 16:3 17:10 24:21,22 34:22 44:14 51:13 81:9,11,12,22 82:5 84:11,15 84:22 88:11 105:8 108:1 115:13 121:24 134:11 141:9 147:14 151:4,7 177:7 179:20 180:9 188:16 194:23 199:13 199:15,16,18 213:12 230:17 231:11,16 234:19
**we've** 27:23 47:17 78:16 96:17 129:6 213:7
**wednesday** 1:11
**week** 115:19
**weighing** 91:1
**weinstein** 1:6 2:16 72:2,7,13 94:15,21,24 164:20 176:13 177:10 179:24 213:17 216:8
**went** 14:5 56:10 59:15

95:15 111:24 120:17,18 126:22 155:1,6 157:14,15 168:2 181:24 203:16 232:24 233:24,25 234:2
**west** 14:8 15:14 17:20 20:9
**whatsoever** 80:9 95:8 134:8 189:18 228:3
**wilentz** 1:16 2:7
**wilentz.com** 2:10
**willing** 87:16
**winkler** 101:11 101:14 137:5
**wire** 60:3 80:3 105:17,23 117:12,14,20 117:20,23 118:8 143:13 143:14 150:7 150:11 151:23 152:25 157:2 157:12 159:8 163:10 202:25 227:16,20 235:19,21 236:2,3

**wired**  119:4,12 149:13,17 153:6 159:24 201:8 235:13

**wires**  56:7

**wiring**  118:1 145:2 149:19 162:14

**withdraw** 171:19

**withdrawal** 31:18

**withdrawn** 31:11,14,17 32:20 177:15 180:23 183:8 189:23,24

**withdrew** 30:11

**withhold**  13:11

**witness**  3:3 4:17 19:23 23:20 39:10 40:16 54:2 131:7,12 132:13 152:19 152:22 161:7 164:7,11 169:5 179:2 188:5 191:17 198:9 212:22 220:5 220:24 221:22 223:18 224:15 224:24 233:4,8

236:6,9,12

**woodbridge** 1:16,17 2:8,9

**woodruff**  1:6 2:16 60:17 64:7 70:23 71:11 72:9,10 73:3 76:8,18 88:3 94:4,21 98:15,25 106:25 107:6 107:22 126:2 141:17 143:11 144:8,21 164:21 221:6 231:4,21

**word**  25:16 102:19,21,22 112:6,9 179:20 188:15 227:5

**words**  64:11 83:13,16 111:9 118:6 178:3 179:19 187:22

**work**  5:18,20 9:20 10:5 140:22 166:18 173:21 174:13 174:20,24 175:1 214:4 227:13

**worked**  9:13 90:19

**working**  21:8 21:10,20 37:6 37:9,15 116:16 117:1 122:8,17

**works**  222:8

**world**  90:10

**worry**  164:10

**worth**  88:7 98:1

**write**  127:11 199:19

**writes**  118:6 148:11 226:22

**writing**  31:19 45:2,9,16,22 46:2,10 70:17 74:12 75:18,23 101:2 103:1 133:8 167:15 178:9,14 191:6

**written**  10:24 25:20 38:8 58:20 60:18 81:10,11,13,22 82:4 150:19 155:8 167:24 171:15

**wrong**  12:22 20:1 28:4 57:19 129:16 146:13 160:12 197:16 201:23 209:20 211:17 227:12

**wrote**  35:15 81:25 171:21

**x**

**x**  3:2,11

**y**

**yahoo.com** 135:7

**yeah**  82:25 91:19 92:3,5 120:14 122:25 123:2,4,7 146:23 151:8 153:19 154:5 154:20,23 155:2 166:22 171:18 172:16 185:12 196:11 196:12 200:13 204:17,20 205:2,10,15,20 207:5,9 208:16 216:5 218:6 219:14 223:12 224:6 226:10 233:10,10,20

**year**  7:25 8:1,1 166:7 204:16 204:18

**years**  10:10 15:8 18:20 23:5 26:22 170:16,19

**[york - zero]**                                              Page 49

| | |
|---|---|
| **york** | 1:1 2:14 8:12 10:12 19:22,24 40:11 65:21 74:2,21 74:24 75:10 77:6 80:2 88:11 94:11 141:17 170:5,7 176:21 177:15 177:17 178:5 178:21 206:10 |
| **z** | |
| **zero** | 142:13,19 |

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to the witness for examination and shall be read to or by him or her, and any changes in form or substance which the witness desires to make shall be entered at the end of the deposition with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness before any officer authorized to administer an oath. If the witness fails to sign and return the deposition within sixty days, it may be used as fully as though signed. No changes to the transcript may be made by the witness more than sixty days after submission to the witness for examination.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.