**EXHIBIT F**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CIVIL ACTION NO. 1:23-cv-04260-DG-RML

x ------------------------------ x

JEST HOLDINGS, LLC,                      CIVIL ACTION

        Plaintiff,                      DEPOSITION

        -v-                                   OF:

IRA RUSSACK, HENRY WEINSTEIN,       JOSEPH TEICHMAN

OCEAN WOODRUFF DEVELOPMENT

CORP., JOSEPH HARRISON, ESQ.,

and HSK LAW GROUP, LLC,

        Defendants.

x ------------------------------ x

T R A N S C R I P T of the deposition of
JOSEPH TEICHMAN called for Oral Examination
in the above-entitled action, said deposition
being taken pursuant to Rules governing
Civil Practice in the Courts of New Jersey, by
and before DEBRA-ANN BALSAMO, CSR, a Certified
Shorthand Reporter of the State of New Jersey,
License No. X101161, taken on Wednesday,
February 19, 2025 at the offices of WILENTZ,
GOLDMAN & SPITZER, P.A., 90 Woodbridge Center Drive,
Suite 900, Woodbridge, New Jersey 07095
commencing at approximately 10:00 in the forenoon.



A P P E A R A N C E S

LAW OFFICE OF ARTHUR H. LANG, ESQUIRE
BY:   ARTHUR H. LANG, ESQ.
        918 E. Kennedy Boulevard
        Lakewood, New Jersey 08701
Attorneys for Plaintiff

WILENTZ, GOLDMAN & SPITZER, P.A.
BY:   DANIEL S. BERNHEIM, ESQ.
        90 Woodbridge Center Drive
        Suite 90
        Woodbridge, New Jersey 07095
Attorneys for Defendant Ira Russack

FRIEDMAN SANCHEZ, LLP
BY:   ANDREW M. FRIEDMAN, ESQ.
        16 Court Street
        26th Floor
        Brooklyn, New York 11241
Attorneys for Defendant Ocean Woodruff
Development Corp

LAW OFFICE OF JOSEPH I. HARRISON
BY:   JOSEPH I. HARRISON, ESQ.
        34 Geffen Drive
        Lakewood, New Jersey 08701
Attorney for Joseph I. Harrison, Esq.

ALSO PRESENT:  Henry Weinstein, Defendant.



                                   I N D E X

                                           Witness
Name                                       Examination
JOSEPH TEICHMAN
   By Mr. Bernheim                     5,177
   By Mr. Friedman                   160,179
   By Mr. Harrison                       176


            EXHIBITS MARKED FOR IDENTIFICATION
EXHIBIT            DESCRIPTION                    PAGE
JT-1    Notice of Deposition to Corporate
        Designee of Plaintiff, Jest Holdings,
        LLC                                          7
JT-2    Membership Sale Agreement                   55
JT-3    Assignment of Shares                        58
JT-4    Letter from Ira Russack to Henry
        Weinstein dated October 16, 1985            70

JT-5    Affidavit of Confession of Judgement        97

JT-6    E-mails dated March 22, 2020               103

JT-7    Declaration of Restrictions                107

JT-8    Letter to Jest Holdings, LLC from
        Noah Burton, Esquire, dated
        March 12, 2020                             112



Page 4

EXHIBITS MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| JT-9 | E-mail dated March 12, 2020 | 117 |
| JT-10 | E-mail dated March 11, 2020 | 118 |
| JT-11 | E-mail chain dated March 12, 2020 | 120 |
| JT-12 | Letter from Joseph Harrison, Esq. to Jest Holdings, LLC dated March 17, 2020 | 125 |
| JT-13 | Certification signed by Ira Russack dated March 12, 2020 | 132 |
| JT-14 | Heter Iska - Investment Agreement | 137 |
| JT-15 | Letter from Jest Holdings, LLC, to Ira Russack dated July 16, 2020 | 140 |
| JT-16 | First Amendment to Membership Sale Agreement | 145 |
| JT-17 | Second Amendment to Membership Sale Agreement | 146 |
| JT-18 | Original Loan through Last Payment Date Chart | 153 |
| JT-19 | E-mail chain dated July 19, 2021 | 179 |



Page 5

J O S E P H   T E I C H M A N, 906 E. Kennedy Boulevard, Lakewood, New Jersey 08701, affirms:

EXAMINATION BY MR. BERNHEIM:

Q.    Could you please state your full name for the record.

A.        Joseph Teichman, T-e-i-c-h-m-a-n.

Q.    Mr. Teichman, as we were just introduced a moment ago, my name is Dan Bernheim and I represent Ira Russack in a matter which is being commenced by an entity, Jest Holdings, LLC, which I understand you are the sole member of and we're here today for the purposes of taking your deposition as a corporate designee of that company.  I also understand you're an attorney.  Would I be correct that you've been involved in depositions before?

A.    Yes.

Q.    Have you ever taken a deposition as an attorney where you were asking the questions?

A.    I don't think so.

Q.    Alright.  Did you ever defend one where you had a witness of yours that was being deposed?

A.    I don't think so.

Q.    Have you yourself ever been in a deposition before where you were a witness?

A.    Yes.



Page 6

Q.    Okay.  So you may understand very well how this takes place, but you'll permit me just to emphasize.  I'm going to ask questions, your job is to answer to the best of your ability.  If for any reason you don't understand my question, let me know and I'll do my very best to rephrase it.  Otherwise, the assumption is you understand.  Is that fair?

A.    Yes.

Q.    Also, it's my anticipation we're going to be here for most, if not the entire day.  This is not an endurance test so if you need a break for any reason, let me know, we'll be glad to accommodate. The only caveat to that is if there's a question pending, I'm going to ask you to respond before we take a break.  Do you understand that?

A.    Yes.

Q.    Now you are here, correct, as a corporate designee of Jest Holdings, LLC?

A.    Yes.

Q.    And you are the sole member of that entity?

A.    That's correct.

Q.    Okay.  Alright.  Now have you seen the deposition notice for you as the corporate designee?

A.    Yes.



Page 7

MR. BERNHEIM:  I'm going to ask if you would be kind enough to mark that as exhibit one.

(Notice of Deposition to Corporate Designee of Plaintiff, Jest Holdings, LLC is received and marked JT-1 for identification.)

Q.     Sir, I'll show you what's been marked for identification purposes for this deposition, JT number one.  It is a letter and behind it is a copy of the Deposition Notice which brings us here today.  Are you familiar with this?

A.     I did see it in my - I'm not a litigator admittedly - until last night I only noticed the first page in my experience which again, recognizing that they're limited.  Last I noticed there's a long list of questions behind it so I did look at them last night and this morning.  But the letter is dated the 10th.  I have not used the nine days or so to prepare all of the information.

With that being said, I would be pretty much the only person to have a lot of the information so I think we can get through it today and we can provide any additional information to the extent that you would like any.

Q.     Alright.  So you're prepared to testify



Page 8

on the topics which are identified there?

A.          To the best of my current recollection at this moment, yes.

Q.     Alright.  You were also asked to bring documents.  Did you bring any documents with you?

A.          I did not bring any documents with me.

Q.     And why is that, sir?

A.          Because, as I noted, my, again, limited experience.  I was going to be here to discuss it and I didn't look at the list.  Honestly, I just looked at the first page, okay.  I'm being deposed and I'll be there.  So I didn't bring any of these materials with me today.

But I am pretty familiar with most of the information and, you know, we can supplement and send you anything you may need.

Q.     Well, we'll have to deal with that as we go through the course of the deposition.  And to the extent that we need to then follow-up with questions on any particular document, we'll deal with that in due course.  We're not going to stop and reconvene today, but I truly wished that the materials were here.

A.          That works for me.

MR. LANG:  You have everything



Page 9

here pretty much in yesterday's exhibits.

                    MR. BERNHEIM:  I don't have everything that's on the list.  We'll proceed and we'll deal with it to the extent that it creates any difficulty.

        Q.    Sir, let me just ask you a little bit about your personal background before we get into some details here.

              You are an attorney, correct?

A.      Yes.

        Q.    And where did you go to law school?

A.      University of Pennsylvania.

        Q.    And when did you graduate?

A.      2001.

        Q.    And after graduating law school, did you practice law in some capacity?

A.      Yes.

        Q.    Where?

A.      Paul, Weiss, Rifkind, Wharton & Garrison.

        Q.    And how long were you at Paul Weiss?

A.      Until 2007.

        Q.    And what was the nature of your practice at Paul Weiss?

A.      Corporate transactions.  Leverage finance transactions.



Page 10

Q.    And after Paul Weiss where were you employed?

A.    I moved from there to my current place which is called the Lightstone Group.

Q.    And what is the business of the Lightstone Group?

A.    Lightstone Group is a real estate company.

Q.    And they're located where?

A.    They have offices all around the country and out of the country.  They're headquartered in New York City.

Q.    And your title and position at Lightstone?

A.    Executive vice-president and general counsel.

Q.    And what are your responsibilities?

A.    Responsibilities would be typical of the title; I manage the legal department, I sit on the management committee.  I can talk about that as much as you'd like if you have any more specific questions.

Q.    I've looked up a little bit about Lightstone, but maybe you can tell us briefly the nature of the real estate transactions that gets involved in as it relates to your responsibilities?

A.    We own lots of real estate in a variety of



Page 11

access classes.  We manage that real estate.  Typical activities include buying, selling, arranging for the financing for that real estate.  And then the nature of operating a large business, employee matters.  Of course, real estate, lots of tax matters.  Just generally running a big company of that size, scale and scope.

Q.     Does Lightstone act as lender in some of these transactions?

A.     Lightstone does have a lending arm, yes.

Q.     And what role, if any, do you play when Lightstone's acting as a lender?

A.     People under my supervision are responsibile for the making of funds, managing outside counsel in their presentation of the company and those transactions.

Q.     And do you get involved in any of the loan documents related to those transactions as general counsel?

A.     Not on a regular basis, but if there's something acute or unusual, I will be brought in.

Q.     Is it fair to say you're familiar with the loan documents that are utilized in those transactions; promissory notes, mortgages, et cetera?

A.     As a general concept, yes.



Page 12

Q.    Right.  And in the course of your work you would, from time-to-time, review those on behalf of Lightstone?

A.    Not on a regular basis, but I am quite familiar with how loan transactions generally work.

Q.    Now in addition to being a lender, did Lightstone ever act as an investor in any real estate?

A.    I apologize.  My daughter's mother-in-law is quite ill.  I'm just making sure that that's all that it is.

MR. BERNHEIM:  Off the record.

(There is a discussion held off the record.)

A.    Could you repeat the question?

Q.    I certainly can.  Did Lightstone ever act as an investor in any of these real estate projects?

A.    I'm not sure I'm understanding what you're asking me.

Q.    You referenced that sometimes Lightstone would be a lender.  Are they ever sometimes an investor where they're taking equity in any of these projects?

A.    The loan project or the --

Q.    Any of the real estate projects with



Page 13

which the company is, you know, affiliated.

A.         Its primary business is as an investor.

Q.      Does it then act as a developer in any of these properties on occasion as well?

A.         It has, on occasion, it has been a small, overall part of our business.  In the last ten years there was more activity and we moved away from it.

Q.      How many employees are there at Lightstone so we can get an idea of its size?

A.         I think it's around seven hundred.

Q.      Okay.  And you said in a number of states.  How many different states?

A.         We have offices in, I think, six states.

Q.      Okay.  And the type of real estate, we're talking about various commercial-type real estate, correct?

A.         I'll expand a little bit.  We have commercial properties, we have hospitality properties, we have multi-family residential properties.

Q.      When you talk about "hospitality", like hotels?

A.         Yes.

Q.      And office and retail as well under the commercial umbrella?

A.         We don't do office, we do retail.




Page 14

Q.    Can you give me the feel for the size of the transactions that your company is dealing with in any of these projects dollar-wise?

A.    There's a very, very wide variety.

Q.    Mm-hmm.

A.    But they have been as large as nine billion. You know, we're pretty active currently in the 50 to 70 million dollar space.

Q.    And you stated that you oversee the legal department, correct?

A.    Yes.

Q.    And how many attorneys are in that department?

A.    Seven.

Q.    Now in the course of these transactions whether it be lending or as an investor or what have you, are there within some due diligence period, opportunities where you end up reviewing organizational documents for an entity, be it a shareholder's agreement or operating agreement?

A.    As a general rule that would not be within the scope of my work.

Q.    Okay.  There are other people who work in your department who would look at that for one reason or another?



Page 15

A.           Either them or other outside counsel.  We invariably have outside counsel on all of our transactions.

Q.      And you retained an outside counsel in order to review be it a Shareholders Agreement or an Operating Agreement or some other organization documents?

A.           As appropriate.

Q.      You, yourself, are familiar with those types of documents; is that fair?

A.           Absolutely.

Q.      Okay.  Do you ever go through a process where there's a determination of credit worthiness of some of the lenders that you're dealing with?

A.           We as a company or me individually?

Q.      First, as a company and then we'll drop down to you individually.

A.           I hope that we do that as a company on every single transaction.  We're supposed to.

Q.      And in the course of that you would look at financial records such as tax returns, financial statements, rent roles, things of that nature; is that correct?

A.           As a general rule the answer to that would be yes.



Page 16

Q.    Okay.  Now you differentiated between the company and yourself.  Do you ever get involved in that process of reviewing those type of materials for credit worthiness?

A.    No.

Q.    Alright.  But would it be fair to say you are familiar with those type of documents which would be produced in connection with a determination of credit worthiness, correct?

A.    Without any level of expertise, yes.  You used the word familiar, yes.

Q.    If you were to look at tax returns for an entity you would be able to try to determine what its income and expenses are, would you not?

A.    I would not take any responsibility for that.

Q.    You would pass that off to somebody else with greater expertise than yourself to make that determination?

A.    Yes.

Q.    Let's go if we can then to Jest Holdings, LLC.  What is the business of Jest Holdings?

A.    Jest is an acronym for my name and my wife's name and it is an LLC that I formed for purposes of holding investments in the name of an LLC as opposed



Page 17

to holding it individually.  And Jest has made a number of investments primarily what I refer to as hard money loans.

Q.     And when you use the term "hard money loan", what do you mean?

A.          It refers to what you sometimes call alternative borrowers.  They are intended to be relatively short-term.  They have high rates of interest.  The benefits for a borrower is ease of access, quick closing.  They are, I can't speak for the whole industry, but at least in a limited area in which I play they are always secured.  And it's called hard money because it refers to it being somebody who needs access to quick cash.

Q.     When was Jest Holdings formed?

A.          I don't remember the date.

Q.     If I were to suggest to you December of 2010 maybe on a document that I saw somewhere, does that sound about right?

A.          It does.  I was going to say 15 years, but I'm terrible with dates.

Q.     Jest Holdings, and you'll correct me if I'm wrong, was originally a Delaware company?

A.          I believe that's right.

Q.     And subsequently it's been moved to New



Page 18

Jersey?

A.      Yes.

Q.      Okay.  And do you recall when that occurred?

A.      I think four-ish years ago.  Around four years ago.

Q.      During its tenure, how long did Jest Holdings been in the hard money lending aspect of the lending world?  In other words, how long have you been doing the hard money lending?

A.      I would guess around 12 or 13 years is my guess.

Q.      Are there any employees of Jest Holdings?

A.      There are not any employees.  There is one woman with whom I have a relationship who does some work in connection with transactions.  And it is not an employee.

Q.      Okay.  Would this be somebody who is compensated through the issuance of a 1099?

A.      That's right.  Although often times she isn't paid by Jest at all, she's paid by a borrower.

Q.      And who is this individual?

A.      Her name is Miriam Flegmann, F-l-e-g-m-a-n-n.



Page 19

Q.    I'm sorry, what was that?

A.    Miriam, M-i-r-i-a-m.

Q.    Last name?

A.    F-l-e-g-m-a-n-n.

Q.    And is Miss Flegmann still affiliated with Jest Holdings?

A.    Yes.

Q.    And how long has she been with Jest Holdings?

A.    Around eight years.

Q.    Other than Miss Flegmann, is there anybody else that works, be it a W-2, a 1099?

A.    No.

Q.    Is there an accountant for Jest Holdings?

A.    Umm, Jest doesn't file tax returns because it is included on my personal tax return.

Q.    And do you have a personal accountant who prepares those returns?

A.    I do.

Q.    And that individual's name is?

A.    Jacob Gottlieb.  G-o-t-t-l-i-e-b.

Q.    And Mr. Gottlieb works out of where?

A.    Lakewood, New Jersey.

Q.    Do you have a firm or something else



Page 20

that identifies where he works?

A.          He works for himself.

Q.          As of March 2020 on how many occasions has Jest Holdings been involved in hard money lending transactions?

A.          I would guess around 15.

Q.          And what is the source of the funds that Jest utilizes in these hard money lending transactions?

A.          Primarily my personal funds.

Q.          Do you ever have any other investors in any of these transactions?

A.          On a limited basis some family.

Q.          What about the transaction that brings us here today, were there any other investors?

A.          There were.

Q.          And who were they?

A.          I don't remember the name of the entity that they chose to invest through, but my uncle, David Bodner, B-o-d-n-e-r, had money in the transaction.

Q.          And -- I'm sorry.

A.          And it's been a few years.  I don't remember the details.  Like I said, I'll be happy to supplement afterwards.

Q.          That was one of the documents that was



asked for.

A.          I appreciate it.  Pointing out, I didn't get past page one.

Q.          Any other investors in this?

A.          Jonathan Rubin.  He's my first cousin.  He arranged the transaction and had some money in it.

Q.          Do you know if Mr. Rubin operated through some entity?

A.          I do not believe that he did, but I'm not certain.

Q.          Are you familiar with the name of an entity Queen Equities?

A.          I don't think so.

Q.          What about an entity Miriam Equities, are you familiar with that?

A.          Don't think so.

Q.          Are there any documents which describe the nature of the investments that either Mr. Rubin or -- how do you pronounce David's last name?

A.          Bodner.

Q.          Bodner.  Mr. Boder had in connection with this transaction?

A.          On occasion we have something called a Participation Agreement which simply states you have X percent of a transaction.  It's a two or three-page



Page 22

document.  In this instance, I don't believe that we had one, but I can double-check to confirm.

Q.    That, too, was one of the other documents that was requested.

Now a participation agreement, you correct me if I'm wrong here, is frequently a document utilized when you have various lenders such as banks and it all identifies the responsibilities of those various lenders, are you familiar with that?

A.    As a general rule, yes.

Q.    Okay.  Right.  And the Participation Agreement that you're referring to that you sometimes use, but don't have with you today if it exists, does it do something similar where it describes who has what responsibility in the transaction?

A.    It clearly says that all of the responsibilities lie with Jest.  The only thing that an investor has is a percentage of the loan which is in direct proportion to the amount of money that they put in.

Q.    Does the Participation Agreement also describe what benefits the participant is going to receive as a result of the transaction?

A.    They are always in direct proportion.  If you put in half the money, then you'll have half of



the investment.

Q.    So they would get the same return rate as you would get as a participant; is that correct?

A.    Correct.

Q.    Do you know how much Mr. Bodner invested in this transaction?

A.    I do not recall.

Q.    A dollar, $100,000?

A.    A material amount.  I believe that half of this was, half of the entire investment was my money and half was others.  I'm not exactly, but rough numbers that's what I'm remembering.

Q.    Among the documents were asked were those which would have provided an accounting.

But you state today that your recollection is that you gave half and between the other two investors they would have given the other fifty percent, correct?

A.    Yes.

Q.    Between Mr. Bodner and Mr. Rubin of that other fifty percent, can you tell me who gave what percentage; for example, was it 25 percent or something different?

A.    I am fairly certain that Mr. Rubin was entitled to a brokerage fee for this transaction and



Page 24

he used that brokerage fee as his investment in the transaction.

Q.    In other words, and we'll come back to the details on the brokerage fee, Mr. Rubin didn't put up any money or cash, but in return for whatever his fee was he got a percentage, is that what you're telling me?

A.    I'm not certain, but I think that that's right.

Q.    Would that be in writing, this Participation Agreement, or some other document?

A.    It may not be in writing.

Q.    So this may be an oral arrangement that you had with Mr. Rubin?

A.    Yes.

Q.    Would there be any type of e-mail, letter or anything in writing which describes this relationship?

A.    May or may not, but I'll certainly look for it and provide whatever we have.

Q.    And you state he was entitled to a brokerage fee.  What is it that Mr. Rubin did that would entitle him to a brokerage fee?

A.    He arranged and introduced the transaction.

Q.    When you say "he arranged", tell me what



you mean by that.

A.          Mr. Rubin has a business introducing borrowers and lenders to each other and evaluating transactions.  Say somebody needs a loan, he will evaluate the request and make recommendations for what is an appropriate loan.  And then he will bring it to people who he knows and either simply introduce or in my case I think he does more than introduce, he weighs in on what he thinks of a given transaction.  And this is a relatively full time activity for him.  This is not even a part-time activity for me.  And in case I did not mention the fact that somebody later would say how come you didn't mention it, but Mr. Rubin is my first cousin.

Q.     You did mention it.  Do you know if the Miriam that you referenced has any relationship, be it to yourself or Mr. Rubin?

A.       She does not.

Q.     Do you know the name of Mr. Rubin's wife?

A.       I do.

Q.      And what is it?

A.        Malka, M-a-l-k-a.

Q.     Let's go back to your comments first. Are you aware if Mr. Rubin is licensed in any fashion


MAGNA
LEGAL SERVICES

Page 26

as a broker for transactions of this nature?

A.          I don't know what licenses he does and does not posses.

Q.     When you state when he evaluates the request, this goes back to what we were talking about earlier, somebody may take a look at the credit worthiness of a potential borrower?

A.          Yes.   But in this business that is ancillary to the primary collateral as I mentioned.   These are always secured transactions and, so, the focus is the value of the real estate.

Q.     Correct me if I'm wrong, part of credit worthiness would be evaluating, you know, any of the collateral, right?

A.          I would invert that.   That's above 90 percent of it.

Q.     So when you talk, also, about secured transactions, let's make sure we're talking about the same thing, in connection with real estate, some real estate would be pledged or mortgaged in some fashion in order to secure an underlying debt if the debt is not paid, correct?

A.          Correct, yes.

Q.     Would these be mortgage transactions?

A.          They are almost always mortgage



Page 27

transactions.  We almost never do something that's not a mortgage transaction.  The transaction here is an unusual one for us and not one we'll do again.

Q.    Alright.  Prior to this transaction had you been involved in any other transactions with Mr. Rubin?

A.    Yes.

Q.    How many?

A.    I'm guessing around 15.

Q.    You indicated before that the total of the hard money lending transactions you did were around 15.  Does that mean that all of them that you did were with Mr. Rubin?

A.    No.  I am a trustee of a trust for the benefit of some orphans and some of their money is invested in hard money loan transactions.  Mr. Rubin typically helps me find them.

Q.    You're the trustee for what?

A.    A trust.  Money that belongs to some orphans.

Q.    Is there an organizational name?

A.    It is called the AYYZ Insurance Trust.  I may not have that exactly right, but I'm pretty close.

Q.    And where is this trust located?

A.    In Lakewood, New Jersey.



Page 28

Q.    And you state it's for orphans.  Can you give just a brief explanation of what that entails.

A.    Sure.  Certainly.

Q.    Thank you.

A.    My friend died and he had some life insurance proceeds and I am -- that money was put into a trust and I am one of the trustees of that trust.

Q.    And in connection with the trust, the trust then gets involved as a participant in some of these hard money lending transactions?

A.    I don't think that we've ever done it on a joint basis, I believe that we've only done them individually.  So if the trust makes a loan, the trust makes a loan and vice versa.

Q.    Did Mr. Rubin bring some of these transactions to you as trustee on behalf of the AYYZ Insurance Trust?

A.    Yes.  He was also friends with the deceased.

Q.    You stated that in the course of the transaction that part of Mr. Rubin's responsibilities besides evaluating the transaction, your terms were that he, quote, weighs in, end quote.  What do you mean by that?

A.    Mr. Rubin has a background in evaluating real estate and he will form a view as to the value of


MAGNA
LEGAL SERVICES

collateral which, as we've discussed, is an important part of deciding to transact.

Q.     Now there are different degrees that are given out for commercial real estate evaluators.  For example, you know, MAI which I'm sure you're familiar with.  Are you aware if Mr. Rubin has any such training or degrees?

A.     I believe that he has a real estate brokerage license.

Q.     Okay.  So before when I asked you about licenses and you said you were unsure and you now recall he has a real estate brokers license?

A.     That's different than the license to perform these transactions.  I don't believe that a real estate brokerage license would cover this.  I'm not certain.

I apologize if my answer is not a distinction that I should have made, but I was aware when I answered that he has a broker's license.  I'm not certain exactly the nature of it.  I don't think it's intended to cover.

Q.     So a real estate brokers license, not a mortgage brokers license, you're making that distinction, is that what you're doing?

A.     I think he has a real estate agent license



Page 30

which I think allows you to represent people in the buying and selling of real estate which is not what we -- I have done with him.

Q.    We got off on a little tangent there.  I was asking you about his educational or training background for evaluation of commercial real estate.

A.    Yes.  He does a lot of many, many more transactions than I have participated in.  He spends most of his professional time in what I would broadly call the world of real estate.

Q.    So in this particular transaction where you indicated that he weighed in, part of what he did was to perform some evaluation regarding the value of any real estate which would be collateral?

A.    Yes.

Q.    Okay.  Was any of those evaluations put in writing?

A.    It tends not to be formal so I cannot remember if there is an e-mail that says I think it's worth X.  That might constitute a writing, but there's certainly no formal report.

Q.    Was there ever in this transaction a formal real estate appraisal that was done by a licensed appraiser?

A.    There certainly was not one done in



connection with this transaction, there may have been an older one that had been provided at some point.  I can double-check.  I don't remember.

Q.    Again, that was another document that was requested.  But sitting here today, do you have a recollection one way or another if there was a formal appraisal of this property that was presented to you in the course of this transaction?

A.    I do not think that there was and it certainly was not done in the connection with the transaction itself.

Q.    Did Mr. Rubin give you a valuation for the value of the property that's the subject of this transaction?

A.    I believe he told me that he thinks it's worth not less than three million dollars.

Q.    When you say "it's not worth less than three million" describe what the "it" is?

A.    The fifty percent interest of the Ocean Woodruff condos or whatever they are.

Q.    There were representations that were made in pleadings that there was a value of that interest, that fifty percent interest, in the 12 or 13 units of four million dollars.  Does that refresh your recollection of anything that Mr. Rubin may have told



Page 32

you as opposed to three million?

A.        Values certainly have fluctuated dramatically since the inception of this transaction.

Q.      Am I to draw from that that your comment about -- well, let's backup for a moment as opposed to me doing anything of that nature.

At the time of this transaction when Mr. Rubin gave you a valuation, do you recall what the valuation was that he gave you, was it three million or four million?

A.        As I just testified, my recollection is that he said that it's worth not less than three million dollars.  He does not perform a rigorous, formal analysis.

Q.      You are aware there are various ways upon which real estate can be appraised, correct?

A.        Yes.

Q.      Alright.  Someone can look at the income stream for one, correct?

A.        Yes.

Q.      One can look at market value was another, right?

A.        Yes.

Q.      Do you know which, either those two or other methodologies, that Mr. Rubin utilized in order



Page 33

to make his determination be it three, four million dollars, whatever it was?

A.          I do not know.

Q.          Did you provide this valuation to any of the -- the other investor?

A.          No.

Q.          Was there not any inquiry that was made by him as an investor what's the value of this collateral if I'm theoretically would be a participant in?

A.          I likely would have said something along the lines of it's at a roughly fifty percent LTV.

Q.          Lend to value?

A.          Yes.

Q.          Would that assessment be in writing, an e-mail or any other communication of any nature?

A.          No.  My communications with him are typically telephonic.

Q.          What was the brokerage fee for Mr. Rubin's work?

A.          I believe it was three percent.

Q.          Three percent of what?

A.          Of the overall transaction; 1.5 million.

Q.          And how was that percentage determined to be an appropriate brokerage fee?



Page 34

A.          That's how the transaction was presented to me.

Q.     By Mr. Rubin, correct?

A.          Yes.

Q.     At the time that the transaction was presented to you by Mr. Rubin, did he provide to you an explanation of the nature of the transaction?

A.          I don't understand the question.

Q.     For example, you stated that in your experience doing hard money lending you generally do it with real estate which is secured by a mortgage, right?

A.          Yes.

Q.     So, theoretically, I'm not suggesting it happened, Mr. Rubin comes to you and says I've got somebody in need of money through hard money lending and we're going to do a mortgage transaction, alright. Did he come to you and give you any explanation of the nature of the transaction?  Do you understand what I'm asking now?

A.          I'm sorry, let me try to answer that question.

Q.     When Mr. Rubin came to you, what did he explain to you was going to be this transaction?

A.          He explained that there was -- he was



Page 35

proposing a loan against the equity interest in this transaction.

Q.    And the equity interest being fifty percent of the units in Ocean Woodruff?

A.    Yes.

Q.    And did he explain that to you as well?

A.    I'm not sure I'm understanding.

Q.    Well, did he tell you where the property is, what the percentage is?  I mean what did he tell you about this?

A.    Yes.  He told me that there are these condos, this is what he thinks its worth, the security would be the equity interest.

Q.    Did he tell you anything more specific than that?

A.    I do remember asking who the borrower is and I remember him telling me that Mr. Russack had had a very successful career in the clothing industry and he believed him to be a person of substantial network.

Q.    Did he provide you any documents?

A.    I'm fairly certain that he did not.  I do recall that he sent me a link to a news article that talks about Mr. Russack and made him appear to be successful.

Q.    Successful in the retail world, correct?




Page 36

A.          Yes.

Q.          Other than that link, were you provided some of the financial documents that you talked about, be it tax returns or P&L statements, rent roles, anything which would relate to the real estate?

A.          I don't believe so.

Q.          Were you provided with anything about -- well, let me backup.

Who did you understand owned the real estate?

A.          The entity.

Q.          The entity being Ocean Woodruff?

A.          Yes.

Q.          Were you provided anything regarding Ocean Woodruff such as shareholder agreements, bylaws, operating agreements, anything of that nature similar to the documents that we've talked about before?

A.          I don't think any of those were provided directly to me.

Q.          When you say they weren't provided directly to you, were they provided to somebody else who provided it indirectly to you?

A.          Yes.  We hired a lawyer in connection with this transaction.

Q.          And who did you hire?



Page 37

A.          Noah Burton.   B-u-r-t-o-n.

Q.      When you say "we hired" who is the "we"?

A.          It was arranged by Mr. Rubin actually who has a professional relationship with Mr. Burton, I did not.  And to today, I believe that this is the only time he has ever represented me.  When I say "me" in this instance I mean Jest Holdings.  So he was brought on to represent the interest of Jest Holdings in this transaction.

Q.      Did I understand you to be stating that this transaction is not the first time that Mr. Burton acted as legal counsel for Jest Holdings?

A.          The opposite.  This is the first and I believe the only time that he acted to represent Jest's interest.

Q.      Okay.  Did you have any engagement letter, "you" being Jest Holdings, with Mr. Burton?

A.          I don't remember specifically, but I'm happy to check.

Q.      Again, another one of the documents requested.

You are aware that the Rules of Professional Conduct attorneys are to have engagement letters with their clients?

A.          Yes.



Page 38

Q. Knowing yourself and your own practice, would you require that of attorneys who are doing work for Jest Holdings?

A. I don't have an independent practice.

Q. But your practice as the sole member of Jest Holdings and entered into no less than 15 different hard money lending transactions, did you have attorneys for those matters?

A. Typically, yes.

Q. And typically when you have those, would you have engagement letters with the attorneys that you hire?

A. I personally wouldn't require it, it's their obligation.

Q. Do you recall when Mr. Burton was hired?

A. The date I do not.

Q. Was there ever any other attorney of which you are aware that represented Jest Holdings during the course of this transaction?

A. I don't believe so.

Q. You don't recall if there was an engagement letter? Do you recall receiving any invoices from Mr. Burton?

A. I believe that as is typical in these transactions he was paid by the borrower.



Q.    Now sometimes, and you'll correct me if you have a different view, typical to these transactions at the closing there's payment of attorneys fees that would be on a HUD-1 statement or a settlement statement.  Has that been consistent with your experience?

A.    Generally, yes.

Q.    Was there some type of closing that Mr. Burton got paid at?

A.    I don't know.

Q.    Do you know if he was indeed paid by the borrower?

A.    I do not know.

Q.    Do I understand your testimony, however, you've never seen an invoice for Mr. Burton; is that correct?

A.    I do not believe I've ever seen an invoice from him.

Q.    Do you remember what the arrangement was with Mr. Burton, was he charged a flat fee, an hourly fee?

A.    I don't know and I don't think I ever knew.

Q.    Well, did you have any dealings with Mr. Burton or was that something that was handled by Mr. Rubin?



Page 40

A.          Both.  I also had direct dealings.  It was primarily handled through Mr. Rubin, but I also had direct dealings.

Q.     What was the nature of your direct dealings with Mr. Burton?

A.          I seem to recall asking him to confirm prior to closing the transaction that all is in order.  I certainly was copied on a lot of e-mails, that does not mean that I read them.  But I don't -- any direct interaction would have been very limited, but I'm sure there was some.

Q.     Alright.  Who was, and we're going to go through a number of documents.  Do you know who drafted the transaction documents in this matter?

A.          Not for certain, but I believe it was Mr. Burton.

Q.     Are you aware of any other attorney that was involved for Jest Holdings or for Mr. Russack in the course of this transaction?

A.     Yes.

Q.     Who else?

A.     Mr. Harrison.

Q.     And do you recall when Mr. Harrison got involved?

A.     Mr. Harrison got involved towards the end



Page 41

for purposes of providing an opinion that Mr. Burton did not want to provide because he had, in the past, represented Mr. Russack.

Q.    Hold that thought.  We're going to come back to that topic shortly.

You indicated earlier that the nature of this transaction differed from what you normally do and I believe you said that you would never do it again.  Do you recall saying that?

A.    Yes.

Q.    You're smiling.  What was the nature of this transaction?

A.    I was specifically referring to the nature of the security, having a mortgage versus a pledge that we got here or, in this instance, actually transferring the equity with rights of Mr. Russack to buy it back.  Fundamentally, the substance of it was to know what a lending transaction would have looked like.

Q.    So explain, if you would, please, what you understood the transaction to be when you refer to this pledge and right to buy back, how did you understand this transaction was to work?

A.    Well, there's two parts.  There is the economics of it and then the security of it.  The



Page 42

economics of it was basically a 12 percent interest rate.  Like any other loan, you pay the interest and then you repay the principal and you stop paying interest.  Because we were not getting a mortgage, we had assignment to transfer to Jest which Mr. Russack's right to buy them back in a manner that would mimic the economics that Jest would have obtained had it been actually structured as a loan.

Q.    Whose concept was it to do this transaction in this fashion as opposed to that which you've indicated was your norm of having a mortgage secured?

A.        Mr. Rubin.

Q.    Have you ever been involved in a transaction of this nature before where there was a pledge as opposed to a mortgage?

A.        Has Jest ever undertaken such a transaction?

Q.    Yes.

A.        I don't believe so.

Q.    Prior to this transaction in March of 2020, had you ever had any dealings with Ira Russack?

A.        I do not believe so.

Q.    Other than the description you received from Mr. Rubin, did you know anything else about him in your investigation on the internet?



Page 43

A.          No.

          Q.     Any idea what his educational background was?

A.          No.

          Q.     Any knowledge of what his actual real estate experience was?

A.          No.

          Q.     As of March of 2020 were you familiar with an individual by the name of Sam Sprei?  I think it's S-p-r-e-i.

A.          I don't believe I had known his name.

          Q.     At some point in time did you learn of Mr. Sprei?

A.          Yes.

          Q.     When do you recall learning of Mr. Sprei?

A.          Umm, I don't remember the exact time, but at some point his name had come up and I understood that he was working for Mr. Russack.

          Q.     Okay.  What was the source of information that led you to believe he was working for Mr. Russack?

A.          I believe he was on some e-mails and Mr. Rubin told me that he knew him.

          Q.     I'm sorry, Mr. Rubin --



Page 44

A.          Mr. Rubin said that he knew Mr. Sprei.

Q.      Let me backup and try it again.  Did Mr. Rubin give you any explanation about Mr. Sprei, what his experience was and how he knew him?

A.          He told me that Mr. Russack had been active in real estate after getting out of the clothing business and that he and Mr. Sprei were frequently doing deals together.  It wasn't a clear delineation for me what their relationship was, but they were in business together.

Q.      That Mr. Rubin and Mr. Sprei were in business together or Mr. Sprei and Mr. Russack?

A.          Mr. Sprei and Mr. Russack.

Q.      Did you have any details beyond that they were, quote, in business together?

A.          No.

Q.      Did Mr. Rubin ever tell you of any other transactions in which he acted as a hard money lender or otherwise that involved Mr. Sprei and Mr. Russack?

A.          I do not remember him saying that he had done any other transactions with Mr. Russack and I don't think I asked further questions about his relationship with Mr. Sprei.

Q.      Did you have any direct contact with Mr. Sprei at any time?



Page 45

A.          I don't think so.

Q.    Did you ever learn of Mr. Sprei's background?

A.          I don't think I know it today.

Q.    Did you ever do a Google search of Mr. Sprei?

A.          Subsequent to engaging in this transaction, I have learned a little bit about Mr. Sprei.

Q.    And what did you learn?

A.          It's seems pretty clear that he's a crook.

Q.    What are the details as best you can recollect that brings you to that conclusion?

A.          He seems to be involved in a lot of litigation in which people are accusing him of things that can't be trusted.

Q.    You're being polite.

A.          Only because I don't have the details.

Q.    Okay.  You're aware there's a number of judgements entered against Mr. Sprei for being involved in real estate lending transactions?

A.          No.

Q.    Okay.  You're unaware if there are any judgements against him at all from your research?

A.          I don't remember.

Q.    Were you aware of any accusations of


MAGNA
LEGAL SERVICES

Page 46

criminal fraud against Mr. Sprei?

A.          I don't have a specific recollection, but I've been left with a clear, you know, impression that the guy is a crook.  I haven't looked up his name in a couple of years.  Did I know that at one time?  I may have.

                    (There is a brief recess taken.)

Q.     Okay.  Sir, did you ever meet Mr. Russack?

A.        No.

Q.     Prior to documents which were signed in March of 2020, did you ever talk to Mr. Russack?

A.        No.

Q.     You indicated that this transaction was going to be with a 12 percent interest charge.  Who determined that rate?

A.        That's part of Mr. Rubin presenting the transaction.

Q.     Earlier you stated it was Mr. Rubin who had this entire concept of the pledge.  He also presented the specific terms of the amount and percentage that was to be paid; is that correct?

A.        Yes.

Q.     Okay.  This wasn't a negotiated term, correct?



Page 47

A.          Correct.  Not negotiated with me and anybody.  I can't speak for what Mr. Rubin may or may not have done.  Basically, I provide the money for these deals.  I get a basic idea what's going on at a comfort level and they're primarily run-by Mr. Rubin.  We'll hire counsel to make sure that the transaction documents are done.  But I'm not active in the transactions.

Q.     But when you get other investors such as Mr. Bodner you would explain to him we're going to get a 12 percent return for this period of time on this transaction, correct?

A.          Yes.  There's not an activity of going to get investors.  These are close family.  And the entirety of the discussions are measured in minutes on the phone.

Q.     Alright.  But within those minutes you tell him the terms, correct?

A.          Correct.  I would clearly tell him it's paying 12 percent.

Q.     And those were the terms that were explained to you by Mr. Rubin, right?

A.          Correct.  12 percent I believe was the rate for all of the deals that we've done.

Q.     When you say "all of the deals that



MAGNA
LEGAL SERVICES

Page 48

we've done" you're referring to Jest Holdings?

A.        Correct.

Q.        How did you learn that Mr. Russack had a fifty percent interest in the Ocean Woodruff entity that's involved in this transaction?

A.        I believe it was presented that way.

Q.        Presented by Mr. Rubin?

A.        Yes.

Q.        Okay.  Were you presented, and I may have asked this, I apologize, any of the organizational documents of the Ocean Woodruff?

A.        I may or I may not have been presented with them in the scope of these transactions.  I don't look at the documents.

Q.        Prior to the closing of the transaction, do you have a recollection one way or another if you would have been presented with any organizational documents regarding Woodruff?

A.        Copied on an e-mail.  But presented, I'm not asking to see the documents.

Q.        And you're not reviewing them; is that correct?

A.        Correct.

Q.        You're relying on Mr. Rubin and the attorney that he hires to review them?



Page 49

A.            Yes.  With the emphasis that the attorney has duties to Jest, not to Rubin.

Q.        Do you know if there was any corporate records such as a stock ledger that was ever presented?

A.            I do not know.

Q.        At the time of this transaction before it closed or to whatever degree it was funded, were you ever concerned about the ability of a fifty percent owner of Ocean Woodruff having the capabilities of pledging an interest?

A.            There's always a question about whether somebody who owns an asset has the ability to pledge it and I am certain that I would have asked that question.

Q.        And you would have asked it of whom?

A.            Either Mr. Rubin or Mr. Burton.

Q.        You have no specific recollection of doing so, but given your background, you would have assumed that would have been an inquiry that you would have made?

A.            Yes.

Q.        Would that have been in writing?

A.            Most of the dealings were over the phone so it would be more likely to have been oral.



Page 50

Q.      Do you maintain any type of file for transactions such as this one?

A.      Unfortunately, not with any great discipline.

Q.      Not withstanding that caveat, do you maintain any type of file?

A.      There's a file that has some documents in it, yes.

Q.      Do you know if that file has been produced to counsel in the course of this litigation so that it could be provided pursuant to our request?

A.      I would refer that to Mr. Lang.  I do not know whether or not everything that is in that file has been produced.

Q.      My question was, the first part of it, have you produced the entire file to counsel?

A.      I would have to double-check.  It's been awhile.

Q.      Again, one of the requests for the deposition today.

A.      And I can assure you that there's nothing in there that I'm not happy for you to have and that I don't think you already have.

Q.      It may be.  But we've already identified a couple of things that have not been produced.



Page 51

Typically, what do you keep in your file?

A.        Unfortunately, there isn't a typical keeping of anything.  Generally, the transactions are secured by a mortgage, the mortgage is recorded, the title company has files.  So I don't, with any discipline, maintain anything in particular.

Q.        Would you maintain the loan documents, not just the mortgage, the note, correct?

A.        I don't necessarily file all of these.  I typically keep a hardcopy of a note.  So if I've received a hardcopy of a note with an original signature I would keep that.  But often times we don't even have that in time for closing and we rely on the fact that it is a recorded mortgage.

Q.        In the world of mortgages you're aware the mortgage follows the note, correct?

A.        Okay.

Q.        Right?  You understand that as a concept?

A.        Correct.  I'm not sure I understand the question.

Q.        Well, have you ever been involved in having to foreclose upon a mortgage?

A.        Yes.



Page 52

Q.    And you're aware that in foreclosing upon the mortgage, the mortgage is affiliated with a promissory note, correct?

A.    Typically.

Q.    Right.  And if, for example, you're aware on occasion there are lenders, especially in the mortgage world which will transfer documents, correct, to somebody else and sell them, you're aware of that, right?

A.    Yes.

Q.    And somebody, an assignee wants to go ahead and bring a foreclosure action, they have to have the promissory note to foreclose on the mortgage because the mortgage follows the note.  You understand that concept, correct?

A.    I'm not intimately familiar with the details of that and I assume they're different in every jurisdiction across the country, but I don't profess to have -- I don't litigate and I don't know, you know.  I've never personally foreclosed.

Q.    Well, you indicated you've had some foreclosure experience.  Let me backup.

Whenever you're securing a property with a mortgage, is there not a promissory note in those transactions?



Page 53

A.          I think there are jurisdictions in which you don't need to have it done that way, but if I'm wrong, I'm wrong.

Q.          But what about the manner in which you handle your transactions, do you have promissory notes with those mortgages?

A.          We do, yes.

Q.          Do you also have a loan agreement as well?

A.          I think that varies.  Sometimes yes, sometimes no.

Q.          If there are guarantees you'd have a guarantee agreement?

A.          We'd expect to have a guarantee to present.

Q.          Do you do that within your transactions, give guarantees be it personal or from other entities?

A.          Typically if the borrower, if the title holder of a piece of property is an entity, we would typically get a guarantee from the individual.

Q.          Do you know if there are any personal guarantees in this transaction?

A.          I do not remember if there was a document called a guarantee.  I know you will spend plenty of time on a document called a Confession of Judgment.

Q.          Well, let's go back to my question as



Page 54

opposed to your characterization.

Do you know if there was a personal guarantee in this transaction, yes or no?

A.       I don't remember.  If the borrower is an individual then he doesn't need a guarantee, the individual is the obligor.

Q.       Right.  But we're not talking about situations where we're having an individual borrower, we're talking about where we have an entity that's the borrower.  That's where you stated that if property held by an entity was borrowing money, you make the individuals who own the entity guarantors, right?

A.       Right.

Q.       And I'm asking if you recall one way or the other whether there was a guarantee in this matter, correct me if I'm wrong, you don't recall?

MR. LANG:  Who are you referring to as the guarantee, a second person besides Mr. Russack?

THE WITNESS:  I'll answer the question.

A.       Mr. Russack provided certain agreements which may or may not have been entitled a guarantee, but which would have the same effect.  So it would be fair to refer to Mr. Russack as a guarantor of this



Page 55

transaction.

Q.    I assume you are referring to the Confession of Judgment document when you say that?

A.    Correct.  And any other documents pursuant to which he may have liability.

Q.    Okay.  We will review that.  Prior to the date of deposition, have you reviewed the transactional documents in preparation for today?

A.    Not in preparation for today.

Q.    But you have at some point in time reviewed the documents and you're familiar with them?

A.    I have at some point in time reviewed them, yes.  I have some familiarity with them, yes.

(Membership Sale Agreement is received and marked JT-2 for identification.)

Q.    Sir, I show you what's been marked for identification purposes as deposition exhibit JT number two and it's captioned Membership Sale Agreement.  Are you familiar with this document?

A.    I'm familiar with it.

Q.    Do you recognize this document as part of the transaction that dealt with the pledge that you've referenced in testimony here today?

A.    I recognize this document, yes.

Q.    Okay.  Indeed is that what this document



Page 56

is supposed to -- let me rephrase that.

What do you understand the purpose of this document to be?

A.    As I previously testified, this is one of the documents that represents the transaction which was designed to provide the economics of what a loan at a 12 percent rate would have provided.  The document provides for a sale of fifty percent of the corporation that owns some condos.

Q.    And this document which is dated March 12, 2020 captioned Membership Sale Agreement, this was drafted by Mr. Burton, correct?

A.    I previously testified that I wasn't certain, but I believe so.

Q.    Did you ever review any drafts of the Membership Sale Agreement before March 12, 2020 to give your approval of its content?

A.    I don't remember.

Q.    I'd ask you if you'd be kind enough to look at what has at the bottom a small 17 which appears to have some signatures or a signature line, excuse me.

A.    I'm there.

Q.    Okay.  And above the name Ira Russack there appears to be some scribble and for the purposes


MAGNA
LEGAL SERVICES

of this deposition maybe that's Mr. Russack's signature, but by Jest Holdings it is not signed.  Do you see that?

A.        I do.

Q.       This document was appended to the Complaint that was filed in this matter.  Are you aware of a signed copy of this agreement by Jest Holdings?

A.        I assume that there is a signed copy of this agreement, yes.

Q.       Would that be in the file that you referenced?

A.        I'll be certainly happy to look there.

Q.       Alright.  And if there was a signed copy of the materials that you provided to counsel, he would have been provided one?

A.        Either he was or was not, I don't know.

Q.       Do you know one way or the other if this document was signed because there are a number of unsigned documents.

A.        My expectation is that this was a signed document.

Q.       If you take a look under what's generally referred to as a whereas clause, the first one says:  "Whereas purchaser", which is defined



Page 58

above, "Whereas purchaser previously owned fifty

percent of the outstanding shares in Ocean Woodruff

Development Corp, a New York corporation, (the

"Corporation"), which, pursuant to a Assignment of

Shares, as provided for on the form annexed hereto as

Exhibit "B" ("Assignment of Shares"), dated as of the

even date hereof, Purchaser assigned 100% of his

shares ("Interest") to Seller."

          Did I read that accurately?

A.     I wasn't paying that close attention.

    Q.    The purchaser then is identified as Ira

Russack, correct?

A.    Yes.

           (Assignment of Shares is received

and marked JT-3 for identification.)

    Q.    Sir, I show you what's been marked for

identification purposes for this deposition, exhibit

JT-3.  And it's captioned at the top Exhibit B,

Assignment of Shares.  Do you recognize that?

A.    Yes.

    Q.    And it states at the very beginning of

the first paragraph:  "For valuable consideration, the

receipt and sufficiency of which are hereby

acknowledged."  What valuable consideration was given

in connection with this Assignment of Shares?



Page 59

A.        The agreement to enter into the overall transaction.

Q.     Which agreement are you referring to?

A.        The parties engaged in the transaction.

Q.     Yes, I know.  But are you referring to a written agreement, sir?

A.        No, I'm referring to the willingness to engage in all of the transactions which are represented by the suite of documents.

Q.     And the suite of documents would include the Membership Sale Agreement that we've marked as exhibit number two, correct?

A.     Yes.

Q.     Okay.  Are you aware -- let me ask you this.  As of March 12, 2020 were any funds transferred from Jest Holdings to the benefit of Mr. Russack?

A.        I don't remember the date of the transfer of funds.

Q.     Okay.  Do you have any documents which show what, if any, funds were transferred in connection with this transaction?

A.        There are such documents.  I'd be happy to provide them.

Q.     Again, it's documents that we requested.  What documents would you have that would show the



Page 60

transfer?

MR. LANG: They were provided.

A.        I believe they have been produced.

Q.        What documents do you believe reflect --

A.        The documents --

Q.        Let me just finish the question for the record if you would be so kind.

What documents do you believe show a transfer of funds?

A.        The one's that were produced showing transfer of funds.

Q.        And what are they, sir?

A.        I don't remember exactly what they are.

Q.        Do you have bank records?

A.        What is your question?

Q.        Do you have bank records that show the transfer of funds?

A.        I believe that we do.

Q.        And what bank would that be from?

A.        That would be from Chase bank.

Q.        Would that be an account in the name of Jest or something else?

A.        It would either be an account in the name of Jest or it would be an account in my own name.

Q.        Do you recall which if any of those two



Page 61

accounts at Chase would have records regarding the transfer of funds in this transaction?

A.          One of those two accounts.

Q.      But you don't recall which one?

A.      No.

Q.      Okay.  And the one that would be in your name, just your individual name or jointly with anyone else?

A.          My wife is on the account as well.

Q.      Any other bank records of which you're aware which would show a transfer of funds?

A.      No.

Q.      Do you know to whom funds were transferred?

A.      Yes.

Q.      To whom?

A.      Mr. Burton.

Q.      Do you have a recollection of the date of any transfers?

A.      I do not.

Q.      Why were funds transferred to Mr. Burton who was your attorney, meaning Jest's attorney?

A.      My understanding was that Mr. Burton had previously represented Mr. Russack multiple times and that they had a positive relationship and that Mr.



Page 62

Russack was working directly with Mr. Burton.  As I previously testified, I believe that was the reason Mr. Burton did not provide an opinion here.  As I previously testified, I had never at that time talked to Mr. Russack to the best of my recollection and as I testified I didn't recall a closing statement.  These were all handled by Mr. Burton.

My involvement was on a personal level, very limited and these things were all handled by other people.

Q.     I'm just going to start with your comment about Mr. Burton and his relationship with Mr. Russack.  Not having spoken to Mr. Russack, you certainly didn't get it from him.  Where did you get the information about their relationship?

A.     Mr. Rubin.

Q.     I asked you earlier about you being an attorney.  Are you still licensed to practice?

A.     Yes.

Q.     In which states?

A.     New York and New Jersey.

Q.     Okay.  And do you have to take continuing legal education to maintain your license?

A.     Yes.

Q.     Does that include any aspect of


MAGNA
LEGAL SERVICES

reviewing the Rules of Professional Conduct?

A.          Yes.

Q.      You're familiar with rules 1.7 and 1.9 in the Rules of Professional Conduct which deals with conflict?

A.          I don't have any specific recollection.

Q.      You understand the concept of conflicts of interest as an attorney.  For example, an attorney would not be able to represent both the buyer and seller of a piece of real estate without there being a conflict, correct?

A.          You're asking now multiple different questions.  The answer is, yes, I'm familiar with the concept of conflicts of interest.

Q.      Are you familiar with where there's a conflict of interest, it's asked if one attorney with a concurrent conflict required to give a written waiver before they could ever proceed in the matter?

A.          Yes.

Q.      Are you aware of a written waiver that exists that Mr. Burton could represent Jest Holdings as a lender so-to-speak while Mr. Russack was a borrower?

A.          I have no such recollection.

Q.      Alright.  Did you ever require or



Page 64

inquire of Mr. Burton if he obtained a written waiver

as the Rules of Professional Conduct would dictate?

A.        No.

Q.      Was that ever a concern of yours that

there was no written waiver for Mr. Burton to act as

Jest Holdings counsel if he had previously served as

an attorney for Mr. Russack?

A.        No.

Q.      Did you ever ask Mr. Burton to opine on

his ability to act as counsel for Jest Holdings not

withstanding that he had previously represented Mr.

Russack?

A.        Compound question.

Q.      Which part of it don't you understand?

A.        I understand it, I can only answer it in

part.

Q.      Go ahead.

A.        I confirmed with Mr. Burton that he would be

representing Jest Holdings.  Period.  Full stop.

Q.      So do I understand you never asked Mr.

Burton if he received a waiver from Mr. Russack,

correct?

A.        I believe that is correct.

Q.      Let's go back to exhibit number three

which is the Assignment of Shares.  Where I left off



Page 65

states that "Ira Russack ("Assignor") does hereby assign, transfer and convey to Jest Holdings LLC ("Asignee") 100% of ("Assignor") shares in and to Ocean Woodruff Development Corp."  Do you see that?

A.          I do.

Q.          Okay.  If you go down then to the second paragraph you'll see there are certain representations that Mr. Russack is making.

A.          Yes.

Q.          Do you see that?  And number iii it states:  "The shares being assigned, transferred and conveyed pursuant to this Assignment of Shares is 100% of all membership interest in the company."  Do you see that?

A.          I do.

Q.          Okay.  Did you understand that to be accurate?

A.          At what point in time?

Q.          At the time of the assignment of the shares, this document indicates that 100% of the company is being assigned?

A.          I don't know that I ever read the document at that time.

Q.          Did you ever read the document prior to closing?



Page 66

A.          Not that I recall.

Q.          Were you relying on somebody else to make sure that the documents were accurate?

A.          Yes.

Q.          And that would be Mr. Burton?

A.          Yes.

Q.          And Mr. Rubin?

A.          No, Mr. Burton.

Q.          You were relying on Mr. Burton because he was the attorney that you hired for Jest Holdings, correct?

A.          Yes.

Q.          At some subsequent time did you ever read this Assignment and note that it states that the Assignment is for 100% of all of the membership interest in the company, meaning a 100% of the company.  Did you ever note that?

A.          No.

Q.          First time you see that it's got that inconsistency?

A.          Yes.

                    MR. LANG:  Me, too.

Q.          If you go to the second page of this Assignment you'll see signature lines again.

A.          Yes.



Page 67

Q.    Alright.  And, again, it appears that there's a signature for Mr. Russack, correct?

A.    Yes.

Q.    And there appears or, excuse me, there's a place for Jest Holdings to sign.  But, once again, it's not signed by Jest Holdings.

A.    Yes.

Q.    Do you know why that is?

A.    Do I know --

Q.    Does Jest Holdings not sign these documents as a matter of course?

A.    As a matter of course it does sign these documents.

Q.    Do you know one way or another if there's a signed copy of this document?

A.    I believe there is a signed copy of this document.

Q.    Okay.  You'll note that this document appears to be notarized by Noah Burton on March 12th, right?

A.    Yes.

Q.    Earlier you stated there was no formal closing, correct?

A.    That I participated in, correct.

Q.    Okay.  Do you know if there was a formal



Page 68

closing in which you were not a participant?

A.          I do not know.

Q.      Let's go back, if we can, to the Assignment of Shares.  I drew your attention to paragraph number three, let me draw your attention to paragraph number one.  It's a little i.  It states: "Assignor has not and shall not", meaning in the future, "Assignor has not and shall not pledge, assign, convey or transfer any portion of its shares to any other person or entity."  Do you see that?

A.          I do.

Q.      Okay.  Did you understand that this document, this Assignment of Shares, was supposed to transfer 100% percent of whatever Mr. Russack had at the time of the execution of the Assignment?  Did you understand that?

A.          I previously testified that I may or may not have ever seen this document prior to the transaction.

Q.      But that's what you understood was supposed to take place, correct?

A.          Yes.

Q.      Okay.  And this document indicates that you won't do some Assignment in the future.  He's making the Assignment at the time of the closing of March 12, 2020.  Why would there be any representation



Page 69

about not making any future pledges or assignments, you wouldn't have anything to assign?

A.         That is correct.

Q.     Is it fair to say that that inconsistency in this language is not something that you realized until sitting her today?

MR. LANG:  I object to your question.  It characterizes the inconsistency.

Q.     You can respond.

A.         I'm sorry, ask your question again or have the Reporter read it back, please.

Q.     Is this the first time that you see that this document has an inconsistency and that is stating that somebody's not going to assign or pledge something that he's already assigned and pledged?

A.         Within the last half hour, yes.

Q.     Okay.  Paragraph there's a little four, iv, states:  "That he", meaning the Assignor, "has the requisite power and authority to enter into and perform his respective obligations under this Assignment of Shares such that this Assignment of Shares constitutes a legal, valid and binding obligation of Assignor enforceable in accordance with its terms, subject to general principles of equity."  Did I read that accurately?



MAGNA
LEGAL SERVICES

Page 70

A.          I believe so.

Q.          Okay.  As of March 12, 2020, did you have in your possession any of the organizational documents of Ocean Woodruff?

A.          I don't know.

Q.          To the extent that any of those documents existed and one had to determine whether the requisite power and authority existed for the transfer or pledge of shares, you would have relied upon counsel, Mr. Burton?

A.          I'm not sure I followed the whole question, but certainly followed at the end.  I was relying on Mr. Burton exclusively to tell me that Mr. Russack had the unfettered right to engage in the transaction that you and I have been talking about, including the transfers of shares.

                    (Letter from Ira Russack to Henry Weinstein dated October 16, 1985 is received and marked JT-4 for identification.)

Q.          Sir, I'll show you what's been marked for identification purposes for this deposition JT number four.  It appears to be a letter dated October 16, 1985 from Mr. Russack to Mr. Weinstein in connection with Ocean Woodruff Development Corporation.  Have you ever seen this document before



Page 71

today?

A.          I have.

        Q.      In what context?

A.          In the context of this litigation.

        Q.      Was there any specific aspect of this agreement that you looked at or reviewed in connection with this litigation?

A.          I'm not sure I understand the question. It's a two-page document.  I read it in connection with this litigation.

        Q.      Was there any issue that you were concerned about when you were reading this document?

A.          I don't recall a concern with this document.

        Q.      Are you aware in the course of this litigation the question has arisen as to whether Mr. Russack had the authority to transfer or assign any interest that he had in Ocean Woodruff?

A.          Yes.

        Q.      Okay.  Did you review this document in order for yourself to make some type of analysis or judgment regarding his ability to transfer that interest?

A.          Yes.

        Q.      And did you come to any type of conclusion?



Page 72

A.          Umm, I don't have a particular conclusion one way --

Q.     One way or the other -- I'm sorry.  I didn't interrupt you.  My apologies.

A.          I don't have a particular conclusion one way or another other than - and I don't remember if it is this piece of paper or a different document.  And I later learned that this was called out in an opinion provided in the transactions that I inappropriately did not read which called that into question as to whether or not Russack had the right to transfer.

MR. BERNHEIM:  Would you kindly read that back, please.

(The pending question is read back by the Reporter as follows: "I don't have a particular conclusion one way or another other than - and I don't remember if it is this piece of paper or a different document.  And I later learned that this was called out in an opinion provided in the transactions that I inappropriately did not read which called that into question as to whether or not Russack had the right to transfer.")

Q.     Take a look if you would be so kind at paragraph seven of this document.  That paragraph states: "This agreement may not be changed orally, may



Page 73

not be assigned and shall be construed in accordance with the laws of the State of New York."  Did I read that accurately for the record?

A.          Yes.  I missed that in my review a few minutes ago.

Q.      Did that paragraph or sentence give you any concern as to the ability of Mr. Russack to transfer any interest that he may have in Ocean Woodruff?

A.          I can assure you that I was not aware of this prior to closing of this transaction.

Q.      Okay.  You individually?

A.          Me individually.

Q.      But you understood that this document had been provided prior to the closing to Mr. Rubin and/or Mr. Burton, correct?

A.          Absolutely no clue.

Q.      One way or the other?

A.          Correct.

Q.      Did you ever inquire of Mr. Rubin or Mr. Burton if they had this document prior to closing?

A.          I did not.

Q.      Would you expect that your attorney, Mr. Burton, would seek to obtain whatever organizational documents existed in connection with Ocean Woodruff



prior to closing?

A.          Absolutely.

Q.          Have you informed Mr. Burton of any potential claim that Jest Holdings may be making against him in connection with this transaction?

A.          Umm, I may not have told him directly, but I certainly delivered that message, yes.

Q.          You're going to have to explain that to me when you say you may not have told him directly, but you delivered the message.  How did you deliver the message?

A.          I certainly -- I have very limited interaction and I have always had very limited interaction with Mr. Burton.  As I previously testified, I made sure that on my own that he had accepted representation of Jest in connection with this transaction and then almost all of the communications then would have been handled by and through Mr. Rubin.  I don't need to be involved in the details, I simply need to know that I am providing funds and getting the agreed security and that's it.

So my communications have since went sour, also, primarily being through Mr. Rubin.  And as Mr. Rubin was the one who introduced Mr. Burton to this transaction, I made it very clear that I'll have



Page 75

a claim against Mr. Burton.

Q. You made that very clear to Mr. Rubin?

A. Yes. With the instructions to pass that on.

Q. Are you aware if Mr. Rubin followed your instructions and passed onto Mr. Burton that you'd be asserting a claim?

A. I didn't say I would assert a claim, but I had a claim. If Mr. Russack makes good on his deal then we move on. If Mr. Russack does not make good, and part of the reason for that is Mr. Burton's lack of perfect representation of Jest's interests, than you can be certain under those circumstances I will assert a claim.

Q. And my question to you is do you know if Mr. Rubin, in fact, conveyed that to Mr. Burton?

A. Mr. Rubin has told me that he did.

Q. Okay.

A. I also believe that Mr. Lang communicated that to Mr. Burton, but you didn't ask me that directly.

Q. Let's go back to the Membership Sale Agreement if you would, please. Exhibit number two.

A. I'm there.

Q. In paragraph number three it's captioned Purchase Price. And it states: "The purchase price



Page 76

for the interest shall be one million five hundred thousand dollars payable as follows: (i) $45,000 payable on the date hereof by check subject collection.  (ii) One million five hundred thousand payable at closing by bank, cashier or good certified check drawn on a New York Clearing House or wire transfer and issued to seller and/or other person or entities as seller may direct."  For the record, did I read that accurately?

A.        I believe so.

Q.        Okay.  How was the purchase price of $1,500,000 determined?

A.        That reflected the principal amount of the transaction.

Q.        Alright.  And when you say it reflected the principal amount of the transaction, are you representing that at some point in time -- let me rephrase that.

Are you representing that 1.5 million dollars was transferred to Mr. Burton on behalf of Mr. Russack?

A.        No.

Q.        Okay.  Then can you please explain the 1.5 million dollars.

A.        Yes.  The agreed to transaction was for 1.5,



Page 77

but there is often a concept of net funding.  So, for example, there may have been expenses that may have been paid, other amounts that were owed and those may have been paid by or on behalf of Jest or Mr. Russack as appropriate.  So the fact that the transaction is for 1.5 does not mean that Mr. Russack received 1.5 million into his account on the day of closing.

Q.    Is there any document which describes those terms as you just referenced?

A.    My assumption is that Mr. Burton as the one who handled the closing has documentation that can explain all fee amounts.

Q.    Well, we're here today for your deposition as the corporate designee of Jest Holdings. We've gone through a number of items that were requested that were not brought, including any type of accounting.  I'm trying to find out now the terms of this deal and we don't have your file either.  Is there any document that Jest Holdings has that that describes the terms as you just outlined them in writing?

A.    I would not expect there to be a document in my file that shows all of the fees, costs and expenses at the closing.

Q.    Well, let's go with my question first,



Page 78

please.  Any document that exists that spells out the terms as you've just described them; but you're not getting 1.5, there's a deduction for expenses, something that states that.

A.        I don't know.

Q.        Well, you do know, do you not, there's no promissory note in this transaction, correct?

A.        I believe that's right.

Q.        There's no loan agreement in this transaction, correct?

A.        I believe that's right.

Q.        In fact, there is no document which spells out terms as you've just described them, is there?

A.        I don't know that that is correct.

Q.        It's certainly not here today and it hasn't been produced in this litigation, has it?

A.        I don't know that it has not been produced in this litigation.  I do know that it has not been brought to you today.

MR. BERNHEIM:  Mr. Lang, do you have such a document?

MR. LANGE:  I'm looking for it now, but I do have some of the other documents that you asked for in my computer.



Q.    Can you tell me, sir, of any document which obligates Jest Holdings to provide to Mr. Russack 1.5 million dollars be it less expenses or as net funding as you put it?

A.    I don't know.

Q.    In paragraph three there's reference to $45,000 being payable on the date hereof being March 12, 2020.  What was the $45,000 for?

A.    I'm not certain, but I think that was three months worth of interest paid upfront.  Interest being the substitute for the economics, but, obviously, not the actual interest.

Q.    Are you aware of any document which describes the $45,000 as an interest payment?

A.    I don't remember.

Q.    Are you aware of any documents which sets forth that there will be an interest charge of 12 percent as you indicated earlier?

A.    As I indicated earlier, the substance of the financial transaction was to mirror the terms that I described.  The document affected that to other means.

So to respond better to your prior question and to respond to this one, I don't think anything was ever described as a, quote unquote, interest payment.



Page 80

Q.    So if I understand your response, you'll correct me if I'm wrong, there's no document which states that Mr. Russack will be paid 12 percent interest on 1.5 million dollars?

A.    I believe that is correct.

Q.    Earlier you referenced that there was no closing statement.  Do you recall saying that?

A.    No, I don't know that I said that.  I said that I don't know if there is or there is not one.  If Burton had one, wonderful.  I think that you asked me if I was involved in the closing statement or if I remembered one and the answer to that is no.

Q.    Well, the transcript will bear us out.  You volunteered that in the course of an answer that there was no closing statement.  Be that as it may, are you aware sitting here today of a closing statement?

A.    I don't think so.

Q.    When you say you don't think so, you don't think one exists?

A.    No, that's not what I mean.  What I mean is that this is nearly five years ago and I don't remember every piece of paper in the transaction, certainly not one that I can tell you I would not have focused on.


MAGNA
LEGAL SERVICES

Page 81

My understanding at the time, which is consistent with my understanding throughout the time, is that we were providing 1.5 million dollar economics of a loan in the form of a transaction as we've discussed today.

Q.    Let's go back to my question if you would be so kind.  Are you aware of the existence of a closing statement, yes or no?

A.        No idea.

Q.    So the record's clear, when you're referring to a closing statement, this would be a document similar to a HUD-1 type statement that spells out the transaction, the amount of the loan, any of the expenses that are being charged against it, correct?

A.        In this form of transaction I would expect it would look nothing like a HUD-1.  I have been allowing up to borrowers which would explain where money is allocated; how you get to an agreed value of a transaction of 1.5 million dollars.

Q.    If my use of the analogy of a HUD-1 wasn't appropriate, my apologies, but I think we are saying the same thing.

A closing statement would show the amount of the principal of the loan, any expenses as



Page 82

you put it that you were deducting for net funding at the time of closing and show what actual cash is being transferred, correct?

A.        I don't mean the word closing statement to denote a particular form of document, I would expect that the people arranging and managing the transaction have documentations which account for the terms of the transaction and the use of funds and the transfer of funds.

Q.    Well, leaving aside that closing statement which is your term, not mine, you would agree with me that somewhere you would expect to exist an accounting showing what expenses were being charged against, as you referred, to this loan, correct?

A.        Yes.

Q.        And we don't have that here today, do we?

A.        Correct.

Q.        Is that something that you would need when you are preparing your tax return since you don't have a separate return for Jest Holdings for your personal return?

A.        No.

Q.        Why not?

A.        Just not needed.



Page 83

Q.    It's your understanding -- well, let me ask you this.

When you filed your personal return, how is it that the operation of Jest Holdings is reflected upon it?

A.    As required by IRS code.

Q.    Do you know what that means when you say "as required", what's required?

A.    Income and expenses.

Q.    So the expense part, would that not include the expenses that you were setting off against this loan to get to your net funding?

A.    I believe that those are all Mr. Russack's expenses.

Q.    Are you aware then of any document that would have been provided to Mr. Russack identifying these expenses?

A.    We previously discussed a few minutes ago that I would expect that there are documents that describe all of it and those documents would have all that information that Russack would need.

Q.    You would expect sitting here today, A, you don't have them and, B, you can't tell me where they are, correct?

A.    I would expect them to be had by others, not



MAGNA
LEGAL SERVICES

Page 84

by me.

Q.    And "others" meaning whom?

A.    Mr. Burton and maybe Mr. Rubin.  And I would have expected Mr. Russack to be a party to them and have those himself.

Q.    But sitting here today as the corporate designee for Jest Holdings you can't tell us with any degree of certainty that such documents were ever provided to Mr. Russack?

A.    By whom?

Q.    By anybody.

A.    Curious George?

Q.    Come on.  You just indicated that it would either be Mr. Rubin or Mr. Burton.  So my question is sitting here today as the corporate designee of Jest Holdings you can't say with certainty that any such documents were provided to Mr. Russack, can you?

A.    I certainly cannot say that.

Q.    Okay.

A.    I would also point out that Mr. Russack should have been asking for them or people representing him should have been asking for them as part of the closing.

Q.    Alright.



Page 85

A.          And prior to him delivering any documents with his signature on it.

Q.       Take a look, if you would please, at the Membership Agreement at paragraph number four.

A.          Membership Sale Agreement?

Q.       Yes.  Thank you.

A.          I'm there.

Q.       It's captioned Lack of Financing Contingency.  It says:  "This agreement is not made subject to or contingent upon the Purchaser obtaining any financing whatsoever.  Purchaser warrants and represents that it has the funds necessary to close hereunder."  Did I read that accurately?

A.       Yes.

Q.       Okay.  Now the purchaser, being Mr. Russack, is representing that he has the funds, the 1.5 million dollars as of March 13, 2020 to do the closing.  Is that how that's intended to read?

A.          I didn't draft it.

Q.       Alright.  There may be other real estate transactions in which you've been involved that there's an agreement of sale and the agreement states it's not contingent on mortgage or other financing, correct?  You've been involved in that?

A.       Yes.



Page 86

Q.    And at the time of signing the agreement the purchaser says I have the money, you can count on that, I don't need to go elsewhere to get it, correct? You're familiar with that type of language?

A.    Yes.

Q.    Okay.  Alright.  This seems to be that type of language indicating that as of March 12th, the date of the Membership Sale Agreement, Mr. Russack already has the 1.5 million dollars that he's theoretically borrowing.  Does that make any sense to you?

A.    I don't agree with your characterization of what the words mean.  Having the funds and choosing where to allocate your funds or how you access your funds is not the same thing as saying I've put the money in an account for this transaction.  It means that within his, in this instance, empire, or what was believed to be an empire, the funds are there.  So, yes, it can make sense exactly as written.

Q.    And this transaction, as you've described before, was to be a short-term transaction, correct?

A.    Depending on your definition of "short-term".

Q.    Well, if you take a look at paragraph



MAGNA
LEGAL SERVICES

Page 87

number five it refers to a closing taking place three months later, on June 13, 2020.

A.          Yes.

Q.          Short-term is three months, right?

A.          Yes.

Q.          So a short-term transaction?

A.          I believe the initial intention was for it to be somewhere between three months and 12 months.

Q.          Okay.  Well, the $45,000 that you discussed earlier was to be three months of interest, right?

A.          Meaning it was going to be a minimal of three months.

Q.          And closing was to be on, according to this, on June 12, 2020 noting time is of the essence, correct?

A.          Yes.

MR. LANG:  Just for the record, it says June 13th.

MR. BERNHEIM:  I'm sorry if I said a different date.

Q.          And then paragraph four indicates that Mr. Russack warranting and representing that he has the funds necessary to close on June 13th as of March 12th, right?



Page 88

A.          Right.

Q.          Are you familiar with the term liquidated?

A.          Yes.

Q.          What's your understanding of what that means?

A.          An agreed amount of damages amongst parties.

Q.          Was there an agreed amount of damages in this matter, liquidated damages?

A.          I don't remember.

Q.          If it existed would it be in some document?

A.          Yes.

Q.          And of the documents that you've reviewed since the commencement of this litigation, do you recall liquidated damages being set forth in any form?

A.          It's been a long time, I don't remember one way or another.

Q.          But, nevertheless, sitting here today as the corporate designee, you don't recall any such document that has a liquidated damage provision, correct?

A.          I don't know.

Q.          Okay.  And not to be argumentative with



Page 89

you, the reason under Rule 30(b)(6) you designate somebody as a corporate designee, they're required to do the homework before they come to testify; meaning at trial, ah, look, now I know.  You're aware of that, are you not?

A.          Okay.

Q.      Not "okay".  You are aware that that's how the rules work, aren't you?

A.          I'm not current.

Q.      You're not current?

A.          I am not current with, umm, you were pretty specific not just about the words of the rule, which I don't recall specifically, but the idea that somebody is going to produce something or a piece of information at trial that they were avoiding giving here I believe is how you're presenting the rule.  I don't remember one way or the other.  I'm a transaction lawyer and that's fine.

Q.      The idea of listing the topics and the reason I ask you if you're able to testify about them is because you would be prepared to do so.  These answers, maybe this, maybe that, are opening the door that we're going to find something at another point in time.

A.          Okay.  Well, you have failed as to the point



Page 90

of being argumentative.  I've participated in approximately, I don't know, more than a few depositions.

Q.    Okay.

A.        And the one's I've seen they talk about appearing.  Whether or not the documents does or doesn't exist that has certain provisions, no matter how much I boned up to be here today, I would never tell you I know whether the documents are or aren't there at any level of detail.  This is a matter that's been going on for five years.  There's nobody you can -- if I later found a document that had been agreed upon or signed by the parties, it will be used at trial.

So whatever your question was about, whatever rule you're citing, the documents that the parties have agreed to, have signed, have produced, have shared, have exchanged, they're all part of the trial.

Q.    And that's the universe of documents, correct?

A.        What is the "universe of documents"?

Q.    The one's that have been produced, right?

A.        I did not say that.



MAGNA
LEGAL SERVICES

Page 91

MR. LANG: Object. He didn't say that.

Q.    Take a look if you would, please, at it's page 13 at the bottom. It's paragraph five.

A.    I'm sorry, give me that again?

Q.    In paragraph five of the Membership Sale Agreement on page 13, paragraph five, it spills over to that next page.

A.    Okay.

Q.    Five lines up it reads: "Failure by purchaser to pay any such extension fee on or before the expiration of each extension period or failure to pay the purchase price when due, shall be deemed an automatic termination of purchaser's right under this agreement and seller may cancel this agreement and apply all monies deposited hereunder towards payment of liquidated damages." Do you see that sentence?

A.    I see the sentence.

Q.    Alright. Do you know what liquidated damages are being referenced in that sentence?

A.    I think that it speaks for itself.

MR. LANG: We haven't determined whether he ever read this whole thing and read that clause at the time.

A.    It says all monies hereunder can be used



Page 92

towards payment.

Q.    Of liquidated damages.  What liquidated damages, sir?

A.    That would mean that the contract from Mr. Russack to buy back his shares would be terminated and he wouldn't be getting back any monies that he may have paid.

Q.    Again, I'm going to ask you are you aware of any document which defines liquidated damages as you're just defining it here and now?

A.    I believe that's not a question that you've asked before.  So is your question you're asking me about the definition of liquidated damages?

Q.    I'm asking you if you are aware of any document which defines what the liquidated damages would be in this transaction as you've just described it?

A.    I don't recall one way or another.

Q.    Let me ask you.  If you would look at paragraph 17 which is found on page 15 of the document.

A.    I'm there.

Q.    Paragraph 17 it has several subparts, but it's captioned Miscellaneous.

A.    I'm sorry, I was on page 17.  What page are



Page 93

you on, I apologize.

Q.    Page 15.  That's quite alright.

A.    Go ahead.

Q.    Okay.  Are you there now?

A.    I'm there.

Q.    Okay.  Subparagraph C states:  "It is specifically understood and agreed by and between the parties that the within Agreement is the result of extensive negotiations between the parties."  That's the first sentence, do you see that?

A.    I do.

Q.    Are you aware of any negotiations, let alone extensive negotiations, that took place regarding the terms of this transaction?

A.    Yes.

Q.    What are you aware of?

A.    I am under the clear understanding that Mr. Rubin and Mr. Burton each had extensive discussions with Mr. Russack.

Q.    And you got that information from whom?

A.    It's my understanding from five years ago.

Q.    Okay.  Not the time period, I'm asking the individual who indicated to you or how you learned that Mr. Rubin and Mr. Burton had discussions with Mr. Russack.



Page 94

A.        I believe you asked me if that was my understanding and my answer is, yes, that is my understanding.

Q.        And now I'm asking you the source of your understanding, sir.  Did anybody tell you something?

A.        It was just my understanding.

Q.        Alright.  Have you seen any iterations or other drafts of any of these documents that were exchanged back and forth between the parties?

A.        Umm, there were some e-mails.

Q.        E-mails regarding terms of the transaction and negotiating those terms?

A.        I don't specifically recall the e-mails, but I can tell you that they were enough to support my understanding as described.

Q.        Alright.  Are you aware of any terms in this entire transaction that were requested by Mr. Russack?

A.        Yes.

Q.        What are those terms, sir?

A.        His desire to only sign a Confession of Judgment for $750,000 as opposed to 1.5 million dollars.

Q.        Let's hold back until we get to the



Page 95

Confession of Judgment.

Are you aware of any attorney, other than Mr. Harrison, whoever acted on behalf of Mr. Russack during this transaction?

A.        I don't know whether Mr. Burton was acting jointly to any extent, but I don't remember whether or not Mr. Russack had separate counsel.

Q.    You'd agree with me that Mr. Burton certainly couldn't have extensive negotiations on behalf of both borrower and lender?

A.        Yes.

Q.      In reference to the Confession of Judgment you said something about in your other transactions with Jest Holdings that you became familiar with?

A.        This may have been the only time that we did that.

Q.      What else, did you ever utilize the Confession of Judgment?

A.        Ever, yes.  I think so.

Q.      Okay.  You, yourself, are familiar with the concept of what a Confession of Judgment is?

A.        Reasonable familiarity.

Q.      Are you aware of any of the challenges through the years about Confessions of Judgement



Page 96

working its way up to the U.S. Supreme Court?

A.          Not specifically.

Q.          Alright.  Do you have any knowledge then if it's not specific, about the U.S. Supreme Court decisions that state for Confessions of Judgment based to be knowing, intelligent, voluntary with valuable consideration, were you ever aware of that?

A.          No.

Q.          Do you know what a Confession of Judgment clause is?

A.          I don't think so.

Q.          Okay.  Have you ever seen a promissory note, a guarantee or a loan agreement, a provision which describes what a Confession of Judgment is and that that's part of the transaction?

A.          I don't remember, although, I'm sure I did.

Q.          Alright.  Do you know one way or the other if that is a requirement in New York?

A.          I do not.

Q.          Alright.  Do you yourself know what the requirements are in order to have an enforceable Confession of Judgment in New York?

A.          I do not.

Q.          Would you have relied on Mr. Burton in this transaction for that?



Page 97

A.        Yes.

                    (Affidavit of Confession of Judgement is received and marked JT-5 for identification.)

Q.      Sir, I show you what's been marked for identification purposes for this deposition, JT number five.  And it has a caption of Jest Holdings against Ira Russack and indicates that it's an Affidavit of Confession of Judgment.  Are you familiar with this?

A.        Umm, I'm not sure if I've ever seen it before.  But it's one page, I certainly see it now.

Q.      You'll note that it appears to have a signature, again, of Ira Russack and there appears to be a notary stamp on March 12, 2020.  Do you see that?

A.      I do.

Q.      Alright.  The name of the notary is not Noah Burton as was on earlier documents we looked at, but someone, I don't want to mispronounce it, J-a-a-k-o-v Winkler.

A.      I see that.

Q.      Do you know who Mr. Winkler is?

A.      I do not.

Q.      Do you have any knowledge as to why some documents on March 12, 2020 was notarized by Mr. Winkler as opposed to others by Mr. Burton?



Page 98

A.          I have no idea.

Q.          Now you made reference to the fact that this document refers to a Confession of Judgment in the amount of $750,000.  Tell me why is it that amount?  You indicated that you knew something about it.

A.          Yes.  I understood that Mr. Russack was not willing to provide a Confession of Judgment in the full amount of the transaction which was 1.5 million.

Q.          And this information came from whom?

A.          Umm, I believe it came from Mr. Rubin.

Q.          And do you recall when that occurred?

A.          In the period leading up to the closing of the transaction.

Q.          So it would have been prior to the closing, not subsequent to?

A.          Prior to the closing.

Q.          Did you then have to approve that?

A.          Approve the concept or the document?

Q.          Well, let's first deal with the concept.

A.          Yes, I would have had to approve the concept.

Q.          Can you explain if this transaction involved a pledge of Mr. Russack's interest in Ocean Woodruff for property that was valued between three or



four million dollars why there is a Confession of a Judgment for $750,000 or why there's a Confession of Judgment at all?

A.    I don't know that there was actually a pledge in this transaction.

Q.    When we looked at the Membership Sale Agreement we then also looked at the other exhibit being the Assignment of Shares.  Did you not understand that the shares of Mr. Russack would be assigned to Jest Holdings as of March 12, 2020?

A.    They were being assigned.

Q.    Yes.  Okay.  If those shares were assigned why then was there also a Confession of Judgment?

A.    So you're retracting your prior question and asking a new question.

Q.    Let's just take what's on the record right here and now as opposed to retracting so we don't get back to that argument aspect.  Can you explain it?

A.    So long as we are clear that we don't have an agreement on the use of the word "pledge".

Q.    Correct.  An assignment, you're correct.

A.    Now your question is why is there a Confession of Judgment for $750,000?


MAGNA
LEGAL SERVICES

Page 100

Q.    Right.  Where there has been an assignment for shares --

A.    Mm-hmm.

Q.    -- in property that's been valued, you know, at least at three million dollars?

A.    Mm-hmm.  Umm, I'd like to take this in part. I'm not sure what the value of the shares has to do with the amount of a Confession of Judgment.

There is two layers.  One is whether the document themselves have a relationship, that's one. Two is the amount.  So if you can help me with working through the question, I would love to help you with the answer.

Q.    Explain, if you would be so kind, why is there a Confession of Judgment in this transaction?

A.    The answer for that is that people do not like to have Confessions of Judgments against them. This was signed, but not filed.  It was clear to the parties, was my understanding, that if there were to become a hiccup in the transaction, that Mr. Russak would not want the Confession of Judgment filed against him and that would help incentivize him to comply with the transaction documents and the overall deal.

Q.    Did you understand that if in this



MAGNA
LEGAL SERVICES

Page 101

transaction in your view Mr. Russack breached the transaction, whatever it is, that you no longer had to adhere to the terms of the Membership Sales Agreement and sell back his interest and you could also confess judgment for $750,000 against Mr. Russack?

A.        But not to double count.  Meaning if you got clear possession of the shares without any challenge, I would not have understood it that under those circumstances it would be appropriate to attempt to collect also on the Confession of Judgment.

Q.    Are you aware of any document which states that?

A.        I'm am neither aware or not aware.  I don't know.

Q.    If you look on this Confession of Judgement --

A.        Although, I do believe that, I mean I'm thinking as we go here.  Had the shares been worth less than 1.5 and there had been a breach, I would like to leave the door open for somebody to come up with a creative way to allow movement against the Confession of Judgement.  I don't want to lose the right.  I haven't thought it all the way through.

Q.    I'll ask the question again.  Are you aware of any document which states that as well, that



Page 102

you could cancel the purchase Membership Sale Agreement and Confession of Judgement, that you have that option?

A.         The transaction documents speak for themselves and I believe they all have been previously provided.

Q.     I'm asking you here today whether you can identify any document that states that specifically.  Either you can or you cannot.

A.         I don't know.

Q.     Staying with the Confession of Judgement, exhibit five, above Mr. Russack's name it says:  "Nonpayment of $1,500,000 debt evidenced by a Promissory Note (copy of which is attached hereto).  Do you see that?

A.         I do.

Q.     Earlier you confirmed there is no promissory note, right?

A.         I don't know that I confirmed that, I do recall that you said that.  There either is a note or there is not a note.  If there is one, we have, I believe, previously produced the transaction documents.  There either is one or there is not one.

Q.     Again, we'll let the transcript speak for itself regarding your prior testimony on a note.



Page 103

But sitting here today, I'm going to represent to you that none has been provided in this transaction and I'm going to ask you whether you know one way or the other if there is a note; either you do or you do not.

A.          I do not.

(There is a luncheon recess taken.)

Q.          Before we took a quick lunch break, we'd been talking about the Confession of Judgement and its amount for $750,000 that you indicated that prior to the March 12th closing you had approved that amount.

I'd like to show you an e-mail that's dated March 22, 2020 about that Confession of Judgement and the amount.  And once it's marked for identification purposes, maybe you can shed some light about this.

(E-mail dated March 22, 2020 is received and marked JT-6 for identification.)

Q.          Sir, I show you what's been marked for identification purposes for this deposition it's deposition JT number six and it's an e-mail exchange between yourself and Mr. Rubin and Mr. Burton is copied and I'll give you time to take a look at that.

A.          Okay.



Page 104

Q.    Looking at the first page e-mail of March 22, 2020 at 9:07 p.m. you write to Mr. Burton, you said, "Why is Confession of Judgment for $750,000", do you see that?

A.    I do see that.

Q.    That's about ten days after the closing. Does that, by chance, refresh your recollection that it wasn't until after the closing that you became aware of the amount?

A.    That's what this looks like.

Q.    But looking at it, does that refresh your recollection or you're uncertain?

A.    I'm uncertain.

Q.    The response it appears to be from Mr. Rubin after that it says:  "Because you have to give some credit for r the shares acquired."  Do you have an understanding of what that means?

A.    I can tell you what I think it means.

Q.    Go ahead.

A.    I think it means that there is going to be some value assigned to the fact that shares had been transferred and the expectation that Jest would receive some value for that.

Q.    Well, as of March 22nd did you not understand that all of Mr. Russack's interest in the



Page 105

shares of Ocean Woodruff had been assigned to Jest Holdings?

A.        Yes.

Q.      Okay.  So what do you mean when you state that some value had to be given to those shares?

A.        As I previously testified, the economics of what a loan would do.  It was not a desire to get paid more than we would have under a loan, but in a scenario in which there was some sort of pickup or default in this transaction and we wanted to make sure that we at least got the minimum expected return.

There may have been some value realized by Jest under the -- by the transfer of shares, there may or there may not have been.  There wasn't any value at that time.  They may or may not have owned it.  They certainly didn't have cash in their bank account for it.  And as we now know, in fact, the kind of scenario in which you think you own it and what you had gotten for it and the idea behind that there was also going to be an additional source of funds from Mr. Russack personally to make sure that Jest was realizing its minimum expected return from this investment.

Q.      Okay.  At the time of the closing of this transaction, sir, you did not contemplate that



MAGNA
LEGAL SERVICES

Page 106

this assignment was invalid, did you?

A.        Correct.

Q.        The explanation that Mr. Rubin seems to give you --

A.        I'm sorry.  I did not expect that it would be contemplate to the extent that contemplate means recognize that there is a possibility.  There are lots of possibilities, certainly no expectations, but a possibility.  I just want to be accurate.

Q.        And the explanation provided by Mr. Rubin does not state, does it, that the $750,000 Confession of Judgement was at the request of Mr. Russack, does it?

A.        It does not say that this is at the request of Mr. Russack.

Q.        You then respond to Mr. Rubin stating "That makes zero sense - it's unrealized.  Separately, does this get filed or only upon default?"  Do you see that?

A.        I do.

Q.        And you stated "that makes zero sense.  It's unrealized."  What did you mean?

A.        I don't have a recollection of what I meant on the date that I wrote the e-mail because I don't remember the e-mail, but looking at it now I think it



Page 107

means what I previously described a moment ago, that the shares were not valued as Jest had realized.  For example, they were not held in a securities account with a national brokerage firm.  There were no distributions being paid.  The nominal ownership represented by the documents that we've looked at today are not what I would call a realized gain or asset.

Q.    In response Mr. Rubin writes: "There is a note for 1,500,000", correct?

A.        That is what the e-mail says, yes.

Q.    The rest being redundant.  We have not seen a copy of any such note, have we?

A.        I do not believe we have.  Certainly not today.  And I am not testifying that that note does not exist.

(Declaration of Restrictions is received and marked JT-7 for identification.)

Q.    Alright.  Sir, I show you what's been marked for identification purposes deposition exhibit number seven.  It's captioned Declaration of Restrictions.  It also bears the date of March 12, 2020.  Are you familiar with this document?

MR. LANG:  Could you rephrase the question.  What time, at the time of the 2020 or



Page 108

today?

A.          I'm familiar with this document.

Q.     Do you recall whether you reviewed this in or around March 12, 2020?

A.          No recollection.

Q.     Do you have any recollection as to when you first saw this document?

A.          No.

Q.     Do you have any understanding as to what the purpose of this document is?

A.          Yes.

Q.     What's your understanding?

A.          This would be a document of public record which would make it difficult for Mr. Russack to attempt to do the things listed in paragraph one with respect to this interest.  And it is designed to ensure that there aren't competing claims for the interest that was the subject of the transaction that we've been discussing today.

Q.     Let's take a look at the language under the first whereas clause.  It refers that "the Declarant is the legal and beneficial owner of 12 condominium units located at 353 Ocean Avenue, Brooklyn, New York, as more particularly described in Schedule A annexed hereto (the "Property")."  Do you



see that?

A.        Yes.

Q.        Okay.  The Declarant is Ocean Woodruff, correct?

A.        Yes.

Q.        It then goes onto state: "The Declarant shall not sell, mortgage, assign, lease, convey, transfer, encumber, pledge, hypothecate or otherwise take any action creating a security interest in itself and/or any or all of the parcels comprising the Premises without the written consent of Jest Holdings, LLC having an address 1120 Lexington Avenue, Lakewood, New Jersey.  Any such transfer, assignment or encumbrance shall be null and void and of no force and effect."  Did I read that accurately?

A.        I believe so.

Q.        As of March 12, 2020 was not Mr. Russack assigning to Jest Holdings his interest in Ocean Woodruff; isn't that the intent?

A.        It depends on the time of the day because we have multiple transactions occurring on the same day, but I believe everything that we've seen today has the March 12, 2020 date.

Q.        This document appears to be as others do, not all of them, but as others do to be notarized



by Mr. Burton, correct?

A.       This document appears to be notarized by Mr. Burton, yes.

Q.       And after March 12, 2020 or the execution of the assignment, Mr. Russack would not have the ability, would he, to speak for Ocean Woodruff one way or the other, correct?

A.       I believe that is correct.

Q.       Okay.  Was it your understanding this document was to be filed of record, is that what I heard you say?

A.       I don't know if that happened at a point in time, but I can tell you what I think today.

Q.       Well, let's deal back first with March 12th of 2020.  Did you understand that there was to be a Declaration of Restrictions containing these terms filed of record?

A.       I don't remember as of that date and I previously testified that I didn't remember when I had first seen this document.

Q.       But you did, and correct me if I'm wrong, testify just a couple of minutes ago that the document was to be filed, did you not?

A.       That is my expectation.

Q.       When did you come to this expectation?



Page 111

A.          I don't remember the date.

Q.          At some point subsequent to March 12, 2020?

A.          It may have been prior.  I don't remember whether we discussed every element of the transaction and whether we specifically discussed this element of the transaction.

Q.          So educate me if you would be so kind to explain why if on March 12, 2020 when Mr. Russack is assigned and transferred his interest in Ocean Woodruff, there would be any concern about Ocean Woodruff -- let me rephrase that.  I can't be more awkward if I tried.

If Mr. Russack was assigned his interest in Ocean Woodruff on March 12, 2020, what would be the import of any declaration that he makes as of that date regarding the activities of Ocean Woodruff?

A.          Which occurred first in time?

Q.          You tell me, it's your transaction.

A.          If the Declaration of Restriction occurred first in time it would be a useful document.

Q.          So if these documents were all being signed at the same time similar to closings that I'm sure you've observed in your career, if this one is signed before the assignment, you know, ten seconds



Page 112

before the assignment, you think this is a useful document?

A.          Absolutely.  Transactions are done that way all the time.  You can make all the faces you want.  I would hold my transaction experience against yours any day.  You can have all the litigation experience you want.

Q.     Sir, my apologies.  My grin was not intended to do anything more than your several grins throughout the deposition.

Now earlier you made reference to the issuance of an opinion letter and it kind of confirmed that Mr. Burton had regarding issuing such a letter because of his relationship or prior relationship with Mr. Russack, do you recall that testimony?

A.          Not with specificity, but generally, yes.

(Letter to Jest Holdings, LLC, from Noah Burton, Esquire, dated March 12, 2020 is received and marked JT-8 for identification.)

Q.     Sir, I show you what's been marked for identification purposes.  It's deposition exhibit JT number eight and it appears to be a letter of March 12, 2020 addressed to Jest Holdings from Mr. Burton and it says "Re: Assignment of Shares - Ocean Woodruff Development Corp. Ira Russak ("Assignor") to Jest


MAGNA
LEGAL SERVICES

Page 113

Holdings LLC (Assignee)."  Are you familiar with this letter?

A.          I have some recollection of this letter, yes.

Q.     The last sentence of the letter states: "This opinion is made for the benefit of and can be relied on by the addresses hereof, their successors and/or assigns in connection with the Assignment." Did I read that accurately?

A.          Yes.

Q.     Did not Mr. Burton issue an opinion letter on March 12, 2020?

A.          I'm actually not certain as to the answer of that question.  I believe that he is of the view that this opinion was not officially issued.  That does not mean that I'm conceding that point or willing to let him off the hook for it.

Q.     In the letter, the first paragraph states:  "I have acted as counsel to Ira Russack in connection with the above referenced assignment of 50% of the outstanding shares in Ocean Woodruff Development Corp. to the Assignee."  I've read that accurately?

A.          Yes.

Q.     It does not state that he's acting as



Page 114

counsel for Jest Holdings, correct?

A.        Correct.

Q.        But you indicated earlier that indeed he was hired at the outset in order to represent Jest Holdings in the preparation of these agreements and documents, correct?

A.        Correct.

Q.        Was Mr. Burton prior to March 12, 2020 actually acting as Mr. Russack's lawyer to your knowledge?

A.        I don't know.

(E-mail dated March 12, 2020 is received and marked JT-9 for identification.)

Q.        Sir, I show you what's been marked for identification purposes as deposition exhibit JT number nine.  It appears to be an e-mail from Mr. Rubin to yourself and Noah Burton.  It also appears to be copied to Mr. Russack and its regarding Jest loan to Russack.  Are you familiar with this e-mail?

A.        I see it now.

Q.        Prior to today do you have any recollection of receiving this e-mail in and around March 12, 2020 and I'll note it's at 9:51.

A.        I believe so.

Q.        The body of the e-mail says:  "To be



clear, Noah Burton will be representing the lender (Jest)in this transaction. Noah, please call me briefly to discuss." That's the body of the e-mail, correct?

A.      Yes.

Q.      Was this clarifying what was in existence or as I read it what's taking place in the future where it says "will be representing the lender"?

A.      I'll go with neither. In between. Current meaning that a decision had been made and a meeting of the minds have been reached about this. Not that it was a future tense, a plan to do so, but a decision had been reached. Exactly by whom, that I don't remember. But not, as you described, completely past or completely future. But this is what we're doing. If that was unclear, I'll be happy to try and clarify it.

Q.      Was this a decision which you made or a decision which was made by Mr. Rubin or some combination thereof?

A.      The decision was made by me that Jest needed its own counsel representing its interest. Somebody saying I, state your name, represent Jest in this transaction. That was what Rubin was tasked with,



MAGNA
LEGAL SERVICES

Page 116

making that happen.  I don't have a specific recollection.  Maybe I even have a specific recollection that he recommended that Burton be the one to handle it.  I don't remember if there were prior conversations and at what point in time I became aware that he had some sort of relationship or knowledge of Mr. Russack, but certainly prior to the decision that Burton would be counsel to Jest I signed off.  I approved on Burton being the one and I insisted on having that be more than an oral conversation.  At a minimum, I had this e-mail. I don't remember what else I did have off the top of my head, but at a minimum there's this.

Q.    This is Mr. Rubin's instruction to Mr. Burton.  Do you have any recollection if you have anything from Mr. Burton back to Jest Holdings indicating the scope of the services he'll be providing to Jest Holdings?

A.    I don't recall whether that does or does not exist, but I am certain that there is nothing to suggest that he would not be representing Jest.

Q.    The e-mail is copied to Jest Servicing. Is that a different entity?

A.    Umm, that is a gmail account that is used to track like payments that come in and things like that.



Page 117

It's a shared e-mail between myself and the woman I mentioned earlier named Miriam who does, you know, like the secretarial work, you know.

Q.    There are other e-mails which appear to be drafted by Miriam from Jest Servicing.

A.       Mm-hmm.

Q.    Also, I saw something that indicated there's a separate LLC Jest Servicing?

A.       I think she created an LLC called Jest Servicing which, as I indicated, she is often paid by borrowers for some of these services.  But to the extent that you've suggested that she has an LLC, I don't recall if she said that she had one.  It is not owned by me at all.

Q.    Do you have any recollection of the $45,000 noted in the Membership Sale Agreement being tendered in or around March 12, 2020?

A.       I think that was part of the net funding. So we discussed that there should be, I would expect that there are, there's evidence of the accounting for the various sums that should add up to 1.5 million. And I believe that there was not a separate payment for the 45,000.  But this is five years ago and I don't know that I have a specific recollection.

Q.    Okay.  I asked you earlier if you were


MAGNA
LEGAL SERVICES

Page 118

familiar with a company known as Queen Equities and I believe you stated you weren't certain. Do you know of any reason as to why on March 12, 2020 any money would have been sent to Queen Equities?

A.        I don't know.

                    (E-mail dated March 12, 2020 is received and marked JT-10 for identification.)

Q.        Sir, I show you what's been marked for deposition purposes, it's deposition exhibit JT number 10. It appears to be an e-mail at the top indicating from Mr. Rubin on March 12, 2020 at 9:58 p.m. just minutes after the prior e-mail clarifying that Mr. Burton is to represent Jest. It is sent to Sam Sam with copies to Yitty Rosenberg and Noah Burton and Ira Russack. Who is Yitty Rothenberg, excuse me, do you know who Yitty Rothenberg is?

A.        And the answer to your question is I have no clue.

Q.        And the question was who Yitty Rothenberg is. You don't know?

A.        I have no clue.

Q.        Where it says Sam Sam, do you know who that is?

A.        If I can kickback, Rothenberg is lower down on the paper indicated as having an e-mail


MAGNA
LEGAL SERVICES

@schwartzburton, but I don't know if I've ever come across her before.  And Sam Sam I understand is Mr. Sprei who you mentioned earlier.

Q.    Okay.  Mr. Rubin writes in the e-mail: "In other words, to make this gibberish clear, upon receipt of the $100,000, please wire $32,500 to Queen Equities, LLC as per instructions below."  And below are some wiring instructions.  Do you know what that's in reference to?

A.    I do not.

Q.    You're unaware what the $100,000 is or the wiring of the $32,500?

A.    Sitting here today I don't have any recollection.

Q.    Do you know if the $32,500 was to be part of the $45,000 payment that's referred to in the Membership Sale Agreement?

A.    I don't, but I also would not think so.

Q.    Do you have any knowledge from any source as to any reason for which Mr. Russack would have money transferred to Mr. Rubin's company, Queen Equities, after March 12th of 2020?

A.    No such knowledge.

Q.    Are you aware if any payments were made after March 12, 2020 in connection with any extensions



Page 120

of this transaction to Queen Equities as opposed to being paid to Jest?

A.         I would be shocked if that were the case.

                    (E-mail chain dated March 12, 2020 is received and marked JT-11 for identification.)

Q.     Okay.  Sir, I show you what's been marked deposition exhibit JT number 11 and it appears to be an e-mail from Mr. Burton on March 12, 2020 to yourself, Mr. Rubin and Mr. Russack.  The body of the e-mail says:  "Please see the revised Membership Sale Agreement."  Do you see that?

A.       I do.

Q.     Do you know what that is referring to when it uses the term "revised"?

A.       I do not.

Q.     Let me ask you to be so kind as to look at what's page three of the document and it is another e-mail from Mr. Burton.  This is on March 12th at 3:15 p.m.

A.       I've got it.

Q.     And on that e-mail Mr. Burton writes to Mr. Russack:  "I am working on the loan with Mr. Teichman and the lender is requiring that your certification further stipulate as to the accuracy of



MAGNA
LEGAL SERVICES

Page 121

the financial statement that you've submitted.  I've revised the certification accordingly."  And for the record I've read that accurately?

A.        Yes.

Q.        Where it indicates:  "I'm working on the loan with Mr. Teichman and the lender, are you aware by any other e-mails or other source at any point in time that Mr. Burton indicated to Mr. Russack that he was working on this transaction regardless who he was working for?

A.        That I don't remember one way or another about the date or the time.  I think we looked earlier at some documents that might have predated this, but they say what they say.

Q.        In Mr. Burton's e-mail at 3:15 he makes reference to a certification and wanting to confirm a financial statement.  Are you aware what that's about?

A.        I see what it says.  If you're asking me if I recall Thursday, March 12, 2020, the answer is I do not.

Q.        Well, it indicates that the lender is requiring the certification, the accuracy of the financial statement.  Do you have any recollection of you making such a requirement?

A.        I don't, but I don't want that to suggest



Page 122

that the e-mail is inaccurate.  It may have been, for example --

Q.    Well, let's not guess.  If you recall, you recall.  If you do not, you do not.

A.    I don't recall.

Q.    Do you have any recollection of reviewing a financial statement of Mr. Burton prior to March 12, 2020?

A.    I don't recall.

Q.    Do you have any recollection of requesting a personal financial statement of Mr. Burton?

A.    I don't recall.

Q.    If you take a look at page two, the e-mail from Mr. Burton now at 4:30 p.m. he writes to you and says:  "I have the signed documents in my office and I am available to review the file with you at your earliest convenience.  It is my understanding that the borrower needs the funds as soon as possible. Please call me as soon as you have a chance."  Do you see that e-mail?

A.    I do.

Q.    Do you have a recollection of that e-mail?

A.    I don't have a specific recollection.


MAGNA
LEGAL SERVICES

Page 123

Q.    Do you have any recollection of a follow-up conversation with Mr. Burton after, you know, 4:30 p.m. on March 12th?

A.    I don't have a specific recollection, but I believe based on this that a call would have been had.

Q.    Do you have any recollection of anybody expressing to you the borrower's need for funds as soon as possible?

A.    I understood that the borrower was requesting a loan and wanted to be funded, yes.

Q.    Do you know what the funds were to be used for?

A.    I don't know if I ever knew.  I certainly don't remember today.

Q.    Would that be something that you would ask in the course of your own determination whether to make a loan?

A.    Not necessarily.  I understood that Mr. Russack was active in the real estate market and was actively seeking to engage in a new transaction.  I don't remember whether we discussed his specific use and we are more focused on the collateral and don't typically ask them to tell us what they're using the money for.

Q.    In the course of your transactions, your



MAGNA

LEGAL SERVICES

Page 124

hard money lending transactions, are there ever any requirements that the funds have to be used for a specific purpose?

A.          On rare occasions, but it has happened.

Q.     But you don't have any recollection of that occurring here or even inquiring what the use of the funds would be?

A.          The scenario in which we typically have a requirement is where somebody says I will approve the value of the collateral, you will give me $100,000 and we will change the carpets and paint.  In that scenario we want to be sure that it goes there.  But in a typical scenario, if the collateral looks good, the loan is made.

Q.     That's from your view and not to be facetious, you're not going to ask and they're not going to tell and to fund the loan you don't care, correct?

A.          Correct.

Q.     Have you ever learned at any point in time where the funds were supposed to go?

A.          No.

Q.     Had you ever learned at any point in time where the funds did go?

A.          I don't think so.



Page 125

Q.    Now in addition to the opinion letter signed by Mr. Burton that we've reviewed, there was another opinion letter issued, was there not?

A.    There was.

Q.    And this was the opinion letter by Mr. Harrison, correct?

A.    Correct.

(Letter from Joseph Harrison, Esquire, to Jest Holdings, LLC, dated March 17, 2020 is received and marked JT-12 for identification.)

Q.    Sir, I show you what's been marked for identification purposes as deposition exhibit JT number 12.  It appears to be a letter from Mr. Joseph Harrison, Esquire, dated March 17, 2020 addressed to Jest Holdings LLC.  Are you familiar with this letter?

A.    Yes.

Q.    When do you recall becoming familiar with it?

A.    Sometime after there had been a default in the transaction and well after Jest had funded the transaction.

Q.    Were you aware that an opinion letter had been issued by Mr. Harrison in or around March 17, 2020?

A.    I was aware that an opinion had been



Page 126

provided, I don't know that I knew the name Harrison at the time.

Q.    Did you review the opinion letter?

A.    No.

Q.    Okay.  Who required the opinion letter in this transaction?

A.    I don't remember if I specifically made the request or not.  I may have.  I do believe that in this transaction I was the one who requested an opinion.  Typically in our transactions we don't need opinions because we have title.

Q.    Mm-hmm.  This opinion letter, and we can pull out the other one, is almost identical to the one submitted by Mr. Burton.  And it starts with the statement by Mr. Harrison:  "I have acted as counsel to Ira Russack in connection with the above referenced assignment of 50% of the outstanding shares in Ocean Woodruff Development Corp to the Assignee."  Same exact paragraph, correct?

A.    That's right.

Q.    Okay.  Now Mr. Harrison, however, was not involved in this transaction prior to March 12th, was he?

A.    I don't know.

Q.    Now do you recall having any involvement



Page 127

in the selection of Mr. Harrison as your attorney?

A.        I know for certain I did not have any involvement in the selection of Mr. Harrison.

Q.        Do you have any recollection of you being provided names of attorneys who were going to issue an opinion letter other than Mr. Burton?

A.        I don't remember one way or the other.

Q.        Do you know who found Mr. Harrison to issue this opinion letter?

A.        I do not.

Q.        Do you know if payment to Mr. Harrison would be on any of the expenses related to your net funding assuming you've got paid?

A.        That would be my expectation.

Q.        But you don't know one way or the other, fair?

A.        Yes, correct.

Q.        Let me make sure I understand something. Did you ever do any investigation, due diligence, Google searches, anything about Mr. Harrison?

A.        I did not.  I'm sorry, prior to the transaction I did not.

Q.        Okay.  Did you do it subsequently?

A.        I did.

Q.        And what did you learn?



Page 128

A.          Umm, that there have been some irregularity or at least alleged irregularity with his practice. There may have been a disbarment for various claims.

Q.      Did you ever learn that Mr. Harrison was disbarred in the State of Florida?

A.          I do believe so.

Q.      Do you know if he was disbarred in any other states?

A.          I don't remember.  Sorry, to be honest, I don't know if I remember that it was Florida, I do remember that there was a disbarment issue.

Q.      As I said, this letter is almost identical to the one we reviewed for Mr. Burton.  I'm going to point out paragraph four of Mr. Harrison's letter and it states that:  "Pursuant to the documents examined and the law of the State of New York, Assignor has full power and authority to assign interest to the Assignee subject to the interpretation of paragraph seven of the October 16, 1985 agreement."

A.          You read that accurately.

Q.      Right.  So if we look at --

A.          Exhibit eight.

Q.      Yes.  Mr. Burton's opinions, you'll see that that last portion "subject to the interpretation of paragraph seven of October 16, 1985" is not



Page 129

included.

A.        Correct.

Q.      Prior to sitting here today were you aware of that difference?

A.        Prior to today I was aware.

Q.      And when did you first become aware?

A.        Sometime well after the transaction.  And, in fact, only at the point in time in which the transaction had already started to sour.  So a significant portion of time after the transaction had closed.

Q.      Okay.  Do you know if Mr. Burton ever reviewed this opinion letter before it was provided to you at Jest Holdings?

A.        I cannot tell you whether or not he did or did not read it.  I can tell you that we looked at an e-mail a few minutes ago in which he said he had reviewed everything.

Q.      Are you aware who, if anybody, approved adding that clause to paragraph four referring to the October 16, 1985 agreement?

A.        I'm not sure what you mean when you say "who".

Q.      Who, if anybody, approved adding that to the opinion letter?




Page 130

A.          I don't mean to be difficult.

Q.      You're not.  Go ahead.  I told you in the beginning if you don't understand the question, let me know and I'll do my best to rephrase it, so.

A.          I don't know whose approval is required.  Is your question who drafted it, who decided to put it in?  I mean I'm happy to answer all of those questions.

Q.      Well, do you know -- exhibit 8, Mr. Burton's opinion letter --

A.          Right.

Q.      -- do you know who drafted that?

A.          I do not.

Q.      Do you have any reason to believe it was anyone other than Mr. Burton?

A.          I do not.

Q.      The opinion letter of Mr. Harrison which is almost identical to Mr. Burton, do you know who drafted that?

A.          I do not.

Q.      Do you have any reason to believe it was anybody other than Mr. Harrison?

A.          I do not.

Q.      Okay.  Do you have any knowledge if Mr. Harrison was requested to emulate the opinion letter


MAGNA
LEGAL SERVICES

that we looked at as exhibit 8 which appears to be signed by Mr. Burton?

A.        I do not other than they, as you have pointed out, are very similar.

Q.     Okay.  Take a look at the last paragraph of Mr. Harrison's letter.  "This opinion is made for the benefit of and can be relied on by the addressees hereof, their successors and/or assigns in connection with the Assignment.  However, you are recommended to obtain your own counsel as well."  Do you see that?

A.        I do.

Q.     That last clause "you are recommended to obtain your own counsel as well" is not contained in Mr. Burton's letter, correct?

A.        Correct.

Q.     Okay.  When did you first become aware of that?

A.        Of that clause?

Q.     Yes.

A.        I don't remember it before 20 seconds ago.

Q.     Were you aware that an additional clause was in Mr. Harrison's letter, and when I say additional, meaning it was not in Mr. Burton's?

A.        No, that's what I meant.  I never noticed it before.



Page 132

Q.    Okay.

A.        I'm not actually sure I know what it means.

(Certification signed by Ira Russack dated March 12, 2020 is received and marked JT-13 for identification.)

Q.    Sir, I show you what's been marked for identification purposes at this deposition exhibit JT number 13.  It's captioned at the top Certification and it has a date of March 12, 2020.  Are you familiar with this Certification?

A.        I don't specifically recall it, but I don't question it.

Q.    I said to you it has a date of March 12, 2020.  Actually, if you look above where Ira Russack's name and what appears to be his signature it says: "Affirm as of this day on March 9, 2020."  Do you see that?

A.    I do.

Q.    And then there's a notary of March 12, 2020, right, do you see that?

A.    I do.

Q.    And this notary is Mr. Winkler, not Mr. Burton, right?

A.    I see that.

Q.    And, again, you don't know who Mr.



Page 133

Winkler is, do you?

A.        Correct.

Q.        And I would take it you have no idea why he would be notarizing something on March 12th that was purportedly signed on March 9th?

A.        I can hazard a guess.

Q.        No, I don't want that.  Only if you know, sir.

A.        I don't.

Q.        Okay.  Do you know who prepared this Certification?

A.        I do not.

Q.        The Certification in paragraph six says: "My personal financial statement dated November 14, 2018 attached hereto as exhibit A is a true and accurate reflection of my current financial holdings and my net worth is not less than the amount stated therein."

And then on page two there appears to be a personal financial statement.  Do you see that?

A.        I do.

Q.        Okay.  Did you rely upon this personal financial statement for any reason in this loan transaction?

A.        It appears from the things that we have



Page 134

looked at that the answer to that is yes.  Whether or not I specifically looked at his financial statement or had somebody like Rubin look at it, that's a possibility.  I don't recall.

Q.    Alright.

A.    I looked at the financial statement and there's some specific things there that they don't ring a bell for me.

Q.    Okay.  So, for example, in the financial statement under assets it says real estate, net of liability, and it gives a value of $36,746,011.  But there's no identification of any of this real estate, is there?

A.    There is not.

Q.    Right.  No way for anybody to look at this and make an assessment if that's accurate or inaccurate, correct?

A.    Based solely on that sheet, that is correct.

Q.    Are you aware of any other disclosures regarding assets or liabilities of Mr. Russack that were provided to you in the course of this transaction?

A.    I believe that there were specific discussions that were had with Mr. Rubin about assets, but I don't specifically recall assets or what those



Page 135

discussions were.

Q.    Other than oral discussions I'm referencing written documents.  Are you aware of any written documents?

A.    There may have been, I don't remember one way or another.

Q.    Paragraph five of the Certification says:  "I have full authority to Assign the Interest to the Assignee without the consent of any third party."

Q.    Do you see that?

A.    I do.

Q.    Do you know one way or the other if any attorney on behalf of Mr. Russack ever reviewed the Certification or provided any type of opinion as to what, if any, authority he possessed to assign interest in Ocean Woodruff?

A.    The answer to that is, no, I do not know any of those subject to what is written in the Harrison opinion, which speaks for itself.

Q.    The Harrison opinion we've noted is written on March 17th, the closing we have is on March 12th, correct?

A.    It is correct that the opinion is dated March 17th.  I don't know that we know what the



Page 136

closing date is.

Q.      Well, the documents are signed on March 12th, correct?

A.      I believe we looked at a lot of documents that were signed on March 12th.  We also looked at documents that had other dates on them.

Q.      Are you aware of any funding that took place by Jest Holdings prior to March 12th?

A.      I am not good with dates and I cannot tell you the exact date sitting here.  We looked not long ago at an e-mail with some numbers on them which are in this pile.  They say what they say and the dates are the dates.

I'm not trying to be evasive, but, for example, if we looked in exhibit JT 6 and the only information that relates to funding in an e-mail there that talks about the 13th and the 19th.

Q.      But you would have, would you not, bank records which would indicate the date and the amount of any actual funding, correct?

A.      For sure.

Q.      Were you waiting for an opinion from either Mr. Harrison or some lawyer other than Mr. Burton before there was any funding?

A.      If I'm understanding the question correctly,


MAGNA
LEGAL SERVICES

Page 137

I previously testified that in this transaction I wanted an opinion. Whether or not that was the reason for changes in dates, I don't recall. But it would have been a but for a moment in agreeing to a transaction to have been deemed closed and to be funded.

(Heter Iskka Investment Agreement is received and marked JT-14 for identification.)

Q.    Sir, I show you what's been marked for identification purposes it's deposition exhibit JT number 14.

Q.    I may mispronounce it, the Heter Iskka Investment Agreement, are you familiar with this document?

A.    I have it in front of me.

Q.    Well, let's go back to my question. Are you familiar with it? Have you seen this before?

A.    I don't remember one way or another.

Q.    Have you ever seen a document similar to this?

A.    Yes.

Q.    Okay. And in what context?

A.    In the context of making loans amongst Jewish people and charging interest.

Q.    And what's your understanding of the



purpose of the document?

A.         The purpose of the document is to create obligations which have the effect of an alternative structure of a transaction which does not violate Jewish rules against charging interest.

Q.     This document does not appear to be signed.  Do you know if there's a signed copy of it?

A.         I don't remember.

Q.     Was this not one of the documents that was required for the closing of the loan?

A.         I don't remember whether it was or was not.

Q.     Okay.  This document states in the first paragraph:  "This money shall be used in the form of a joint business venture."  Four lines up from the bottom, do you see that?

A.         Yes.

Q.     Okay.  What joint business venture is being referenced?

A.         That's the standard language that is used to allow a loan transaction to pass the muster on the rules of charging of interest.

Q.     It goes onto state in the next sentence: "All profit that we may earn as a result of the said 1,500,000 which is to be used in the business venture shall be divided equally, i.e., 50% shall inure to the



Page 139

benefit of ourselves with the other 50% going to the financier." Can you explain what that means?

A.         Oh, I would say that the document speaks for itself. But I can tell you --

Q.    Well, I wouldn't ask if it did.

A.         I can tell you the intention of these transactions.

         To go back to the question you asked about whether this was required for the transaction, my answer to that is it's certainly not required for the transaction. It may have been required to keep on the side of the Jewish rules about the charging of interest, but not from the perspective of ensuring the economics of the transaction.

         My understanding, and I am no expert, about the way these agreements work is that they are, in effect, if you'd like, if the parties would like they can treat this as a form of business venture in which the person standing in the position as a borrower would have the worse possible outcome so-to-speak from the economics of the transaction. And my understanding is that that is what that sentence is intended to do. And then later in the contract it provides but if you don't want to do that you can pay the stated rate, which in this case was 12



Page 140

percent.  Not to be evasive, but I don't present to understand it.

Q.    You may not be the only one.  The last paragraph, and I won't belabor it then.  I'll take you at your word.  It states in that last paragraph:  This agreement shall supersede and take precedent over the sale of shares agreed to by the Ocean Woodruff Development Corp., a New York corporation.  Said sale of shares and note, etc, are only to secure active partners obligations under this agreement, but in no way bind the active partner more than this agreement."

Did I read that accurately?

A.    Yes.

Q.    Okay.  I may have asked you this before and I apologize.  Are you aware if there is a signed copy of this anywhere?

A.    I believe you did ask and I cannot remember.

MR. BERNHEIM:  I need to respond to an e-mail on something.  Can we take a two-minute break.  And I apologize.

MR. LANG:  Of course.

(There is a brief recess taken.)

(Letter from Jest Holdings to Ira Russack is received and marked JT-15 for identification.)



Page 141

Q.    Sir, I now show you a document that's been marked for identification purposes as JT 15.  It appears to be a letter dated July 16, 2020 from Jest Holdings LLC to Ira Russack with your electronic signature.  Are you familiar with this?

A.    I don't recall it, but I don't doubt its authenticity.

Q.    The letter is captioned Seller's Notice of Cancellation.

A.    Okay.

Q.    Have you had a chance to read through the letter?

A.    Yes.

Q.    The letter indicates, does it not, that you're cancelling your right to repurchase shares pursuant to the Membership Sale Agreement, correct?

A.    Yes.

Q.    Why was that done?

A.    As stated, payments were not made as required in accordance with the contract.

Q.    And at that point in time did you take any action in reference to the ownership interest in the property?

A.    I don't remember on what day what was done, but I believe that this was ultimately rescinded.


MAGNA
LEGAL SERVICES

Page 142

Q.    Okay.  Well, even prior to that, after March 12, 2020 when there was the assignment that was executed, did you contact the other fifty percent shareholder in Ocean Woodruff?

A.    Of course not.

Q.    Why not?

A.    Because neither Mr. Russack nor I expected that I was going to do so.

Q.    Did you not think that there was any responsibility or obligation that you had to alert the other fifty percent shareholder that you now, being Jest Holdings, owned fifty percent of the company?

A.    The intention was for that not to continue to be the case.  The intention was for me to get paid the monthly payment and then the principal and I was not going to be the owner.  Mr. Russack did not want me to be the owner.

Q.    But the documents themselves, did you not understand them to transfer that interest to you as of March 12, 2020?

A.    Yes.

Q.    Okay.  So as of March 12, 2020 you would have whatever obligation existed for a fifty percent shareholder of that company, would you not?

A.    That's fair.



Page 143

Q.    Okay.  So if, for example, a shareholders agreement said that the shareholders were to equally pay expenses, you would have the obligation to pay those expenses, correct?

A.    That is correct.

Q.    And if it provided that the shareholders would equally divide the profits, you would also be entitled to those profits, correct?

A.    If there had been, hypothetically, a massive amount of profit that well-exceeded the terms of the investment, Mr. Russack's expectation was that he would pay, at the time, 15,000 a month and I pay the million five and that he would get the benefit of all of those.

Q.    I'm not asking for his expectation, I'm asking for your --

A.    His expectation matched mine.

Q.    Okay.  Let me finish the question for the record if you would be so kind.

I'm asking your understanding of what the documents provided when it transferred interest to Jest Holdings if Jest Holdings then, as you indicated, may be responsible for expenses would also be entitled to profits?

A.    I don't view that as clear-cut as you're



Page 144

presenting it here.

Q.    At any point in time prior to this litigation, did Jest Holdings ever make demand of an accounting from Ocean Woodruff?

A.    I believe so.

Q.    Do you know when that occurred?

A.    I don't remember the date.

Q.    At any point in time after July 16, 2020, the date of this letter, exhibit JT-15, was the cancellation of the Membership Sale Agreement ever rescinded?

A.    I just want to make sure I got that right. We are looking at JT-15 which has a specific date and you are asking whether that specific Notice of Cancellation was rescinded.  If that's the question the answer is, yes, that specific Notice of Cancellation was rescinded.

Q.    And when was that?

A.    I don't know the date.

Q.    Was that through a letter by you?

A.    I don't remember.

Q.    Okay.  Do you know how this decision was communicated be it writing, orally or whatever?

A.    I don't remember.

Q.    Do you know if there is any documentary



Page 145

proof that the Notice of Cancellation was rescinded if you don't recall the actual rescission itself?

A.        It is clear that the parties treated it as rescinded.

Q.    Okay.  You stated it's clear because why, sir?

A.        The parties entered into a subsequent agreement which could not have worked had the July 16, 2020 letter not been rescinded.

(First Amendment to Membership Sale Agreement is received and marked JT-16 for identification.)

Q.    Sir, I show you what's been marked for identification purposes as deposition exhibit JT 16 and it's captioned First Amendment to Membership Sale Agreement.  Are you familiar with this document?

A.        I understand what this is.

Q.    Have you seen it before?

A.        I have.

Q.    Okay.  Now the opening paragraph says: "March blank 2021."  Do you know whether a date was ever filled in on this document?

A.        I don't know and my copy got some black markings there, so.

Q.    I'm going to represent to you that this



Page 146

was also attached to the Complaint which was filed on behalf of Jest Holdings in this matter and this is how it was submitted.

Q.    Take a look at the last page of the document if you would, please.  Again, you see there are signature lines there?

A.    Yes.

Q.    Again, it appears that there's a signature above the name Ira Russack, correct?

A.    Yes.

Q.    And there appears there is no signature for Jest Holdings again, correct?

A.    Correct.

Q.    Are you aware if there is any signed copy by Jest Holdings?

A.    I assume that there is.  I don't know.

Q.    Was there a practice of Jest Holdings not to sign documents for some reason?

A.    I believe you previously asked that question and the answer is there is not such a practice.

(Second Amendment to Membership Sale Agreement is received and marked JT-17 for identification.)

Q.    Sir, I show you what's been marked for identification purposes deposition exhibit JT number



17 and this is captioned the Second Amendment to Membership Sale Agreement and this one appears to have a date of March 15, 2020.  Are you familiar with this document?

A.          I see it.

Q.          I appreciate that you see it here now, are you familiar with it prior to today's deposition?

A.          Yes.

Q.          Were you familiar with it back in March of 2022?

A.          If I recall correctly I think I drafted it.

Q.          Did you also draft the First Amendment?

A.          I think so.

Q.          Were any attorneys involved on behalf of Mr. Russack in connection with either of these documents, the First Amendment or the Second Amendment?

A.          I do not believe so.

Q.          If you look at the last page of the Second Amendment, exhibit JT-17, there is a signature line.  Do you see once again there appears to be a signature on top of Mr. Russack?

A.          I do.

Q.          And there's no signature again for Jest Holdings, correct?



Page 148

A.        That is correct.

Q.        When you drafted either one of these amendments, did you have communication with either Mr. Russack or someone on his behalf regarding the terms of the document?

A.        I believe that I had direct communications with Mr. Russack.

Q.        On both of these?

A.        I believe so.

Q.        Would those communications have been oral, writing or a combination thereof?

A.        A combination.

Q.        Okay.  In connection with the First Amendment to the Membership Sale Agreement, do you have any specific recollection of your communications with Mr. Russack?

A.        No.

Q.        If you go back, and I apologize for making you jump to exhibit 16, the First Amendment Membership Sale Agreement.  In paragraph number three --

A.        Yes.

Q.        -- it refers to purchase price.

A.        Yes.

Q.        It's got a purchase price of $1,605,000.



Page 149

A.          Yes.

          Q.      And in the body thereof it makes reference to a $45,000 payment on the date of the original agreement.  Do you see that?

A.          I'm sorry, say that again.

          Q.      Yeah.  In paragraph three it makes reference to a $45,000 payment on the date of the original agreement.

A.          Yes.

          Q.      Okay.  Was that payment actually made, sir?

A.          I believe that we discussed earlier that it was net funded.

          Q.      It was not?

A.          I believe that we discussed earlier that it was net funded.

          Q.      Right.  You did say that.  Paragraph number two refers to an additional deposit of $30,000 payable on or before March and then it's got a blank 2021.  Was $30,000 submitted in connection with the First Amendment?

A.          I believe so.

          Q.      And that would have been submitted to whom?

A.          To me or to Jest Holdings.


MAGNA
LEGAL SERVICES

Page 150

Q.      This would be --

A.      Jest Holdings.

Q.      And this would be part of what records in order to verify this, sir?

A.      To demonstrate that the money had been actually delivered?

Q.      Yes, sir.

A.      I think we have such a record, yes.

Q.      Would it be deposited into the Jest Holdings account or your personal account?

A.      I believe it would be deposited into a Jest Holdings account.

Q.      Can you explain the basis upon which the purchase price is now $1,605,000?

A.      Hold on while I see if I can remember.  If I am not mistaken, this brings forward the original purchase price of 1.5 plus the amount of -- let me see if that's right.  One second.

        I don't remember how it's calculated.  I did know.  I remember that it was complicated and I can figure it out again.  But I'll get back to you on it.

Q.      As of March 2021, were there any payments that were credited to the transaction?

A.      I'm not sure what you mean when you say



Page 151

"credited".

Q.    Were any payments made?

A.    Yes.

Q.    Okay.  And what payments were made?

A.    Umm, through that date we had the 15,000 amount with the possible exception of the initial three months of the 45 which I think were net funded. So I believe that he had made payments for June through March of actual payments.

Q.    And, again, these would have been payments to Jest Holdings?

A.    Oh, yeah.

Q.    And they're included in your calculation to get to the $1,605,000 purchase price?

A.    As I said, I didn't remember how we calculated the 1,605,000.

Q.    Did you have any type of interest calculations performed for the amount of money, length and its accrual of interest of 12 percent, like an amortization schedule or something of that nature?

A.    Well, amortization --

Q.    Yeah, it's different.

A.    Umm, there are different ways to calculate interest.

Q.    Mm-hmm.



Page 152

A.            And we had agreed to use a straight 12 percent annually divided into 12 amounts which is where you get through at least year one, the 15,000 a month.

Q.      Are you representing that all payments that were made were towards interest, nothing towards principal?

A.            Umm, there should have been those payments for that first year.  I am representing that there have never been payments made towards the 1.5 million of principal.  All other payments have either been extension fees or monthly payments, none of them applicable to the 1.5 million.

Q.      Alright.  Go then to the Second Amendment, if you would, please.  Exhibit JT-17.

A.        Yes.

Q.      That's in March of 2022 and it has the same purchase price, 1,605,000.

A.        Yes.

Q.      Between the date of the First Amendment which appears to be March of 2021 without a specific date to March of 2022, do you know what payments were made in that one-year period?

A.        We do know what payments were made.  I don't remember the exact amount.



Page 153

Q.    These would be part of these other records; is that correct?

A.    Yes.

(Original Loan Through Last Payment Date chart is received and marked JT-18 for identification.)

Q.    I'm showing you what's been marked for identification purposes as deposition exhibit JT number 18 and I'll represent to you that this was provided to us on Monday during the deposition of Mr. Russack for the first time.  Are you familiar with this document?

A.    I think so.

Q.    Okay.  Do you know who prepared this?

A.    I think that either me or Miriam prepared it.

Q.    It appears at the bottom of the boxes on the left of the document that says "total due 6/28/21", correct?

A.    It does say that.

Q.    What is this document supposed to reflect?

A.    This was supposed to reflect the terms of the transaction on June 28, 2021 and payments owing and payments made and remaining payments to conclude



Page 154

the transaction.

Q.    If you look at the top of the document where it says loan amount, 1,500,00, and that goes across and into the three boxes.  Do you see that?

A.    I do.

Q.    And then it says interest rate and that's 12%, 14%, 15%.  Do you see that?

A.    I do.

Q.    And start date 3/19/20, 3/16/22, 9/16/22.  Do you see that?

A.    I do.

Q.    Okay.  Let's first start with the 3/19/20 date.  What does that reflect?

A.    We previously, in this deposition today, looked at a document which indicated that the transaction was funded on the 19th.

Q.    And the amount that was funded on the 19th, the full amount of your net funding; is that correct?

A.    Correct.

Q.    And then on March 16, 2022 the interest rate is supposed to increase by 14%?

A.    To 14%.

Q.    Correct.  Is there a document that specifically states that?



Page 155

A.          I don't believe that there is a document anywhere that talks about interest at 14% or at 12%, but you can back into those numbers very directly by translating them to the form of the transaction which we've looked at extensively in these Membership Sale Agreements.

Q.     We don't have a Membership Sale Agreement of March 16, 2022, do we?

MR. LANG:  We do.

THE WITNESS:  Please hold.

A.          I believe that is addressed in JT-17 in the restatement of paragraph five of the Membership Sale Agreement.

Q.     Paragraph five has several subdivisions. Can you tell me which one you're referring to that the interest rate of 14% is provided?

A.          Again, that's not what I am saying.  What I am saying is that it is giving the amount that we're translating to a 14% rate as we calculated it.

And you may have noticed that the monthly payment amount started to increase.  For example, in section B, they went from 15,000 to 17,500.  I don't have a calculator and I cannot do the math in my head.  That translates to 14% on the million five.



Page 156

Q.    And this agreement has at the top of it a date of March 15, 2022, your start date of March 16, 2022 being the next day.  Is that your representation that this agreement is supposed to indicate the higher interest rate?

A.    I have no idea what you just said.

Q.    Well, you're tieing in the Second Amendment Agreement, correct, of March 15, 2022 to the higher interest rate at 14%, are you not?

A.    That's exactly what I said.

Q.    Okay.  Then can you tell me what agreement increases it from 14% to 16% three months later?

A.    Just go right down the page.  With a correction to what you said, I believe you said three months later, but if I misheard, it's six months later.

Q.    Six months later.

A.    There you go.

Q.    And that would be subsection 5C?

A.    Correct.

Q.    Were any payments made after the date of the Second Amendment to the Membership Sales Agreement?

A.    Yes.


MAGNA
LEGAL SERVICES

Page 157

Q.    And where would they be reflected, sir?

A.    The same place as all the others.

Q.    And you don't have that with you here today, right?

A.    Right.

Q.    Go back to exhibit 18.  There's a reference on the left-hand side of $30,000 exit fee. Do you see that?

A.    I'm sorry, I don't think I have 18.

MR. FRIEDMAN:  It's in your right hand.

A.    Where were you pointing to?

Q.    Two lines above where it says total due, 6/28/21.

A.    Mm-hmm.

Q.    It says $30,000 fee.  Do you see that?

A.    I do.

Q.    Where does that come from?

A.    I believe, I believe that the $30,000 that is referenced in section three of the Membership Sale Agreement I see it in Amendments one and two.  I don't recall if it was in the original.

Q.    Well, according to, we'll just deal with the Second Amendment.

A.    Okay.


MAGNA
LEGAL SERVICES

Page 158

Q.    It indicates that $30,000 was to be paid on the date of the Second Amendment Agreement and I thought maybe erroneously that you indicated that it had been paid.

A.    You used the word "that" which refers to something specific and I'm not sure what specifically you're referring to.

Q.    What I'm referring to is that as of the date, on the date of the Second Amendment Agreement --

A.    Mm-hmm.

Q.    -- that the $30,000 was paid.

A.    Where do you see $30,000?  I don't think that that's right and I don't think that that was my testimony.  And if it was, I want to correct it.

Q.    Actually, it was in reference to the First Amendment where it states that $30,000 would be payable on or before March blank 2021.

A.    Okay.  Hold on.

Q.    Just so it's clear on the record, do you know one way or the other if that sum was paid?

A.    I don't recall one way or another, but you'll also notice that the purchase price has increased with the remaining $30,000 and I suspect -- can I use my phone to do some basic math?

Q.    Go ahead.  We might as well try to get



MAGNA
LEGAL SERVICES

some answers.  I'd like to know what your calculation is.

A.          No problem.  It increased from 1.5 to a 1.605 which includes the $45,000 which is mentioned there in clause one.  It's the $30,000 which you just referenced which you can view as an extension fee or whatever it might be.

And then you have what's referred to in exhibit 18 as an exit fee which is represented by the purchase price having gone up or the remaining payment of the purchase price having gone up by an additional $30,000.  And I fully admit the drafting of this is convoluted.  You will also note that the documents provide for which payments are credited versus not credited.

Q.    Sir, there was a couple of e-mails, I just wanted to show you them.  I'm unable to locate them right now.  What I'm going to do is pass the baton here to allow Mr. Friedman if he has some questions.

A.          I have no objection you bringing me back another day.

Q.    No, no, no.

A.          It's up to you.

MR. FRIEDMAN:  I have a few



Page 160

questions.


EXAMINATION BY MR. FRIEDMAN:

Q.      Mr. Teichman, my name is Andrew Friedman.  I represent Henry Weinstein and the Ocean Woodruff Development Corporation in connection with this action.  Same instructions as Mr. Bernheim gave you still apply.  Okay?

A.      Okay.

Q.      I just want to followup on a few of the areas with respect to Noah Burton.  Prior to this transaction did you know Noah Burton?

A.      It depends on your definition of "know".  I don't -- we live in a relatively small town.  I'm not sure if I would recognize him if he passed me on the street.  I may or may not have come across him in a transaction and I'm certain he never represented me or my interests.  Does that give you enough of a flavor?

Q.      It gives me a flavor.  You can complete your answer whenever you want.  If you're complete, it's fine with me.

A.      I'm also trying to be, you know, give you the story.

Q.      With respect to this transaction, how did it come to be that Mr. Burton represented Jest?



Page 161

A.          Mr. Rubin introduced -- recommended and introduced him.  And, in fact, coordinated with him to work on the transaction.  As you may have gleaned, I tried to spend very little time on this.  I have a full time job elsewhere.  And where somebody like Mr. Rubin is attempting to get a deal done, he's going to do a lot of the legwork.

Q.     Is it fair to say for purposes of this transaction the point person for Jest was Mr. Rubin?

A.          He didn't have any agency or authority to bind Jest, but undoubtedly he was an extraordinarily involved broker.

Q.     And I think you indicated that one of Mr. Rubin's roles was to bring possibly deals to Jest and Jest would make a decision one way or the other on whether to proceed, is that fair?

A.          That's fair.

Q.     Prior to this transaction with Ira Russack, had Mr. Rubin ever brought any deals involving Sam Sprei?

A.          I don't think so.

Q.     Do you know what relationship there is, if any, between Mr. Rubin and Sam Sprei?

A.          I do not know.

Q.     Have you ever spoken to Mr. Rubin about


MAGNA
LEGAL SERVICES

Sam Sprei?

A.          Subsequent to this transaction?

Q.      At any time.

A.          Subsequent to this transaction I have certainly spoken to him about Mr. Sprei.  I don't recall if I have ever spoken, if I had ever spoken to him before this time.

Q.      And when you say you've spoken to him subsequent to this transaction, is it one occasion, more than one occasion or something else?

A.          Probably more than one occasion.

Q.      Approximately how many?

A.          I don't know.

Q.      In sum and substance can you tell me the nature of those conversations?

A.          I have become aware of Mr. Sprei's background and reputation.  I was very uncomfortable with it.  I was uncomfortable with the fact that Mr. Rubin, in my estimation, knew some things that I would have wanted to know earlier and I expected him to figure out how to work this thing out given that he had other relationships, dealings with these various parties.

Q.      What things would you have wanted to know earlier from Mr. Rubin pertaining to Mr. Sprei?



MAGNA
LEGAL SERVICES

Page 163

A.          If he's truly not involved then why are we having to deal with him.  If he has some sort of involvement he has a very poor reputation.  If he is actually a player here that's an area of concern and to be honest about it, I suspect that there is more that Mr. Rubin knows that I have been told.

Q.    Those conversations that you just gave me, sort of the sum and substance on Mr. Sprei, were those oral conversations?

A.          What I was referring to is oral.  There may well be an e-mail back and forth.  But our conversations -- communications are not like in the other areas of my life where I have long back and forth kind of e-mail, that's not the way our pattern has been.

Q.    I believe you indicated that Mr. Rubin is your first cousin.

A.          Still is.

Q.    Has Mr. Rubin ever discussed with you -- withdrawn.

With respect to the concerns you indicated to Mr. Rubin pertaining to Mr. Sprei, what, if anything, did Mr. Rubin say to you?

A.          I don't specifically remember what he said. I think it would be fair to characterize it as


MAGNA
LEGAL SERVICES

Page 164

invasive, inconclusive, clamming up and I previously mentioned that I felt that there's more to the story that I'm being told.  That's what I left the conversations with.  If you want to know what I remember, that's what I remember.

Q.    Does Mr. Rubin still bring you deals? When I say "you" I mean Jest.

A.    We haven't done a deal with Mr. Rubin in quite sometime.

Q.    Is that because of what happened in this deal or something else?

A.    I would say, yeah, for right now that's a big part of it.

Q.    Okay.  With respect to Noah Burton, I think you indicated that the opinion letter that he authored dated March 12, 2020 previously marked as JT number eight, and I'll just show it to you, I think you indicated that was never sent; is that correct?

A.    What I indicated is I think that he is of the view -- we have it, right.  I think he is of the view that it was never officially issued or if it was issued it was retracted in sufficient time for him to consider it not issued.

Q.    When you say "him" you mean Mr. Burton?

A.    Yes.  And I don't necessarily take the



MAGNA
LEGAL SERVICES

Page 165

position.  I also don't, for the moment, say I'm willing to accept that.  I don't know.

Q.    With respect to the opinion letter authored by Mr. Harrison, was there any relationship between Mr. Harrison's opinion letter and Mr. Burton's attempting to withdraw or rescind or not issue his opinion letter to your knowledge?

A.    Without getting to a point in time, my understanding is that the Harrison position was supposed to stand instead of the Burton opinion.

Q.    And with respect to the Harrison opinion letter, whose role was it under Jest to review it?

A.    Mr. Burton.

Q.    And when Mr. Harrison, and this is JT-12, indicated in paragraph four that his opinion was subject to the contents in paragraph seven of the 1985 agreement between Mr. Russack and Mr. Weinstein, was that ever brought to your attention specifically by anybody?

A.    Not prior to closing for sure.  I would not have closed the transaction.

Q.    Whose role would it have been to bring it to your attention?

A.    Burton's.

Q.    And with respect to Mr. Harrison's


MAGNA
LEGAL SERVICES

Page 166

opinion letter, again JT-12 in paragraph five -- I'm sorry, the last paragraph unnumbered where he indicated that you are recommended to obtain your own counsel as well for purposes of this transaction, who was that other counsel?

A.        Well, that's an unclear statement because "other" suggests that he was --

Q.     I'm just talking about Mr. Harrison.

A.        I understand, but Mr. Harrison was never Jest's counsel.

Q.     Correct.  What is your understanding that the reason the opinion letter was authored by Mr. Harrison?

A.        Jest would want to have a statement from a proper source confirming the propriety of the transaction.  The typical things, I don't mean to suggest that you don't know that, it's typical for transactions to get borrower's counsel or a party's counsel to issue opinions such as these.  To the extent that we have today discussed the words recommended to obtain your own counsel as well, well, I'm not sure what that means.  Harrison was never counsel to Jest.  Harrison should have been aware, I assume he was aware.  He definitely never spoke to me that Burton was representing Jest.  So the sentence is


MAGNA
LEGAL SERVICES

Page 167

a little bit unclear as to what it could have meant.

He also opens the letter with saying I am counsel to

Russack.

Q.    Okay.  In this litigation Jest has made

claims against Mr. Harrison.  What's your

understanding what those claims are?

A.       Well, the claims against Mr. Harrison would

be to the extent that anything in that opinion turns

out not to be accurate, those would be the complaints

or the claim.

Q.    With respect to the transaction itself,

at any point in time up until the funding of the

transaction, did you ever actually see any shares of

the stock for Ocean Woodruff?

A.       I'm not sure I understand.

Q.    Well, Ocean Woodruff was purported to be

a corporation, correct?

A.       Yes.

Q.    And corporations have shares of stock,

physically shares of stock, right?

A.       I own lots of stock that I have never seen.

Q.    Ocean Woodruff is not a publicly-traded

corporation, correct, to your knowledge?

A.       Yes.

Q.    It's a small, closely-held corporation



Page 168

and it's your understanding with fifty percent Ira Russack and fifty percent Henry Weinstein, correct?

A.          Correct.

Q.          And your role, as I think you've explained, was to make sure that the collateral for any transaction Jest entered into was real, right?

A.          I wouldn't say that that is quite right. It's a distinction between saying I'm conceptually aware versus is it my role to, for example, we just discussed, review the opinion.  It's not my role to review the stock certificates.  It's not my role to review the mechanics, that's what the lawyer gets paid to do.  I'm not saying I'm not capable of doing it, that wasn't my role in this transaction nor in any of the transactions in which we hire counsel.  That's their role.

And, no, I never saw a stock certificate.  In fact, until today I don't recall having seen it.

Q.          Just so we're clear on the record, for purposes of Jest's representation in this matter, it was the role of Noah Burton to make sure that, A, the shares existed and Mr. Russack had whatever interest he purported to have, is that what you're saying?

A.          Absolutely without addressing the Harrison



Page 169

opinion, yes.

Q.     And, similarly, with respect to any prior incumbrances on whatever Mr. Russack's ownership was, whose role was it to ascertain whether there were any prior incumbrances on his interest in Ocean Woodruff?

A.     I don't think that there is an exclusive answer to that, but there is a litany of things that I expected transaction counsel, Mr. Burton, to do.  We looked into a deposition an other pieces of paper in which there's representations from some of the parties and things like that.  I don't know if that's responsive.

Q.     As of the date of funding, March 19th I believe is the date, 2020, had you ever personally spoken to Ira Russack?

A.     I'm not a hundred percent sure, but I do not think that I did.

MR. BERNHEIM:  And just for the record, I'm not going to accept March 19th as the date of monies being transferred.  I've seen other dates here prior to --

A.     Let me answer it a little bit differently. I don't believe and I am fairly certain that prior to any time in March 2020 I had never spoken to Ira



Page 170

Russack?

Q.    Had you ever spoken to Mr. Burton up until March 19th of 2020 as to whether or not Mr. Russack had representation?

A.    I don't know.  I don't think that I did.  I don't know.

Q.    In entering into these hard money loans that you were referring to, was it routine or was it your expectation that the borrower would have legal representation?

A.    No.

Q.    Was it a concern of yours?

A.    It's generally not.  As I previously mentioned, we typically get mortgages and that is addressed by title.  And I think that's why in this case we insisted that Mr. Russack produce an opinion which did occur.

Q.    And when you requested that Russack get an opinion, I take it by your prior answer that that opinion had to come from a member of the bar, correct?

A.    Yes.

Q.    At any point in time through March 19, 2020 did you ever speak to Mr. Harrison?

A.    No.

Q.    At any point in time up until March 19,



Page 171

2020 did you have any knowledge of who Mr. Harrison was?

A.        No.

Q.        With respect to what was marked as JT-4, it's a letter between Ira Russack and Henry Weinstein dated October 16, 1985.

A.        I got it.

Q.        This is with respect to paragraph seven of that document.  As you sit here today, do you have an understanding of what that paragraph means?

A.        I do not.

Q.        Where it says the document may not be changed orally, do you understand what that means?

A.        Umm, yes.

Q.        What does that mean?

A.        That means if they want any changes to this agreement it's to be in writing.

Q.        Have you ever seen any documents changing the October 16, 1985 document?

A.        I don't remember seeing such document.

Q.        And continuing with paragraph seven it says --

A.        I'd also point out for purposes of you pointing out number seven, number 4 does suggest that there's another piece of paper.  But I don't recall



Page 172

seeing that.

Q.    Paragraph four deals with an accounting by and between two parties to the agreement, right?

A.    Umm, the words "amongst other things" are in there.  So I don't, I just don't know.

Q.    Okay.  The collateral that Jest was relying upon here was some sort of ownership interest in condominiums, correct?

A.    That's fair.

Q.    Was it ever -- did Jest ever reach out to the condominium itself as to whether these shares were assignable?

A.    Prior to the transaction closing?

Q.    Prior to March 19, 2020.

A.    I do not know whether anybody on behalf of Jest did that, for example, Mr. Burton.  But I can assure you that I directly did not.

Q.    How about subsequent, how about at any time up until today?

A.    At some point there was direct, there was communication that was directed by me and there may have even been some letters from Mr. Weinstein or to the corporation asserting the claim that fifty percent of the shares also stated as a hundred percent of the shares owned by Mr. Russack had been transferred to



Page 173

Jest.

Q.    I'm asking a little bit different question so I'll move as nonresponsive.  Let me make it clearer.

You understand that Ocean Woodruff Development Corporation owns shares of stock -- I'm sorry, owned condominiums within a larger condominium, is that your understanding?

A.    I'm not sure if I ever thought that through. I guess that that's right.

Q.    So I take from that answer having not thought it through you never reached out to the condominium separate and apart from Ocean Woodruff; is that correct?

A.    I believe that that is correct.

Q.    In your experience as a real estate investor, person of general counsel, is it your understanding that condominiums separate apart from the owners of the units have certain requirements and rights for the conveyance and encumbrance of shares of ownership interest?

A.    That would be typical.

Q.    And I understand you never looked out or reached out prior to March 19, 2020.  Do you know whether Mr. Burton ever reached out to the condominium



Page 174

itself as separate and apart from Ocean Woodruff as to whether this was a deal that was doable or within the bylaws or anything of that nature?

A.        My understanding is that he looked at all relevant corporate documents which would include any of the documents that you've just enumerated here. But I don't know specifically because I didn't do his work for him or review his work.

Q.    It's fair to say you relied upon him to do his job competently?

A.        Exactly right.

Q.    I think Mr. Bernheim touched upon this a little bit, I just want to briefly followup.

In evaluating the value of the purported collateral, was anything done other than asking Ira Russack what it was worth?

MR. BERNHEIM:  Objection.  I don't believe that that was --

MR. FRIEDMAN:  Withdrawn.

Q.    What was done in terms of evaluating the purported collateral?

A.        As I've previously testified, I don't know exactly what Mr. Rubin did in determining his views on a not less than value.  I think I previously testified it probably wasn't overly formal.  I believe it was



Page 175

something along the lines of I know the area, I know what kind of in that area go for, et cetera. I have always accepted an amount of wiggle room from him and I've always factored that in, but I am pretty sure based on course of conduct and a long history of dealing with Mr. Rubin, that there's no, there is not a formal analysis done?

Q. As of the time that this loan was originated, did anybody ever inquire as to whether the apartments were occupied?

A. I think two or three years ago there were some discussions about what they're worth. You may actually have been a party to some of those. I don't specifically recall a discussion about occupancy. I do seem to recall some discussion about some rental payments which would suggest a level of occupancy, but I don't remember with specificity.

Q. I want to be clear on the time parameter. Up until March 19, 2020 --

A. Oh, I'm sorry.

Q. -- was there any discussion that you are aware of pertaining to whether or not these apartments were occupied?

A. I have no idea.

Q. Was there any discussion as to whether



Page 176

or not the apartments were rent-regulated under New York City or New York state law?

A.        I don't remember, but I would have expected Mr. Rubin to know the answer to that question.

Q.    What about Mr. Burton, should he know the answers to those questions?

A.        Umm, not to the question of whether they were regulated or not because that goes to how much rent you can charge which really only goes to the value and I would not have expected Mr. Burton to look at that all.

Q.    Okay.  Alright.  Have you ever been to the building?

A.        No.

Q.    Do you know whether or not Mr. Rubin ever went to the building?

A.        I don't know.

MR. FRIEDMAN:  I have nothing further.  Thank you.

EXAMINATION BY MR. HARRISON:

Q.    So why was I in this lawsuit again as a defendant, I'm just wondering if you can explain.  You answered this question before.  You named me as a defendant because?



Page 177

A.          If there's a viable claim, we'll pursue them.

Q.      And what viable claims do you know as of now?

A.          Our claims that have been asserted in the lawsuit.  If you believe those claims are inappropriate, you can move to strike them or whatever the current procedure is.

Q.      So you don't know in other words?

A.          I think those were my own words.

Q.      So nothing further except what's stated in the Complaint?

A.          Without proposing any rights to bring additional claim.

MR. HARRISON:  Okay.  No other questions.

EXAMINATION BY MR. BERNHEIM:

Q.      Just a few followups if I may and I won't take much of your time, sir.

I told you there were some e-mails that I was looking for and trying to find.  I'm going to represent to you that I recall an e-mail from Mr. Rubin stating that you were to receive a broker fee of three points.  Did you receive a broker fee?



Page 178

A.        Well, I'm not sure that I remember a broker fee of three points and I don't believe the transaction had me receiving a brokerage fee of three points. We looked at some fees in this transaction, extension fees that you and I talked about, but I would have expected Mr. Rubin to get a brokerage fee.

Q.    Earlier you testified that your arrangement with Mr. Rubin was as opposed to him putting in any cash into this transaction as an investor, that he was going to have a three percent broker's fee and that fee that's supposed to be paid to him would be considered his investment, correct?

A.        That is correct. I said it was an approximate, I didn't remember the exact numbers, but the concept.

Q.    Right. And taking it as to face value to the extent you wish, but I'm not going to represent that I recall something unless I recall it, but I do recall that there was an e-mail from Mr. Rubin stating that you were to get a broker's fee for three points. Did that actually occur?

A.        That does not sound right to me.

Q.    At some point we'll see if I can locate that and show it to you.

A.        I can tell you that, as I described, I think



Page 179

it was net funded and --

Q.    Okay.  I understand.  One other followup, if I may.

In connection with this transaction, if there was a cancellation pursuant to the letter that we looked at to the purchase by Mr. Russack to get his membership interest back and at the time we used the 1.6 million dollar number that that was the amount that you were claiming was due and we'll also state that the value of the fifty percent interest was three million.  Was it your understanding that Jest Holdings would get that full three million as a result of Mr. Russack's default as opposed to just the 1.6 million?  Do you follow my question?

A.       Yes, I follow your question.  Yes, my understanding is that if the transaction ended with Russack not purchasing the interest in accordance with the terms of the transaction, that Jest would get to keep all of it.

Q.    Okay.

MR. BERNHEIM:  Thank you.  I do not have any other questions for you, sir.

MR. FRIEDMAN:  I have just one followup.  Can I just mark that?

(E-mails are received and marked



Page 180

JT-19 for identification.)

EXAMINATION BY MR. FRIEDMAN:

Q.    I have now marked a document JT-19 which is, it's a page with some different e-mails.  I'm going to direct your attention to an e-mail on Monday, July 19, 2021, at 9:10 a.m. from you to Adam. Evidently, Adam Kalish.  And I'm going to read it and I'll show it to you and I'll ask you a couple of questions.

"Adam, per below, please let me know when you and I can have a conversation.  At this point I'd like to keep the group to you, Ira (attendance optional) and myself.  I suspect the others are certainly the opposite of helpful (certainly true for me.)  Joe."

Take a look at that and make sure I read it right.

A.    It sounds right.

Q.    Tell me when you're ready.

A.    I'm ready.

Q.    Who are the others you're referring to?

A.    It's an e-mail from a longtime ago.  I don't remember.

Q.    And when you say less than helpful, what



Page 181

did you mean?

A.          If you have the opportunity to meet and talk to Mr. Rubin you will find that his communication skills are, his communication style is different than what you're used to.  I'm guessing based on the date of July 21st we were not having a helpful conversation about, I assume, payments were not being regularly made and I don't know whether or not at that time I already felt I was getting the runaround.

I previously testified at some point I did feel like I was getting the runaround and I wanted to get a clear path forward without everybody else's story.  Either we were making payments or at all times my preference has been to get my money back and I made that quite clear.  And I think that's what we're looking at here.

To be honest, I don't remember this fellow, Adam Kalish, I don't remember communicating with him in '21 and I don't remember what this was about honestly.

MR. FRIEDMAN:  Thank you.  I have nothing further.

THE COURT REPORTER:  Mr. Friedman, would you like a copy of the transcript?

MR. FRIEDMAN:  Yes.



Page 182

THE COURT REPORTER:  Mr. Lang, would you like a copy of the transcript?

MR. LANG:  Yes, please.

(Deposition of JOSEPH TEICHMAN is concluded at 3:30 in the afternoon.)



Page 183

CERTIFICATE

I, DEBRA-ANN BALSAMO, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, certify that the foregoing is a true and accurate transcript of the deposition of JOSEPH TEICHMAN who was first duly sworn by me.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which the deposition is taken and that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in the action.

*Debra-Ann Balsamo*
DEBRA-ANN BALSAMO
CERTIFIED SHORTHAND REPORTER

Dated:  March 10, 2025
License No. X101161



# Magna
## Key Contacts

**Schedule a Deposition:**

Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**

CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**

ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**

Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**

Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**

Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**

Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**

Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**

Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



## A

**ability**
6:4 49:9,13 64:10
71:21 73:7 110:6
**able**
16:13 63:9 89:20
**above-entitled**
1:11
**Absolutely**
15:11 73:17 74:2
112:3 168:25
**accept**
165:2 169:20
**accepted**
74:16 175:3
**access**
11:1 17:10,14 86:14
**accommodate**
6:12
**account**
60:21,23,24 61:9
77:7 82:7 86:16
105:17 107:3
116:24 150:10,10
150:12
**accountant**
19:14,18
**accounting**
23:14 77:17 82:13
117:20 144:4 172:2
**accounts**
61:1,3
**accrual**
151:19
**accuracy**
120:25 121:22
**accurate**
65:17 66:3 106:9
133:16 134:16
167:9 183:8
**accurately**
58:9 69:25 73:3 76:9
85:13 109:15 113:9
113:23 121:3
128:20 140:12

**accusations**
45:25
**accusing**
45:14
**acknowledged**
58:24
**acquired**
104:16
**acronym**
16:23
**act**
11:8 12:7,16 13:3
64:5,10
**acted**
37:12,14 44:18 95:3
113:19 126:15
**acting**
11:12 95:5 113:25
114:9
**action**
1:2,3,11 52:12 109:9
141:22 160:7
183:12,16
**active**
14:7 44:5 47:7
123:19 140:9,11
**actively**
123:20
**activities**
11:2 111:17
**activity**
13:7 25:10,11 47:13
**actual**
43:5 79:12 82:2
136:20 145:2 151:9
**acute**
11:21
**Adam**
180:7,8,11 181:18
**add**
117:21
**adding**
129:20,24
**addition**
12:6 125:1
**additional**

7:23 105:20 131:21
131:23 149:18
159:11 177:14
**address**
109:12
**addressed**
112:23 125:14
155:11 170:15
**addressees**
131:7
**addresses**
113:7
**addressing**
168:25
**adhere**
101:3
**admit**
159:12
**admittedly**
7:13
**Affidavit**
3:19 97:2,8
**affiliated**
13:1 19:5 52:2
**Affirm**
132:16
**affirms**
5:1
**afternoon**
182:5
**agency**
161:10
**agent**
29:25
**ago**
5:8 18:5,6 73:5 80:22
83:18 93:21 107:1
110:22 117:23
129:17 131:20
136:11 175:11
180:23
**agree**
82:12 86:12 95:8
**agreed**
74:21 76:25 81:19
88:7,8 90:12,17

93:7 140:7 152:1
**agreeing**
137:4
**agreement**
3:16 4:15,18,20
14:20,20 15:5,6
21:24 22:5,12,21
24:11 53:8,13 55:14
55:19 56:11,16 57:7
57:10 59:1,3,6,11
71:6 72:25 75:22
78:9 85:4,5,9,22,22
86:1,8 91:7,15,15
93:8 96:13 99:7,22
101:3 102:2 117:16
119:17 120:12
128:19 129:21
137:7,13 140:6,10
140:11 141:16
143:2 144:10 145:8
145:11,16 146:22
147:2 148:14,20
149:4,8 155:8,13
156:1,4,8,12,24
157:21 158:2,9
165:17 171:17
172:3
**agreements**
36:15,16 54:22 114:5
139:16 155:6
**ah**
89:4
**ahead**
52:12 64:17 93:3
104:19 130:2
158:25
**alert**
142:10
**alleged**
128:2
**allocate**
86:14
**allocated**
81:19
**allow**
101:21 138:20



159:19

**allowing**
81:18

**allows**
30:1

**alright**
5:20 6:23 7:25 8:4
16:6 27:4 32:18
34:17 40:12 47:17
57:14 63:25 67:1
76:15 84:25 85:20
86:6 91:19 93:2
94:8,17 96:3,17,20
97:16 107:19 134:5
152:14 176:12

**alternative**
17:7 138:3

**Amendment**
4:18,19 145:10,15
146:21 147:1,12,16
147:17,20 148:14
148:19 149:21
152:15,20 156:8,23
157:24 158:2,9,16

**amendments**
148:3 157:21

**amortization**
151:20,21

**amount**
22:19 23:9 46:21
76:13,16 81:13,25
88:7,8 98:4,5,9
100:8,11 103:11,12
103:15 104:9
133:17 136:19
143:10 150:17
151:6,18 152:25
154:3,17,18 155:18
155:21 175:3 179:8

**amounts**
77:3,12 152:2

**analogy**
81:21

**analysis**
32:14 71:20 175:7

**ancillary**

26:8

**Andrew**
2:13 160:4

**and/or**
73:16 76:7 109:10
113:8 131:8

**annexed**
58:5 108:25

**annually**
152:2

**answer**
6:4 15:24 29:17
34:21 54:20 63:13
64:15 80:12,14 94:2
100:13,16 113:13
118:17 121:19
130:7 134:1 135:18
139:10 144:16
146:20 160:20
169:8,23 170:19
173:11 176:4

**answered**
29:19 176:24

**answers**
89:22 159:1 176:6

**anticipation**
6:9

**anybody**
19:12 47:2 84:11
94:5 123:6 129:19
129:24 130:22
134:15 165:19
172:15 175:9

**apart**
173:13,18 174:1

**apartments**
175:10,22 176:1

**apologies**
72:4 81:22 112:8

**apologize**
12:8 29:17 48:10
93:1 140:15,20
148:18

**appear**
35:23 117:4 138:6

**appearing**

90:6

**appears**
56:21,25 67:1,4,19
70:22 97:12,13
104:14 109:24
110:2 112:22
114:16,17 118:10
120:8 125:13 131:1
132:15 133:19,25
141:3 146:8,11
147:2,21 152:21
153:17

**appended**
57:5

**applicable**
152:13

**apply**
91:16 160:8

**appraisal**
30:23 31:7

**appraised**
32:16

**appraiser**
30:24

**appreciate**
21:2 147:6

**appropriate**
15:8 25:6 33:25 77:5
81:22 101:9

**approval**
56:17 130:5

**approve**
98:18,19,21 124:9

**approved**
103:12 116:9 129:19
129:24

**approximate**
178:14

**approximately**
1:20 90:2 162:12

**area**
17:11 163:4 175:1,2

**areas**
160:11 163:13

**argument**
99:19

**argumentative**
88:25 90:1

**arisen**
71:15

**arm**
11:10

**arranged**
21:6 24:24,25 37:3

**arrangement**
24:13 39:19 178:8

**arranging**
11:2 82:6

**ARTHUR**
2:5,5

**article**
35:22

**ascertain**
169:4

**aside**
82:10

**Asignee**
65:3

**asked**
8:4 21:1 23:13 29:10
44:22 48:10 49:14
49:16 62:17 63:16
64:20 78:25 80:10
92:12 94:1 117:25
139:8 140:14
146:19

**asking**
5:18 12:19 30:5
34:20 35:16 40:6
48:20 54:14 63:12
84:22,23 92:12,14
93:22 94:4 99:16
102:7 121:18
143:15,16,20
144:14 173:2
174:15

**aspect**
18:8 62:25 71:5
99:19

**assert**
75:7,13

**asserted**



177:5
**asserting**
 75:6 172:23
**assessment**
 33:15 134:16
**asset**
 49:13 107:8
**assets**
 134:10,20,24,25
**assign**
 65:2 68:9 69:2,14
  71:16 109:7 128:17
  135:8,16
**assignable**
 172:12
**assigned**
 58:7 65:11,21 69:15
  73:1 99:10,11,13
  104:21 105:1
  111:10,14
**assignee**
 52:11 113:1,22
  126:18 128:18
  135:9
**assigning**
 109:18
**assignment**
 3:17 42:5 58:4,6,14
  58:19,25 64:25
  65:12,19 66:14,15
  66:24 68:4,13,15,23
  68:24 69:21,21 99:8
  99:23 100:2 106:1
  109:13 110:5
  111:25 112:1,24
  113:8,20 126:17
  131:9 142:2
**assignments**
 69:1
**Assignor**
 65:1,3 68:7,8 69:18
  69:23 112:25
  128:17
**assigns**
 113:8 131:8
**assume**

52:17 55:2 57:9
  146:16 166:24
  181:7
**assumed**
 49:20
**assuming**
 127:13
**assumption**
 6:7 77:10
**assure**
 50:21 73:10 172:17
**attached**
 102:14 133:15 146:1
**attempt**
 101:9 108:15
**attempting**
 161:6 165:6
**attendance**
 180:13
**attention**
 58:10 68:4,5 165:18
  165:23 180:6
**attorney**
 2:19 5:14,18 9:9
  38:17 40:17 48:25
  49:1 61:22,22 62:18
  63:8,8,16 64:7
  66:10 73:23 95:2
  127:1 135:14
  183:11,14
**attorneys**
 2:7,11,15 14:12
  37:23 38:2,8,11
  39:4 127:5 147:14
**authenticity**
 141:7
**authored**
 164:16 165:4 166:12
**authority**
 69:19 70:8 71:16
  128:17 135:8,16
  161:10
**automatic**
 91:14
**available**
 122:17

**Avenue**
 108:23 109:12
**avoiding**
 89:15
**aware**
 25:25 29:6,18 32:15
  37:22 38:18 40:17
  45:18,25 51:16 52:1
  52:6,8 57:7 59:14
  61:11 63:20 71:14
  73:10 75:4 79:13,16
  80:16 81:7 83:15
  89:4,7 92:9,14
  93:12,16 94:17 95:2
  95:24 96:7 101:11
  101:13,13,25 104:9
  116:6 119:24 121:6
  121:17 125:22,25
  129:4,5,6,19 131:16
  131:21 134:19
  135:3 136:7 140:15
  146:14 162:16
  166:23,24 168:9
  175:22
**awhile**
 50:18
**awkward**
 111:13
**AYYZ**
 27:22 28:16
**a.m**
 180:7

---
                **B**
---
**B**
 58:6,18 83:23 155:22
**back**
 24:3 25:24 26:5 41:5
  41:17,22 42:6 53:25
  64:24 68:3 69:11
  72:13,15 75:21 81:6
  92:5,6 94:10,25
  99:19 101:4 110:14
  116:16 137:16
  139:8 147:9 148:18
  150:21 155:3 157:6

 159:21 163:11,13
  179:7 181:14
**background**
 9:7 28:24 30:6 43:2
  45:3 49:19 162:17
**backup**
 32:5 36:8 44:2 52:22
**BALSAMO**
 1:14 183:5,20
**bank**
 60:14,16,19,20 61:10
  76:5 105:16 136:18
**banks**
 22:7
**bar**
 170:20
**based**
 96:5 123:5 134:18
  175:5 181:5
**basic**
 47:4 158:24
**basically**
 42:1 47:3
**basis**
 11:20 12:4 20:13
  28:12 150:13
**baton**
 159:19
**bear**
 80:13
**bears**
 107:22
**becoming**
 125:17
**beginning**
 58:21 130:3
**behalf**
 12:2 28:16 76:20
  77:4 95:3,10 135:14
  146:2 147:14 148:4
  172:15
**belabor**
 140:4
**believe**
 17:24 21:9 22:1 23:9
  28:12 29:8,14 31:15



33:21 36:6 37:5,14
38:20,24 39:17
40:15 41:8 42:19,22
43:11,21,23 47:23
48:6 56:14 60:3,4,8
60:18 62:2 64:23
67:16 70:1 75:18
76:10 78:8,11 80:5
83:13 87:7 89:16
92:11 94:1 98:11
101:17 102:5,22
107:14 109:16,22
110:8 113:14
114:24 117:22
118:2 123:5 126:8
128:6 130:14,21
134:23 136:4
140:17 141:25
144:5 146:19
147:18 148:6,9
149:12,15,22
150:11 151:8 155:1
155:11 156:15
157:19,19 163:16
169:15,24 173:15
174:18,25 177:6
178:2
**believed**
35:19 86:18
**bell**
134:8
**belongs**
27:19
**beneficial**
108:22
**benefit**
27:15 59:16 113:6
131:7 139:1 143:13
**benefits**
17:9 22:22
**Bernheim**
2:9 3:7 5:3,8 7:1 9:2
12:11 72:12 78:21
87:20 140:18 160:7
169:19 174:12,17
177:18 179:21

**best**
6:4,6 8:2 45:11 62:5
130:4
**better**
79:22
**beyond**
44:14
**big**
11:6 164:13
**billion**
14:6
**bind**
140:11 161:11
**binding**
69:22
**bit**
9:6 10:21 13:17 45:8
167:1 169:23 173:2
174:13
**black**
145:23
**blank**
145:21 149:19
158:17
**Boder**
21:21
**Bodner**
20:20 21:20,21 23:5
23:20 47:10
**body**
114:25 115:3 120:10
149:2
**boned**
90:8
**borrower**
17:9 18:22 26:7
35:16 38:25 39:12
53:17 54:4,8,10
63:23 95:10 122:19
123:9 139:20 170:9
**borrowers**
17:7 25:3 81:18
117:11
**borrower's**
123:7 166:18
**borrowing**

54:11 86:10
**bottom**
56:20 91:4 138:15
153:17
**Boulevard**
2:6 5:1
**boxes**
153:17 154:4
**breach**
101:19
**breached**
101:1
**break**
6:11,15 103:9 140:20
**brief**
28:2 46:7 140:22
**briefly**
10:22 115:3 174:13
**bring**
8:4,5,6,12 25:6 28:15
52:12 161:14 164:6
165:22 177:13
**bringing**
159:21
**brings**
7:10 20:14 45:12
150:16
**broadly**
30:9
**broker**
26:1 161:12 177:24
177:25 178:1
**brokerage**
23:25 24:1,4,22,23
29:9,15 33:19,25
107:4 178:3,6
**brokers**
29:12,22,23
**broker's**
29:19 178:11,20
**Brooklyn**
2:14 108:24
**brought**
11:21 37:7 77:16
78:20 161:19
165:18

**building**
176:13,16
**Burton**
3:23 37:1,4,11,17
38:15,23 39:9,15,20
39:24 40:5,16 41:1
49:17 56:12 61:17
61:21,23 62:1,3,7
62:12 63:21 64:1,5
64:9,18,21 66:5,8,9
67:19 70:10,13
73:16,21,24 74:3,14
74:24 75:1,5,15,19
76:20 77:10 80:10
84:3,14 93:18,24
95:5,8 96:24 97:17
97:25 103:23 104:2
110:1,3 112:13,18
112:23 113:11
114:8,17 115:1
116:3,8,9,15,16
118:13,14 120:9,19
120:22 121:8 122:7
122:12,15 123:2
125:2 126:14 127:6
128:13 129:12
130:15,18 131:2
132:23 136:24
160:11,12,25
164:14,24 165:10
165:13 166:25
168:22 169:9 170:2
172:16 173:25
176:5,10
**Burton's**
75:10 121:15 128:23
130:10 131:14,23
165:5,24
**business**
10:5 11:4 13:2,6
16:22 25:2 26:8
44:7,10,12,15
138:14,17,24
139:18
**buy**
41:17,22 42:6 92:5



**buyer**
63:9
**buying**
11:2 30:2
**bylaws**
36:15 174:3
**B-o-d-n-e-r**
20:20
**B-u-r-t-o-n**
37:1

---

**C**

**C**
1:9 2:2 5:1 93:6
**calculate**
151:23
**calculated**
150:19 151:16
155:19
**calculation**
151:13 159:1
**calculations**
151:18
**calculator**
155:23
**call**
17:6 30:10 107:7
115:2 122:20 123:5
**called**
1:10 10:4 17:12
21:23 27:22 53:23
53:24 72:8,10,19,20
117:9
**cancel**
91:15 102:1
**cancellation**
141:9 144:10,15,17
145:1 179:5
**cancelling**
141:15
**capabilities**
49:11
**capable**
168:13
**capacity**
9:16

**caption**
97:7
**captioned**
55:18 56:11 58:18
75:24 85:8 92:24
107:21 132:8 141:8
145:15 147:1
**care**
124:17
**career**
35:18 111:24
**carpets**
124:11
**case**
25:8,11 120:3 139:25
142:14 170:16
183:15
**cash**
17:14 24:5 82:2
105:16 178:9
**cashier**
76:5
**caveat**
6:13 50:5
**Center**
1:18 2:9
**certain**
21:10 23:24 24:8
29:16,20 35:21
40:15 49:14 54:22
56:14 65:7 75:12
79:9 90:7 113:13
116:20 118:2 127:2
160:17 169:24
173:19
**certainly**
12:15 24:19 28:3
30:21,25 31:10 32:2
40:8 57:13 62:14
70:12 74:7,12 78:16
80:24 84:19 95:9
97:11 105:16 106:8
107:14 116:7
123:13 139:10
162:5 180:15,15
**certainty**

84:8,16
**certificate**
168:18 183:2
**certificates**
168:11
**certification**
4:14 120:25 121:2,16
121:22 132:3,8,10
133:11,13 135:7,15
**certified**
1:14 76:5 183:5,20
**certify**
183:7,10
**cetera**
11:24 175:2
**chain**
4:11,22 120:4
**challenge**
101:7
**challenges**
95:24
**chance**
104:7 122:20 141:11
**change**
124:11
**changed**
72:25 171:13
**changes**
137:3 171:16
**changing**
171:19
**characterization**
54:1 86:12
**characterize**
163:25
**characterizes**
69:8
**charge**
46:15 79:17 176:9
**charged**
39:20 81:14 82:13
**charging**
137:24 138:5,21
139:12
**chart**
4:21 153:5

**Chase**
60:20 61:1
**check**
37:19 76:3,6
**choosing**
86:13
**chose**
20:19
**circumstances**
75:12 101:9
**citing**
90:16
**City**
10:11 176:2
**Civil**
1:2,3,13
**claim**
74:4 75:1,6,7,8,13
167:10 172:23
177:1,14
**claiming**
179:9
**claims**
108:17 128:3 167:5,6
167:7 177:3,5,6
**clamming**
164:1
**clarify**
115:17
**clarifying**
115:6 118:12
**classes**
11:1
**clause**
57:24 91:24 96:10
108:21 129:20
131:12,18,21 159:5
**clear**
44:8 45:10 46:3
74:25 75:2 81:10
93:17 99:21 100:18
101:7 115:1 119:5
145:3,5 158:19
168:20 175:18
181:12,15
**clearer**



173:4
**Clearing**
76:6
**clearly**
22:16 47:19
**clear-cut**
143:25
**clients**
37:24
**close**
27:23 47:14 58:10
85:12 87:24
**closed**
49:8 129:11 137:5
165:21
**closely-held**
167:25
**closing**
17:10 39:3,8 40:7
48:15 51:14 62:6
65:25 67:23 68:1,24
73:11,15,21 74:1
76:5 77:7,11,24
80:7,11,15,16 81:8
81:11,24 82:2,4,10
84:24 85:18 87:1,14
98:13,16,17 103:12
104:6,8 105:24
135:22 136:1
138:10 165:20
172:13
**closings**
111:23
**clothing**
35:18 44:6
**clue**
73:17 118:18,21
**code**
83:6
**collateral**
26:9,14 29:1 30:14
33:9 123:22 124:10
124:13 168:5 172:6
174:15,21
**collect**
101:10

**collection**
76:4
**combination**
115:21 148:11,12
**come**
24:3 25:13 34:18
41:4 43:18 71:24
84:13 89:3 101:20
110:25 116:25
119:1 157:18
160:16,25 170:20
**comes**
34:15
**comfort**
47:5
**commenced**
5:9
**commencement**
88:15
**commencing**
1:20
**comment**
32:4 62:12
**comments**
25:24
**commercial**
13:18,24 29:4 30:6
**commercial-type**
13:15
**committee**
10:19
**communicated**
75:18 144:23
**communicating**
181:18
**communication**
33:16 148:3 172:21
181:3,4
**communications**
33:17 74:18,22 148:6
148:10,15 163:12
**company**
5:13 10:7 11:6,15
13:1 14:2 15:15,16
15:18 16:2 17:23
51:6 65:13,21 66:16

66:17 118:1 119:21
142:12,24
**compensated**
18:20
**competently**
174:10
**competing**
108:17
**Complaint**
57:6 146:1 177:12
**complaints**
167:9
**complete**
160:19,20
**completely**
115:15,16
**complicated**
150:20
**comply**
100:23
**Compound**
64:13
**comprising**
109:10
**computer**
78:25
**conceding**
113:16
**concept**
11:25 42:9 46:20
51:20 52:15 63:7,14
77:1 95:22 98:19,20
98:22 178:15
**conceptually**
168:8
**concern**
64:4 71:13 73:7
111:11 163:4
170:12
**concerned**
49:9 71:12
**concerns**
163:21
**conclude**
153:25
**concluded**

182:5
**conclusion**
45:12 71:25 72:1,5
72:16
**concurrent**
63:17
**condominium**
108:23 172:11 173:7
173:13,25
**condominiums**
172:8 173:7,18
**condos**
31:20 35:12 56:9
**conduct**
37:23 63:1,4 64:2
175:5
**confess**
101:4
**Confession**
3:19 53:24 55:3
94:22 95:1,12,19,22
96:9,14,22 97:2,9
98:3,8 99:1,2,13,25
100:8,15,21 101:10
101:15,22 102:2,11
103:10,14 104:3
106:12
**Confessions**
95:25 96:5 100:17
**confirm**
22:2 40:6 121:16
**confirmed**
64:18 102:17,19
112:12
**confirming**
166:15
**conflict**
63:5,11,16,17
**conflicts**
63:7,14
**connection**
16:8 18:17 21:21
26:19 28:8 31:1,10
36:23 58:25 59:21
70:24 71:6,9 73:25
74:5,16 113:8,20



119:25 126:16
131:8 147:15
148:13 149:20
160:6 179:4
**consent**
109:11 135:9
**consider**
164:23
**consideration**
58:22,24 96:7
**considered**
178:12
**consistent**
39:5 81:2
**constitute**
30:20
**constitutes**
69:22
**construed**
73:1
**contact**
44:24 142:3
**contained**
131:13
**containing**
110:16
**contemplate**
105:25 106:6,6
**content**
56:17
**contents**
165:16
**context**
71:3,4 137:22,23
**Contingency**
85:9
**contingent**
85:10,23
**continue**
142:13
**continuing**
62:23 171:21
**contract**
92:4 139:24 141:20
**convenience**
122:18

**conversation**
116:11 123:2 180:12
181:6
**conversations**
116:5 162:15 163:7,9
163:12 164:4
**convey**
65:2 68:9 109:7
**conveyance**
173:20
**conveyed**
65:12 75:15
**convoluted**
159:13
**coordinated**
161:2
**copied**
40:8 48:19 103:24
114:18 116:22
**copies**
118:14
**copy**
7:9 57:7,9,14 67:15
67:16 102:14
107:13 138:7
140:16 145:23
146:15 181:24
182:2
**Corp**
1:6 2:15 58:3 65:4
112:25 113:22
126:18 140:8
**corporate**
3:14 5:12 6:18,24 7:5
9:24 49:3 77:14
84:6,15 88:21 89:2
174:5
**corporation**
56:9 58:3,4 70:25
140:8 160:6 167:17
167:23,25 172:23
173:6
**corporations**
167:19
**correct**
5:14 6:17,22 9:9

13:16 14:10 15:23
16:9 17:22 22:6
23:3,4,18 26:12,22
26:23 32:16,19 34:3
35:25 39:1,16 46:22
46:25 47:1,12,18,19
47:23 48:2,22,23
51:9,17,21 52:3,7
52:15 54:16 55:4
56:12 58:12 59:12
63:11 64:22,23
66:11 67:2,23,24
68:20 69:3 73:16,19
78:7,10,15 80:2,5
81:15 82:3,14,18
83:24 85:24 86:3,22
87:16 88:23 90:21
99:23,23 106:2
107:10 109:4 110:1
110:7,8,21 114:1,2
114:6,7 115:4
124:18,19 125:6,7
126:19 127:17
129:2 131:14,15
133:2 134:17,18
135:23,24 136:3,20
141:16 143:4,5,8
146:9,12,13 147:25
148:1 153:2,19
154:19,20,24 156:8
156:21 158:14
164:18 166:11
167:17,23 168:2,3
170:20 172:8
173:14,15 178:12
178:13
**correction**
156:15
**correctly**
136:25 147:11
**costs**
77:23
**counsel**
10:15 11:14,19 15:1
15:2,4 37:12 47:6
50:10,16 57:15 64:6

64:10 70:10 95:7
113:19 114:1
115:23 116:8
126:15 131:10,13
166:4,5,10,18,19,21
166:23 167:2
168:15 169:9
173:17 183:11,14
**count**
86:2 101:6
**country**
10:9,10 52:18
**couple**
46:5 50:25 110:22
159:16 180:9
**course**
8:18,21 11:5 12:1
14:15 15:20 28:19
31:8 38:19 40:19
50:10 67:11,12
71:14 80:14 123:16
123:25 134:21
140:21 142:5 175:5
**Court**
1:1 2:13 96:1,4
181:23 182:1
**Courts**
1:13
**cousin**
21:5 25:14 163:17
**cover**
29:15,21
**create**
138:2
**created**
117:9
**creates**
9:4
**creating**
109:9
**creative**
101:21
**credit**
15:13 16:4,9 26:6,12
104:16
**credited**


MAGNA
LEGAL SERVICES

150:24 151:1 159:14,15
**criminal** 46:1
**crook** 45:10 46:4
**CSR** 1:14
**Curious** 84:12
**current** 8:2 10:3 89:9,10,11 115:10 133:16 177:8
**currently** 14:7

---
**D**
---

**D** 3:3
**damage** 88:22
**damages** 88:7,8,9,16 91:17,20 92:2,3,9,13,15
**Dan** 5:8
**DANIEL** 2:9
**date** 4:21 17:16 38:16 55:7 58:7 59:17 61:18 76:3 79:7 86:8 87:21 106:24 107:22 109:23 110:18 111:1,17 121:12 132:9,13 136:1,10,19 144:7,9 144:13,19 145:21 147:3 149:3,7 151:5 152:20,22 153:5 154:9,13 156:2,2,22 158:2,9,9 169:14,15 169:20 181:5
**dated** 3:18,20,23 4:9,10,11

4:12,14,17,22 7:17 56:10 58:6 70:18,22 103:14,18 112:18 114:12 118:6 120:4 125:9,14 132:4 133:14 135:24 141:3 164:16 171:6 183:22
**dates** 17:21 136:6,9,12,13 137:3 169:21
**daughter's** 12:8
**David** 20:19
**David's** 21:19
**day** 6:10 77:7 109:20,21 112:6 132:16 141:24 156:3 159:22
**days** 7:18 104:6
**deal** 8:17,20 9:4 75:8 77:18 98:20 100:24 110:14 157:23 161:6 163:2 164:8 164:11 174:2
**dealing** 14:2 15:14 175:6
**dealings** 39:23 40:1,3,5 42:21 49:24 162:22
**deals** 44:8 47:4,24,25 63:4 161:14,19 164:6 172:2
**dealt** 55:22
**DEBRA-ANN** 1:14 183:5,20
**debt** 26:21,21 102:13
**deceased**

28:18
**December** 17:17
**decided** 130:6
**deciding** 29:2
**decision** 115:11,13,19,20,22 116:8 144:22 161:15
**decisions** 96:5
**Declarant** 108:22 109:3,6
**declaration** 3:21 107:17,21 110:16 111:16,20
**deducting** 82:1
**deduction** 78:3
**deemed** 91:13 137:5
**default** 105:10 106:18 125:19 179:13
**defend** 5:20
**defendant** 2:11,15,20 176:23,25
**Defendants** 1:7
**defined** 57:25
**defines** 92:9,15
**defining** 92:10
**definitely** 166:24
**definition** 86:23 92:13 160:13
**degree** 49:8 84:8
**degrees**

29:3,7
**Delaware** 17:23
**delineation** 44:8
**deliver** 74:10
**delivered** 74:7,10 150:6
**delivering** 85:1
**demand** 144:3
**demonstrate** 150:5
**denote** 82:5
**department** 10:18 14:10,13,24
**Depending** 86:23
**depends** 109:20 160:13
**deposed** 5:21 8:11
**deposit** 149:18
**deposited** 91:16 150:9,11
**deposition** 1:4,9,11 3:14 5:12,17 5:24 6:24 7:4,8,10 8:18 50:20 55:7,17 57:1 58:17 70:21 77:14 97:6 103:21 103:22 107:20 112:10,21 114:15 118:9,9 120:8 125:12 132:7 137:10 145:14 146:25 147:7 153:8 153:10 154:14 169:10 182:4 183:8 183:13
**depositions** 5:15 90:3



**describe**
21:17 22:22 31:18 83:20
**described**
78:2,13 79:21,24 86:21 92:16 94:16 107:1 108:24 115:15 178:25
**describes**
22:14 24:17 77:8,20 79:14 96:14
**description**
3:13 4:7 42:23
**designate**
89:1
**designed**
56:6 108:16
**designee**
3:14 5:13 6:18,24 7:5 77:14 84:7,16 88:21 89:2
**desire**
94:22 105:7
**detail**
90:10
**details**
9:8 20:23 24:4 44:14 45:11,17 52:16 74:20
**determination**
15:13 16:8,19 33:1 123:16
**determine**
16:13 70:7
**determined**
33:24 46:16 76:12 91:22
**determining**
174:23
**developer**
13:3
**Development**
1:5 2:15 58:3 65:4 70:24 112:25 113:22 126:18 140:8 160:6 173:6

**dictate**
64:2
**died**
28:5
**differed**
41:7
**difference**
129:4
**different**
13:12 23:23 29:3,13 38:7 39:2 52:17 63:12 72:7,18 87:21 116:23 151:22,23 173:2 180:5 181:4
**differentiated**
16:1
**differently**
169:23
**difficult**
108:14 130:1
**difficulty**
9:5
**diligence**
14:17 127:19
**direct**
22:19,24 40:1,3,4,9 44:24 76:8 148:6 172:20 180:6
**directed**
172:21
**directly**
36:19,21 62:1 74:6,9 75:20 155:3 172:17
**disbarment**
128:3,11
**disbarred**
128:5,7
**discipline**
50:4 51:6
**disclosures**
134:19
**discuss**
8:9 115:3
**discussed**
29:1 81:5 83:18 87:10 111:5,6

117:19 123:21 149:12,15 163:19 166:20 168:10
**discussing**
108:19
**discussion**
12:12 175:14,15,21 175:25
**discussions**
47:15 93:18,24 134:24 135:1,2 175:12
**distinction**
29:18,24 168:8
**distributions**
107:5
**DISTRICT**
1:1,1
**divide**
143:7
**divided**
138:25 152:2
**doable**
174:2
**document**
8:20 17:18 22:1,6 24:11 31:4 53:22,24 55:3,19,21,24,25 56:3,8,10 57:5,19 57:22 65:20,22,24 67:15,17,18 68:13 68:18,22 69:13 70:25 71:9,12,13,19 72:7,18,24 73:14,21 77:8,19,22 78:1,12 78:22 79:1,13,21 80:2 81:12 82:5 83:15 88:12,22 90:12 92:9,15,21 98:3,19 100:10 101:11,25 102:8 107:23 108:2,7,10 108:13 109:24 110:2,10,20,23 111:21 112:2 120:18 137:14,19

138:1,2,6,12 139:3 141:1 145:16,22 146:5 147:4 148:5 153:12,18,21 154:2 154:15,24 155:1 171:9,12,19,20 180:4
**documentary**
144:25
**documentation**
77:11
**documentations**
82:7
**documents**
8:5,5,6 11:18,23 14:19 15:7,10 16:7 20:25 21:17 22:4 23:13 35:20 36:3,17 37:20 40:13,14 46:11 47:7 48:11,14 48:18,20 50:7 51:8 52:7 55:4,8,11 56:5 57:20 59:9,10,19,22 59:24,25 60:4,5,8 66:3 67:11,13 70:4 70:7 73:25 78:24 79:16 83:19,20 84:8 84:17 85:1 88:14 90:6,9,16,20,22 94:9 97:17,24 100:23 102:4,23 107:6 111:22 114:6 121:13 122:16 128:15 135:3,4 136:2,4,6 138:9 142:18 143:21 146:18 147:16 159:13 171:18 174:5,6
**doing**
18:10 29:24 32:6 34:10 38:2 44:8 49:19 115:16 168:13
**dollar**
14:8 23:8 81:3 179:8



MAGNA
LEGAL SERVICES

**dollars**
31:16,24 32:13 33:2
76:2,20,24 79:3
80:4 81:20 85:17
86:9 94:24 99:1
100:5
**dollar-wise**
14:3
**door**
89:22 101:20
**double**
101:6
**double-check**
22:2 31:3 50:17
**doubt**
141:6
**draft**
85:19 147:12
**drafted**
40:14 56:12 117:5
130:6,12,19 147:11
148:2
**drafting**
159:12
**drafts**
56:15 94:9
**dramatically**
32:3
**draw**
32:4 68:5
**drawn**
76:6
**drew**
68:4
**Drive**
1:18 2:9,18
**drop**
15:16
**due**
8:21 14:17 91:13
127:19 153:18
157:13 179:9
**duly**
183:9
**duties**
49:2

— **E** —
**E**
2:2,2,6 3:3 5:1,1,1
**earlier**
26:6 41:6 46:19
62:17 67:22 79:18
79:19 80:6 87:10
97:17 102:17
112:11 114:3 117:2
117:25 119:3
121:12 149:12,15
162:20,25 178:7
**earliest**
122:18
**earn**
138:23
**ease**
17:9
**EASTERN**
1:1
**economics**
41:25 42:1,7 56:6
79:11 81:3 105:6
139:14,21
**educate**
111:8
**education**
62:23
**educational**
30:5 43:2
**effect**
54:24 109:15 138:3
139:17
**eight**
19:10 112:22 128:22
164:17
**either**
15:1 21:18 25:7
32:24 49:17 57:17
60:23 77:18 84:14
102:9,20,23 103:4
136:23 147:15
148:2,3 152:11
153:15 181:13
**electronic**

141:4
**element**
111:5,6
**else's**
181:12
**emphasis**
49:1
**emphasize**
6:3
**empire**
86:17,18
**employed**
10:2 183:12,15
**employee**
11:4 18:18 183:14
**employees**
13:8 18:13,15
**emulate**
130:25
**encumber**
109:8
**encumbrance**
109:14 173:20
**ended**
179:16
**endurance**
6:11
**enforceable**
69:23 96:21
**engage**
59:8 70:14 123:20
**engaged**
59:4
**engagement**
37:16,23 38:11,22
**engaging**
45:7
**ensure**
108:17
**ensuring**
139:13
**entails**
28:2
**enter**
59:1 69:19
**entered**

38:6 45:19 145:7
168:6
**entering**
170:7
**entire**
6:10 23:10 46:20
50:16 94:18
**entirety**
47:15
**entities**
53:16 76:8
**entitle**
24:23
**entitled**
23:25 24:21 54:23
143:8,23
**entity**
5:10 6:21 14:19
16:13 20:18 21:8,12
21:14 36:11,12 48:4
53:18 54:9,11,12
68:10 116:23
**enumerated**
174:6
**equally**
138:25 143:3,7
**Equities**
21:12,14 118:1,4
119:7,22 120:1
**equity**
12:22 35:1,3,13
41:16 69:24
**erroneously**
158:3
**especially**
52:6
**Esq**
1:6 2:5,9,13,17,19
4:12
**Esquire**
2:5 3:23 112:18
125:9,14
**essence**
87:15
**estate**
10:7,23,25 11:1,3,5


MAGNA
LEGAL SERVICES

12:7,16,25 13:14,16
26:11,19,20 28:25
29:4,8,12,15,22,25
30:2,6,10,14,23
32:16 34:11 36:5,10
43:6 44:6 45:20
63:10 85:20 123:19
134:10,12 173:16
**estimation**
162:19
**et**
11:24 175:2
**evaluate**
25:5
**evaluates**
26:4
**evaluating**
25:3 26:13 28:21,24
174:14,20
**evaluation**
30:6,13
**evaluations**
30:16
**evaluators**
29:4
**evasive**
136:14 140:1
**everybody**
181:12
**evidence**
117:20
**evidenced**
102:13
**Evidently**
180:8
**exact**
43:17 126:19 136:10
152:25 178:14
**exactly**
23:11 27:23 29:20
60:13 86:19 115:14
156:10 174:11,23
**Examination**
1:10 3:6 5:3 160:3
176:21 177:18
180:3

**examined**
128:16
**example**
23:22 29:5 34:9 52:5
63:8 77:2 107:3
122:2 134:9 136:15
143:1 155:22 168:9
172:16
**exception**
151:6
**exchange**
103:22
**exchanged**
90:18 94:10
**exclusive**
169:7
**exclusively**
70:13
**excuse**
56:22 67:4 118:15
**executed**
142:3
**execution**
68:15 110:5
**Executive**
10:14
**exhibit**
3:13 4:7 7:2 55:17
58:6,17,18 59:12
64:24 75:22 99:7
102:12 107:20
112:21 114:15
118:9 120:8 125:12
128:22 130:9 131:1
132:7 133:15
136:15 137:10
144:9 145:14
146:25 147:20
148:19 152:15
153:8 157:6 159:9
**exhibits**
3:12 4:5 9:1
**exist**
82:12 90:7 107:16
116:20
**existed**

70:7,8 73:25 88:11
142:23 168:23
**existence**
81:7 115:7
**exists**
22:13 63:21 78:1
80:20
**exit**
157:7 159:9
**expand**
13:17
**expect**
53:14 73:23 77:22
81:16 82:5,12 83:19
83:22,25 106:5
117:19
**expectation**
57:21 104:22 110:24
110:25 127:14
143:11,15,17 170:9
**expectations**
106:8
**expected**
84:4 105:11,22 142:7
162:20 169:9 176:3
176:10 178:6
**expense**
83:10
**expenses**
16:14 77:2,23 78:3
79:3 81:14,25 82:13
83:9,11,14,17
127:12 143:3,4,23
**experience**
7:14 8:9 34:10 39:6
43:6 44:4 52:22
112:5,6 173:16
**expert**
139:15
**expertise**
16:10,18
**expiration**
91:12
**explain**
34:24 35:6 41:20
47:10 74:8 76:23

77:12 81:18 98:23
99:20 100:14 111:9
139:2 150:13
176:23
**explained**
34:25 47:22 168:5
**explanation**
28:2 34:7,18 44:3
106:3,10
**expressing**
123:7
**extension**
91:11,12 152:12
159:6 178:5
**extensions**
119:25
**extensive**
93:9,13,18 95:9
**extensively**
155:5
**extent**
7:23 8:19 9:4 70:6
95:6 106:6 117:12
166:20 167:8
178:17
**extraordinarily**
161:11
**e-mail**
4:9,10,11,22 24:16
30:19 33:16 48:19
103:13,18,22 104:1
106:24,25 107:11
114:12,16,19,22,25
115:3 116:11,22
117:1 118:6,10,12
118:25 119:4 120:4
120:9,11,19,22
121:15 122:1,15,21
122:24 129:17
136:11,16 140:19
163:11,14 177:23
178:19 180:6,23
**e-mails**
3:20 40:8 43:23
94:11,12,14 117:4
121:7 159:16



**F**

**face**
178:16
**faces**
112:4
**facetious**
124:16
**fact**
25:12 51:15 75:15
77:5 78:12 98:2
104:21 105:17
129:8 161:2 162:18
168:18
**factored**
175:4
**failed**
89:25
**failure**
91:10,12
**fair**
6:7 11:22 15:10 16:6
54:25 69:4 127:16
142:25 161:8,16,17
163:25 172:9 174:9
**fairly**
23:24 35:21 169:24
**familiar**
7:11 8:14 11:22 12:5
15:9 16:7,11 21:11
21:15 22:9 29:5
43:8 52:16 55:11,19
55:20 63:3,13,15
86:4 88:2 95:15,21
97:9 107:23 108:2
113:1 114:19 118:1
125:15,17 132:9
137:13,17 141:5
145:16 147:3,7,9
153:11
**familiarity**
55:13 95:23
**family**
20:13 47:14

177:21 179:25
180:5

**fashion**
25:25 26:20 42:10
**February**
1:17
**fee**
23:25 24:1,4,6,22,23
33:19,25 39:20,21
77:12 91:11 157:7
157:16 159:6,9
177:24,25 178:2,3,6
178:11,11,20
**feel**
14:1 181:11
**fees**
39:4 77:23 152:12
178:4,5
**fellow**
181:18
**felt**
164:2 181:9
**fifty**
23:18,21 31:19,23
33:12 35:3 48:4
49:9 56:8 58:1
142:3,11,12,23
168:1,2 172:23
179:10
**figure**
150:21 162:21
**file**
19:16 50:1,6,7,9,13
50:16 51:2,10 57:11
77:18,23 122:17
**filed**
57:6 83:3 100:18,21
106:18 110:10,17
110:23 146:1
**files**
51:6
**filled**
145:22
**finance**
9:24
**financial**
15:21,21 36:3 79:20
121:1,17,23 122:7

122:11 133:14,16
133:20,23 134:2,6,9
**financially**
183:15
**financier**
139:2
**financing**
11:3 85:8,11,23
**find**
27:17 77:17 89:23
177:22 181:3
**fine**
89:18 160:21
**finish**
60:6 143:18
**firm**
19:25 107:4
**first**
4:18 7:13 8:11 15:16
21:5 25:14,24 37:11
37:13 50:15 57:24
58:22 66:19 69:12
77:25 93:10 98:20
104:1 108:7,21
110:14,20 111:18
111:21 113:18
129:6 131:16
138:12 145:10,15
147:12,16 148:13
148:19 149:21
152:9,20 153:11
154:12 158:16
163:17 183:9
**five**
76:1,4 80:22 87:1
90:11 91:4,6,7,10
93:21 97:7 102:12
117:23 135:7
143:13 155:12,14
155:25 166:1
**flat**
39:20
**flavor**
160:18,19
**Flegmann**
18:24 19:5,11

**Floor**
2:14
**Florida**
128:5,10
**fluctuated**
32:2
**focus**
26:10
**focused**
80:25 123:22
**follow**
179:14,15
**followed**
70:11,12 75:4
**follows**
51:17 52:14 72:15
76:2
**followup**
160:10 174:13 179:3
179:24
**followups**
177:19
**follow-up**
8:19 123:2
**force**
109:14
**foreclose**
51:24 52:13
**foreclosed**
52:20
**foreclosing**
52:1
**foreclosure**
52:12,22
**foregoing**
183:7
**forenoon**
1:20
**form**
28:25 58:5 81:4,16
82:5 88:17 138:13
139:18 155:4
**formal**
30:18,21,23 31:6
32:13 67:22,25
174:25 175:7



**formed**
16:24 17:15
**forth**
79:17 88:16 94:10
163:11,14
**forward**
150:16 181:12
**found**
90:12 92:20 127:8
**four**
18:5 31:24 32:10
33:1 69:17 70:22
85:4 87:22 99:1
128:14 129:20
138:14 165:15
172:2
**four-ish**
18:5
**fraud**
46:1
**frequently**
22:6 44:7
**Friedman**
2:12,13 3:8 157:10
159:19,25 160:3,5
174:19 176:18
179:23 180:3
181:21,24,25
**friend**
28:5
**friends**
28:18
**front**
137:15
**full**
5:4 25:10 64:19 98:9
128:17 135:8
154:18 161:5
179:12
**fully**
159:12
**fund**
124:17
**Fundamentally**
41:17
**funded**

49:8 123:10 125:20
137:6 149:13,16
151:7 154:16,17
179:1
**funding**
77:1 79:4 82:1 83:12
117:18 127:13
136:7,16,20,24
154:18 167:12
169:14
**funds**
11:14 20:7,10 59:15
59:18,20 60:9,11,17
61:2,11,13,21 74:21
82:8,9 85:12,16
86:13,14,15,18
87:24 105:20
122:19 123:7,11
124:2,7,21,24
**further**
44:22 120:25 176:19
177:11 181:22
183:10
**future**
68:8,23 69:1 115:8
115:13,16
**F-l-e-g-m-a-n-n**
18:25 19:4

――――――――――

**G**

――――――――――

**gain**
107:7
**Garrison**
9:19
**Geffen**
2:18
**general**
10:14 11:19,25 14:21
15:24 22:10 69:24
173:17
**generally**
11:6 12:5 34:10 39:7
51:4 57:24 112:16
170:13
**George**
84:12

**getting**
42:4 44:6 74:21 78:3
92:6 165:8 181:9,11
**gibberish**
119:5
**give**
14:1 28:2 31:12
34:18 44:3 53:16
56:17 63:17 73:6
91:5 103:24 104:15
106:4 124:10
160:18,22
**given**
23:17 25:9 29:4
49:19 58:24 105:5
162:21
**gives**
134:11 160:19
**giving**
89:15 155:18
**glad**
6:12
**gleaned**
161:3
**gmail**
116:24
**go**
8:18 9:11 15:12
16:21 25:24 40:12
52:11 53:25 64:17
64:24 65:6 66:23
68:3 75:21 77:25
81:6 86:3 93:3
101:18 104:19
115:10 124:21,24
130:2 137:16 139:8
148:18 152:14
156:14,19 157:6
158:25 175:2
**goes**
26:5 109:6 124:12
138:22 154:3 176:8
176:9
**going**
6:3,9,14 7:1 8:9,21
17:20 22:22 34:17

34:24 40:12 41:4
46:15 47:4,10,13
62:11 69:14 74:8
87:12 89:14,23
90:11 92:8 103:1,3
104:20 105:20
124:16,17 127:5
128:14 139:1 142:8
142:16 145:25
159:18 161:6
169:20 177:22
178:10,17 180:6,8
**GOLDMAN**
1:18 2:8
**good**
75:8,9 76:5 124:13
136:9
**Google**
45:5 127:20
**gotten**
105:19
**Gottlieb**
19:22,23
**governing**
1:12
**graduate**
9:13
**graduating**
9:15
**great**
50:3
**greater**
16:18
**grin**
112:8
**grins**
112:9
**group**
1:6 10:4,6,7 180:13
**guarantee**
53:13,14,19,23 54:3
54:5,15,18,23 96:13
**guarantees**
53:12,16,21
**guarantor**
54:25


MAGNA
LEGAL SERVICES

**guarantors**
54:12
**guess**
18:11,12 20:6 122:3
133:6 173:10
**guessing**
27:9 181:5
**guy**
46:4
**G-o-t-t-l-i-e-b**
19:22

**H**

**H**
2:5,5 5:1,1
**half**
22:25,25 23:9,10,11
23:16 69:16
**hand**
157:11
**handle**
53:5 116:4
**handled**
39:24 40:2 62:7,9
74:18 77:11
**happen**
116:1
**happened**
34:15 110:12 124:4
164:10
**happy**
20:23 37:18 50:22
57:13 59:22 115:17
130:7
**hard**
17:3,4,13 18:8,10
20:4,8 27:11,16
28:10 34:10,16 38:7
44:18 124:1 170:7
**hardcopy**
51:11,12
**Harrison**
1:6 2:17,17,19 3:9
4:12 40:22,23,25
95:3 125:6,8,14,23
126:1,15,21 127:1,3

127:8,11,20 128:4
130:17,22,25
135:19,21 136:23
165:4,9,11,14 166:8
166:9,13,22,23
167:5,7 168:25
170:23 171:1
176:21 177:15
**Harrison's**
128:14 131:6,22
165:5,25
**hazard**
133:6
**head**
116:13 155:24
**headquartered**
10:10
**heard**
110:11
**held**
12:12 54:11 107:3
**help**
100:11,12,22
**helpful**
180:15,25 181:6
**helps**
27:17
**Henry**
1:5 2:20 3:18 70:17
160:5 168:2 171:5
**hereof**
58:7 76:3 79:7 113:7
131:8
**hereto**
58:5 102:14 108:25
133:15
**hereunder**
85:13 91:16,25
**Heter**
4:15 137:7,12
**he'll**
116:17
**hiccup**
100:20
**high**
17:8

**higher**
156:4,9
**hire**
36:25 38:12 47:6
168:15
**hired**
36:23 37:2 38:15
66:10 114:4
**hires**
48:25
**history**
175:5
**hold**
41:4 94:25 112:5
150:15 155:10
158:18
**holder**
53:18
**holding**
16:25 17:1
**holdings**
1:3 3:14,22 4:12,16
5:10 6:18 7:5 16:22
16:22 17:15,22 18:8
18:14 19:6,9,15
20:4 37:7,8,12,17
38:3,6,18 40:18
48:1 57:2,8 59:16
63:21 64:6,10,19
65:2 66:10 67:5,6
67:10 74:4 77:14,19
79:2 82:21 83:4
84:7,16 95:14 97:7
99:10 105:2 109:11
109:18 112:17,23
113:1 114:1,5
116:16,18 125:9,15
129:14 133:16
136:8 140:23 141:4
142:12 143:22,22
144:3 146:2,12,15
146:17 147:25
149:25 150:2,10,12
151:11 179:11
**homework**
89:3

**honest**
128:9 163:5 181:17
**honestly**
8:10 181:20
**hook**
113:17
**hope**
15:18
**hospitality**
13:18,20
**hotels**
13:21
**hour**
69:16
**hourly**
39:20
**House**
76:6
**HSK**
1:6
**HUD-1**
39:4 81:12,17,21
**hundred**
13:10 76:1,4 169:17
172:24
**hypothecate**
109:8
**hypothetically**
143:9

**I**

**idea**
13:9 43:2 47:4 81:9
89:13,19 98:1
105:19 133:3 156:6
175:24
**identical**
126:13 128:13
130:18
**identification**
3:12 4:5 7:6,8 55:15
55:17 58:15,17
70:19,21 97:4,6
103:16,19,21
107:18,20 112:19
112:21 114:13,15



118:7 120:6 125:10
125:12 132:5,7
134:12 137:8,10
140:25 141:2
145:12,14 146:23
146:25 153:6,8
180:1
**identified**
8:1 50:24 58:11
**identifies**
20:1 22:8
**identify**
102:8
**identifying**
83:16
**ii**
76:4
**iii**
65:10
**ill**
12:9
**import**
111:16
**important**
29:1
**impression**
46:3
**inaccurate**
122:1 134:17
**inappropriate**
177:7
**inappropriately**
72:9,20
**incentivize**
100:22
**inception**
32:3
**include**
11:2 59:10 62:25
83:11 174:5
**included**
19:17 129:1 151:13
**includes**
159:4
**including**
70:15 77:16

**income**
16:14 32:18 83:9
**inconclusive**
164:1
**inconsistency**
66:20 69:5,8,13
**increase**
154:22 155:21
**increased**
158:23 159:3
**increases**
156:12
**incumbrances**
169:3,5
**independent**
38:4
**indicate**
136:19 156:4
**indicated**
27:10 30:12 41:6
42:11 46:14 52:21
79:18,19 84:13
93:23 98:5 103:11
114:3 117:7,10
118:25 121:8
143:22 154:15
158:3 161:13
163:16,22 164:15
164:18,19 165:15
166:3
**indicates**
65:20 68:22 87:22
97:8 121:5,21
141:14 158:1
**indicating**
86:7 116:17 118:10
**indirectly**
36:22
**individual**
18:23 43:9 53:19
54:5,6,8 61:7 93:23
**individually**
15:15,17 17:1 28:13
73:12,13
**individuals**
54:12

**individual's**
19:21
**industry**
17:11 35:18
**information**
7:19,21,23 8:15
43:21 62:15 83:21
89:15 93:20 98:10
136:16
**informed**
74:3
**initial**
87:7 151:6
**inquire**
64:1 73:20 175:9
**inquiring**
124:6
**inquiry**
33:7 49:20
**insisted**
116:10 170:16
**instance**
22:1 37:7 41:15
86:17
**instruction**
116:14
**instructions**
75:3,5 119:7,8 160:7
**insurance**
27:22 28:6,17
**intelligent**
96:6
**intended**
17:7 29:21 85:18
112:9 139:23
**intent**
109:19
**intention**
87:7 139:6 142:13,14
**interaction**
40:10 74:13,14
**interest**
17:9 31:19,23,23
35:1,3,13 37:8,15
42:1,2,4 46:15 48:4
49:11 58:8 63:8,14

63:16 65:13 66:16
71:17,22 73:8 76:1
79:10,10,12,14,17
79:25 80:4 87:10
98:24 101:4 104:25
108:16,18 109:9,18
111:10,14 115:23
128:18 135:8,17
137:24 138:5,21
139:13 141:22
142:19 143:21
151:17,19,24 152:6
154:6,21 155:2,16
156:5,9 168:23
169:5 172:7 173:21
179:7,10,17
**interested**
183:16
**interests**
75:11 160:18
**internet**
42:25
**interpretation**
128:18,24
**interrupt**
72:4
**intimately**
52:16
**introduce**
25:7,8
**introduced**
5:7 24:24 74:24
161:1,2
**introducing**
25:2
**inure**
138:25
**invalid**
106:1
**invariably**
15:2
**invasive**
164:1
**invert**
26:15
**invest**



20:19
**invested**
23:5 27:16
**investigation**
42:25 127:19
**investment**
4:15 23:1,10 24:1
105:23 137:7,13
143:11 178:12
**investments**
16:25 17:2 21:18
**investor**
12:7,16,22 13:2
14:16 22:18 33:5,8
173:17 178:10
**investors**
20:11,15 21:4 23:17
47:9,14
**invoice**
39:15,17
**invoices**
38:23
**involved**
5:15 10:24 11:17
16:2 20:4 27:5 28:9
40:18,24,25 42:14
44:19 45:13,20 48:5
51:23 74:19 80:11
85:21,24 98:24
126:22 147:14
161:12 163:1
**involvement**
62:8 126:25 127:3
163:3
**involving**
161:20
**Ira**
1:5 2:11 3:18 4:14,17
5:9 42:21 56:24
58:11 65:1 70:17
97:8,13 112:25
113:19 118:14
126:16 132:3,14
140:23 141:4 146:9
161:18 168:1
169:16,25 171:5

174:15 180:13
**irregularity**
128:1,2
**IRS**
83:6
**Iska**
4:15
**Iskka**
137:7,12
**issuance**
18:20 112:12
**issue**
71:11 113:11 127:6,9
128:11 165:6
166:19
**issued**
76:7 113:15 125:3,23
164:21,22,23
**issuing**
112:13
**items**
77:15
**iterations**
94:8
**iv**
69:18
**i.e**
138:25

---

### J

**J**
5:1
**Jacob**
19:22
**Jersey**
1:13,15,19 2:6,10,18
5:1 18:1 19:24
27:25 62:21 109:13
183:7
**Jest**
1:3 3:14,22 4:12,16
5:10 6:18 7:5 16:21
16:22,23 17:1,15,22
18:7,13,22 19:6,8
19:14,16 20:4,8
22:17 37:7,8,12,17

38:3,6,18 40:18
42:5,7,17 48:1 49:2
57:2,7 59:16 60:22
60:24 63:21 64:6,10
64:19 65:2 66:10
67:5,6,10 74:4,16
77:4,14,19 79:2
82:21 83:4 84:7,16
95:14 97:7 99:10
104:22 105:1,13,21
107:2 109:11,18
112:17,23,25 114:1
114:4,18 115:22,24
116:8,16,18,21,22
117:5,8,9 118:13
120:2 125:9,15,20
129:14 136:8
140:23 141:3
142:12 143:22,22
144:3 146:2,12,15
146:17 147:24
149:25 150:2,9,11
151:11 160:25
161:9,11,14,15
164:7 165:12
166:14,23,25 167:4
168:6 172:6,10,16
173:1 179:11,18
**Jest's**
37:15 61:22 75:11
166:10 168:21
**Jest)in**
115:2
**Jewish**
137:24 138:5 139:12
**job**
6:3 161:5 174:10
**Joe**
180:16
**joint**
28:12 138:14,17
**jointly**
61:7 95:6
**Jonathan**
21:5
**Joseph**

1:5,6,10 2:17,17,19
3:7 4:12 5:6 125:8
125:13 182:4 183:8
**JT**
7:8 55:17 70:21 97:6
103:22 112:21
114:15 118:9 120:8
125:12 132:7
136:15 137:10
141:2 145:14
146:25 153:8
164:16
**JT-1**
3:14 7:6
**JT-10**
4:10 118:7
**JT-11**
4:11 120:5
**JT-12**
4:12 125:10 165:15
166:1
**JT-13**
4:14 132:5
**JT-14**
4:15 137:8
**JT-15**
4:16 140:24 144:9,13
**JT-16**
4:18 145:11
**JT-17**
4:19 146:22 147:20
152:15 155:11
**JT-18**
4:21 153:5
**JT-19**
4:22 180:1,4
**JT-2**
3:16 55:15
**JT-3**
3:17 58:15,18
**JT-4**
3:18 70:19 171:4
**JT-5**
3:19 97:3
**JT-6**
3:20 103:19



MAGNA
LEGAL SERVICES

**JT-7**
3:21 107:18
**JT-8**
3:22 112:19
**JT-9**
4:9 114:13
**Judgement**
3:19 95:25 97:3
101:16,22 102:2,12
103:10,15 106:12
**judgements**
45:19,23
**judgment**
53:24 55:3 71:21
94:23 95:1,13,19,22
96:5,10,14,22 97:9
98:3,8 99:2,3,14,25
100:8,15,21 101:5
101:10 104:3
**Judgments**
100:17
**July**
4:17,22 141:3 144:8
145:8 180:7 181:6
**jump**
148:19
**June**
87:2,15,19,24 151:8
153:24
**jurisdiction**
52:18
**jurisdictions**
53:1
**J-a-a-k-o-v**
97:19

---
**K**
**Kalish**
180:8 181:18
**keep**
51:1,11,13 139:11
179:19 180:13
**keeping**
51:3
**Kennedy**
2:6 5:1

**kickback**
118:24
**kind**
7:2 56:19 60:7 72:23
81:7 100:14 105:17
111:8 112:12
120:17 143:19
163:14 175:2
**kindly**
72:12
**knew**
39:22 43:24 44:1,4
98:5 123:13 126:1
162:19
**know**
6:5,12 8:15 13:1 14:7
21:7 23:5 25:15,19
26:2,13 29:5 32:24
33:3 39:10,11,13,22
40:13 41:18 42:24
45:4 46:3,5 49:3,6
50:9,13 52:19,20
53:20,23 54:2 57:17
57:18 59:5 61:13
65:22 67:8,9,14,25
68:2 70:5 74:20
75:14 78:5,6,15,18
78:19 79:5 80:8,9
83:7 88:24 89:4
90:2,9 91:19 95:5
96:9,17,20 97:21
99:4 100:5 101:14
102:10,19 103:3
105:17 110:12
111:25 114:11
117:2,3,24 118:2,5
118:16,20,22 119:1
119:8,15 120:14
123:3,11,13 126:1
126:24 127:2,8,11
127:15 128:7,10
129:12 130:4,5,9,12
130:18 132:2,25
133:8,10 135:13,18
135:25,25 138:7
144:6,19,22,25

145:21,23 146:16
150:20 152:22,24
153:14 158:20
159:1 160:12,13,22
161:22,24 162:13
162:20,25 164:4
165:2 166:17
169:12 170:5,6
172:5,15 173:24
174:7,22 175:1,1
176:4,5,15,17 177:3
177:9 180:11 181:8
**knowing**
38:1 96:6
**knowledge**
43:5 96:3 97:23
114:10 116:7
119:19,23 130:24
165:7 167:23 171:1
**known**
43:11 118:1
**knows**
25:7 163:6

---
**L**
**lack**
75:10 85:8
**Lakewood**
2:6,18 5:1 19:24
27:25 109:12
**Lang**
2:5,5 8:25 50:12
54:17 60:2 66:22
69:7 75:18 78:21
87:18 91:1,22
107:24 140:21
155:9 182:1,3
**LANGE**
78:23
**language**
69:5 86:4,7 108:20
138:19
**large**
11:4 14:6
**larger**
173:7

**law**
1:6 2:5,17 9:11,15,16
128:16 176:2
**laws**
73:2
**lawsuit**
176:22 177:6
**lawyer**
36:23 89:18 114:9
136:23 168:12
**layers**
100:9
**leading**
98:13
**learn**
43:12 45:2,9 48:3
127:25 128:4
**learned**
45:8 72:8,18 93:23
124:20,23
**learning**
43:15
**lease**
109:7
**leave**
101:20
**leaving**
82:10
**led**
43:21
**ledger**
49:4
**left**
46:3 64:25 153:18
164:3
**left-hand**
157:7
**legal**
10:18 14:10 37:12
62:23 69:22 108:22
170:9
**legwork**
161:7
**Lend**
33:13
**lender**



11:8,12 12:6,21 44:18 63:22 95:10 115:1,9 120:24 121:6,21

**lenders**
15:14 22:7,9 25:3 52:6

**lending**
11:10 14:16 18:8,9 18:10 20:4,8 27:11 28:10 34:10,16 38:7 41:18 45:20 124:1

**length**
151:18

**letter**
3:18,22 4:12,16 7:9 7:17 24:17 37:17 38:22 70:17,22 112:12,13,17,22 113:2,3,5,12,18 125:1,3,5,8,13,15 125:22 126:3,5,12 127:6,9 128:12,15 129:13,25 130:10 130:17,25 131:6,14 131:22 140:23 141:3,8,12,14 144:9 144:20 145:9 164:15 165:3,5,7,12 166:1,12 167:2 171:5 179:5

**letters**
37:24 38:11 172:22

**let's**
16:21 25:24 26:18 32:5 53:25 64:24 68:3 75:21 77:25 81:6 94:25 98:20 99:17 108:20 110:14 122:3 137:16 154:12

**level**
16:10 47:5 62:8 90:10 175:16

**Leverage**
9:24

**Lexington**
109:12

**liabilities**
134:20

**liability**
55:5 134:11

**license**
1:16 29:9,12,13,15 29:19,22,23,25 62:23 183:23

**licensed**
25:25 30:24 62:18

**licenses**
26:2 29:11

**lie**
22:17

**life**
28:5 163:13

**light**
103:16

**Lightstone**
10:4,6,7,13,22 11:8 11:10 12:3,7,15,20 13:9

**Lightstone's**
11:12

**limited**
7:15 8:8 17:11 20:13 40:10 62:9 74:12,13

**line**
56:21 147:21

**lines**
33:12 66:24 91:10 138:14 146:6 157:13 175:1

**link**
35:22 36:2

**liquidated**
88:3,9,16,22 91:17 91:19 92:2,2,9,13 92:15

**list**
7:15 8:10 9:3

**listed**
108:15

**listing**

89:19

**litany**
169:8

**litigate**
52:19

**litigation**
45:14 50:10 71:4,7 71:10,15 78:17,19 88:15 112:6 144:3 167:4

**litigator**
7:12

**little**
9:6 10:21 13:17 30:4 45:8 68:6 69:17 161:4 167:1 169:23 173:2 174:13

**live**
160:14

**LLC**
1:3,6 3:15,22 4:12,16 5:10 6:18 7:5 16:22 16:24,25 65:2 109:12 112:17 113:1 117:8,9,12 119:7 125:9,15 141:4

**LLP**
2:12

**loan**
4:21 11:18,23 12:5 12:24 17:5 22:18 25:4,6 27:16 28:13 28:14 35:1 42:2,8 51:8 53:8 56:6 78:9 81:4,13,25 82:14 83:12 96:13 105:7,8 114:18 120:23 121:6 123:10,17 124:14,17 133:23 138:10,20 153:4 154:3 175:8

**loans**
17:3 137:23 170:7

**locate**
159:17 178:23

**located**
10:8 27:24 108:23

**long**
7:15 9:20 18:7,9 19:8 88:18 99:21 136:10 163:13 175:5

**longer**
101:2

**longtime**
180:23

**look**
7:16 8:10 14:24 15:20 16:12 24:19 26:6 32:18,21 48:13 56:20 57:13,23 72:23 81:17 85:3 86:25 89:4 91:3 92:19 101:15 103:24 108:20 120:17 122:14 128:21 131:5 132:14 134:3,15 146:4 147:19 154:2 176:10 180:17

**looked**
8:10 10:21 41:18 46:4 71:6 97:17 99:6,7 107:6 121:12 129:16 131:1 134:1 134:2,6 136:4,5,10 136:15 154:15 155:5 169:10 173:23 174:4 178:4 179:6

**looking**
78:23 104:1,11 106:25 144:13 177:22 181:16

**looks**
104:10 124:13

**lose**
101:22

**lot**
7:21 30:7 40:8 45:13 136:4 161:7

**lots**



10:25 11:5 106:7
167:21
**love**
100:12
**lower**
118:24
**LTV**
33:12
**lunch**
103:9
**luncheon**
103:7

**M**

**M**
2:13 5:1
**MAI**
29:5
**maintain**
50:1,6 51:7,8 62:23
**making**
11:14 12:9 29:23
65:8 68:24 69:1
74:4 116:1 121:24
137:23 148:19
181:13
**Malka**
25:23
**manage**
10:18 11:1
**management**
10:19
**managing**
11:14 82:6
**manner**
42:6 53:4
**March**
3:20,23 4:9,10,11,13
4:14 20:3 42:20
43:8 46:12 56:10,16
59:15 67:19 68:25
70:2 79:7 85:17
86:7 87:24 97:14,24
99:10 103:12,14,18
104:2,24 107:22
108:4 109:17,23

110:4,14 111:2,9,15
112:18,22 113:12
114:8,12,23 117:17
118:3,6,11 119:22
119:25 120:4,9,19
121:19 122:8 123:3
125:9,14,23 126:22
132:4,9,13,16,19
133:4,5 135:22,22
135:25 136:2,5,8
142:2,20,22 145:21
147:3,9 149:19
150:23 151:9
152:17,21,22
154:21 155:8 156:2
156:2,8 158:17
164:16 169:14,20
169:25 170:3,22,25
172:14 173:24
175:19 183:22
**mark**
7:2 179:24
**marked**
3:12 4:5 7:6,7 55:15
55:16 58:15,16
59:11 70:19,20 97:3
97:5 103:15,19,20
107:18,20 112:19
112:20 114:13,14
118:7,8 120:5,8
125:10,11 132:4,6
137:8,9 140:24
141:2 145:11,13
146:22,24 153:5,7
164:16 171:4
179:25 180:4
**market**
32:21 123:19
**markings**
145:24
**massive**
143:9
**matched**
143:17
**material**
23:9

**materials**
8:12,22 16:3 57:15
**math**
155:24 158:24
**matter**
5:9 40:14 54:16 57:6
63:18 67:11,12 88:9
90:7,10 146:2
168:21
**matters**
11:4,5 38:8
**mean**
17:5 25:1 27:12
28:23 35:9 37:7
40:9 77:6 80:21,21
82:4 86:13 92:4
101:17 105:4
106:22 113:16
129:22 130:1,7
150:25 164:7,24
166:16 171:15
181:1
**meaning**
61:22 66:16 68:7
69:18 84:2 87:12
89:3 101:6 115:11
131:23
**means**
79:21 83:7 86:16
88:6 104:17,18,20
106:6 107:1 132:2
139:2 166:22
171:10,13,16
**meant**
106:23 131:24 167:1
**measured**
47:15
**mechanics**
168:12
**meet**
46:8 181:2
**meeting**
115:11
**member**
5:11 6:20 38:5
170:20

**membership**
3:16 4:18,19 55:14
55:18 56:11,16
59:11 65:13 66:15
75:21 85:4,5 86:8
91:6 99:6 101:3
102:1 117:16
119:17 120:11
141:16 144:10
145:10,15 146:21
147:2 148:14,20
155:5,7,12 156:23
157:20 179:7
**mention**
25:12,13,15
**mentioned**
26:9 117:2 119:3
159:4 164:2 170:14
**message**
74:7,10,11
**methodologies**
32:25
**million**
14:8 31:16,18,24
32:1,9,10,12 33:1
33:23 76:1,4,19,24
77:7 79:3 80:4 81:3
81:20 85:17 86:9
94:23 98:9 99:1
100:5 117:21
143:13 152:10,13
155:25 179:8,11,12
179:13
**mimic**
42:6
**minds**
115:12
**mine**
82:11 143:17
**minimal**
87:12
**minimum**
105:11,22 116:11,13
**minutes**
47:15,17 73:5 83:18
110:22 118:12



**Miriam**
18:24 19:2 21:14 25:16 117:2,5 153:15
**mirror**
79:20
**Miscellaneous**
92:24
**misheard**
156:16
**mispronounce**
97:18 137:12
**missed**
73:4
**mistaken**
150:16
**Mm-hmm**
14:5 100:3,6 117:6 126:12 151:25 157:15 158:10
**moment**
5:8 8:3 32:5 107:1 137:4 165:1
**Monday**
153:10 180:6
**money**
17:3,4,13 18:8,10 20:4,8,20 21:6 22:19,25 23:10 24:5 27:11,15,16,19 28:6 28:10 34:10,16,16 38:7 44:18 47:3 54:11 81:19 86:2,16 118:3 119:21 123:24 124:1 138:13 150:5 151:18 170:7 181:14
**monies**
91:16,25 92:6 169:21
**month**
143:12 152:4
**monthly**
142:15 152:12 155:21

**months**
79:10 87:2,4,8,8,10 87:13 151:7 156:12 156:16,16,18
**morning**
7:17
**mortgage**
26:24,25 27:2 29:23 34:11,17 41:14 42:4 42:11,16 51:5,5,9 51:15,17,24 52:2,2 52:7,13,14,24 85:23 109:7
**mortgaged**
26:20
**mortgages**
11:24 51:16 53:6 170:14
**mother-in-law**
12:8
**move**
75:9 173:3 177:7
**moved**
10:3 13:7 17:25
**movement**
101:21
**multiple**
61:24 63:12 109:21
**multi-family**
13:19
**muster**
138:20
**M-a-l-k-a**
25:23
**M-i-r-i-a-m**
19:2

---
**N**
---

**N**
1:9 2:2 3:3 5:1
**name**
3:6 5:4,8 16:23,24,25 18:24 19:3,21 20:18 21:11,19 25:19 27:21 43:9,11,18 46:4 56:24 60:21,23

60:24 61:7,7 97:16 102:12 115:24 126:1 132:15 146:9 160:4
**named**
117:2 176:24
**names**
127:5
**national**
107:4
**nature**
9:22 10:23 11:3 15:22 21:18 26:1 29:20 32:6 33:16 34:7,19 36:16 40:4 41:6,11,13 42:15 151:20 162:15 174:3
**nearly**
80:22
**necessarily**
51:10 123:18 164:25
**necessary**
85:12 87:24
**need**
6:11 8:16,19 34:16 53:2 54:5 74:19,20 82:19 83:21 86:3 123:7 126:10 140:18
**needed**
82:25 115:22
**needs**
17:14 25:4 122:19
**negotiated**
46:24 47:1
**negotiating**
94:13
**negotiations**
93:9,12,13 95:9
**neither**
101:13 115:10 142:7 183:10
**net**
77:1 79:4 82:1 83:12 117:18 127:12

133:17 134:10 149:13,16 151:7 154:18 179:1
**network**
35:19
**never**
27:1 39:15 41:8 52:20 62:4 64:20 90:8 131:24 152:10 160:17 164:18,21 166:9,22,24 167:21 168:17 169:25 173:12,23
**nevertheless**
88:20
**new**
1:1,13,15,19 2:6,10 2:14,18 5:1 10:10 17:25 19:24 27:25 58:3 62:21,21 73:2 76:6 96:18,22 99:16 108:24 109:13 123:20 128:16 140:8 176:1,2 183:7
**news**
35:22
**night**
7:13,17
**nine**
7:18 14:6 114:16
**Noah**
3:23 37:1 67:19 97:17 112:18 114:17 115:1,2 118:14 160:11,12 164:14 168:22
**nominal**
107:5
**Nonpayment**
102:13
**nonresponsive**
173:3
**norm**
42:11
**normally**
41:7



**notarized**
67:19 97:24 109:25
110:2
**notarizing**
133:4
**notary**
97:14,16 132:19,22
183:6
**note**
51:9,11,12,17 52:3
52:13,14,24 66:14
66:17 67:18 78:7
96:13 97:12 102:14
102:18,20,21,25
103:4 107:10,13,15
114:23 140:9
159:13
**noted**
8:8 117:16 135:21
**notes**
11:24 53:5
**notice**
3:14 6:24 7:4,10
141:8 144:14,16
145:1 158:22
**noticed**
7:13,15 131:24
155:20
**noting**
87:15
**November**
133:14
**null**
109:14
**number**
7:9 13:11 17:2 40:13
45:18 55:18 57:19
59:12 64:24 65:10
68:5,6 70:22 75:22
75:24 77:15 85:4
87:1 97:6 103:22
107:21 112:22
114:16 118:9 120:8
125:13 132:8
137:11 146:25
148:20 149:18

153:9 164:17
171:24,24 179:8
**numbers**
23:12 136:11 155:3
178:14

---

**O**

**O**
5:1
**object**
69:7 91:1
**objection**
159:21 174:17
**obligates**
79:2
**obligation**
38:14 69:23 142:10
142:23 143:3
**obligations**
69:20 138:3 140:10
**obligor**
54:6
**observed**
111:24
**obtain**
73:24 131:10,13
166:3,21
**obtained**
42:7 64:1
**obtaining**
85:10
**obviously**
79:11
**occasion**
13:4,5 21:23 52:6
162:9,10,11
**occasions**
20:3 124:4
**occupancy**
175:14,16
**occupied**
175:10,23
**occur**
170:17 178:21
**occurred**
18:4 98:12 111:18,20

144:6
**occurring**
109:21 124:6
**Ocean**
1:5 2:15 31:19 35:4
36:12,15 48:4,11
49:10 58:2 65:4
70:4,24 71:17 73:8
73:25 98:24 105:1
108:23 109:3,18
110:6 111:10,11,15
111:17 112:24
113:21 126:17
135:17 140:7 142:4
144:4 160:5 167:14
167:16,22 169:5
173:5,13 174:1
**October**
3:18 70:18,22 128:19
128:25 129:21
171:6,19
**office**
2:5,17 13:23,25
122:17
**offices**
1:17 10:9 13:13
**officially**
113:15 164:21
**Oh**
139:3 151:12 175:20
**okay**
6:1,23 8:11 13:11,14
14:23 15:12 16:1
18:3,19 22:11 29:10
30:16 37:16 43:20
45:18,22 46:8,24
48:9 51:18 55:6,25
56:24 59:14,19 61:6
62:22 65:6,16 67:18
67:25 68:12,22
69:17 70:2 71:19
73:12 75:17 76:11
76:23 84:20 85:15
86:6 87:9 88:25
89:6,7,25 90:4 91:9
93:4,6,22 95:21

96:12 99:12 103:25
105:4,24 109:3
110:9 117:25 119:4
120:7 126:5,21
127:23 129:12
130:24 131:5,16
132:1 133:10,22
134:9 137:22
138:12,17 140:14
141:10 142:1,22
143:1,18 144:22
145:5,20 148:13
149:10 151:4
153:14 154:12
156:11 157:25
158:18 160:8,9
164:14 167:4 172:6
176:12 177:15
179:2,20
**older**
31:2
**once**
67:5 103:15 147:21
**one's**
60:10 90:5,23
**one-year**
152:23
**open**
101:20
**opening**
89:22 145:20
**opens**
167:2
**operated**
21:7
**operating**
11:4 14:20 15:6
36:16
**operation**
83:4
**opine**
64:9
**opinion**
41:1 62:3 72:8,19
112:12 113:6,11,15
125:1,3,5,22,25



126:3,5,10,12 127:6
127:9 129:13,25
130:10,17,25 131:6
135:15,20,21,24
136:22 137:2
164:15 165:3,5,7,10
165:11,15 166:1,12
167:8 168:10 169:1
170:16,19,20
**opinions**
126:11 128:23
166:19
**opportunities**
14:18
**opportunity**
181:2
**opposed**
16:25 32:1,5 42:10
42:16 54:1 94:23
97:25 99:18 120:1
178:8 179:13
**opposite**
37:13 180:15
**option**
102:3
**optional**
180:14
**oral**
1:10 24:13 49:25
116:10 135:2
148:11 163:9,10
**orally**
72:25 144:23 171:13
**order**
15:5 26:21 32:25
40:7 71:20 96:21
114:4 150:4
**organization**
15:6
**organizational**
14:19 27:21 48:11,17
70:3 73:24
**original**
4:21 51:12 149:4,8
150:16 153:4
157:22

**originally**
17:23
**originated**
175:9
**orphans**
27:15,20 28:1
**outcome**
139:20
**outlined**
77:20
**outset**
114:4
**outside**
11:14 15:1,2,4
**outstanding**
58:2 113:21 126:17
**overall**
13:6 33:23 59:1
100:23
**overly**
174:25
**oversee**
14:9
**owed**
77:3
**owing**
153:24
**owned**
36:9 58:1 105:15
117:14 142:12
172:25 173:7
**owner**
49:10 108:22 142:16
142:17
**owners**
173:19
**ownership**
107:5 141:22 169:3
172:7 173:21
**owns**
49:13 56:9 173:6

———————————
**P**
———————————
**P**
1:9 2:2,2 5:1
**page**

3:13 4:7 7:14 8:11
21:3 66:23 91:4,7,8
92:20,25,25 93:2
97:11 104:1 120:18
122:14 133:19
146:4 147:19
156:14 180:5
**paid**
18:22,22 26:22 38:25
39:9,11 46:22 77:3
77:4 79:10 80:3
92:7 105:7 107:5
117:10 120:2
127:13 142:14
158:1,4,11,20
168:12 178:11
**paint**
124:11
**paper**
72:7,17 80:23 118:25
169:10 171:25
**paragraph**
58:22 65:7 68:5,6
69:17 72:24,24 73:6
75:24 79:6 85:4
86:25 87:22 91:4,6
91:7 92:20,23
108:15 113:18
126:19 128:14,19
128:25 129:20
131:5 133:13 135:7
138:13 140:4,5
145:20 148:20
149:6,17 155:12,14
165:15,16 166:1,2
171:8,10,21 172:2
**parameter**
175:19
**parcels**
109:10
**part**
13:6 26:12 28:20
29:2 30:12 46:17
50:15 55:21 64:14
64:16 75:10 83:10
84:24 90:18 96:15

100:6 117:18
119:16 150:3 153:1
164:13
**participant**
22:22 23:3 28:9 33:9
68:1
**participated**
30:8 67:24 90:1
**participation**
21:24 22:5,11,21
24:11
**particular**
8:20 30:11 51:7 72:1
72:5,16 82:5
**particularly**
108:24
**parties**
59:4 88:7 90:13,17
93:8,9 94:10 100:19
139:17 145:3,7
162:23 169:11
172:3 183:12
**partner**
140:11
**partners**
140:10
**parts**
41:24
**party**
84:4 135:10 175:13
**party's**
166:18
**part-time**
25:11
**pass**
16:17 75:3 138:20
159:18
**passed**
75:5 160:15
**path**
181:12
**pattern**
163:14
**Paul**
9:19,20,23 10:1
**pay**



42:2 91:11,13
139:25 143:3,4,12
143:12
**payable**
76:2,3,5 79:7 149:19
158:17
**paying**
42:3 47:20 58:10
**payment**
4:21 39:3 79:14,25
91:16 92:1 117:22
119:16 127:11
142:15 149:3,7,10
153:5 155:21
159:10
**payments**
116:25 119:24
141:19 150:24
151:2,4,8,9,11
152:5,8,10,11,12,22
152:24 153:24,25
153:25 156:22
159:14 175:16
181:7,13
**pending**
6:14 72:14
**Pennsylvania**
9:12
**people**
11:13 14:23 25:7
30:1 45:14 62:10
82:6 84:22 100:16
137:24
**percent**
21:25 23:18,21,22
26:16 31:19,23
33:12,21,22 35:4
42:1 46:15 47:11,20
47:23 48:4 49:10
56:7,8 58:2 68:14
79:18 80:3 140:1
142:3,11,12,23
151:19 152:2 168:1
168:2 169:17
172:23,24 178:10
179:10

**percentage**
22:18 23:22 24:6
33:24 35:9 46:22
**perfect**
75:11
**perform**
29:13 30:13 32:13
69:20
**performed**
151:18
**period**
14:17 47:11 64:19
91:12 93:22 98:13
152:23
**permit**
6:2
**person**
7:21 35:19 54:18
68:10 76:7 139:19
161:9 173:17
**personal**
9:7 19:17,18 20:10
53:16,20 54:2 62:8
82:22 83:3 122:11
133:14,20,22
150:10
**personally**
38:13 52:20 105:21
169:15
**perspective**
139:13
**pertaining**
162:25 163:22
175:22
**phone**
47:16 49:24 158:24
**physically**
167:20
**pickup**
105:9
**piece**
53:18 63:10 72:7,17
80:23 89:14 171:25
**pieces**
169:10
**pile**

136:12
**place**
6:2 10:3 67:5 68:20
87:1 93:13 115:7
136:8 157:2
**Plaintiff**
1:4 2:7 3:14 7:5
**plan**
115:13
**play**
11:11 17:12
**player**
163:4
**pleadings**
31:22
**please**
5:4 41:20 69:11
72:13 75:22 76:23
78:1 85:3 91:3
115:2 119:6 120:11
122:20 146:5
152:15 155:10
180:11 182:3
**pledge**
41:14,22 42:16 46:20
49:13 55:22 68:8
69:14 70:9 98:24
99:5,22 109:8
**pledged**
26:20 69:15
**pledges**
69:1
**pledging**
49:11
**plenty**
53:23
**plus**
150:17
**point**
31:2 43:12,18 55:10
55:12 65:18 76:17
84:21 89:23,25
110:12 111:2
113:16 116:5 121:7
124:20,23 128:14
129:8 141:21 144:2

144:8 161:9 165:8
167:12 170:22,25
171:23 172:20
178:23 180:12
181:10
**pointed**
131:4
**pointing**
21:2 157:12 171:24
**points**
177:25 178:2,4,20
**polite**
45:16
**poor**
163:3
**portion**
68:9 128:24 129:10
**position**
10:12 139:19 165:1,9
**positive**
61:25
**posses**
26:3
**possessed**
135:16
**possession**
70:3 101:7
**possibilities**
106:8
**possibility**
106:7,9 134:4
**possible**
122:19 123:8 139:20
151:6
**possibly**
161:14
**potential**
26:7 74:4
**power**
69:19 70:8 128:17
**practice**
1:13 9:16,22 38:1,4,5
62:18 128:2 146:17
146:20
**precedent**
140:6


MAGNA
LEGAL SERVICES

121:13
**preference**
181:14
**Premises**
109:11
**preparation**
55:8,9 114:5
**prepare**
7:18
**prepared**
7:25 89:21 133:10
153:14,15
**prepares**
19:19
**preparing**
82:20
**present**
2:20 53:14 140:1
**presentation**
11:15
**presented**
31:7 34:1,6 46:21
48:6,7,9,12,17,19
49:5
**presenting**
46:17 89:16 144:1
**pretty**
7:20 8:14 9:1 14:7
27:23 45:10 89:11
175:4
**previously**
56:4,13 58:1 61:24
62:2,4 64:6,11
68:17 74:14 83:18
102:5,22 105:6
107:1 110:19 137:1
146:19 154:14
164:1,16 170:13
174:22,24 181:10
**price**
75:25,25 76:11 91:13
148:23,25 150:14
150:17 151:14
152:18 158:22
159:10,11
**primarily**

17:2 20:10 40:2 47:5
74:23
**primary**
13:2 26:9
**principal**
42:3 76:13,16 81:25
142:15 152:7,11
**principles**
69:24
**prior**
27:4 40:6 42:20
46:11 48:15 55:6
65:24 68:18 73:11
73:15,21 74:1 79:22
85:1 98:15,17 99:15
102:25 103:11
111:4 112:14 114:8
114:21 116:5,7
118:12 122:7
126:22 127:21
129:3,5 136:8 142:1
144:2 147:7 160:11
161:18 165:20
169:3,5,22,24
170:19 172:13,14
173:24
**probably**
162:11 174:25
**problem**
159:3
**procedure**
177:8
**proceed**
9:3 63:18 161:16
**proceeds**
28:6
**process**
15:12 16:3
**produce**
89:14 170:16
**produced**
16:8 50:10,14,16,25
60:3,10 78:17,18
90:17,23 102:22
**profess**
52:18

**professional**
30:9 37:4,23 63:1,4
64:2
**profit**
138:23 143:10
**profits**
143:7,8,24
**project**
12:24
**projects**
12:17,23,25 14:3
**promissory**
11:24 52:3,13,24
53:5 78:7 96:12
102:14,18
**pronounce**
21:19
**proof**
145:1
**proper**
166:15
**properties**
13:4,18,18,19
**property**
31:7,13 35:8 52:23
53:18 54:10 98:25
100:4 108:25
141:23
**proportion**
22:19,24
**proposing**
35:1 177:13
**propriety**
166:15
**provide**
7:23 24:20 33:4 34:6
35:20 41:2 47:3
56:6 59:23 62:3
79:2 98:8 159:14
**provided**
23:14 31:2 36:2,7,14
36:18,20,21,22
50:11 54:22 56:7
57:15,16 58:5 60:2
72:9,19 73:15 83:16
84:9,17 102:6 103:2

106:10 126:1 127:5
129:13 134:21
135:15 143:6,21
153:10 155:16
**provides**
56:8 139:24
**providing**
41:1 74:20 81:3
116:18
**provision**
88:22 96:13
**provisions**
90:7
**public**
108:13 183:6
**publicly-traded**
167:22
**pull**
126:13
**purchase**
75:25,25 76:11 91:13
102:1 148:23,25
150:14,17 151:14
152:18 158:22
159:10,11 179:6
**purchaser**
57:25 58:1,7,11
85:10,11,15 86:2
91:11
**purchaser's**
91:14
**purchasing**
179:17
**purported**
167:16 168:24
174:14,21
**purportedly**
133:5
**purpose**
56:2 108:10 124:3
138:1,2
**purposes**
5:12 7:8 16:24 41:1
55:17 56:25 58:17
70:21 97:6 103:16
103:21 107:20



112:21 114:15
118:9 125:12 132:7
137:10 141:2
145:14 146:25
153:8 161:8 166:4
168:21 171:23

**pursuant**
1:12 50:11 55:4 58:4
65:12 128:15
141:16 179:5

**pursue**
177:1

**put**
22:20,25 24:4 28:6
30:16 79:4 82:1
86:15 130:6

**putting**
178:9

**P&L**
36:4

**P.A**
1:18 2:8

**p.m**
104:2 118:11 120:20
122:15 123:3

_____
**Q**
_____

**Queen**
21:12 118:1,4 119:6
119:21 120:1

**question**
6:5,13 12:14 34:8,22
49:12,15 50:15
51:22 53:25 54:21
60:6,15 64:13 69:8
69:10 70:11 71:8,15
72:10,14,21 75:14
77:25 79:23 81:6
84:15 90:15 92:11
92:12 99:15,16,24
100:12 101:24
107:25 113:14
118:17,19 130:3,6
132:12 136:25
137:16 139:8
143:18 144:15

146:19 173:3 176:4
176:7,24 179:14,15

**questions**
5:18 6:3 7:16 8:19
10:20 44:22 63:13
130:8 159:20 160:1
176:6 177:16
179:22 180:10

**quick**
17:10,14 103:9

**quite**
12:4,9 93:2 164:9
168:7 181:15

**quote**
28:22,22 44:15 79:24

_____
**R**
_____

**r**
1:9,9 2:2 104:16

**rare**
124:4

**rate**
23:2 42:2 46:16
47:23 56:7 139:25
154:6,22 155:16,19
156:5,9

**rates**
17:8

**reach**
172:10

**reached**
115:12,14 173:12,24
173:25

**read**
40:9 58:9 65:22,24
66:14 69:11,25 71:9
72:10,13,14,20 73:2
76:9 85:13,18 91:23
91:23 109:15 113:9
113:22 115:7 121:3
128:20 129:16
140:12 141:11
180:8,17

**reading**
71:12

**reads**

91:10

**ready**
180:20,21

**real**
10:7,23,25 11:1,3,5
12:7,16,25 13:14,15
26:11,19,19 28:25
29:4,8,12,14,22,25
30:2,6,10,14,23
32:16 34:11 36:5,9
43:5 44:6 45:20
63:10 85:20 123:19
134:10,12 168:6
173:16

**realized**
69:6 105:12 107:2,7

**realizing**
105:22

**really**
176:9

**reason**
6:4,12 14:25 62:2
75:10 89:1,20 118:3
119:20 130:14,21
133:23 137:2
146:18 166:12

**Reasonable**
95:23

**recall**
18:3 23:7 29:12 32:8
35:22 38:15,21,22
40:6,23 41:9 43:15
54:14,16 60:25 61:4
62:6 66:1 71:13
80:7 88:16,21 89:13
92:18 94:14 98:12
102:20 108:3
112:15 116:19
117:13 121:19
122:3,4,5,9,13
125:17 126:25
132:11 134:4,25
137:3 141:6 145:2
147:11 157:22
158:21 162:6
168:18 171:25

175:14,15 177:23
178:18,18,19

**receipt**
58:23 119:6

**receive**
22:23 104:23 177:24
177:25

**received**
7:6 42:23 51:12
55:15 58:14 64:21
70:18 77:6 97:3
103:19 107:18
112:19 114:13
118:7 120:5 125:10
132:4 137:8 140:24
145:11 146:22
153:5 179:25

**receiving**
38:22 114:22 178:3

**recess**
46:7 103:7 140:22

**recognize**
55:21,24 58:19 106:7
160:15

**recognizing**
7:14

**recollect**
45:12

**recollection**
8:2 23:16 31:6,25
32:11 46:2 48:16
49:18 61:18 62:5
63:6,24 104:7,12
106:23 108:5,6
113:3 114:22 116:2
116:3,15 117:15,24
119:14 121:23
122:6,10,23,25
123:1,4,6 124:5
127:4 148:15

**recommendations**
25:5

**recommended**
116:3 131:9,12 161:1
166:3,21

**reconvene**



8:21
**record**
5:5 12:11,13 60:7
73:3 76:8 87:18
99:17 108:13
110:10,17 121:3
143:19 150:8
158:19 168:20
169:20
**recorded**
51:5,15
**records**
15:21 49:4 60:14,16
61:1,10 136:19
150:3 153:2
**record's**
81:10
**redundant**
107:12
**refer**
17:2 41:21 50:12
54:25
**reference**
79:6 95:12 98:2
112:11 119:9
121:16 141:22
149:3,7 157:7
158:15
**referenced**
12:20 25:16 55:23
57:12 77:9 80:6
91:20 113:20
126:16 138:18
157:20 159:6
**referencing**
135:3
**referred**
57:24 82:14 119:16
159:8
**referring**
22:12 41:13 48:1
54:17 55:2 59:3,5,7
81:11 120:14
129:20 155:15
158:7,8 163:10
170:8 180:22

**refers**
17:6,13 87:1 98:3
108:21 148:23
149:18 158:5
**reflect**
60:4 153:22,23
154:13
**reflected**
76:13,15 83:4 157:1
**reflection**
133:16
**refresh**
31:24 104:7,11
**regarding**
30:13 36:14 48:18
61:1 71:21 93:14
94:12 102:25
111:17 112:13
114:18 134:20
148:4
**regardless**
121:9
**regular**
11:20 12:4
**regularly**
181:7
**regulated**
176:8
**relate**
36:5
**related**
11:18 127:12 183:11
**relates**
10:24 136:16
**relationship**
18:16 24:18 25:16
37:4 44:9,23 61:25
62:12,15 100:10
112:14,14 116:6
161:22 165:4
**relationships**
162:22
**relative**
183:14
**relatively**
17:8 25:10 160:14

**relevant**
174:5
**relied**
70:9 96:24 113:7
131:7 174:9
**rely**
51:14 133:22
**relying**
48:24 66:2,9 70:12
172:7
**remaining**
153:25 158:23
159:10
**remember**
17:16 20:18,22 30:19
31:3 35:16,17 37:18
39:19 43:17 44:20
45:24 53:22 54:4
56:18 59:17 60:13
72:6,17 79:15 80:23
88:10,18 89:17 95:6
96:16 106:25
110:18,19 111:1,4
115:15 116:4,12
121:11 123:14,21
126:7 127:7 128:9
128:10,11 131:20
135:5 137:18 138:8
138:11 140:17
141:24 144:7,21,24
150:15,19,20
151:15 152:25
163:24 164:5,5
171:20 175:17
176:3 178:1,14
180:24 181:17,18
181:19
**remembered**
80:12
**remembering**
23:12
**rent**
15:22 36:4 176:9
**rental**
175:15
**rent-regulated**

176:1
**repay**
42:3
**repeat**
12:14
**rephrase**
6:6 56:1 76:18
107:24 111:12
130:4
**report**
30:21
**Reporter**
1:15 69:11 72:15
181:23 182:1 183:6
183:20
**represent**
5:8 30:1 37:8,14 63:9
63:21 103:2 114:4
115:24 118:13
145:25 153:9 160:5
177:23 178:17
**representation**
68:25 74:16 75:11
156:3 168:21 170:4
170:10
**representations**
31:21 65:7 169:11
**represented**
37:6 38:18 41:3 59:9
61:24 64:11 107:6
159:9 160:17,25
**representing**
64:19 76:17,19 84:23
85:16 87:23 115:1,8
115:23 116:21
152:5,9 166:25
**represents**
56:5 85:12
**repurchase**
141:15
**reputation**
162:17 163:3
**request**
25:5 26:5 50:11
106:12,14 126:8
**requested**



22:4 31:5 37:21
59:24 77:16 94:18
126:9 130:25
170:18
**requesting**
122:11 123:10
**requests**
50:19
**require**
38:2,13 63:25
**required**
63:17 83:6,8,8 89:2
126:5 130:5 138:10
139:9,10,11 141:20
**requirement**
96:18 121:24 124:9
**requirements**
96:21 124:2 173:19
**requiring**
120:24 121:22
**requisite**
69:19 70:8
**rescind**
165:6
**rescinded**
141:25 144:11,15,17
145:1,4,9
**rescission**
145:2
**research**
45:23
**residential**
13:19
**respect**
108:16 160:11,24
163:21 164:14
165:3,11,25 167:11
169:2 171:4,8
**respective**
69:20
**respond**
6:14 69:9 79:22,23
106:16 140:18
**response**
80:1 104:14 107:9
**responsibile**

11:13
**responsibilities**
10:16,17,24 22:8,17
28:20
**responsibility**
16:15 22:15 142:10
**responsible**
143:23
**responsive**
169:13
**rest**
107:12
**restatement**
155:12
**Restriction**
111:20
**Restrictions**
3:21 107:17,22
110:16
**result**
22:23 93:8 138:23
179:12
**retail**
13:23,25 35:25
**retained**
15:4
**retracted**
164:22
**retracting**
99:15,18
**return**
19:17 23:2 24:5
47:11 82:20,21,22
83:3 105:11,22
**returns**
15:21 16:12 19:16,19
36:4
**review**
12:2 15:5 48:25 55:6
56:15 71:19 73:4
122:17 126:3
165:12 168:10,11
168:12 174:8
**reviewed**
55:7,11,12 71:6
88:15 108:3 125:2

128:13 129:13,18
135:14
**reviewing**
14:18 16:3 48:21
63:1 122:7
**revised**
120:11,15 121:2
**Rifkind**
9:19
**right**
12:1 17:19,24 18:21
22:11 24:9 26:14
27:23 32:22 34:12
41:22 42:6 47:22
51:19 52:5,9 54:7
54:12,13 67:20
70:14 72:11,22 78:8
78:11 87:4,11,25
88:1 90:24 91:14
99:18 100:1 101:23
102:18 126:20
128:21 130:11
132:20,23 134:15
141:15 144:12
149:17 150:18
156:14 157:4,5,10
158:13 159:18
164:12,20 167:20
168:6,7 172:3
173:10 174:11
178:16,22 180:18
180:19
**rights**
41:16 173:20 177:13
**rigorous**
32:13
**ring**
134:8
**role**
11:11 165:12,22
168:4,9,10,11,14,16
168:22 169:4
**roles**
15:22 36:4 161:14
**room**
175:3

**Rosenberg**
118:14
**Rothenberg**
118:15,16,20,24
**rough**
23:11
**roughly**
33:12
**routine**
170:8
**Rubin**
21:5,7,18 23:20,24
24:4,14,22 25:2,13
25:17,25 27:6,13,16
28:15,24 29:6 31:12
31:25 32:8,25 34:3
34:6,15,23 37:3
39:25 40:2 42:13,24
43:24,25 44:1,3,11
44:17 46:17,19 47:2
47:5,22 48:7,24
49:2,17 62:16 66:7
73:15,20 74:19,23
74:24 75:2,4,15,16
84:3,14 93:18,24
98:11 103:23
104:15 106:3,11,16
107:9 114:17
115:20,25 118:11
119:4 120:10 134:3
134:24 161:1,6,9,19
161:23,25 162:19
162:25 163:6,16,19
163:22,23 164:6,8
174:23 175:6 176:4
176:15 177:24
178:6,8,19 181:3
**Rubin's**
25:19 28:20 33:20
116:14 119:21
161:14
**rule**
14:21 15:24 22:10
89:1,12,16 90:16
**rules**
1:12 37:22 63:1,3,4



64:2 89:8 138:5,21 139:12
**runaround**
181:9,11
**running**
11:6
**run-by**
47:5
**Russack**
1:5 2:11 3:18 4:14,17 5:9 35:17,23 40:18 41:3,16 42:21 43:19 43:22 44:5,12,13,19 44:21 46:9,12 48:3 54:19,22,25 56:24 58:12 59:16 61:24 62:1,5,13,13 63:22 64:7,12,21 65:1,8 67:2 68:14 70:13,17 70:23 71:16 72:11 72:21 73:7 75:8,9 76:21 77:4,6 79:3 80:3 83:16,21 84:4 84:9,17,21 85:16 86:8 87:23 92:5 93:19,25 94:19 95:4 95:7 97:8,13 98:7 99:9 101:1,5 105:21 106:13,15 108:14 109:17 110:5 111:9 111:14 112:15 113:19 114:18,19 116:7 118:15 119:20 120:10,23 121:8 123:19 126:16 132:4 134:20 135:14 140:24 141:4 142:7 142:16 146:9 147:15,22 148:4,7 148:16 153:11 161:19 165:17 167:3 168:2,23 169:16 170:1,4,16 170:18 171:5 172:25 174:16

179:6,17
**Russack's**
42:5 57:1 83:13 98:24 102:12 104:25 114:9 132:14 143:11 169:3 179:13
**Russak**
100:20 112:25

---
**S**

**S**
1:9 2:2,9 5:1
**sale**
3:16 4:18,19 55:14 55:18 56:8,11,16 59:11 75:21 85:5,22 86:8 91:6 99:6 102:1 117:16 119:17 120:11 140:7,8 141:16 144:10 145:11,15 146:22 147:2 148:14,20 155:5,7 155:12 157:20
**Sales**
101:3 156:23
**Sam**
43:9 118:13,13,22,22 119:2,2 161:20,23 162:1
**SANCHEZ**
2:12
**saw**
17:18 108:7 117:7 168:17
**saying**
41:9 44:20 80:7 81:23 86:15 115:24 155:17,18 167:2 168:8,13,24
**says**
22:16 30:19 34:15 57:25 85:9 86:2 87:19 91:25 102:13 104:15 107:11

112:24 114:25 115:8 118:22 120:11 121:18 122:16 124:9 132:15 133:13 134:10 135:8 145:20 153:18 154:3,6 157:13,16 171:12,22
**scale**
11:6
**scenario**
105:9,18 124:8,12,13
**schedule**
108:25 151:20
**school**
9:11,15
**schwartzburton**
119:1
**scope**
11:7 14:22 48:13 116:17
**scribble**
56:25
**search**
45:5
**searches**
127:20
**second**
4:19 54:18 65:6 66:23 146:21 147:1 147:16,20 150:18 152:14 156:7,23 157:24 158:2,9
**seconds**
111:25 131:20
**secretarial**
117:3
**section**
155:22 157:20
**secure**
26:21 140:9
**secured**
17:12 26:10,17 34:11 42:12 51:4
**securing**

52:23
**securities**
107:3
**security**
35:12 41:14,25 74:21 109:9
**see**
7:12 48:20 57:3 65:4 65:7,10,14 66:19,24 68:10 69:12 91:17 91:18 93:10 97:11 97:14,20 102:15 104:4,5 106:18 109:1 114:20 120:11,12 121:18 122:21 128:23 131:10 132:16,20 132:24 133:20 135:11 138:15 146:5 147:5,6,21 149:4 150:15,17 154:4,7,10 157:8,16 157:21 158:12 167:13 178:23
**seeing**
171:20 172:1
**seek**
73:24
**seeking**
123:20
**seen**
6:23 39:15,17 68:18 70:25 90:5 94:8 96:12 97:10 107:13 109:22 110:20 137:17,19 145:18 167:21 168:19 169:21 171:18
**selection**
127:1,3
**sell**
52:8 101:4 109:7
**seller**
58:8 63:10 76:7,8 91:15
**Seller's**



141:8
**selling**
11:2 30:2
**send**
8:16
**sense**
86:10,19 106:17,21
**sent**
35:22 118:4,13
164:18
**sentence**
73:6 91:17,18,20
93:10 113:5 138:22
139:23 166:25
**separate**
82:21 95:7 117:8,22
173:13,18 174:1
**Separately**
106:17
**served**
64:6
**services**
116:17 117:11
**Servicing**
116:22 117:5,8,10
**set**
88:16
**sets**
79:17
**setting**
83:11
**settlement**
39:5
**seven**
13:10 14:14 72:24
107:21 128:19,25
165:16 171:8,21,24
**shared**
90:18 117:1
**shareholder**
36:15 142:4,11,24
**shareholders**
15:5 143:2,2,6
**shareholder's**
14:20
**shares**

3:17 58:2,5,6,8,14,19
58:25 64:25 65:3,11
65:12,20 68:4,9,13
69:21,22 70:9,16
92:5 99:8,9,12
100:2,7 101:7,18
104:16,21 105:1,5
105:13 107:2
112:24 113:21
126:17 140:7,9
141:15 167:13,19
167:20 168:23
172:11,24,25 173:6
173:20
**shed**
103:16
**sheet**
134:18
**shocked**
120:3
**Shorthand**
1:15 183:6,20
**shortly**
41:5
**short-term**
17:8 86:21,24 87:4,6
**show**
7:7 55:16 58:16
59:20,25 60:8,16
61:11 70:20 81:24
82:2 97:5 103:13,20
107:19 112:20
114:14 118:8 120:7
125:11 132:6 137:9
141:1 145:13
146:24 159:17
164:17 178:24
180:9
**showing**
60:10 82:13 153:7
**shows**
77:23
**side**
139:12 157:7
**sign**
67:5,10,12 94:22

146:18
**signature**
51:13 56:21 57:2
66:24 67:2 85:2
97:13 132:15 141:5
146:6,9,11 147:20
147:22,24
**signatures**
56:21
**signed**
4:14 46:11 57:2,7,9
57:14,19,21 67:6,15
67:16 90:13,17
100:18 111:23,25
116:8 122:16 125:2
131:2 132:3 133:5
136:2,5 138:7,7
140:15 146:14
**significant**
129:10
**signing**
86:1
**similar**
22:14 36:16 81:12
111:23 131:4
137:19
**similarly**
169:2
**simply**
21:24 25:7 74:20
**single**
15:19
**sir**
7:7 8:7 9:6 46:8
55:16 58:16 59:6
60:12 70:20 79:1
92:3 94:5,21 97:5
103:20 105:25
107:19 112:8,20
114:14 118:8 120:7
125:11 132:6 133:8
137:9 141:1 145:6
145:13 146:24
149:11 150:4,7
157:1 159:16
177:20 179:22

**sit**
10:18 171:9
**sitting**
31:5 69:6 80:16
83:22 84:6,15 88:20
103:1 119:13 129:3
136:10
**situations**
54:8
**six**
13:13 103:22 133:13
156:16,18
**size**
11:6 13:9 14:1
**skills**
181:4
**small**
13:5 56:20 160:14
167:25
**smiling**
41:11
**sole**
5:11 6:20 38:5
**solely**
134:18
**somebody**
16:17 17:13 18:19
25:4,12 26:6 34:16
36:21 49:13 52:8,11
66:2 89:2,13 101:20
115:23 124:9 134:3
161:5
**somebody's**
69:14
**soon**
122:19,20 123:8
**sorry**
19:1 20:21 34:21
43:25 69:10 72:3
87:20 91:5 92:25
106:5 127:21 128:9
149:5 157:9 166:2
173:7 175:20
**sort**
105:9 116:6 163:2,8
172:7



sound
17:19 178:22
sounds
180:19
sour
74:23 129:9
source
20:7 43:20 94:4
105:20 119:20
121:7 166:15
so-to-speak
63:22 139:21
space
14:8
speak
17:10 47:2 102:4,24
110:6 170:23
speaks
91:21 135:20 139:3
specific
10:20 35:14 46:2,21
49:18 63:6 71:5
89:12 96:4 116:1,2
117:24 122:25
123:4,21 124:3
134:7,23 144:13,14
144:16 148:15
152:21 158:6
specifically
37:18 41:13 89:13
93:7 94:14 96:2
102:9 111:6 126:7
132:11 134:2,25
154:25 158:6
163:24 165:18
174:7 175:14
specificity
112:16 175:17
spells
78:1,13 81:12
spend
53:23 161:4
spends
30:8
spills
91:7

SPITZER
1:18 2:8
spoke
166:24
spoken
62:13 161:25 162:5,6
162:6,8 169:16,25
170:2
Sprei
43:9,13,16 44:1,3,7
44:11,12,13,19,23
44:25 45:6,8,19
46:1 119:3 161:20
161:23 162:1,5,25
163:8,22
Sprei's
45:2 162:16
stamp
97:14
stand
165:10
standard
138:19
standing
139:19
start
62:11 154:9,12 156:2
started
129:9 155:21
starts
126:14
state
1:15 5:4 23:15 24:21
26:4 28:1 73:2 96:5
105:5 106:11 109:6
113:25 115:24
128:5,16 138:22
176:2 179:9 183:6
stated
14:9 28:19 34:9
46:19 54:10 67:22
106:21 118:2
133:17 139:25
141:19 145:5
172:24 177:11
statement

39:4,5 62:6 80:7,11
80:15,17 81:8,11,12
81:24 82:4,11 121:1
121:17,23 122:7,11
126:15 133:14,20
133:23 134:2,6,10
166:6,14
statements
15:22 36:4
states
1:1 13:12,12,13
21:24 58:21 62:20
65:1,11 66:14 68:6
69:18 72:25 75:25
78:4 80:3 85:22
93:6 101:12,25
102:8 113:5,19
128:8,15 138:12
140:5 154:25
158:16
stating
37:10 69:13 106:16
177:24 178:19
Staying
102:11
stipulate
120:25
stock
49:4 167:14,19,20,21
168:11,17 173:6
stop
8:21 42:3 64:19
story
160:23 164:2 181:13
straight
152:1
stream
32:19
street
2:13 160:16
strike
177:7
structure
138:4
structured
42:8

style
181:4
subdivisions
155:14
subject
31:13 69:24 76:3
85:10 108:18
128:18,24 135:19
165:16
submitted
121:1 126:14 146:3
149:20,23
Subparagraph
93:6
subparts
92:23
subsection
156:20
subsequent
45:7 66:13 98:16
111:2 145:7 162:2,4
162:9 172:18
subsequently
17:25 127:23
substance
41:17 79:19 162:14
163:8
substantial
35:19
substitute
79:11
successful
35:18,24,25
successors
113:7 131:8
sufficiency
58:23
sufficient
164:22
suggest
17:17 116:21 121:25
166:17 171:24
175:16
suggested
117:12
suggesting


MAGNA
LEGAL SERVICES

34:14
**suggests**
166:7
**suite**
1:19 2:10 59:9,10
**sum**
158:20 162:14 163:8
**sums**
117:21
**supersede**
140:6
**supervision**
11:13
**supplement**
8:15 20:23
**support**
94:15
**supposed**
15:19 56:1 68:13,20
124:21 153:21,23
154:22 156:4
165:10 178:11
**Supreme**
96:1,4
**sure**
12:9,18 26:18 28:3
29:5 35:7 40:10
47:6 51:21 66:3
70:11 71:8 74:15
96:16 97:10 100:7
105:10,21 111:24
124:12 127:18
129:22 132:2
136:21 144:12
150:25 158:6
160:15 165:20
166:22 167:15
168:5,22 169:17
173:9 175:4 178:1
180:17
**suspect**
158:23 163:5 180:14
**sworn**
183:9
**S-p-r-e-i**
43:10

**T**

**T**
1:9,9 5:1
**take**
6:15 16:15 26:6
57:23 62:22 68:20
72:23 85:3 86:25
91:3 99:17 100:6
103:24 108:20
109:9 122:14 131:5
133:3 140:4,6,19
141:21 146:4
164:25 170:19
173:11 177:20
180:17
**taken**
1:12,16 5:17 46:7
103:8 140:22
183:13
**takes**
6:2
**talk**
10:19 13:20 26:17
46:12 90:5 181:2
**talked**
36:3,17 62:4 178:5
**talking**
13:15 26:5,18 54:7,9
70:15 103:10 166:8
**talks**
35:23 136:17 155:2
**tangent**
30:4
**tasked**
115:25
**tax**
11:5 15:21 16:12
19:16,17 36:4 82:20
**Teichman**
1:5,10 3:7 5:6,7
120:24 121:6 160:4
182:4 183:9
**telephonic**
33:18
**tell**

10:22 23:21 24:25
35:8,9,14 44:17
47:18,19 70:13 79:1
80:24 83:23 84:7
90:9 94:5,15 98:4
104:18 110:13
111:19 123:23
124:17 129:15,16
136:9 139:4,6
155:15 156:11
162:14 178:25
180:20
**telling**
24:7 35:17
**ten**
13:6 104:6 111:25
**tendered**
117:17
**tends**
30:18
**tense**
115:13
**tenure**
18:7
**term**
17:4 46:24 82:11
88:2 120:15
**terminated**
92:5
**termination**
91:14
**terms**
28:21 46:21 47:18,21
69:24 77:9,17,20
78:2,13 79:20 82:7
93:14 94:12,13,17
94:21 101:3 110:16
143:10 148:4
153:23 174:20
179:18
**terrible**
17:21
**test**
6:11
**testified**
32:11 56:4,13 62:2,4

62:6 68:17 74:15
105:6 110:19 137:1
174:22,24 178:7
181:10
**testify**
7:25 89:3,20 110:22
**testifying**
107:15
**testimony**
39:14 55:23 102:25
112:15 158:14
**Thank**
28:4 85:6 176:19
179:21 181:21
**theoretically**
33:9 34:14 86:10
**thereof**
115:21 148:11 149:2
**thing**
22:17 26:19 81:23
86:15 91:23 162:21
**things**
15:22 45:14 50:25
62:9 108:15 116:25
133:25 134:7
162:19,24 166:16
169:8,12 172:4
**think**
5:19,22 7:22 13:10
13:13 18:5 21:13,16
24:8 25:8 28:11
29:20,25 30:1,19
31:9 36:18 39:22
43:9 44:22 45:1,4
50:23 53:1,10 79:9
79:23 80:10,18,19
80:20 81:22 91:21
95:20 96:11 104:18
104:20 105:18
106:25 110:13
112:1 117:9,18
119:18 121:12
124:25 142:9
147:11,13 150:8
151:7 153:13,15
157:9 158:12,13



161:13,21 163:25 164:15,17,19,20 168:4 169:7,18 170:5,15 174:12,24 175:11 177:10 178:25 181:15

**thinking**
101:18

**thinks**
25:9 31:15 35:12

**third**
135:9

**thought**
41:4 101:23 158:3 173:9,12

**thousand**
76:2,4

**three**
31:16,18 32:1,9,12 33:1,21,22 64:24 68:5 75:24 79:6,9 87:1,4,8,10,13 98:25 100:5 120:18 148:21 149:6 151:7 154:4 156:12,15 157:20 175:11 177:25 178:2,3,10 178:20 179:10,12

**three-page**
21:25

**Thursday**
121:19

**tieing**
156:7

**time**
25:10 30:9 32:7 34:5 37:6,11,14 43:12,17 44:25 46:5 47:11 49:7 51:14 53:24 55:10,12 62:4 65:18 65:19,23 66:13,19 68:15,24 69:12 76:17 81:1,2 82:2 86:1 87:15 88:18 89:24 91:24 93:22 95:16 103:24

105:15,24 107:25 107:25 109:20 110:13 111:18,21 111:23 112:4 116:5 121:8,12 124:21,24 126:2 129:8,10 141:21 143:12 144:2,8 153:11 161:4,5 162:3,7 164:22 165:8 167:12 169:25 170:22,25 172:19 175:8,18 177:20 179:7 181:8

**times**
18:21 51:13 61:24 181:13

**time-to-time**
12:2

**title**
10:12,18 51:5 53:17 126:11 170:15

**today**
5:11 7:10,22 8:13,22 20:15 22:13 23:15 31:5 37:5 45:4 50:20 55:8,9,23 69:6 71:1 77:13 78:16,20 80:16 81:5 82:16 83:22 84:6,15 88:20 90:8 102:7 103:1 107:7,15 108:1,19 109:22 110:13 114:21 119:13 123:14 129:3,5 154:14 157:4 166:20 168:18 171:9 172:19

**today's**
147:7

**told**
31:15,25 35:11 43:24 44:5 74:6,9 75:16 130:2 163:6 164:3 177:21

**top**
58:18 116:12 118:10 132:8 147:22 154:2 156:1

**topic**
41:5

**topics**
8:1 89:19

**total**
27:10 153:18 157:13

**touched**
174:12

**town**
160:14

**track**
116:25

**training**
29:7 30:5

**transact**
29:2

**transaction**
15:19 20:14,20 21:6 21:22,25 22:15,23 23:6,25 24:2,24 25:9 27:2,2,4 28:20 28:21 30:11,22 31:1 31:8,11,14 32:3,7 33:23 34:1,5,7,17 34:19,24 35:2 36:24 37:9,11 38:19 40:7 40:14,19 41:7,12,18 41:21,23 42:10,15 42:17,20 45:7 46:14 46:18 47:6,12 48:5 48:15 49:7 53:21 54:3 55:1,22 56:5 59:2,4,21 61:2 68:18 70:14 73:11 74:5,17,25 76:14,16 76:25 77:5 78:7,10 79:20 80:23 81:4,13 81:16,20 82:6,8 86:16,20,21 87:6 89:18 92:16 93:14 94:13,18 95:4 96:15 96:25 98:9,14,23

99:5 100:15,20,23 101:1,2 102:4,22 103:3 105:10,25 108:18 111:5,7,19 112:5 115:2,25 120:1 121:9 123:20 125:20,21 126:6,9 126:22 127:22 129:7,9,10 133:24 134:22 137:1,5 138:4,20 139:9,11 139:14,21 150:24 153:24 154:1,16 155:4 160:12,17,24 161:3,9,18 162:2,4 162:9 165:21 166:4 166:16 167:11,13 168:6,14 169:9 172:13 178:3,4,9 179:4,16,18

**transactional**
55:8

**transactions**
9:24,25 10:23 11:9 11:16,18,24 12:5 14:2,15 15:3 18:17 20:5,9,12 25:4 26:1 26:10,18,24 27:1,5 27:11,16 28:10,16 29:14 30:8 38:7,25 39:3 44:18,21 45:20 47:8 48:13 50:2 51:4 52:25 53:5,15 59:8 72:9,19 85:21 95:14 109:21 112:3 123:25 124:1 126:10 139:7 166:18 168:15

**transcript**
80:13 102:24 181:24 182:2 183:8

**transfer**
42:5 52:7 59:17 60:1 60:9,11,17 61:2,11 65:2 68:9,14 70:8 71:16,21 72:11,22



73:8 76:7 82:8
105:13 109:8,13
142:19
**transferred**
59:15,20 61:14,21
65:11 76:20 82:3
104:22 111:10
119:21 143:21
169:21 172:25
**transferring**
41:16
**transfers**
61:19 70:16
**translates**
155:24
**translating**
155:4,19
**treat**
139:18
**treated**
145:3
**trial**
89:4,15 90:14,19
**tried**
111:13 161:4
**true**
133:15 180:15 183:7
**truly**
8:22 163:1
**trust**
27:14,19,22,24 28:7
28:7,8,9,13,13,17
**trusted**
45:15
**trustee**
27:14,18 28:16
**trustees**
28:7
**try**
16:13 34:21 44:2
115:17 158:25
**trying**
77:17 136:14 160:22
177:22
**turns**
167:8

**two**
21:25 23:17 32:24
41:24 55:18 59:12
60:25 61:3 75:22
100:9,11 122:14
133:19 149:18
157:13,21 172:3
175:11
**two-minute**
140:19
**two-page**
71:9
**type**
13:14 16:3,7 24:16
39:8 50:1,6 71:20
71:24 77:16 81:12
86:4,7 135:15
151:17
**types**
15:10
**typical**
10:17 11:1 38:24
39:2 51:3 124:13
166:16,17 173:22
**typically**
27:17 33:18 38:9,10
51:1,11 52:4 53:17
53:19 123:23 124:8
126:10 170:14
**T-e-i-c-h-m-a-n**
5:6

_____
**U**
_____
**ultimately**
141:25
**umbrella**
13:24
**umm**
19:16 43:17 72:1
74:6 89:11 94:11
97:10 98:11 100:6
116:24 128:1 151:5
151:23 152:8
171:14 172:4 176:7
**unable**
159:17

**unaware**
45:22 119:11
**uncertain**
104:12,13
**uncle**
20:19
**unclear**
115:17 166:6 167:1
**uncomfortable**
162:17,18
**underlying**
26:21
**understand**
5:10,13 6:1,5,7,15
34:8,19 36:9 37:10
39:14 41:23 51:19
51:21 52:14 56:2
63:7 64:14,15,20
65:16 68:12,16 71:8
80:1 99:9 100:25
104:25 110:15
119:2 127:18 130:3
140:2 142:19
145:17 166:9
167:15 171:13
173:5,23 179:2
**understanding**
12:18 35:7 61:23
81:1,2 83:1 88:5
93:17,21 94:2,3,5,7
94:16 100:19
104:17 108:9,12
110:9 122:18
136:25 137:25
139:15,22 143:20
165:9 166:11 167:6
168:1 171:10 173:8
173:18 174:4
179:11,16
**understood**
41:21 43:18 68:19
73:14 93:7 98:7
101:8 123:9,18
**undertaken**
42:17
**undoubtedly**

161:11
**unfettered**
70:14
**Unfortunately**
50:3 51:3
**UNITED**
1:1
**units**
31:24 35:4 108:23
173:19
**universe**
90:20,22
**University**
9:12
**unnumbered**
166:2
**unquote**
79:24
**unrealized**
106:17,22
**unsigned**
57:20
**unsure**
29:11
**unusual**
11:21 27:3
**upfront**
79:10
**use**
17:4 22:13 81:21
82:8 99:22 123:21
124:6 152:1 158:24
**useful**
111:21 112:1
**uses**
120:15
**utilize**
95:18
**utilized**
11:23 22:7 32:25
**utilizes**
20:8
**U.S**
96:1,4
_____
**V**
_____


MAGNA
LEGAL SERVICES

**v**
1:4
**valid**
69:22
**valuable**
58:22,24 96:6
**valuation**
31:12 32:8,9 33:4
**value**
26:11 28:25 30:13
31:13,22 32:21 33:8
33:13 81:19 100:7
104:21,23 105:5,12
105:15 124:10
134:11 174:14,24
176:10 178:16
179:10
**valued**
98:25 100:4 107:2
**Values**
32:2
**varies**
53:10
**variety**
10:25 14:4
**various**
13:15 22:7,9 32:15
117:21 128:3
162:22
**venture**
138:14,17,24 139:18
**verify**
150:4
**versa**
28:14
**versus**
41:14 159:14 168:9
**viable**
177:1,3
**vice**
28:14
**vice-president**
10:14
**view**
28:25 39:2 101:1
113:14 124:15

143:25 159:6
164:20,21
**views**
174:23
**violate**
138:4
**void**
109:14
**voluntary**
96:6
**volunteered**
80:14

———————
**W**
———————
**waiting**
136:22
**waiver**
63:18,20 64:1,5,21
**want**
41:2 97:18 100:21
101:22 106:9 112:4
112:7 121:25
124:12 133:7
139:24 142:16
144:12 158:14
160:10,20 164:4
166:14 171:16
174:13 175:18
**wanted**
105:10 123:10 137:2
159:17 162:20,24
181:11
**wanting**
121:16
**wants**
52:11
**warranting**
87:23
**warrants**
85:11
**wasn't**
44:8 46:24 56:13
58:10 81:22 104:8
105:14 168:14
174:25
**way**

31:6 48:6,16 53:2
54:14 57:18 67:14
72:2,3,5,16 73:18
88:19 89:17 92:18
96:1,17 101:21,23
103:4 110:7 112:3
121:11 127:7,15
134:15 135:6,13
137:18 139:16
140:11 158:20,21
161:15 163:14
**ways**
32:15 151:23
**Wednesday**
1:16
**weighed**
30:12
**weighs**
25:8 28:22
**Weinstein**
1:5 2:20 3:18 70:18
70:23 160:5 165:17
168:2 171:5 172:22
**Weiss**
9:19,20,23 10:1
**well-exceeded**
143:10
**went**
74:22 155:22 176:16
**weren't**
36:20 118:2
**we'll**
6:12 8:17,20 9:3,4
15:16 24:3 27:3
47:6 102:24 157:23
177:1 178:23 179:9
**we're**
5:11 6:9 8:21 13:15
14:7 15:19 26:18
34:17 40:12 41:4
47:10 54:7,8,9
77:13 89:23 115:16
155:18 168:20
181:15
**we've**
28:11,12 29:1 36:17

47:24 48:1 50:24
59:11 77:15 81:4
107:6 108:19
109:22 125:2
135:21 155:5
**Wharton**
9:19
**whatsoever**
85:11
**wide**
14:4
**wife**
25:20 61:9
**wife's**
16:23
**wiggle**
175:3
**WILENTZ**
1:17 2:8
**willing**
98:8 113:16 165:2
**willingness**
59:7
**Winkler**
97:19,21,25 132:22
133:1
**wire**
76:6 119:6
**wiring**
119:8,12
**wish**
178:17
**wished**
8:22
**withdraw**
165:6
**withdrawn**
163:20 174:19
**withstanding**
50:5 64:11
**witness**
3:5 5:21,24 54:20
155:10
**woman**
18:16 117:1
**wonderful**



80:10
**wondering**
176:23
**Woodbridge**
1:18,19 2:9,10
**Woodruff**
1:5 2:15 31:20 35:4
36:12,15 48:4,11,18
49:10 58:2 65:4
70:4,24 71:17 73:9
73:25 98:25 105:1
109:3,19 110:7
111:11,12,15,17
112:24 113:21
126:18 135:17
140:7 142:4 144:4
160:6 167:14,16,22
169:6 173:5,13
174:1
**word**
16:11 82:4 99:22
140:5 158:5
**words**
18:9 24:3 86:13
89:12 119:5 166:20
172:4 177:9,10
**work**
12:1,5 14:22,23
18:17 33:20 38:2
41:23 89:8 117:3
139:16 161:3
162:21 174:8,8
**worked**
145:8
**working**
43:19,21 62:1 96:1
100:11 120:23
121:5,9,10
**works**
8:24 19:12,23 20:1,2
**world**
18:9 30:10 35:25
51:16 52:7
**worse**
139:20
**worth**

30:20 31:16,17 32:12
35:12 79:10 101:18
133:17 174:16
175:12
**worthiness**
15:13 16:4,9 26:7,13
**wouldn't**
38:13 69:2 92:6
139:5 168:7
**write**
104:2
**writes**
107:9 119:4 120:22
122:15
**writing**
24:10,12,17 30:17,20
33:15 49:23 77:21
144:23 148:11
171:17
**written**
59:6 63:17,20 64:1,5
86:19 109:11 135:3
135:4,19,22
**wrong**
17:23 22:6 26:12
53:2,3 54:16 80:2
110:22
**wrote**
106:24
**W-2**
19:12

___ **X** ___

**x**
1:3,3,7,7 3:3 21:24
30:20
**X101161**
1:16 183:23

___ **Y** ___

**yeah**
149:6 151:12,22
164:12
**year**
152:3,9
**years**

13:6 17:20 18:5,6,11
19:10 20:22 46:5
80:22 90:11 93:21
95:25 117:23
175:11
**yesterday's**
9:1
**Yitty**
118:14,15,16,19
**York**
1:1 2:14 10:10 58:3
62:21 73:2 76:6
96:18,22 108:24
128:16 140:8 176:2
176:2

___ **Z** ___

**zero**
106:17,21

___ **$** ___

**$1,500,000**
76:12 102:13
**$1,605,000**
148:25 150:14
151:14
**$100,000**
23:8 119:6,11 124:10
**$30,000**
149:18,20 157:7,16
157:19 158:1,11,12
158:16,23 159:5,12
**$32,500**
119:6,12,15
**$36,746,011**
134:11
**$45,000**
76:2 79:7,8,14 87:9
117:16 119:16
149:3,7 159:4
**$750,000**
94:23 98:4 99:2,25
101:5 103:11 104:4
106:11

___ **0** ___

**07095**
1:19 2:10
**08701**
2:6,18 5:1

___ **1** ___

**1,500,00**
154:3
**1,500,000**
107:10 138:24
**1,605,000**
151:16 152:18
**1.5**
33:23 76:19,24,25
77:6,6 78:3 79:3
80:4 81:3,20 85:17
86:9 94:23 98:9
101:19 117:21
150:17 152:10,13
159:3
**1.6**
179:8,13
**1.605**
159:4
**1.7**
63:3
**1.9**
63:3
**1:23-cv-04260-DG-...**
1:2
**10**
118:10 183:22
**10th**
7:18
**10:00**
1:20
**100%**
58:7 65:3,12,20
66:15,16 68:14
**103**
3:20
**107**
3:21
**1099**
18:20 19:12
**11**


**MAGNA**
**LEGAL SERVICES**

4:10 120:8
**112**
3:23
**1120**
109:12
**11241**
2:14
**117**
4:9
**118**
4:10
**12**
3:23 4:9,11,14 18:11
31:23 42:1 46:15
47:11,20,23 56:7,11
56:16 59:15 68:25
70:2 79:8,17 80:3
87:8,15 97:14,24
99:10 107:22 108:4
108:22 109:17,23
110:4 111:2,9,15
112:18,23 113:12
114:8,12,23 117:17
118:3,6,11 119:25
120:4,9 121:19
122:8 125:13 132:4
132:9,13,19 139:25
142:2,20,22 151:19
152:1,2 164:16
**12th**
67:19 86:7 87:25
103:12 110:15
119:22 120:19
123:3 126:22 133:4
135:23 136:3,5,8
**12%**
154:7 155:2
**120**
4:11
**125**
4:13
**13**
18:11 31:23 85:17
87:2 91:4,7 132:8
**13th**
87:19,24 136:17

**132**
4:14
**137**
4:15
**14**
133:14 137:11
**14%**
154:7,22,23 155:2,16
155:19,24 156:9,12
**140**
4:17
**145**
4:18
**146**
4:20
**15**
17:20 20:6 27:9,12
38:6 92:20 93:2
141:2 147:3 156:2,8
**15%**
154:7
**15,000**
143:12 151:5 152:3
155:22
**153**
4:21
**16**
2:13 3:18 4:17 70:18
70:23 128:19,25
129:21 141:3 144:8
145:8,14 148:19
154:21 155:8 156:2
171:6,19
**16%**
156:12
**160,179**
3:8
**17**
4:13 56:20 92:20,23
92:25 125:9,14,23
147:1
**17th**
135:22,25
**17,500**
155:23
**176**

3:9
**179**
4:22
**18**
153:9 157:6,9 159:9
**19**
1:17 4:22 170:22,25
172:14 173:24
175:19 180:7
**19th**
136:17 154:16,18
169:14,20 170:3
**1985**
3:18 70:18,23 128:19
128:25 129:21
165:17 171:6,19

___

**2**

**20**
131:20
**2001**
9:14
**2007**
9:21
**2010**
17:18
**2018**
133:15
**2020**
3:20,23 4:9,10,11,13
4:14,17 20:3 42:21
43:8 46:12 56:11,16
59:15 68:25 70:2
79:8 85:17 87:2,15
97:14,24 99:10
103:14,18 104:2
107:23,25 108:4
109:17,23 110:4,15
111:3,9,15 112:18
112:23 113:12
114:8,12,23 117:17
118:3,6,11 119:22
119:25 120:5,9
121:19 122:8 125:9
125:14,24 132:4,9
132:14,16,20 141:3

142:2,20,22 144:9
145:9 147:3 164:16
169:15,25 170:3,23
171:1 172:14
173:24 175:19
**2021**
4:22 145:21 149:20
150:23 152:21
153:24 158:17
180:7
**2022**
147:10 152:17,22
154:21 155:8 156:2
156:3,8
**2025**
1:17 183:22
**21**
181:19
**21st**
181:6
**22**
3:20 103:14,18 104:2
**22nd**
104:24
**25**
23:22
**26th**
2:14
**28**
153:24

___

**3**

**3/16/22**
154:9
**3/19/20**
154:9,13
**3:15**
120:19 121:15
**3:30**
182:5
**30(b)(6)**
89:1
**34**
2:18
**353**
108:23



MAGNA
LEGAL SERVICES

| 4 | 9/16/22 | | |
|---|---|---|---|
| **4** | 154:10 | | |
| 171:24 | **9:07** | | |
| **4:30** | 104:2 | | |
| 122:15 123:3 | **9:10** | | |
| **45** | 180:7 | | |
| 151:7 | **9:51** | | |
| **45,000** | 114:23 | | |
| 117:23 | **9:58** | | |
| **5** | 118:11 | | |
| **5C** | **90** | | |
| 156:20 | 1:18 2:9,10 26:15 | | |
| **5,177** | **900** | | |
| 3:7 | 1:19 | | |
| **50** | **906** | | |
| 14:7 | 5:1 | | |
| **50%** | **918** | | |
| 113:20 126:17 | 2:6 | | |
| 138:25 139:1 | **97** | | |
| **55** | 3:19 | | |
| 3:16 | | | |
| **58** | | | |
| 3:17 | | | |
| **6** | | | |
| **6** | | | |
| 136:15 | | | |
| **6/28/21** | | | |
| 153:19 157:14 | | | |
| **7** | | | |
| **7** | | | |
| 3:15 | | | |
| **70** | | | |
| 3:18 14:8 | | | |
| **8** | | | |
| **8** | | | |
| 130:9 131:1 | | | |
| **9** | | | |
| **9** | | | |
| 132:16 | | | |
| **9th** | | | |
| 133:5 | | | |



MAGNA
LEGAL SERVICES